UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                                    )
IN RE IBIS TECHNOLOGY SECURITIES    )          Civ. No. 04-10446 RCL
LITIGATION                                               )
                                                                    )
_____)


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT**


TESTA, HURWITZ & THIBEAULT, LLP

Brian E. Pastuszenski (BBO #391030)
Jason D. Frank (BBO #634985)
Laura M. Stock (BBO #652276)
125 High Street
Boston, MA 02110
Tel:  (617) 248-7000

Attorneys for Defendants
Ibis Technology Corp. and Martin J. Reid

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ........................................................................................................... 4

    I.      PLAINTIFFS' ALLEGATIONS
            CONCERNING SALE OF AN IMPLANTER TO IBIS'
            "LARGEST CUSTOMER" FAIL TO STATE A CLAIM .................................... 5

    II.     PLAINTIFFS' ALLEGATIONS CONCERNING
            BOOKING OF ORDERS FAIL TO STATE A CLAIM ........................................ 7

            A.     Plaintiffs Fail To Plead Falsity Or Scienter With Particularity ................. 7

            B.     Defendants' Forecast Of Implanter
                  Orders Is Protected By The Safe Harbor .................................................. 10

    III.    PLAINTIFFS' IMPAIRMENT ALLEGATIONS FAIL TO STATE A CLAIM  12

    IV.   PLAINTIFFS' WAFER SALES
            ALLEGATIONS FAIL TO STATE A CLAIM .................................................. 16

    V.     PLAINTIFFS' GENERALIZED MOTIVE
            ALLEGATIONS DO NOT SUPPORT AN INFERENCE
            OF SCIENTER, PARTICULARLY ABSENT ANY TRADING ...................... 18

CONCLUSION ....................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

In re Advanta Corp. Sec. Litig.,
    180 F.3d 525 (3d Cir. 1999) ................................................................ 12

Aldridge v. A.T. Cross Corp.,
    284 F.3d 72 (1st Cir. 2002)................................................................. 5

Backman v. Polaroid Corp.,
    910 F.2d 10 (1st Cir. 1990)........................................................... passim

In re Baker Hughes Sec. Litig.,
    136 F. Supp. 2d 630 (S.D. Tex. 2001) ...................................... 18

In re Blockbuster Inc. Sec. Litig.,
    No. 3:03-CV-0398-M, 2004 WL 884308 (N.D. Tex. Apr. 26, 2004) ...................... 11

In re Boston Tech. Inc. Sec. Litig.,
    8 F. Supp. 2d 43 (D. Mass. 1998) ...................................... 10, 19

In re Cabletron Sys., Inc.,
    311 F.3d 11 (1st Cir. 2002)........................................................ 4, 15

Capri Optics Profit Sharing v. Digital Equip. Corp.,
    950 F.2d 5 (1st Cir. 1991) ....................................................... 17

Carney v. Cambridge Tech. Partners, Inc.,
    135 F. Supp. 2d 235 (D. Mass. 2001) ............................... passim

Coates v. Heartland Wireless Comm's, Inc.,
    26 F. Supp. 2d 910 (N.D. Tex. 1998) ................................. 19

Coates v. Heartland Wireless Comm's Inc.,
    100 F. Supp. 2d 417 (N.D. Tex. 2000) ................................ 16

Colby v. Hologic, Inc.,
    817 F. Supp. 204 (D. Mass. 1993) ..................................... 6, 7

Cutsforth v. Renschler,
    235 F. Supp. 2d 1216 (M.D. Fla. 2002) ............................. 10

DiLeo v. Ernst & Young,
    901 F.2d 624 (7th Cir. 1990) .............................................. 13

<u>Eizenga v. Stewart Enters., Inc.,</u>
    124 F. Supp. 2d 967 (E.D. La. 2000) ........................................................................ 18

<u>In re Galileo Corp. S'holders Litig.,</u>
    127 F. Supp. 2d 251 (D. Mass. 2001) ........................................................ 4, 12, 13, 19

<u>Glassman v. Computervision Corp.,</u>
    90 F.3d 617 (1st Cir. 1996) ........................................................................ 3, 8, 11, 17

<u>Glickman v. Alexander & Alexander Servs., Inc.,</u>
    No. 93 Civ. 7594(LAP), 1996 WL 88570 (S.D.N.Y. Feb. 29, 1996) ........................ 18

<u>Greebel v. FTP Software, Inc.,</u>
    194 F.3d 185 (1st Cir. 1999) ............................................................................... passim

<u>Guerra v. Teradyne, Inc.,</u>
    No. 01-11789-NG, 2004 WL 1467065 (D. Mass. Jan. 16, 2004) .......................... 7, 17

<u>Harris v. Ivax Corp.,</u>
    182 F.3d 799 (11th Cir. 1999) ................................................................................... 10

<u>Kalnit v. Eichler,</u>
    99 F. Supp. 2d 327 (S.D.N.Y. 2000) .......................................................................... 19

<u>Kramer v. Time Warner, Inc.,</u>
    937 V.2d 767 (2d Cir. 1991) ........................................................................................ 5

<u>Lirette v. Shiva Corp.,</u>
    999 F. Supp. 164 (D. Mass. 1998) ............................................................................... 4

<u>Lirette v. Shiva Corp.,</u>
    27 F. Supp. 2d 268 (D. Mass. 1998) ......................................................................... 10

<u>Maldonado v. Dominguez,</u>
    137 F.3d 1 (1st Cir. 1998) ......................................................................................... 20

<u>In re Northern Telecom Ltd. Sec. Litig.,</u>
    116 F. Supp. 2d 446 (S.D.N.Y. 2000) ....................................................................... 19

<u>In re Noven Pharms., Inc. Sec. Litig.,</u>
    238 F. Supp. 2d 1315 (S.D. Fla. 2002) ..................................................................... 12

<u>In re PETsMart, Inc. Sec. Litig.,</u>
    61 F. Supp. 2d 982 (D. Ariz. 1999) ..................................................................... 15, 20

Plevy v. Haggerty,
      38 F. Supp. 2d 816 (C.D. Cal. 1998) ............................................................ 13, 14, 15

Roeder v. Alpha Indus., Inc.,
      814 F.2d 22 (1st Cir. 1987) ...................................................................................... 6, 7

Schiller v. Physicians Resource Group, Inc.,
      No. Civ. A. 3:97-CV-3188L, 2002 WL 318441 (N.D. Tex. Feb. 26, 2002) .............. 14

In re Segue Software, Inc. Sec. Litig.,
      106 F. Supp. 2d 161 (D. Mass. 2000) ......................................................................... 19

Shaw v. Digital Equip. Corp.,
      82 F.3d 1194 (1st Cir. 1996). ............................................................................. 2, 6, 16

Shore v. Costello,
      No. C-91-20195-RMW (EAI), 1992 WL 682762 (N.D. Cal. May 15, 1992) .............. 9

In re Stac Elecs. Sec. Litig.,
      89 F.3d 1399 (9th Cir. 1996) ..................................................................................... 13

