UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE IBIS TECHNOLOGY SECURITIES LITIGATION | ) ) ) ) | Civ. No. 04-10446 RCL |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT**

TESTA, HURWITZ & THIBEAULT, LLP

Brian E. Pastuszenski (BBO #391030)
Christine S. Chung (BBO #631724)
Laura M. Stock (BBO #652276)
125 High Street
Boston, MA 02110
Tel:  (617) 248-7000

Attorneys for Defendants
Ibis Technology Corp. and Martin J. Reid

- i -

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .................................................................................................................................. 1

I. IBIS' IMPLANTER SALES FORECAST IS NOT ACTIONABLE ............................. 1

    A. Ibis Made No False Or Misleading Statements About Cash ...................................................................... 1

    B. The Safe Harbor For Forward-Looking Statements Bars Plaintiffs' Claim .......................................... 4

II. THE IBM-RELATED ALLEGATIONS FAIL TO STATE A CLAIM ......................... 5

III. PLAINTIFFS' IMPAIRMENT ALLEGATIONS FAIL TO STATE A CLAIM ................................................................................................... 6

IV. PLAINTIFFS' GENERAL SCIENTER ALLEGATIONS ARE INADEQUATE ............................................................................................................ 8

CONCLUSION ............................................................................................................................. 10

## **TABLE OF AUTHORITIES**

**Case**                                                                                                                  **Page (s)**

Aldridge v. A.T. Cross Corp.,
284 F.3d 72 (1st Cir. 2002) ............................................................................................... 8

Backman v. Polaroid Corp.,
910 F.2d 10 (1st Cir. 1990) ........................................................................................... 2, 6

Baron v. Smith,
285 F. Supp. 2d 96 (D. Mass. 2003) .............................................................................. 2

Baron v. Smith,
389 F.3d 49 (1st Cir. 2004) ............................................................................................ 2

In re Cabletron Sys., Inc.,
311 F.3d 11 (1st Cir. 2002) ......................................................................................... 4, 5

Chatman v. Gentle Dental of Waltham,
973 F. Supp. 228 (D. Mass. 1997) ................................................................................. 4

Coates v. Heartland Wireless Communications, Inc.,
55 F. Supp. 2d 628 (N.D. Tex. 1999) ........................................................................... 10

In re Copley Pharm., Inc. Sec. Litig.,
No 94-11897, 1995 WL 169215 (D. Mass. Mar. 16, 1995) ............................................... 2, 5

Fitzer v. Security Dynamics Techs., Inc.,
119 F. Supp. 2d 12 (D. Mass. 2000) ...................................................................... 2, 4, 5

David v. Simware,
N.Y.L.J. Mar. 20, 1997, at 29, Col. 4 (N.Y. Sup. Ct. 1997) ......................................... 9

In re Galileo Corp. S'holders Litig.,
127 F. Supp. 2d 251 (D. Mass. 2001) ............................................................................ 7

Glassman v. Computervision Corp.,
90 F.3d 617 (1st Cir. 1996) ............................................................................................ 9

Greebel v. FTP Software, Inc.,
194 F.3d 185 (1st Cir. 1999) .................................................................................... 7, 10

Gross v. Summa Four, Inc.,
93 F.3d 987 (1st Cir. 1996) ............................................................................................ 9

Harris v. Ivax,
182 F.3d 799 (11th Cir. 1999) ............................................................................................. 4

Jakobe v. Rawlings Sporting Goods Co.,
943 F. Supp. 1143 (E.D. Mo. 1996)..................................................................................... 5

Kriendler v. Chemical Waste Mgmt., Inc.,
877 F. Supp. 1140 (N.D. Ill. 1995) ...................................................................................... 8

Lirette v. Shiva Corp.,
27 F. Supp. 2d 268 (D. Mass. 1998) .................................................................................... 4

In re Number Nine Visual Tech. Corp. Sec. Litig.,
51 F. Supp. 2d 1 (D. Mass. 1999) ........................................................................................ 5

