# EXH. A

Westlaw

1995 WL 169215                                                                                                   Page 1
1995 WL 169215 (D.Mass.), Fed. Sec. L. Rep. P 98,695
(Cite as: 1995 WL 169215 (D.Mass.))

C

United States District Court, D. Massachusetts

In re COPLEY PHARMACEUTICAL, INC.
Securities Litigation.

Civ. A. No. 94-11897-WGY.

March 16, 1995.

Thomas G. Shapiro, Shapiro, Grace & Haber, Boston, MA, Marc I. Gross, Paul O. Paradis, Pomerantz, Levy, Hauder, Block & Grossman, New York City, Robert M. Kornreich, Wolf Popper Ross Wolf & Jones, L.L.P., New York City, for Morris Lidsky.

Glen DeValerio, Berman, DeValerio & Pease, Boston, MA, Marc I. Gross, Paul O. Paradis, Pomerantz, Levy, Hauder, Block & Grossman, New York City, for Richard E. Delnunzio, Jay Thomas Fox

Thomas G. Shapiro, Shapiro, Grace & Haber, Glen DeValerio, Berman, DeValerio & Rease, Boston, MA, Marc I. Gross, Paul O. Paradis, Pomerantz, Levy, Hauder, Block & Grossman, Robert M. Kornreich, Wolf, Popper, Ross, Wolf & Jones, New York City, for Jeffrey S. Hyman.

Thomas G. Shapiro, Shapiro, Grace & Haber, Glen DeValerio, Berman, DeValerio & Pease, Boston, MA, Sanford P. Dumain, Milberg, Weiss, Berhad Specthrie & Lerach, Laurence Paskowitz, Robert M. Kornreich, Wolf Popper Wolf Ross & Jones, Marc I. Gross, Paul O. Paradis, Pomerantz, Levy, Hauder, Block & Grossman, New York City, for Seymour Lazar.

Glen DeValerio, Berman, DeValerio & Pease, Edmund C. Case, William L. Prickett, Testa, Hurwitz & Thibeault, Boston, MA, for Copley Pharmaceutical, Inc., Defendant Jane C.I. Hirsh, Defendant, Anthony A. Bonelli, Steven N. Tannenbaum, Mark Hirsh.

Thomas G. Shapiro, Shapiro, Grace & Haber, Glen DeValerio, Berman, DeValerio & Pease, Edmund C. Case, Testa, Hurwitz & Thibeault, Ralph D. Gants, Palmer & Dodge, Boston, MA, for Bernard Grubstein.

MEMORANDUM

YOUNG, District Judge.

*1 In this consolidated securities class action, the named plaintiffs, [FN1] on behalf of all purchasers of common stock of the defendant Copley Pharmaceutical, Inc. ("Copley" or "the Company") during the period April 26, 1993 through December 6, 1994 (the "Proposed Class Period"), seek to recover damages to compensate them for losses allegedly sustained as a result of violations of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, [FN2] by Copley and six of its officers and directors. [FN3] The plaintiffs claim that the defendants made materially false and misleading statements regarding the strength of the Company, particularly concerning its compliance, or alleged lack thereof, with the rules and regulations of the Food and Drug Administration ("FDA") governing the manufacture and production of drugs, known as Current Good Manufacturing Practices for Finished Pharmaceuticals ("cGMP"), and that the defendants failed timely to disclose Copley's noncompliance. The Company and the six individual defendants have moved separately to dismiss the Complaint. This motion was heard on February 28, 1995. For the reasons set forth below, the motions were granted in part and denied in part.

I. BACKGROUND

At this stage, the Court must take all intendments in favor of the non-movants, the plaintiffs here, and therefore assumes the truth of their allegations as follows.

Copley was a highly successful manufacturer of approximately 95 generic drugs. Its success was due, at least in part, to its reputation for quality and strict compliance with FDA regulations. That compliance record allowed the company to weather regulatory scandals in the generic drug industry in the late 1980's, which eliminated a good deal of its competition, and to emerge with an enhanced market share. Copley made an initial public offering of 2,200,000 shares of common stock in October of 1992, and a secondary offering of 1,200,000 million shares in April of 1993. [FN4] The value of the stock

1995 WL 169215                                                                                               Page 2
1995 WL 169215 (D.Mass.), Fed. Sec. L. Rep. P 98,695
**(Cite as: 1995 WL 169215 (D.Mass.))**

rose quickly and steadily. In September of 1993, another pharmaceutical company, Hoechst Celanese Corp. ("Hoechst"), bought 51% of Copley's stock at a premium of almost 60% above market price.