Stavros v. Exelon Corp.,
      266 F. Supp. 2d 833 (N.D. Ill. 2003) .................................................................... 12, 13

In re Stone & Webster, Inc., Sec. Litig.,
      253 F. Supp. 2d 102 (D. Mass. 2003) ......................................................... 5, 10, 12, 19

Suna v. Bailey Corp.,
      107 F.3d 64 (1st Cir. 1997) ....................................................................................... 15

In re Sunterra Corp. Sec. Litig.,
      199 F. Supp. 2d 1308 (M.D. Fla. 2002) ...................................................................... 19

Thornton v. Micrografx, Inc.,
      878 F. Supp. 931 (N.D. Tex. 1995) ............................................................................ 9

In re Viewlogic Sys. Sec. Litig.,
      No. 95-10014-DWP, 1996 U.S. Dist. LEXIS 22371 (D. Mass. Mar. 13, 1996) .... 7, 17

## Statutes and Rules

15 U.S.C. § 78u-4(b)(1) ............................................................................................... 4

15 U.S.C. § 78u-4(b)(2) ............................................................................................... 4

15 U.S.C. § 78u-5(c)(1)(B) ..................................................................................... 10, 11

17 C.F.R. § 240.10b-5................................................................................................... 4, 20

H.R. Conf. Rep. No. 104-369 (1995) <u>reprinted</u> <u>in</u> 1995 U.S.C.C.A.N. 730...................... 1, 10

## PRELIMINARY STATEMENT

This securities class action lawsuit against defendants Ibis Technology Corporation

("Ibis") and Martin Reid ("Reid"), its CEO, is precisely the sort of litigation that Congress tar-

geted when it enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Con-

gress enacted the PSLRA in order to deter "baseless and extortionate securities lawsuits."  H.R.

CONF. REP. No. 104-369, at 32 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 731.  The Act was:

> prompted by significant evidence of abuse in private securities lawsuits . . . [which] in-
> clude . . . the routine filing of lawsuits against issuers of securities and others whenever
> there is a significant change in the issuer's stock price, without regard to any underlying
> culpability of the issuer, and with only faint hope that the discovery process might lead
> eventually to some plausible cause of action[.]

Id. at 31, reprinted in 1995 U.S.C.C.A.N. at 730 (emphasis added).  As the First Circuit Court of

Appeals has noted, the PSLRA was "a bipartisan effort to curb abuse in private securities law-

suits, particularly the filing of strike suits."  Greebel v. FTP Software, Inc., 194 F.3d 185, 191

(1st Cir. 1999).  This case is just such a strike suit.

Like the typical strike suit, this litigation was filed as a knee-jerk reaction to a drop in

stock price.  Here, Ibis' stock price dropped following its December 15, 2003 press release in

which it announced certain changed expectations and the Company's decision to write down

certain operating assets.  That write-down, however, was one that Ibis had warned investors ***from***

***the very beginning of the class period*** might ultimately be necessary.  Like many such strike

suits, there is no allegation that Mr. Reid or any other officer or director of Ibis profited from

sales of Ibis securities, or obtained any other personal benefit from the supposed fraud scheme.

Ibis makes equipment that produces "silicon-on-insulator" ("SOI") wafers (sheets of sili-

con out of which computer chips are then made).  Amended Complaint ("AC") ¶ 17.  SOI wafers

differ from traditional silicon wafers in that they have an insulating layer that enables circuitry

fabricated on them to run cooler and more efficiently than circuitry made on traditional, single-layer wafers. App. Tab 5 at 2 (10-K for 2002).[1] Ibis has developed technology called "SIMOX" (**S**eparation by **Im**plantation of **Ox**ygen) that produces SOI wafers by implanting (i.e., inserting) an insulating layer of oxygen atoms just below the top surface of the wafer. AC ¶ 17. Ibis' products are known as "implanters." Id. During the class period Ibis also manufactured SOI wafers itself. Id. Its first implanter product, the "1000," can make 200 mm and smaller diameter wafers, and Ibis' current product, the i2000, makes up to 300 mm wafers. AC ¶ 18.

Plaintiffs make four principal claims. First, they challenge Ibis' announcement that in 2002 it had sold an i2000 implanter to its "largest customer," claiming that this statement is actionable for failing to disclose that the customer was IBM. Second, plaintiffs attack Ibis' statement that it expected to "book" one to three orders in 2003 for its i2000 implanter, claiming that the word "book" did not have its standard meaning (i.e., to receive an order) but that Ibis atypically used the word to mean "ship to the customer." Third, plaintiffs challenge the timing of Ibis' decision to write down the value of its 200 mm and smaller wafer manufacturing line and certain related assets, claiming that Ibis should have recorded an asset impairment charge a few months earlier than it did. Fourth, plaintiffs claim that defendants were under a duty to disclose that Ibis' largest customer would order significantly fewer wafers from Ibis in the fourth quarter ending on December 31, 2003 than it had in the year-earlier period. Each claim is specious.

Plaintiffs' claims suffer from the following fatal defects among others:

- ***Allegation Concerning Implanter Sale To Ibis' "Largest Customer"***: When Ibis stated that in 2002 it had sold an i2000 implanter to its "largest customer," Ibis was under no duty to disclose the identity of the customer. This statement was correct in all respects, and would not have misled an investor to conclude that the customer was

---

[1] The appendix accompanying this brief ("App.") contains documents referred to in the Complaint, which this Court may consider in deciding the motion to dismiss. See Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996).

*not* IBM.  In any event, Ibis' secondary offering registration statement filed on September 18, 2003 disclosed IBM as the purchaser of this implanter.

- ***Allegations Concerning Expected Receipt of Future Implanter Orders***:  Plaintiffs challenge Ibis' forecast that it would "book" orders for one to three i2000 implanters by December 31, 2003 even though Ibis announced the first of those orders only 5 weeks later, *on February 5, 2004*.  Knowing that it would be laughable to attack as fraudulent a delay of only a few weeks in the receipt of an order, plaintiffs resort to rewriting what Ibis actually said and argue that Ibis used the word "book" to mean "ship" a product to the customer.  As the First Circuit has recognized, however, in common business parlance to "book" means to "receive" an order.  And, the Complaint does not allege a single fact even remotely suggesting that defendants did not believe they would receive those orders in 2003.

- ***200 MM Asset Impairment Charge Allegations***:  Like many accounting decisions, deciding when an asset is "impaired," thus requiring a write-down in carrying value, is an intensely subjective assessment.  Courts routinely dismiss challenges to the timing of such decisions because of this inherent subjectivity, and plaintiffs' asset impairment charge allegations here should be dismissed for the same reason.  In addition, from the very beginning of the class period Ibis explicitly warned investors that its 200 mm wafer production line was "underutilized," that its wafer sales were becoming increasingly skewed toward 300 mm wafers, and that acceleration of this trend could require Ibis to write down its 200 mm-related manufacturing assets as obsolete.  The candidness of these disclosures, and the lack of any facts in the Amended Complaint indicating that Ibis understood those assets were impaired prior to the announcement of its decision on December 15, 2003 to take an impairment charge, precludes *any* inference of intent to defraud, let alone the required "strong inference."