In re Peritus Software Servs., Inc. Sec. Litig.,
52 F. Supp. 2d 211 (D. Mass. 1999) .................................................................................... 7

In re Saf T Lok, Inc. Sec. Litig.,
No. 02-80252, 2003 WL 22383607 (S.D. Fla. July 3, 2003) ............................................ 7, 8

In re Segue Software, Inc. Sec. Litig.,
106 F. Supp. 2d 161 (D. Mass. 2000) .................................................................................. 7

In re Sepracor, Inc. Sec.Litig.,
308 F. Supp. 2d 20, 37 (D. Mass 2004) ............................................................................... 4

Shaw v. Digital Equip. Corp.,
82 F.3d 1194 (1st Cir. 1996) ................................................................................................ 5

Stavros v. Exelon Corp.,
266 F. Supp. 2d 833 (N.D. Ill. 2003) ................................................................................... 8

**Statutes and Rules**

17 C.F.R. §240.3b-6.................................................................................................................... 5

**PRELIMINARY STATEMENT**

Plaintiffs' opposition brief ("Opp.") avoids dealing head-on with the infirmities in their arguments that Defendants pointed out in their opening brief ("Mem."). Instead, Plaintiffs have concocted new allegations found nowhere in the Complaint, and attempt to introduce new third party documents not mentioned in the Complaint. Because Plaintiffs nowhere point to any facts demonstrating that any statement was materially false when made, let alone that Ibis knew that any statement was false when made, the Amended Complaint ("AC" or "Complaint") should be dismissed in its entirety, and with prejudice.

**ARGUMENT**

**I.      IBIS' IMPLANTER SALES FORECAST IS NOT ACTIONABLE.**

Plaintiffs principally attack Ibis' statement during the class period that "we also continue to anticipate booking orders for one-to-three implanters during this fiscal year." AC ¶ 49(b). Plaintiffs contended in the Complaint that to "book" an order means to "ship" the product to the customer, and claimed that it was impossible for Ibis to have shipped this number of implanters by the end of 2003. Id. Ibis showed in its opening brief how Plaintiffs had distorted the common meaning of "book an order," see Mem. at 8, and Plaintiffs now concede that book means to receive an order. Opp. at 3, n.1, 7. Rather than drop this meritless claim, Plaintiffs now argue that Ibis' forecast is actionable because it somehow led investors to believe that Ibis would receive "very large amounts of desperately needed cash by the end of 2003." Opp. at 3. This newly-concocted argument is nothing more than a diversionary tactic designed to hide the fact that the Plaintiffs have not alleged an actionable misstatement.

       **A.      Ibis Made No False Or Misleading Statements About Cash.**

Plaintiffs claim that Defendants "argue that there was no financial consequence to booking an order for an i2000 implanter and that the market could not, as a matter of law, believe that

Ibis would receive cash when it booked an order." (Opp. at 3) First, this is not something the Defendants argued in their opening brief. The "financial consequences" following the booking of an order are what they are, and nowhere do Plaintiffs allege that Ibis did not accurately account for its orders once recorded on its books, or that it even once misstated what those consequences would be. Just as Ibis never guaranteed that even a single implanter order would be received by year-end 2003, it never guaranteed that a single dollar of cash would be received in respect of any such order by year-end 2003. Plaintiffs do not contend otherwise.