During the first week of 1994, chinks began to show in Copley's glistening armor. The FDA found "water quality control" problems in Copley's manufacture of Albuterol Sulfate Solution ("Albuterol"), one of the Company's most important and profitable products, useful in the treatment of asthma and other respiratory ailments. On January 5, 1994, the company announced a voluntary recall of all 20 milliliter vials of Albuterol. During the recall period, officials of the company issued various press releases and made numerous statements regarding the problems with Albuterol.

On September 14, 1994, another recall of a key Copley drug, Brompheril SR ("Brompheril"), occurred due to concerns over "a lack of assurance that the coating process [of Brompheril tablets] was conducted in accordance with batch records." Again, the company made various statements regarding the drug and the reasons for the recall.

*2 The plaintiffs allege that during the Proposed Class Period, despite the many statements which they claim left the contrary "impression," Copley was engaged in blatant violations of FDA regulations. The plaintiffs were furthermore "shocked" when Copley announced in September of 1994 that a federal grand jury was investigating Copley's production of Brompheril. In December of 1994, investors were informed that the grand jury investigation had been expanded beyond Brompheril and Albuterol, and that defendant Bonelli, Copley's president, had resigned, had in fact been on leave since the previous August, and had retained a well-known criminal defense attorney. These revelations allegedly caused a drastic decline in the value of Copley stock, for which the plaintiffs now seek recompense.

II. DISCUSSION

The defendants deem this lawsuit "scurrilous" and a "classic, unnecessarily expensive securities fraud strike suit." While their language may be somewhat hyperbolic, their principal contentions, with one exception, are sound: most of the statements recited by the plaintiffs do not constitute material misrepresentations actionable under the securities laws. The complaint centers around "impressions," the securities analogue to "penumbras and emanations," left by the statements. [FN5]

In paragraph 109 of their Complaint, the plaintiffs list the 26 paragraphs which they allege contain actionable misrepresentations. Those paragraphs, by the defendants' (and the Court's) count, detail 29 statements. [FN6] Each statement was made in one or more of the following contexts: 1) a Registration Statement and Prospectus filed with the SEC on April 26, 1993 in connection with Copley's second offering of 1.2 million shares (Statements 1-6); 2) Copley's Form 10-K for the fiscal year ending January 31, 1993, filed with the SEC on May 3, 1993 (Statements 1-6); 3) Copley's Fiscal 1993 Annual Report, filed with the SEC on May 24, 1993 (Statement 7); 4) statements made during and regarding the acquisition of Copley by Hoechst in the fall of 1993 (Statements 8-10); 5) statements made during and regarding the Albuterol recall in January of 1994 (Statements 11-21); 6) Copley's Form 10-K for the fiscal year ending January 31, 1994, filed with the SEC on May 2, 1994 (Statements 22-27); and 7) statements made during and regarding the Brompheril recall (Statements 28-29).

Of these 29 statements, only three--Statements 4, 8, and 22--merit serious discussion. The remaining 26 statements are not actionable as matter of law because they are either statements of fact which are not here controverted or optimistic, vague projections of future success which proved to be ill-founded. *See Colby v. Hologic, 817 F.Supp. 204, 211 (D.Mass.1993).*

Statements 4, 8, and 22 concern the Company's belief of its "material compliance" with FDA regulations and may, with proper factual support, at least conceivably save the plaintiffs' case from oblivion. Statement 4 appeared in Copley's Registration Statement and Prospectus filed with the SEC on April 26, 1993 in connection with the Company's second offering of 1.2 million shares of common stock, and states, "The Company believes it is in material compliance with cGMP standards." Statement 22 is identical to Statement 4, and appeared in Copley's Form 10-K for the fiscal year ending January 31, 1994, filed with the SEC on May 2, 1994. Statement 8 appears in Copley's October 8, 1993 acquisition agreement with Hoechst, in which the Company warranted that