- ***Allegations Concerning Decline In Wafer Sales***:  Plaintiffs' allegation that Ibis misled investors by not disclosing that Q4 03 wafer sales would decline significantly fails as a matter of law.  Not only is an issuer under no duty to forecast future financial results, <u>Glassman v. Computervision Corp.</u>, 90 F.3d 617, 631 (1st Cir. 1996), but plaintiffs allege no facts indicating that Ibis knew that its largest customer would significantly reduce its orders.  In any event, on November 4, 2003 Ibis forecasted that its Q4 03 wafer sales would experience a "slowdown."  Under <u>Backman v. Polaroid Corp.</u>, 910 F.2d 10, 16 (1st Cir. 1990) (<u>en banc</u>), this statement was not rendered misleadingly incomplete by not disclosing by how much wafer sales would slow.  Even assuming it knew such information (and no facts are alleged indicating that it did), Ibis would have had no duty to disclose such information.

In short, this litigation boils down to nothing more than quibbling over the timing of a subjective accounting decision, quibbling over a delay of a few weeks in the receipt of an expected customer order, and complaining that Ibis should have been clairvoyant and forecasted

with precision the amount by which Q4 03 wafer sales would decline, even though no duty to disclose such information existed.  As such, there is no basis for contending that either Ibis or Mr. Reid committed fraud.  The explicitness of Ibis' cautionary disclosures to investors, the absence of any facts suggesting the falsity of any statement or defendants' knowledge of such alleged falsity, and the absence of any allegation that Mr. Reid or any other corporate official received any concrete, personal benefit from the alleged fraud all undermine plaintiffs' allegations.  This opportunistic, meritless litigation should be dismissed now, and with prejudice.

## ARGUMENT

To state a claim under § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, Plaintiffs must allege – with factual particularity – a materially false or misleading statement or omission made with intent to defraud.  Greebel, 194 F.3d at 196-97; 15 U.S.C. § 78u-4(b).  Where a complaint contains allegations made on "information and belief" or on "investigation of counsel," as is the case here, the PSLRA requires that the complaint "state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); In re Cabletron Sys., Inc., 311 F.3d 11, 28 n.8 (1st Cir. 2002); Lirette v. Shiva Corp., 999 F. Supp. 164, 165 (D. Mass. 1998) (Young, J.) ("Shiva I").  As this Court explained in Carney v. Cambridge Tech. Partners, Inc., 135 F. Supp. 2d 235, 246-47 (D. Mass. 2001), "a securities fraud action brought on the basis of an 'investigation of counsel' – with its implications of lawyer-directed and motivated litigation – was precisely the kind of case Congress found most troubling."

Similarly, to satisfy § 10(b)'s scienter requirement, the PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); In re Galileo Corp. S'holders Litig., 127 F. Supp. 2d 251, 260 (D. Mass. 2001).  A merely reasonable inference of scienter is not sufficient:

- 4 -

"inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong.'"
Greebel, 194 F.3d at 195-96. In other words, only where facts are alleged making it "highly likely" that a defendant intended to deceive investors can an inference be considered "strong." Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002). These standards are consistent with the requirements of Federal Rule 9(b), which the First Circuit "has been notably strict and rigorous in applying." Carney, 135 F. Supp. 2d at 241 (quoting Greebel, 194 F.2d at 193). The Amended Complaint must be dismissed for failure to satisfy these rigorous requirements.

## I.    PLAINTIFFS' ALLEGATIONS CONCERNING SALE OF AN IMPLANTER TO IBIS' "LARGEST CUSTOMER" FAIL TO STATE A CLAIM.

During the "class period" Ibis referred in its disclosures to the one i2000 implanter it had sold in 2002 for $8 million, stating in its July 23, 2003 earnings release that the implanter had been sold to its "largest customer" and in other disclosures stating that the customer was a "major semiconductor manufacturer." AC ¶¶ 47(a), 49(b), App. Tab 13 (July 23, 2003 release); App. Tab 7 at 11 (10-Q for Q2 03). Plaintiffs claim that these disclosures were misleading because they did not disclose that the customer was IBM. Of course, this argument is necessarily limited to the period between July 23, 2003 (the beginning of the class period) and the filing on September 18, 2003 of Ibis' secondary offering registration statement on Form S-3. That filing disclosed that IBM was the buyer of the implanter in 2002 for $8 million.[2] See App. Tab 8 at 3. Even as limited, this claim fails because "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." Backman, 910 F.2d at 13.

---

[2] Ibis also made no effort to conceal that IBM was its principal customer, which undermines any inference of scienter. Ibis' 10-K filings for 1998-2002 disclose that IBM was its single biggest customer in most every year. Including revenue from the $8 million implanter sale in 2002 (which was not recognized until customer acceptance in 2003), it was also the biggest customer in 2002. See App. Tab 1 (at 4), Tab 2 (at 4), Tab 3 (at 5), Tab 4 (at 4). The Court can take judicial notice of Ibis' earlier SEC filings even though not referred to in the complaint. See In re Stone & Webster, Inc. Sec. Litig., 253 F. Supp. 2d 102, 128 & n.11 (D. Mass. 2003) (citing Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991)).

Even assuming (a) that the customer's identity was material[3] and (b) that plaintiffs had alleged with particularity any facts indicating an intent to conceal the identity of the customer (none are alleged), Ibis was under no duty to disclose that IBM was the customer.  A duty to disclose "does not arise merely because investors may be interested in withheld information." Colby v. Hologic, 817 F. Supp. 204, 213 (D. Mass. 1993) (citing Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26) (1st Cir. 1987)).  Moreover, "the mere possession of material nonpublic information does not create a duty to disclose it."  Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1202 (1st Cir. 1996).  Rather, the First Circuit has made clear that a duty to disclose arises only in one of three circumstances:  (1) where a statute or rule specifically requires the omitted disclosure (none is alleged here); (2) where there has been insider trading (none is alleged here); or (3) where a prior statement was "inaccurate, incomplete or misleading."  Roeder, 814 F.2d at 27. With respect to this third prong of Roeder, plaintiffs do not allege that Ibis' statements regarding its i2000 implanter customer were *inaccurate,* but only that *omitted* information (the customer's identity) should have been disclosed.  In Backman, however, the First Circuit interpreted this third prong of Roeder as requiring information to be disclosed only if necessary to prevent a statement from being "so incomplete as to mislead"  -- i.e., from ***misleading an investor as to what the true facts are***.  Backman, 910 F.2d at 16.  There was nothing misleading about what Ibis said.