Second, absent a material misstatement by Defendants, it is legally irrelevant what Plaintiffs contend the market "believed." Plaintiffs have not alleged that Ibis ever made a single ***statement*** about the ***receipt of cash*** – let alone any statement that was false or misleading when made. Rather, the only challenged ***statement*** concerns the expected ***receipt of orders***. Plaintiffs' argument that that the "market ***perceived*** that booking an order resulted in an immediate influx of cash" cannot be the basis of any liability because securities law is "not about fostering senses: it is about ***actual statements***, whether or not they are true or false, and, if false, whether or not the utterer knew at the time the statements were made that they were false." In re Copley Pharm., Inc. Sec. Litig., No 94-11897, 1995 WL 169215, at *2 n.5 (D. Mass. Mar. 16, 1995) (emphasis added) (Ex. A); Mem. at 4-5. "Merely alleging the 'fostering' of 'impressions,'" as Plaintiffs do here, "does not adequately plead affirmative misrepresentations." Baron v. Smith, 285 F. Supp. 2d 96, 101 (D. Mass. 2003), aff'd, 389 F.3d 49, 57 (1st Cir. 2004); accord Backman v. Polaroid Corp., 910 F.3d 10, 15 (1st Cir. 1990) (rejecting claim that Polaroid created actionable misimpression that Polavision camera was a success by placing a photo of camera on front of SEC filing, when statements in reports were accurate); Fitzer v. Security Dynamics Techs., Inc., 119 F. Supp. 2d 12, 26 (D. Mass. 2000) (dismissing claim that defendant "conditioned the

market to believe it was healthy"). In any event, the market's alleged impression that Ibis would receive a cash down payment after receipt of a customer order was not a ***misimpression*** – this is in fact what would follow the receipt of a firm order.

Third, Plaintiffs' new argument also ignores the fact that pending final customer acceptance of the implanter any cash down payment was a ***liability***, not an asset available for unrestricted use in Company operations. When Ibis receives an implanter order it records all cash associated with that order as **deferred revenue** until final customer acceptance. Opp. at 4-5. See, e.g., 2002 Form 10-K, App. Tab 5 at 23.[1] That deferred revenue is reflected on the Company's financial statements as a **liability**. See, e.g., id. at 33. This makes perfect sense since any cash down payment must be refunded to the customer if the customer ultimately does not accept the implanter. In other words, the Company has a contingent obligation to repay any cash received pending final customer acceptance. See Accounting for Contingencies, Statement of Financial Accounting Standards No. 5 (Financial Accounting Standards Bd. 1975) (Ex. B). Thus, no reasonable investor could possibly have been led to believe that upon "booking" an implanter order, and prior to final customer acceptance, Ibis would receive "large amounts" of unrestricted cash that it could freely use to run its business. By recording this cash as a liability, Ibis accurately disclosed that it might have to repay that cash to the customer if the customer refused acceptance. Plaintiffs do not – and cannot – contend otherwise.[2]

---

[1] Citations to the Appendix of Exhibits in Support of Defendants' Motion to Dismiss Consolidated Amended Complaint, filed on August 5, 2004, appear as "App. Tab __."

[2] Plaintiffs argue that a July 28, 2003 "Electronic News" article indicates that Ibis "touted the anticipated 'bookings' of orders as indicative of Ibis' improving cash position." Opp. at 6. Plaintiffs claim that, "[i]n response" to Ibis' implanter sales forecast, Electronic News "commented" on the company's cash resources, "referring, *inter alia*, to the anticipated one to three implanter orders." Id. In fact, the article's reference to Ibis' cash resources is not linked in any way to Ibis' forecast of implanter orders, but appears two full paragraphs before any mention of that forecast. Read properly, the article's reference to cash resources concerns Ibis' July 2003 earnings announcement and to revenue recognized in connection with an implanter sold prior to the class period, in Q4 02. Id. The two Needham Equity Research Reports that Plaintiffs cite (Opp. at 6) are equally inapposite -- each shows that the market understood Ibis' implanter sales projection was a forecast of ***orders*** that would be received, not a guarantee of ***cash***. In any event, because these reports do not contain statements about cash attributed to a specific speaker at Ibis, they are

**B.      The Safe Harbor For Forward-Looking Statements Bars Plaintiffs' Claim.**

Ibis' implanter order forecast also is immune from liability under the PSLRA Safe Harbor. Mem. at 10-12. Plaintiffs assert that the risk factor warnings that accompanied Ibis' forecast were neither meaningful nor cautionary (Opp. at 9-10), but give no reason why this is so and do not even attempt to refute the discussion in Defendants' opening brief as to why Ibis' Safe Harbor warning was adequate. See also Harris v. Ivax, 182 F.3d 799, 807-810 (11th Cir. 1999) (affirming dismissal based on similar cautionary language). Plaintiffs cite the Fitzer decision (Opp. at 9), but Fitzer did not involve the PSLRA Safe Harbor, did not address what constitutes "meaningful" cautionary language under the statute, and did not even involve expectations about receipt of future orders.