> *3 the businesses of the Company and its subsidiaries [were] not being conducted in violation of any applicable law, ordinance, rule, regulation, decree or order of any domestic or foreign court or governmental entity, including, but

1995 WL 169215 Page 3
1995 WL 169215 (D.Mass.), Fed. Sec. L. Rep. P 98,695
**(Cite as: 1995 WL 169215 (D.Mass.))**

not limited to, the Federal Food, Drug and Cosmetic Act and the rules and regulations thereunder and all applicable rules, regulations and policies of the Food and Drug Administration, except for violations which in the aggregate do not and would not have a material adverse effect on the business, operations or financial condition of the Company and its subsidiaries taken as a whole.

If plaintiffs are able to allege, with the requisite degree of particularity under Fed.R.Civ.P. 9(b), that at the time of any of these three "material compliance" statements, the responsible defendants knew that the Company was not in fact in material compliance with the appropriate regulations, then a cause of action would exist under Section 10(b) and Rule 10b-5.

The factual predicate for the plaintiffs' contention that the defendants were possessed of such knowledge is contained in paragraphs 114 through 156, 160 and 162 of their complaint, wherein the plaintiffs detail Copley's problems related to the production of Albuterol and Brompheril. The Albuterol problem centered on microbial contamination by bacterial organisms known as Pseudomonas, and the Company's use of an allegedly less-than-ideal preservative, Benzalkonium Chloride ("Benzalkonium"). Brompheril is a time-release tablet whose problem centered on its coating, the proper formulation of which is essential to the efficacy and safety of the drug. The plaintiffs allege that the coating formulation approved by the FDA did not produce the desired coating; that Copley employees altered the formulation without prior FDA approval; and that those employees attempted to cover up their misdeeds by falsifying Brompheril batch records.

The specific allegations focus on the conduct of Copley employees working on and supervising the actual production of Albuterol and Brompheril. With one exception discussed below, there is very little, if any, evidence that these difficulties were known to these specific defendants. [FN7] The plaintiffs attempt to tie the alleged misconduct to these defendants by the following:

1) There is evidence that the defendant Grubstein knew that Benzalkonium was a "poor preservative" in 1990 and 1991. He therefore instructed that certain testing occur to prevent contamination. (Complaint ¶ ¶ 116, 117.)

2) The company manufacturing the brand-name version of Albuterol added an additional ingredient, EDTA, to enhance the preservative capacity of Benzalkonium, but Copley, in an attempt to cut costs, did not. The plaintiffs merely allege the defendants either were aware or should have been aware of these facts. (Complaint ¶ 118.)

3) Nearly 10% of Albuterol lots produced between February 1992 and October 1993 failed "in process" testing due to the observation of extra peaks during the performance of Benzalkonium gas chromatograph assays. The plaintiffs merely allege that "Company officials" were well aware that these extra peaks were indicators of likely contamination. (Complaint ¶ 120.)

*4 4) The plaintiffs try to link the production failures to the defendants by stating that "Product Failure reports and/or summaries thereof were routinely sent" to the defendants Bonelli and Tannenbaum. They do not mention any specific report or allege that it was received by any of the defendants. (Complaint ¶ 124.)

5) The plaintiffs conclusorily allege that "Senior Copley officials" were aware of the Brompheril coating problem. (Complaint ¶ 143.)

The plaintiffs themselves summarize the support for their allegation of knowledge of falsity or reckless disregard in paragraph 160 of the Complaint. They state that such awareness is "evident" by:

1) the defendants' positions as senior corporate personnel;

2) the defendants' receipt of reports;

3) the defendants' failure adequately to investigate;

4) the defendants' awareness of substantial Albuterol production failures;

5) the complaints regarding Albuterol procedures made by employee Mark Riley;

6) the knowledge that the Company was not enhancing Benzalkonium with EDTA like the brand-name manufacturer;

7) the warnings conveyed to "Copley's officials" (none of whom are defendants) by Brompheril production employees;

8) the attempted bribery (see discussion, *infra* );

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

9) the decision to discontinue Brompheril distribution;

10) the nondisclosure of the grand jury investigation.