Backman illustrates how narrowly courts in the First Circuit interpret when a statement is "so incomplete as to mislead."  There, the plaintiffs alleged that certain disclosures made by Polaroid concerning its Polavision instant movie camera -- which ultimately proved to be a

---

[3] Plaintiffs argue this information was material based on the false premise that no customer can purchase an Ibis implanter without first getting a license from IBM, and that IBM essentially controls the market for Ibis implanters. AC ¶¶ 25, 26, 28.  These assertions are contradicted by documents and disclosures referred to in the Complaint itself.  See infra at 9.

commercial disaster -- were misleadingly incomplete.  To support this contention, plaintiffs

principally relied on the third prong of <u>Roeder</u> ("incomplete or misleading" statements).  The

<u>Backman</u> court, however, rejected this argument, stating:

> Plaintiffs quote <u>Roeder</u> . . . [for the proposition] that even a voluntary disclosure
> of information that a reasonable investor would consider material must be "com-
> plete and accurate."  This, however, does not mean that by revealing one fact
> about a product, one must reveal all others that, too, would be interesting, market-
> wise, but means only such others, if any, that are needed so that what was re-
> vealed would not be "so incomplete as to mislead."

910 F.2d at 16.  Applying that rule to the specific facts in <u>Backman</u>, the First Circuit stressed:

> Disclosing that Polavision was being sold below cost was <u>not misleading</u> by rea-
> son of not saying <u>how much</u> below.  <u>Nor was it misleading not to report the num-
> ber of sales, or that they were below expectations.</u>

<u>Id.</u> (emphasis added). [4]

Under this controlling First Circuit law, Ibis' statements that it had sold an implanter "to

a major semiconductor manufacturer" or to its "largest customer" cannot possibly be considered

"so incomplete as to mislead."  The statements were perfectly neutral as to the identity of the

customer, and would not have misled investors to conclude that the buyer was ***not*** IBM.

## II.     PLAINTIFFS' ALLEGATIONS CONCERNING BOOKING OF ORDERS FAIL TO STATE A CLAIM.

### A.     Plaintiffs Fail To Plead Falsity Or Scienter With Particularity.

In Ibis' July 23, 2003 press release announcing earnings for its 2003 second quarter ("Q2

Earnings Release"), Mr. Reid was quoted as saying that "we also continue to anticipate booking

orders for one-to-three implanters during this fiscal year."  AC ¶ 49(b).  Plaintiffs challenge this

---

[4] Since <u>Backman</u>, courts have continued to construe narrowly when a statement can be considered "so incomplete as to mislead."  <u>E.g.</u>, <u>Guerra v. Teradyne, Inc.</u>, No. 01-11789-NG, 2004 WL 1467065, at * 10-12 (D. Mass. Jan. 16, 2004) (Dein, Mag. J.) (App. Tab 22) (statements touting sales, orders and shipments not misleadingly incomplete for failure to disclose alleged product problems, price concessions, increased sales in low margin division, or expected future sales decline); <u>Colby</u>, 817 F. Supp. at 213 (D. Mass. 1993) (issuer's failure to disclose order slowdown while stating it was "'comfortable' with a wide range of analysts' estimates" not actionable); <u>In re Viewlogic Sys. Sec. Litig.</u>, No. 95-10014-DWP, 1996 U.S. Dist. LEXIS 22371, at * 19-23 (D. Mass. Mar. 13, 1996) (App. Tab 25) (statement that company was "on plan" not misleading even though only company's largest division was "on plan").

statement as fraudulent, arguing that by "booking orders" Mr. Reid actually meant "shipping the products ordered" to customers.  <u>See</u> AC ¶¶ 27, 28.[5]  This allegation fails for several reasons, not the least of which is that it distorts the plain meaning of the business term "to book."

As the First Circuit itself has recognized, to "book" an order in common business par-lance means to "receive" an order, not to ship a product to a customer.  <u>Glassman v. Computervi-sion Corp.</u>, 90 F.3d 617, 630 n. 18 (1st Cir. 1996) ("[a] '***booking***' represents the ***receipt of an order***").  Moreover, it is clear from Ibis' other public disclosures that Ibis used the word "book" in the customary way – to mean the ***receipt*** of an order.  Indeed, "book" and "receive" are used interchangeably in these disclosures.  For example, the statement in the Q2 Earnings Release that Ibis "<u>continue[d]</u> to anticipate booking" one to three implanter orders reaffirmed the forecast that had appeared in its 10-Q for Q1 03.  In that earlier filing Ibis had said that "[o]ur outlook also in-cludes ***the receipt of orders*** for one to three implanters."  App. Tab 6 at 16 (emphasis added). Likewise, soon after issuing its Q2 Earnings Release, Ibis repeated this forecast in its 10-Q for Q2 03:  "Our outlook for the year also includes ***the receipt of orders*** for one to three implanters." App. Tab 7 at 18 (emphasis added).  Similarly, plaintiffs themselves allege that Ibis' forecast in its 10-Q for Q3 03 (that it expected to "receive" orders for one to three implanters) was a "re-statement" of its earlier forecast that it expected "booking" orders for one to three implanters. <u>See</u> AC ¶ 39 (10-Q for Q3 03 "restated" forecast in Q2 Earnings Release).  In its December 15, 2003 press release, Ibis again used these words interchangeably, stating that "the Company had expected to ***book*** orders for one to three i2000 implanters before the end of 2003, however, it now expects an order(s) for one to three i2000 implanters ***to be received*** in the first half of

---

[5] Plaintiffs also allege that, in December 2003, Defendants "admitted that they no longer even had the orders they said they had in hand." AC ¶ 61.  Defendants, however, never said they had orders for i2000 implanters "in hand," and Plaintiffs point to no such statement.

2004."  App. Tab 14 (emphasis added).

Even assuming, _arguendo_, that the word "book" meant "ship," this claim would still fail

for the following reasons:

- Plaintiffs have not alleged a single fact suggesting that shipment would not have been possible prior to December 31, 2003.  Ibis' disclosures, which plaintiffs do not challenge, reveal that Ibis had in stock or under construction i2000 implanters that it could have shipped to customers in 2003.  See App. Tab 7 at 12 (10-Q for Q2 03); App. Tab 8 at 8 (Form S-3); AC ¶ 37 (April 23, 2003 press release stating that Ibis had an i2000 implanter "on line").  Moreover, plaintiffs' suggestion that it would have taken 9 months from receipt of an i2000 order to shipment is based on a gross distortion of Ibis' disclosure that it had taken approximately 9 months from receipt of an order for an Ibis 1000 implanter (the predecessor product) to **_customer acceptance_** at the customer's facility, something that occurs only **_after_** shipment to the customer. AC ¶¶ 22, 27; App. Tab 5 at 14.

- Plaintiffs erroneously contend that customers were required to obtain a license from IBM before ordering and receiving shipment of an i2000 implanter. AC ¶¶ 25-26.  In fact, as the Complaint notes, customers may use a variety of processes in the operation of an i2000 implanter, only one of which is IBM's modified low dose ("MLD") process.  AC ¶ 63(b).  Only if a customer wants to use the IBM process would it need to get a license from IBM to use that process, and there is nothing to the contrary in IBM's license agreement with Ibis for the MLD process.  AC ¶ 63(b); App. Tab 5 (license agreement).[6]

- Plaintiffs do not allege a single fact suggesting that it was not possible for implanter customers to obtain an MLD license from IBM before the end of 2003, or that Ibis had received any information indicating this to be the case.  Indeed, on February 5, 2004, only 5 weeks after the date by when Ibis had expected it would receive an implanter order, Ibis announced that it had in fact received an order for an i2000 implanter with an option to buy a second implanter.  AC ¶ 64; App. Tab 15.