Plaintiffs alternatively contend that the Safe Harbor does not apply, arguing that the implanter forecast lacked a "reasonable basis" and that they are thus challenging the truthfulness of statements regarding "present facts" as opposed to forward-looking statements. Opp. at 9-10. This argument is specious. The first prong of the Safe Harbor immunizes a defendant from liability if its forecast is accompanied by appropriate cautionary language – Plaintiffs here have not genuinely disputed that this is precisely what Ibis did. Where an issuer does not satisfy this first prong, the Safe Harbor's second prong requires a plaintiff challenging a forecast to allege, with factual particularity, that the defendant had "actual knowledge" that the forward-looking statement was false. Mem. at 11-12. Plaintiffs have not alleged a single fact showing that Ibis ***actually knew*** that receipt of one to three implanter orders in 2003 was either impossible or even

---

not actionable. In re Cabletron Sys. Inc., 311 F.3d 11, 37-38 (1st Cir. 2002); In re Sepracor, Inc. Sec. Litig., 308 F. Supp. 2d 20, 37 (D. Mass. 2004); Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 280 (D. Mass. 1998). Moreover, since the Electronic News article and the July 24, 2003 Needham Equity report were not mentioned in the Complaint, Defendants respectfully request that they be stricken. See Chatman v. Gentle Dental of Waltham, 973 F. Supp. 228, 236 (D. Mass. 1997) (refusing to consider allegations in plaintiffs' opposition that did not appear in complaint).

improbable.[3]  Actually knowing that a forecast is false is materially different from making an allegedly negligent forecast (i.e., one that – as here – the plaintiff alleges "lacked a reasonable basis").[4]  In any event, the fact that Ibis received an order for an i2000 implanter (with an option for a second) more or less when it thought it would (i.e., only 5 weeks after year-end 2003) hardly supports the conclusion that Ibis actually knew its expectation was unachievable.[5]

## II.  THE IBM-RELATED ALLEGATIONS FAIL TO STATE A CLAIM.

Plaintiffs conveniently argue that Defendants "mischaracterize" their argument about the identity of the first i2000 implanter customer.  They now contend that this is not an "independent claim," apparently abandoning it, but only "support" for the argument that Ibis "conditioned" the market, "painted a misleading portrayal of how quickly and smoothly" the market for i2000 implanters would develop, and "created enough mystery to paint a false portrayal of the breadth and timing of the order pipeline." (Opp. at 11).  Again, the securities laws prohibit false or misleading ***statements***, Copley, 1995 WL 169215, at *2 n.5, Fitzer, 119 F. Supp. at 26, not the impression that Plaintiffs claim the market drew from the statements that Ibis actually made.  The ***only*** statement that Ibis is actually accused of making is that it sold its first implanter to a "leading

---

[3] Ibis' expectations of future orders was unequivocally forward-looking.  The Number Nine case (Opp. at 9) is therefore inapposite because it did not involve statements about future possibilities, but about the types of products that the defendant was currently selling at the time it made the challenged statements.  Shaw (Opp. at 9) is likewise off-base as it also involved a statement (resources were adequate) which was "present-orient[ed]".

[4] The "reasonableness" of a forecast is not an element of the PSLRA Safe Harbor, but only of the more limited safe harbor found in SEC Rule 175 (17 C.F.R. § 240.3b-6).  The Jakobe case (Opp. at 10) is thus inapposite because it concerned only SEC Rule 175.