Finally, and apparently seriously, the plaintiffs allege that the knowledge of Jane Hirsh, Copley's founder, CEO and Chairwoman of the Board, is demonstrated by her "active engagement" in managing the company's operations and by a description of her by defendant Tannenbaum which appeared in *Working Women* magazine in 1993: "Jane is a high-energy, hands-on manager and a natural leader.... She runs around in a lab coat and dungarees telling people how to do things better." [FN8]

With the exception of the bribery allegations discussed below, these averments do not fulfill the requirements of Rule 9(b) as strictly enforced by the First Circuit. *See Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 360 (1st Cir.1994); *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991) (court has been "especially rigorous" in demanding factual support of fraud allegations in securities context); *Konstantinakos v. FDIC,* 719 F.Supp. 35, 38 (D.Mass.1989) (Tauro, J.) (particularity especially important in securities suits where strike suit value is high). Taken as a whole, the complaint is more properly characterized as alleging mismanagement or "fraud by hindsight" which cannot support claims under section 10(b) and Rule 10b-5. *See Greenstone v. Cambex,* 975 F.2d 22, 25-27 (1st Cir.1992); *Romani,* 929 F.2d at 880; *Bryson v. Royal Business Group,* 763 F.2d 491, 494 n. 7 (1st Cir.1985); *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978) (Friendly, J.); *Berliner v. Lotus Devel. Corp.,* 783 F.Supp. 708, 710 (D.Mass.1992) (Tauro, C.J.) (plaintiffs may not simply seize upon disclosures and allege they should have been made earlier).

III. THE ALLEGED BRIBERY

*5 The plaintiffs' bribery allegations center around two brothers, Michael and Mark Riley. Mark Riley was one of the Copley employees responsible for the production of Albuterol, while Michael Riley was primarily responsible for the production of Brompheril. *See* Complaint ¶ ¶ 125, 143-153. According to the plaintiffs, the Rileys each had knowledge of wrongful conduct at the Company. Mark Riley claimed that supervisors on the Albuterol line signed records indicating they had monitored production when in fact they had not. Michael Riley claimed to have been involved in schemes with his superiors (not the defendants) to alter the formulations for the Brompheril coating without FDA approval and the preparation of fraudulent batch production records as part of a coverup. Michael Riley urged in early 1993 that these practices stop, but they did not, so he told his supervisors in January of 1994 that he would no longer participate in the falsification of records.

The plaintiffs further allege that on January 27, 1994, Bonelli and Tannenbaum called Michael Riley at his home to arrange a meeting to discuss his concerns. Michael Riley was considering taking his complaints to the FDA, but "mentioned" that he might be doing some shopping at the South Shore Mall. [FN9] Later on that day, Bonelli and Tannenbaum met the brothers Riley and another Copley employee, Kevin Madden, who worked with Michael Riley on Brompheril, at the South Shore Mall. According to an interview (the complaint does not disclose with whom) in the *Wall Street Journal* published on December 23, 1994, Bonelli said at the meeting, "We heard that you might be going to the FDA." The Rileys said nothing, and Bonelli asked, "What do you want? We have the money. You want stock options? You want a long vacation? You want a job in Canton [the site of the company's headquarters]?" The Rileys again did not respond. Soon afterwards, Michael Riley and Madden resigned. Mark Riley had already left the Company.

These allegations, if believed, adequately support an inference that Bonelli and Tannenbaum were offering bribes or other inducements to potential whistleblowers in order to ensure their silence. From this it may reasonably be inferred that Bonelli and Tannenbaum were aware in late January of 1994, after Statements 4 and 8 but before the issuance of Statement 22, that the Company was not in fact in material compliance with FDA regulations. [FN10] Therefore, the plaintiffs have stated a claim with sufficient particularity as to Statement 22 against Bonelli and Tannenbaum.