In short, because plaintiffs' implanter order allegations turn on an unnatural use of the

term "book," they collapse like a house of cards.  Ibis' prediction that it would receive orders for

---

[6] Plaintiffs misquote Ibis' 10-Q for Q3 03, alleging that Ibis said that '[i]n 2002, we introduced the next generation of SIMOX-SOI technology which included our second-generation oxygen implanter (i2000) . . . licensed to Ibis by IBM."  AC¶ 58 (ellipsis in original).  Plaintiffs deliberately left words out of this quote – those words make clear that IBM licenses only the MLD process, and has no rights in the equipment itself.  What Ibis actually said was that the new technology "included our second-generation oxygen implanter (i2000) **_and the modified low dose ("MLD") SIMOX wafer process, licensed to Ibis by IBM_**."  App. Tab 9 at 11.  Courts condemn this sort of selective and misleading pleading.  See, e.g., Thornton v. Micrografx, Inc., 878 F. Supp. 931, 936-37 (N.D. Tex. 1995); Shore v. Costello, No. C-91-20195-RMW (EAI), 1992 WL 682762, at *2 (N.D. Cal. May 15, 1992) (App. Tab 24).

one to three implanters in 2003, when it did in fact receive an order only five weeks into 2004, was also not materially "off the mark," and accordingly, not securities fraud. Carney, 135 F. Supp. 2d at 245. Accord Cutsforth v. Renschler, 235 F. Supp. 2d 1216, 1231 (M.D. Fla. 2002) (prediction actionable only if "gross disparity between prediction and fact"). In any event, the Amended Complaint does not support any inference of scienter. The Complaint does not allege with factual particularity any document, meeting, or other communication through which Ibis or Mr. Reid learned any information that would have made receipt – or shipment for that matter – of the expected implanter orders impossible or improbable prior to December 31, 2003. See Boston Tech., 8 F. Supp. 2d at 57 (dismissing complaint absent contemporaneous facts indicating knowledge inconsistent with public disclosures); Lirette v. Shiva, 27 F. Supp. 2d 268, 283 (D. Mass. 1998) (same) ("Shiva II").[7]

### B.    Defendants' Forecast Of Implanter Orders Is Protected By The Safe Harbor.

Defendants' forecasts of i2000 implanter orders are also immunized from liability by the PSLRA's Safe Harbor for forward-looking statements. The Safe Harbor has two parts:

> The first shelters forward-looking statements that are accompanied by meaningful cautionary statements . . . . The second … precludes liability for a forward-looking statement unless the maker of the statement had actual knowledge it was false or misleading.

Greebel, 194 F.2d at 201 (citing 15 U.S.C. § 78u-5(c)(1)(B)). Accord In re Stone & Webster, Inc. Sec. Litig., 253 F. Supp. 2d 102, 117 (D. Mass. 2003). The first prong of the Safe Harbor does not require that an issuer's meaningful cautionary statements include the actual risk that ultimately causes results to differ from expectations. H.R. Rep. No. 369, 104th Cong. 2d Sess., at 44; Harris v. Ivax Corp., 182 F.3d 799, 807 (11th Cir. 1999).

---

[7] This claim also incorrectly assumes that the shipment date would be material to an investor. Shipment, however, does not trigger revenue recognition – as Ibis repeatedly cautioned investors, revenue is recognized only after both shipment and customer acceptance of an implanter. See AC ¶ 22.

As required by the first part of the Safe Harbor, Ibis cautioned investors in its Q2 Earnings Release at the beginning of the class period that "[t]his release may contain forward-looking statements that are subject to certain risks and uncertainties including statements . . . that the Company will book orders for one-to-three implanters during this fiscal year."  App. Tab 13. The Q2 Earnings Release then warned that these forward-looking statements "are subject to risks and uncertainties that could cause actual results to differ materially from those set forth in or implied by forward-looking statements," such as "product demand and market acceptance risks," and "the Company's limited history with regard to sales of implanters."  Id.  Ibis also incorporated by reference "the other risks and risk factors described in the Company's Securities and Exchange Commission filings from time to time, including but not limited to, the Company's Annual Report on Form 10-K for the year ended December 31, 2002."  Id.  See In re Blockbuster Inc. Sec. Litig., No. 3:03-CV-0398-M, 2004 WL 884308, at *4 (N.D. Tex. Apr. 26, 2004) (App. Tab 20) (Safe Harbor permits meaningful cautionary statements in a readily available document to be incorporated by reference).  Ibis' 2002 10-K  warned of additional risks, including:  (1) that Ibis had sold only eight Ibis 1000 implanters and only one i2000, and "do[es] not expect to sell more than a limited number of implanters in the near future;" and (2) that "the delay in the manufacture or delivery of even one unit would have a material adverse impact on our quarterly or annual results of operations."  App. Tab 5 at 15.

Plaintiffs' implanter order claim is also barred by the second part of the Safe Harbor because Plaintiffs do not plead with the required factual particularity that Defendants' projection of future orders was made with *actual knowledge* of its falsity.  See 15 U.S.C. §78u-5(c)(1)(B); Greebel, 194 F.3d at 201.  A statement that is merely a forecast and not a guaranty is not actionable simply because it does not turn out to be correct.  Glassman, 90 F.3d at 626.  Courts thus

routinely dismiss complaints where, as here, plaintiffs fail to plead that "[defendant] actually knew – and was not simply reckless in not knowing – that [the forward-looking] statements were untrue." Stone & Webster, 253 F. Supp. 2d at 117. Accord In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535-36 (3d Cir. 1999); Stavros v. Exelon Corp., 266 F. Supp. 2d 833, 847 (N.D. Ill. 2003); In re Noven Pharms., Inc. Sec. Litig., 238 F. Supp. 2d 1315, 1319 (S.D. Fla. 2002).

## III.  PLAINTIFFS' IMPAIRMENT ALLEGATIONS FAIL TO STATE A CLAIM.

Plaintiffs allege that the market for silicon wafers during the class period was transitioning from 200 mm to 300 mm wafers, and that Ibis therefore should have concluded as early as July 2003 that its Ibis 1000 implanters (used to manufacture 200 mm and smaller wafers) were obsolete and should then have written down the value of those assets. AC ¶¶ 43-44, 46. Plaintiffs thus challenge the timing of Ibis' subjective decision to write down those assets, which it announced on December 15, 2003. These allegations cannot state a claim for securities fraud.