[5] Plaintiffs assert that "it was virtually impossible by the beginning of the Class Period for Ibis to ***complete its build*** cycle on new i2000 implanters in time for ***shipment by the end of 2003***."  Even if true, this would have no bearing on whether Ibis could receive implanter orders by that date, which Plaintiffs themselves concede is what "booking" an order means Opp. at 3 and n.1; see also Mem. at 9.  Likewise, Plaintiffs allege that "customers' negotiations for the MLD process were a drawn out sine qua non for the booking and shipment of an i2000 implanter order."  Opp. at 9.  Even if this allegation were adequately pleaded (it is based, however, solely on one former employee's opinion and does not satisfy the requirements set forth in the First Circuit's Cabletron decision for information attributed to undisclosed sources, see Cabletron, 311 F. 3d at 38), this would not establish that Defendants actually knew that Ibis could not receive 1 to 3 implanter orders by the end of 2003.  Plaintiffs do not dispute that the i2000 implanter can be operated with processes other than the IBM MLD process and thus that an IBM license is thus not a prerequisite to buying an implanter.  AC ¶ 36(b); Mem. at 9.  In any event, Plaintiffs do not allege any facts (such as communi-

chipmaker" and that this customer's final acceptance of the implanter indicated that it had been "tested in a customer-oriented production mode." (Opp. at 10). Plaintiffs do not argue that these statements were untrue (nor could they), and nowhere argue that these statements misled investors to conclude that the customer was ***not IBM*** (nor could they). As such, these statements are not actionable under the First Circuit's controlling Backman decision. See Mem. at 7; supra p.4.

In any event, Plaintiffs concede that it was widely known during this period that Ibis' largest customer was IBM, and have thus conceded that the market was not misled. See Opp. at 13 n.8 (referring to Ibis' "largest customer, IBM"); July 28, 2003 Electronic News article, Pltf. Ex. 9 ("While Ibis didn't publicly identify that key customer, it is widely held to be IBM.").[6]

### III. PLAINTIFFS' IMPAIRMENT ALLEGATIONS FAIL TO STATE A CLAIM.

Plaintiffs' third claim -- that Ibis should have written down a few months earlier than it did the value of its 200 mm silicon wafer production line -- also fails. Plaintiffs argue that it was so obvious that a write down was required as of June 30, 2003 that Defendants' failure to do so must have been fraud. Opp. at 15-17. This is nonsense. If anything, Ibis' forthrightness in identifying the risk of obsolescence cuts against an inference of an intent to deceive. Mem. at 14. In any event, Plaintiffs do not cite any authority – either in Generally Accepted Accounting Principles ("GAAP"), case law, or otherwise – that would suggest that that Ibis was required to write down the value of Ibis' 200mm assets as of June 30, 2003 or any other date earlier than the date Ibis actually wrote them down. Decisions about whether and when to take impairment charges involve complex and subjective accounting issues that depend on many factors. Mem. at

---

cations with IBM or the prospective customers) suggesting that Defendants knew IBM would not issue any MLD licenses before the end of 2003 (it actually did issue one only a few weeks later).

[6] Moreover, while Plaintiffs attribute a sinister motive to Ibis for not initially disclosing IBM as the customer, Plaintiffs nowhere acknowledge that Ibis' practice is not to disclose the identity of its customers (see Feb. 2004 press release announcing sale of second implanter to unidentified customer, App. Tab 15), and do not acknowledge that confidentiality obligations to these customers may have been the reason for not disclosing their names.

12-16. Plaintiffs' argument that the decline in 200mm sales during the first few months of 2003 should have led to a write down of these assets as of June 30, 2003 ignores the fact that Ibis had publicly disclosed throughout the class period and before that its wafer sales were highly volatile. See, e.g., 2002 Form 10-K, App. Tab 5 at 12; Q3 03 Form 10-Q, App. Tab 9 at 18. Given that volatility, Plaintiffs have pointed to no authority that would have deprived Ibis the time needed to assess whether the drop off in 200mm sales was due to short term volatility in demand as opposed to a longer term trend indicating evaporation of the entire market for 200mm wafers. Again, this is precisely what Ibis explicitly told the market – that write down would be required if the ostensible trend toward 300mm wafers "accelerated" and, thus, indicated something more than temporary demand volatility.[7]