IV. THE CLASS PERIOD

Given the preceding analysis, the class period for the surviving claim in this action commences on May 2, 1994, the day Copley filed its Form 10-K containing Statement 22, and terminates December 6, 1994. Although the plaintiffs argue that the period should begin with the attempted bribery in January of 1994, there was no statement, and thus no possibility of actionable misrepresentation, until the filing of the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1995 WL 169215 Page 5
1995 WL 169215 (D.Mass.), Fed. Sec. L. Rep. P 98,695
**(Cite as: 1995 WL 169215 (D.Mass.))**

10-K in May. *See Wells v. HBO & Co.,* 813 F.Supp. 1561, 1563 (N.D.Ga.1992) (class period commences on date of filing of 10-K); *Morse v. Abbott Lab.,* No. 90-C-1982, 1992 WL 230400, at *2 (N.D.Ill. Sept. 9, 1992) (filing of 10-K provides "appropriate date" to commence class period).

V. CONCLUSION

*6 The motions to dismiss the complaint are granted except to the extent the complaint states a cause of action under Section 10(b) and Rule 10b-5 against Bonelli and Tannenbaum arising out of Statement 22. The class period shall commence on May 2, 1994 and terminate December 6, 1994.

It is so ordered.

> FN1. Richard E. DelNunzio, Morris Lidsky, Jay Thomas Fox, Glen Freedman, Jeffrey B. Hyman, and Julie Marshall.
>
> FN2. Section 10(b) states in pertinent part:
> It shall be unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.
> 15 U.S.C.A. § 78j(b) (1981). Rule 10b-5 states:
> It shall be unlawful for any person ...
> (a) To employ any device, scheme or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
> 17 C.F.R. § 240.10b-5 (1994).
>
> FN3. The individual defendants and their positions, according to the Consolidated and Amended Class Action Complaint, are Jane C.I. Hirsh ("Jane Hirsh"), founder, Chief Executive Officer and Chairman of the Board of Directors; Mark Hirsh ("Mark Hirsh"), Jane Hirsh's husband, Executive Vice President, and Director until November of 1993; Anthony A. Bonelli ("Bonelli"), President and Chief Operating Officer from May 24, 1993 through November 4, 1994; Bernard Grubstein ("Grubstein"), Executive Vice President and Director until November of 1993; Theodore Iorio ("Iorio"), Jane Hirsh's brother and Vice President; and Steven N. Tannenbaum ("Tannenbaum"), Executive Vice President, Chief Financial Officer, and Treasurer.
>
> FN4. Copley stock is traded on the NASDAQ exchange.
>
> FN5. The plaintiffs have delved deeply into their thesauri in their often breathless characterizations of the defendants' statements: the company "cultivated an image"; it "emphasized"; it "stressed"; it "underscored"; it "indicated"; it "minimized"; it "suggested"; it "sought to portray"; it "furthered the impression"; it "downplayed"; it "sought to reinforce"; and it "fostered the sense that." Securities law is not about fostering senses; it is about actual statements, whether or not they are true or false, and, if false, whether or not the utterer knew at the time the statements were made that they were false.
>
> FN6. For ease of reference, the Court in this opinion will adopt the numbering system employed by the defendants in Exhibit A of their Joint Appendix in Support of Defendants' Motion to Dismiss.
>
> FN7. It must be remembered throughout analysis of this case that the alleged awareness by the defendants of certain problems in the process of production of Albuterol and Brompheril is not the equivalent of knowledge or belief that the Company was not in "material compliance" with FDA or cGMP standards.
>
> FN8. Unable to let this averment pass without comment, the defendants respond, "Whatever flair a lab coat and dungarees adds to plaintiffs' papers, it certainly does not plead with the particularity required by Rule 9(b) that each (or any) defendant knew of any alleged Brompheril coating problems." Individual Defendants' Reply Brief at 7. The Court agrees.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1995 WL 169215
1995 WL 169215 (D.Mass.), Fed. Sec. L. Rep. P 98,695
**(Cite as: 1995 WL 169215 (D.Mass.))**

Page 6

FN9. It is thus unclear from the complaint whether Michael Riley planned the clandestine meeting at the South Shore Mall, or merely stated as an aside during the conversation that he was going to the Mall, where he met up with Bonelli and Tannenbaum.

FN10. Although Statement 22 was not issued until May of 1994, more than three months after the alleged bribery incident, it appears in the Company's Form 10-K for the period ending January 31, 1994, and thus may properly be read as assuring the investing public that the Company was in material compliance as of January 31, just four days after the South Shore Mall meeting.

1995 WL 169215 (D.Mass.), Fed. Sec. L. Rep. P 98,695

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.