Courts are loathe to substitute their own judgment for an issuer's on highly subjective accounting decisions like the determination of when the value of an asset should be written down.[8] For example, this Court in Galileo dismissed a securities fraud claim that defendants should have written off certain accounts receivable due to the inherent subjectivity of such a determination:

> Whether the collection of the Imagyn receivables was 'reasonably assured,' as Galileo argues, is fundamentally a subjective determination. . . . Thus, application of the concept of 'reasonable assurance of collection' in a given situation is a matter of judgment and estimate. In this case, 'reasonable assurance of collection' was a fluid and subjective concept, dependent on the knowledge the defendants had at the time they made decisions about whether to record the Imagyn receivables . . . . Subject thus to judgments, as to which reasonable persons might disagree, the proposition that collectibility of the Imagyn revenues was not reasonably assured . . . cannot support the strong inference of scienter required by the PSLRA and Rule 9(b).

_____

[8] In its 10-K for 2002, Ibis warned investors that the "assessment of long-lived asset impairment" was one of its "most critical accounting policies" that required Ibis "to make difficult and subjective judgments." App. Tab 5 at 23. Ibis also disclosed that it assesses the value of its long-lived assets per SFAS No. 144 , id. at 24, a copy of which is included at App. Tab 18.

Galileo, 127 F. Supp. 2d at 265-66.  Accord DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th

Cir. 1990) ("No matter when a bank [writes down a loan], someone may say that it should have

acted sooner.   If all that is involved is a dispute about the timing of the write-off, based on esti-

mates of the probability that a particular debtor will pay, we do not have fraud; we may not even

have negligence.").

Likewise, in Plevy v. Haggerty, 38 F. Supp. 2d 816 (C.D. Cal. 1998), the court dismissed

with prejudice a securities fraud lawsuit challenging the timing of the issuer's decision to write

down as obsolete the value of its inventory of older technology computer disk drives.  The issuer

wrote these assets down by $148 million in January 1998, but the plaintiffs claimed that the disk

drive industry had begun to shift to newer technology three years earlier and that the write off

should have been taken then.  Plevy, 38 F. Supp. 2d at 819, 824-25.  In dismissing the case, the

court explained that the issuer had cautioned investors of the possibility of obsolescence, and that

the risk of obsolescence is generally well known to those who invest in technology companies:

> We have observed that, as a general matter, investors know of the risk of obsolescence
> posed by older products forced to compete with more advanced rivals.  Indeed, technical
> obsolescence of computer equipment in a field marked by rapid technological advances is
> information within the public domain.

Id. at 825 (quoting In re Stac, 89 F.3d 1399, 1410 (9th Cir. 1996)).  The same may be said of

Ibis' products.  In addition, the Plevy court noted that plaintiffs "fail to point [to] any direct or

circumstantial facts, such as, but not limited to, inconsistent contemporaneous statements or in-

ternal reports that would show that" defendants knew they were required to take a write-down at

an earlier date.   Id. at 826.  Accord Stavros v. Exelon Corp., 266 F. Supp. 2d 833, 851-852 (N.D.

Ill. 2003) (dismissing claim that company failed timely to record an asset impairment).

Here, the Amended Complaint confirms on its face that there was no fraud, and that at

most Plaintiffs are quibbling over the timing of an inherently subjective accounting determina-

tion.  As in <u>Plevy</u>, Ibis explicitly warned investors from the beginning of the class period of the risk of obsolescence in its 200 mm wafer assets due to the trend in its wafer sales toward larger, 300 mm wafers.  As in <u>Plevy</u>, the explicitness and robustness of its warnings of possible obsolescence are fundamentally inconsistent with any inference of intent to defraud.  <u>See Plevy</u>, 38 F. Supp. 2d at 825.  <u>Accord</u> <u>Schiller v. Physicians Resource Group, Inc.</u>, No. Civ. A. 3:97-CV-3188L, 2002 WL 318441 (N.D. Tex. Feb. 26, 2002) (App. Tab 23).  For example, in its 2002 10-K filing, Ibis explicitly warned investors that its 200 mm production line (i.e., its Ibis 1000 implanters) was "underutilized" and that, if customers transitioned to 300 mm wafers sooner than expected, Ibis would be required to record an impairment loss:

> [D]efendants stated that "although ***our 200 mm and smaller wafer size production line is currently underutilized***, considering our future plans, current potential business prospects and alternatives, Management believes that we do not have an impairment issue at this time."  The report further stated that, "however, if our future plans and potential business prospects do not materialize, if semiconductor manufacturers fail to adopt SIMOX technology during the current process cycle (which typically last two to three years) or our customers transition to the 300mm wafer size sooner than we anticipate, ***our 200mm and smaller wafer size production line may become obsolete and we would be required to reduce our income by an impairment loss which could be material.***"

AC ¶ 44(b) (emphasis added).  In its 10-Q for Q1 03, Ibis similarly warned investors that:

> [w]e will continue to review our assumptions about our long-lived assets on a periodic basis for potential impairment in future quarters.  ***We cannot be sure that our implanters or other long-lived assets will not become impaired in the future.***

App. Tab 6 at 12 (emphasis added).   These same warnings appear in other Ibis disclosures during the class period.  <u>See</u> App. Tab 7 at 12 (10-Q for Q2 03), Tab 9 at 12 (10-Q for Q3 03).

    Furthermore, not only did Ibis warn the market of potential obsolescence of its 200 mm production line assets, but the Amended Complaint itself confirms that investors had all of the same information relevant to assessing possible asset impairment that Ibis did.  To the extent that plaintiffs claim that obsolescence was apparent from the industry publications cited in the Complaint, those publications were equally available to investors.  <u>See</u> AC ¶¶ 44(a), (c), (f), (l).  In

addition, Ibis explicitly disclosed that its wafer sales were migrating away from 200 mm and smaller wafers to larger 300 mm wafers.[9]  See AC ¶ 44(j),(k) (citing Ibis' disclosures that sales of 300 mm wafers had grown from 32% of wafer sales in Q1 03 to 97% and 98% of wafer sales in Q2 and Q3 respectively).[10]  The public disclosure of such information prevents drawing the requisite strong inference that it is "highly likely" that defendants intended to mislead investors as to the true value of its 200 mm wafer production line.  See A.T. Cross Corp., 284 F.3d at 82; Plevy, 38 F. Supp. 2d at 825 (disclosure of risk of obsolescence inconsistent with scienter); In re PETsMart, 61 F. Supp. 2d 982, 991-93 (D. Ariz. 1999) (dismissing securities fraud claim where facts relevant to obsolescence determination were publicly available).