In addition to the cases that Ibis cited in its initial brief, In re Saf T Lok, Inc. Sec. Litig., No. 02-80252, 2003 WL 22383607 (S.D. Fla. July 3, 2003) (Ex. C), is squarely on point. In Saf T Lok, the company ("STL") filed a Form 10-K annual report stating that it was in tough financial straits due to poor sales and excessive debt, and that it had received a "going concern" qualification from it auditors. Id. at *1-2. STL nevertheless stated that it believed it would be able to sustain operations by "finding a strategic partner . . . to provide an immediate revenue stream and/or the marketing expertise to help increase sales revenue to a self-sustaining, profitable level." Id. Based on this belief, and the ongoing negotiations between STL and Smith & Wesson ("S&W"), the company classified its inventory as a current asset. Id. The plaintiffs argued

---

[7] Even assuming Ibis should have written these assets down as of June 30, 2003, the Complaint still would not state a claim. Courts in this Circuit routinely dismiss complaints alleging GAAP violations where – as here – plaintiffs fail to allege with particularity "other circumstances indicative of fraudulent intent." In re Peritus Software Servs., Inc. Sec. Litig., 52 F. Supp. 2d 211, 224 (D. Mass. 1999); accord In re Galileo Corp. S'holders Litig., 127 F. Supp. 2d 251, 265 (D. Mass. 2001) (citing Greebel v. FTP Software, Inc., 194 F.3d 185, 203 (1st Cir. 1999)); In re Segue Software, Inc. Sec. Litig., 106 F.Supp. 2d 161, 170 (D. Mass. 2000). The cases Plaintiffs cite about alleged GAAP violations (Opp. at 19) are inapposite because, unlike here, the plaintiffs there had alleged facts which, if true, unquestionably constituted violations of GAAP. Here, plaintiffs have not shown even that GAAP required writing Ibis' 200mm assets down earlier than it did.

that the inventory was worthless and should have been written down. Id. at * 4. The district court, however, held that even though negotiations with S&W had gone on for many months, with many ups and downs, defendants' valuation of its inventory was not actionable because plaintiffs had "failed to take into account the totality of the circumstances." Id. at *8.

Here, Plaintiffs likewise have ignored the totality of the circumstances in making their impairment argument, including the fact that (a) that wafer sales historically had been volatile and difficult to predict and (b) that that two potential customers were evaluating 200 mm wafers for purchase as late as November 2003, fully five months after Plaintiffs argue a write down was required. Mem. at 15. Conversely, Plaintiffs do not plead any specific facts, such as inconsistent statements or internal reports, showing that Defendants knew that the drop off in 200mm sales represented something other than a temporary downturn due to volatile customer demand or that Ibis deliberately disregarded facts mandating a write down. Mem. at 17. Taken together, these facts negate any inference of intent to deceive. See also Stavros v. Exelon Corp., 266 F. Supp. 2d 833, 851-52 (N.D. Ill. 2003) (holding claim that defendants should have written down asset two quarters earlier does not support an inference of scienter); Kriendler v. Chemical Waste Mgmt. Inc., 877 F. Supp. 1140, 1153-54 (N.D. Ill. 1995) (fact that company wrote down a facility four months later than plaintiffs would have liked does not establish scienter).[8]

### IV. PLAINTIFFS' GENERAL SCIENTER ALLEGATIONS ARE INADEQUATE.

Not having any specific facts showing that it "highly likely" that Ibis intended to deceive the market, Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002), Plaintiffs throw together at the end of their brief a potpourri of supposed motives and other allegations that they

---

[8] AC ¶ 47(c) alleged that Ibis knew sales of "all wafers" would decline in Q403. Plaintiffs no longer contend that Ibis should have predicted what sales of smaller wafers in that quarter would be (Opp. at 15), and through their silence have abandoned any such claim as to larger size wafers.