Moreover, the Amended Complaint itself highlights additional facts that further under-mine any inference that the timing of Ibis' decision to write down its 200 mm wafer production assets was deliberately fraudulent.  When Ibis announced its Q3 03 results on November 4, 2003, Ibis disclosed that two customers were then evaluating its 200 mm wafers for purchase in 2004 -- 200 mm wafers that would be produced on the very same assets that plaintiffs contend Ibis should then have written off as valueless:

> During the fourth quarter our priority on the wafer side of the business will be to broaden our customer base in both 300 mm **_and 200 mm_** by sampling our latest SIMOX-SOI wa-fers.  **_We are currently undergoing 200 mm evaluation at two customers and positive results should translate to orders in early 2004._**  Forecasting future wafer sales, on a

---

[9] Plaintiffs claim that Ibis had decided "to get out of the business of manufacturing 200 mm and smaller size wafers" during the class period.  AC ¶ 42.  The only basis for this assertion is the allegation that Simgui, a wafer manufac-turer which had purchased an Ibis 1000 implanter, had allegedly "confirmed in news stories that Simgui does not compete with Ibis because Ibis focuses on selling **_leading-edge 300mm SOI wafers_** while Simgui produces only older generation smaller size wafers."  Id. (emphasis added).  Putting aside the fact that this third-party statement is not a attributable to Ibis because it does not identify any source within Ibis, see In re Cabletron Sys., 311 F.3d at 37; Suna v. Bailey Corp., 107 F.3d 64, 73 (1st Cir. 1997), what Simgui's spokesperson is actually quoted as saying was that "Simgui does not compete with Ibis because … Simgui 'only produces 4- and 6-inch [smaller size] wafers right now.'"  AC ¶ 44(f).  In other words, what Simgui allegedly stated was that the wafers it manufactured were **_much smaller than 200 mm_** (200 mm is the same as **_8-inches_**).  This alleged statement thus does not support the al-legation that Ibis had decided to exit the 200 mm market.

[10] Plaintiffs' suggestion that Ibis' statements that 300 mm wafers constituted the "majority" and "most" of Ibis' wa-fer sales in Q2 and Q3 were misleading fails as a matter of law.  See AC ¶ 44(j), (k).  These statements were entirely accurate, and not misleadingly complete, under controlling First Circuit law.  See supra at 6-7.

quarter-by-quarter basis, remains exceedingly difficult, and significant variations, quarter to quarter, are likely.

AC ¶ 53 (emphasis added).  Plaintiffs do not challenge the truth of this statement, and in assessing the potential impairment of its 200 mm wafer production assets Ibis was entitled to take into account this customer interest in purchasing this very kind of wafer.  Even assuming Ibis erred in determining when its assets became impaired, an accounting error is not securities fraud absent "specific facts [which are not alleged here] that establish that defendants knew that the write-down should have been made earlier."  Coates v. Heartland Wireless Comm's, Inc., 100 F. Supp. 2d 417, 427-30 (N.D. Tex. 2000) ("Coates III").

## IV.    PLAINTIFFS' WAFER SALES ALLEGATIONS FAIL TO STATE A CLAIM.

On December 15, 2003 Ibis announced that "[w]afer sales for the fourth quarter are expected to be in the range of $1.0 million to $1.1 million. Wafer revenue for the fourth quarter is being adversely impacted as the Company's largest customer makes year-end inventory adjustments and prepares for the changing product mix demands for 2004."  AC ¶ 60.  Plaintiffs argue that Ibis somehow knew from the beginning of the class period on July 23, 2003 that IBM (the Company's "largest customer") would significantly reduce its "orders and purchases" for wafers in Q4 03, thereby causing fourth quarter wafer sales to lag significantly behind wafer sales in Q4 02. AC ¶ 47(c).  Plaintiffs then argue that it was securities fraud not to disclose this prior to Ibis' December 15, 2003 press release.  This claim is defective as a matter of law.

As an initial matter, even assuming that Ibis knew prior to December 15, 2003 the amount by which Q4 03 wafer revenues would decline (and no facts are alleged indicating that it did), this claim would fail because Ibis would not have had any duty to disclose such information.  In Shaw, 82 F.3d at 1209, the First Circuit held that an issuer has no duty "to disclose forward-looking information such as internal projections, estimates of future performance,

- 16 -

forecasts, budgets, and similar data." Accord Glassman, 90 F.3d at 631; Capri Optics Profit

Sharing v. Digital Equip. Corp., 950 F.2d 5, 10-11 (1st Cir. 1991) ("Where accurate historical in-

formation is provided, there is no obligation for the company to add that it may have some con-

cerns about the future."). Plaintiffs also do not allege that Ibis made any statement about Q4 03

wafer sales that was inaccurate when made. To the contrary, in its Q3 03 10-Q filed on Novem-

ber 4, 2003, Ibis accurately predicted a "slowdown" in wafer sales for Q4 03:

> Although we anticipate a fourth quarter slowdown for 300 mm wafer business at our
> largest customer, forecasts from this customer and others for 2004 continue to look posi-
> tive.

AC ¶ 56.[11]  This forecast that wafer sales would slow was not rendered misleadingly incomplete

by not specifying by how much they would decline. In this respect the First Circuit's Backman

decision is controlling. In Backman, the Appeals Court held that Polaroid's disclosure that its

Polavision product was being sold below cost "was not misleading by reason of not saying how

much below." 910 F.2d at 16. Accord Glassman, 90 F.3d at 633.[12]

In any event, plaintiffs do not allege a single contemporaneous fact to suggest that Ibis

knew by how much demand for wafers in Q4 03 would decline prior to issuance of its press re-

lease on December 15, 2003. Plaintiffs cite no documents, meetings or other contemporaneous

communications that would have provided defendants with such information, and no such infor-

mation is attributed to any of the unnamed "sources" referred to in the Complaint. Not only is

the absence of such information fatal to any inference of scienter, but Ibis' explicit warnings to

---

[11] An accurate forecast of future results like that in the 10-Q for Q3 03 is not actionable. Carney, 135 F. Supp. 2d at
245 (claim based on prediction "moot" where "prediction in fact was not off the mark").

[12] Plaintiffs also appear to challenge Ibis' statements that "[w]e expect wafer sales in the third quarter [of 2003] to
increase somewhat" and 2003 wafer sales "to be higher than those of 2002" because "defendants knew that sales of
200mm and smaller size wafers had all but stopped." AC ¶ 49(c). These predictions both turned out to be accurate,
App. Tab 9 at 14 (10-Q for Q3 03) and Tab 11 at 25 (10-K for 2003), and therefore are not actionable as a matter of
law. Carney, 135 F. Supp. 2d at 245. Ibis' forecasts were not misleading by virtue of not specifying the relative al-
locations of 200 mm and 300 mm sales. Not only had Ibis disclosed throughout the class period the continuing trend
toward sales of 300 mm wafers and away from 200 mm wafers (e.g., App. Tab 7 at 14) (10-Q for Q2 2003), but
there was nothing misleadingly incomplete about Ibis' statement as to overall wafer sales. See, e.g., Teradyne, 2004
WL1467065, at *11-12 (App. Tab 22) (statements concerning order levels not misleading for failure to disclose in-
crease in low margin sales); Viewlogic, 1996 U.S. Dist. LEXIS 22371 at *19-23 (App. Tab 25) (statement company
"on plan" not misleading for failure to disclose only company's largest division on plan).

investors that its wafer revenues were highly volatile and unpredictable negates any inference of intent to deceive investors.  Both before and during the class period Ibis warned that it "relies heavily on sales to certain significant customers" and that:

> [c]ustomers in the semiconductor industry tend to order large quantities of wafers on an irregular basis. This means that customers who account for a significant portion of our net revenue in one quarter may not place any orders in the succeeding quarter or quarters. These ordering patterns may result in significant quarterly fluctuations in our revenue and operating results.