- 8 -

claim support the required strong inference of scienter, including that (i) Ibis records deferred revenue (a liability) when it receives an order for an implanter; (ii) Ibis' largest customer reduced its purchases of smaller-sized wafers; and (iii) smaller-sized wafers declined as a percentage of total wafer sales during the second half of 2003.  All of these items, however, were fully and accurately disclosed to investors during the class period.  If anything, Ibis' disclosure of these facts supports the contrary inference that Ibis acted in good faith, as does the fact that Ibis disclosed before and during the class period that an implanter order might never turn into revenue unless the product were ultimately accepted by the customer.  Mem. at 13-15; 2002 Form 10-K, App. Tab 5 at 23.

Plaintiffs also argue that the alleged "proximity" of Ibis' October 2003 secondary offering and its December 15, 2003 press release announcing adjusted implanter sale expectations is evidence of scienter.  In the technology industry, however, two months can be a lifetime.  David v. Simware, Inc., N.Y.L.J., Mar. 20, 1997, at 29, Col. 4 (N.Y. Sup. Ct. 1997) (Ex. D).  In any event, Plaintiffs' "proximity" argument is nothing more than prohibited fraud by hindsight pleading (what later turned out bad must have been known earlier).  E.g., Gross v. Summa Four, Inc., 93 F.3d 987, 995 (1st Cir. 1996) (discussion of delay in orders at board meeting five weeks after prospectus issued did not support inference that prospectus was false).[9]  In other words, these explicit disclosures undermine any inference that it is "highly likely" that Ibis intended to defraud.  In any event, the fact that Ibis booked an implanter order (with an option to purchase a second) in early February 2004, only five weeks after it had projected it would, cuts against any inference of scienter.

---

[9] See also Glassman v. Computervision Corp., 90 F.3d 617, 630 (1st Cir. 1996) (announcement six weeks after IPO that issuer would not meet revenue expectations did not support inference that statements in prospectus were false).

Plaintiffs further argue that Defendants "knew" Ibis needed to raise cash (implying that the market did not know this), and had the motive to misrepresent the Company's financial condition. Opp. at 19-20. In reality, Ibis fully disclosed the Company's cash position, including how much cash it had left, its anticipated cash needs, and expected cash usage under its business plan. See, e.g., 2002 Form 10-K, App. Tab 5 at 16-17. Plaintiffs' generalized allegation that Ibis wanted to raise capital cannot, without more, support a strong inference of scienter. See Mem. at 18-19; Coates v. Heartland Wireless Communications, Inc., 55 F. Supp. 2d 628, 645 (N.D. Tex. 1999). Moreover, allegations of motive, without more, will not support an inference of scienter in this circuit. Greebel, 194 F.3d at 197.

Plaintiffs also argue, for the first time, that Ibis' alleged announcement long after the end of the class period that Ibis planned to exit the wafer manufacturing business is evidence of scienter. Opp. at 18. These allegations appear nowhere in the Complaint, however, and any inference that might otherwise be drawn from such facts necessarily is highly attenuated given the passage of time. See supra p.7-9 & n.9.

## **CONCLUSION**

For the reasons in this memorandum, and those set forth in Defendants' opening brief, this meritless case should be dismissed with prejudice.

Dated:  October 25, 2004                     IBIS TECHNOLOGY
                                             CORP. AND MARTIN J. REID

                                               /s/ Brian E. Pastuszenski
                                             Brian E. Pastuszenski (BBO #391030)
                                             Christine S. Chung (BBO #631724)
                                             Laura M. Stock (BBO #652276)
                                             Testa, Hurwitz & Thibeault, LLP
                                             125 High Street
                                             Boston, MA 02110
                                             Tel:  (617) 248-7000

**CERTIFICATE OF SERVICE**

  I, Laura M. Stock, hereby certify that, on October 25, 2004, I caused a true copy of the above document to be filed electronically with the Court, to be served electronically upon counsel of record registered with the Electronic Case Filing System ("ECF"), and to be served upon counsel of record not registered with ECF by First Class United States mail at the address below.

                /s/ Laura M. Stock
                Laura M. Stock

Kenneth Elan, Esq.
Law Offices of Kenneth Elan
217 Broadway, Suite 606
New York, NY 10007
(212) 619-0261


3134823