See, e.g., App. Tab 5 at 12 (10-K for 2002).

## V.     PLAINTIFFS' GENERALIZED MOTIVE ALLEGATIONS DO NOT SUPPORT AN INFERENCE OF SCIENTER, PARTICULARLY ABSENT ANY TRADING.

***Motive Allegations***:  In the First Circuit, "merely pleading motive and opportunity, re-gardless of the strength of the inferences to be drawn of scienter, is not enough" to satisfy the "strong inference" standard.  Greebel, 194 F.3d at 197.  Moreover, plaintiffs' generalized motive allegations – that Ibis was allegedly "motivated to commit the fraud alleged herein so that the Company could complete the October 2003 common stock offering" and raise "critically impor-tant" cash (AC ¶ 68) – have been rejected by numerous cases as overly general and "inadequate to raise a strong inference of scienter as a matter of law."  In re Baker Hughes Sec. Litig., 136 F. Supp. 2d 630, 642 (S.D. Tex. 2001); Eizenga v. Stewart Enters., Inc., 124 F. Supp. 2d 967, 984 (E.D. La. 2000) (rejecting as insufficient allegation that issuer was motivated to inflate stock price in order to complete a secondary offering).  As the Baker Hughes court stated, "the major-ity of cases addressing this motive have decidedly held that a generalized desire to raise capital is inadequate to raise a strong inference of scienter as a matter of law."  Id. (collecting cases). Such a motivation could be attributed to "virtually all corporate insiders."  Id.  Accord Glickman v. Alexander & Alexander Servs., Inc., No. 93 Civ. 7594 (LAP), 1996 WL 88570 at *6 (S.D.N.Y. Feb. 29, 1996) (App. Tab 21) ("desire to raise much needed capital" is too broad and

generalized of a motive to raise a strong inference of scienter).  <u>See also</u> <u>Galileo</u>, 127 F. Supp. 2d at 270 (rejecting as overly general allegation that defendant was "motivated by a desire to use Galileo's common stock as currency for acquisitions of new businesses").[13]

***<u>Absence of Trading</u>***:  The Amended Complaint does not allege any facts that would support any inference whatsoever that Ibis or Mr. Reid intended to mislead the investing public. While the complaint mentions some unnamed "sources," not one of those sources is alleged to have had any contact with Mr. Reid, all but two of them had left the Company before the beginning of the class period, and -- most important -- none of them provides any other information that would even remotely suggest that defendants knew that any of Ibis' public disclosures, at any time, was false or misleading.  Likewise, Plaintiffs do not allege that Mr. Reid -- or any other Ibis official for that matter -- sold <u>even a single share</u> of Ibis stock during the 5 month-long class period.  This materially weakens, if not undermines completely, any inference of scienter.  <u>E.g.</u>, <u>In re Sunterra Corp. Sec. Litig.</u>, 199 F. Supp. 2d 1308, 1326 (M.D. Fla. 2002); <u>In re Segue Software, Inc. Sec. Litig.</u>, 106 F. Supp. 2d 161, 171 & n.23 (D. Mass. 2000); <u>In re Northern Telecom Ltd. Sec. Litig.</u>, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000); <u>Kalnit v. Eichler</u>, 99 F. Supp. 2d 327, 337 (S.D.N.Y. 2000).  Moreover, Mr. Reid's holdings of Ibis stock actually <u>lost</u> approximately $850,000 in value.[14]  "[T]he notion that [Mr. Reid] would engage in fraud and then wait for the stock price to plummet before selling his securities without benefiting from the fraud is a 'nonsensical premise.'"  <u>Coates v. Heartland Wireless Comm's, Inc.</u>, 26 F. Supp. 2d 910, 920

---

[13] Plaintiffs also may not plead scienter through vague allegations regarding Mr. Reid's status as an officer of Ibis or his alleged access to unspecified internal documents and information.  Absent specification of what information Mr. Reid received, when, and from what source, such generalized allegations are insufficient to establish a strong inference of scienter.  <u>See, e.g.</u>, <u>Boston Tech.</u>, 8 F. Supp. 2d at 57-58 (dismissing securities fraud complaint where "[n]ot a single report, memorandum, meeting minute, or like item" received and read by defendants was alleged); <u>Stone & Webster</u>, 253 F. Supp. 2d at 130 (same); <u>Carney</u>, 135 F. Supp. 2d at 255 (same).

[14] <u>See</u> App. Tab 16, which shows how this loss figure was calculated.  Copies of the SEC filings that evidence Mr. Reid's class period holdings are included at App. Tabs 17(A)-(F), and this Court may properly take judicial notice of these documents.  <u>In re Stone & Webster, Inc. Sec. Litig.</u>, 253 F. Supp. at 128 & n.11.

(N.D. Tex. 1998).  Accord Maldonado v. Dominguez, 137 F.3d 1, 12 n.9 (1st Cir. 1998); In re

PETsMART, 61 F. Supp. 2d at 1000.

## **CONCLUSION**

For the foregoing reasons, this meritless case should be dismissed, with prejudice.[15]


Dated:  August 5, 2004                          DEFENDANTS IBIS TECHNOLOGY
                                                CORP. AND MARTIN J. REID


                                                /s/ Brian E. Pastuszenski
                                                Brian E. Pastuszenski (BBO #391030)
                                                Jason D. Frank (BBO #634985)
                                                Laura M. Stock (BBO #652276)
                                                Testa, Hurwitz & Thibeault, LLP
                                                125 High Street
                                                Boston, MA 02110
                                                Tel:  (617) 248-7000

---

[15] Because Plaintiffs have failed to allege a primary violation of § 10(b) of the Exchange Act and SEC Rule 10b-5, Plaintiffs as a matter of law also have failed to state a claim for violation of § 20(a) of the Exchange Act.  Greebel, 194 F.3d at 207; Carney, 135 F. Supp. 2d at 257.

## CERTIFICATE OF SERVICE

I, Jason D. Frank, hereby certify that, on August 5, 2004, I caused a true copy of the

above document to be filed electronically with the Court and to be served upon Lead Plaintiffs'

liaison counsel by hand delivery and upon Lead Plaintiffs' co-lead counsel by overnight mail, at

the addresses below.

/s/ Jason D. Frank
Jason D. Frank

Thomas G. Shapiro, Esq.
Shapiro Haber & Urmy LLP
75 State Street
Boston, MA 02109
(617) 439-3939

Deborah R. Gross, Esq.
Robert P. Frutkin, Esq.
Law Offices of Bernard M. Gross, P.C.
1515 Locust Street, Second Floor
Philadelphia, PA 19102
(215) 561-3600

Peter Harrar, Esq.
Aya Bouchedid, Esq.
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Avenue
New York, NY 10016
(212) 545-4600

Kenneth Elan, Esq.
Law Offices of Kenneth Elan
217 Broadway, Suite 606
New York, NY 10007
(212) 619-0261

Joseph P. Garland, Esq.
Klein & Solomon, LLP
275 Madison Avenue
New York, NY 10016
(212) 213-1812

3103108_1

- 21 -