**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

**IN RE IBIS TECHNOLOGY** )
**SECURITIES LITIGATION** )   Case No. 04 cv 10446 RCL
                         )

**PLAINTIFFS' CORRECTED OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

**PRELIMINARY STATEMENT**

Plaintiffs respectfully submit this memorandum of law in opposition to the motion of defendants Ibis Technology Corporation ("Ibis") and Martin Reid ("Reid") to dismiss the Consolidated Amended Complaint (the "Complaint"). By belaboring disputed factual issues and otherwise drawing every possible factual inference in their favor, coupled with misstating the allegations in the Complaint and jumping to self-fulfilling legal conclusions that may not be drawn at this stage of the litigation, defendants' motion vastly overreaches what is permissible under Fed. R. Civ. P. 12(b)(6), dooming it to failure.

**ARGUMENT**

In reviewing a motion to dismiss, the Court must "take the allegations in the complaint as true and grant all reasonable inferences in favor of the plaintiff," *Monahan v. Dorchester Counseling Center,* 961 F.2d 987, 988 (1st Cir. 1992), and may dismiss the complaint only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 25 (1st Cir. 1987) (citations omitted). Once plaintiffs set forth "factual allegations, either direct or inferential," *Gooley v. Mobil Oil Corp.,* 851 F. 2d 513, 514 (1st Cir. 1988), and "conclusions are logically compelled, or at least supported, by the stated facts, that is, when the suggested inference rises to what experience indicates is an acceptable level of probability, the 'conclusions' become 'facts' for pleading purposes." *Cooperman v. Individual Inc.,* 171 F.3d 47-8 (1st Cir. 1999) (citations omitted).

In considering a motion to dismiss, federal courts have been particularly mindful of the procedural posture of the case, *In re Cabletron Systems, Inc.,* 311 F.3d 11, 33 (1st Cir. 2002), and

the proper standard is whether "the complaint as a whole is sufficiently particular" to pass muster under the PSLRA. *Id.* at 32. Plaintiffs cannot be held to "a standard that would effectively require them, pre-discovery, to plead evidence." *Cooperman,* 171 F.3d at 48-9 (citing *Shaw v. Digital*, 82 F.3d 1194, 1225 (1st Cir. 1996)). Accord, *Maldonado v. Dominguez,* 137 F.3d 1, 9 (1st Cir. 1998) (noting limit on expectations of securities fraud pleadings when discovery is incomplete). In *Aldridge v. A.T. Cross Corp.*, 284 F. 2d 72, 81 (1st Cir. 2002), the Court distinguished *Greebel v. FTP Software, Inc.,* 194 F.3d 185 (1st Cir. 1999), upon which defendants place great reliance, on the basis, equally applicable here, of the difference in the amount of discovery.

**I.    THE COMPLAINT PLEADS ACTIONABLE MISSTATEMENTS
        CONCERNING DEMAND FOR THE i2000 IMPLANTER**

Plaintiffs allege that defendants misled the market when they stated that Ibis expected to book between one and three orders for the i2000 implanter by the end of 2003. Plaintiffs further allege that the statements were misleading because the market believed that, by reason of the booking of the orders, Ibis would be receiving large amounts of cash by the end of 2003. These allegations are based on the following facts, among others pleaded in the Complaint, which defendants do not dispute: a) defendants told the market that Ibis would book between one and three i2000 implanter orders by the end of 2003; b) Ibis was in need of cash infusions to keep its operations running; c) Ibis needed to succeed with its October 2003 stock offering in order to obtain the cash proceeds; d) Ibis laid off much of its workforce in vast cost-cutting efforts; e) Ibis received a cash payment when it received an order for an i2000 implanter; f) Ibis received a second cash payment when it shipped the implanter; g) Ibis recorded both of these cash payments as deferred revenue on its published balance sheet; and h) Ibis shipped the implanter shortly after they announced the order.

Faced with these well-pleaded facts, defendants attempt to confuse the situation by engaging in a semantic discourse on the meaning of the word "book," in an effort to argue that there was no

financial consequence to booking an order for an i2000 implanter and that the market could not, as a matter of law, believe that Ibis would receive cash when it booked an order. However, defendants themselves use the terms "booking an order" and "receiving an order" interchangeably in describing the same transaction in Ibis's SEC filings and press releases. Compare, Ibis's SEC Form 10-Q for the period ended June 30, 2004, Plf. Ex.3, p. 19 (Ibis announced "booking of an order" in February 2004) with its SEC Form 10-Q for the period ended March 31, 2004, Plf. Ex. 2, page 19 (Ibis announced "receipt of an order") and Ibis' February 5, 2004 press release, Def. Ex. 15 (Ibis announced "receipt of an order").[1] Invading the province of the trier of fact, defendants attempt to put their own interpretation on how the market perceived their misrepresentations about the anticipated extent and timing of the booking of i2000 implanter orders, in an effort to argue that the market was not misled.

What is crystal clear and of paramount importance to plaintiffs' allegations of misrepresentation, regardless of whether defendants used the word "book" or the word "receive," is that Ibis received cash when defendants announced the order and that Ibis recorded the cash as deferred revenue on its balance sheet and reported it to the market in its SEC-filed financial statements. That is how defendants, by stating that Ibis would book between one and three i2000 implanter orders by the end of 2003, misled the market into believing that Ibis would receive very large amounts of desperately needed cash by the end of 2003.

### A.  The Complaint Properly Links "Booking" an Implanter Order With the Contemporaneous Infusion of Cash

As the Complaint alleges, Ibis's cash generation arising out of an order for the i2000 implanter works as follows: a) when Ibis receives an order it receives an initial cash payment and

---

[1] Compare also the statements in Ibis' SEC Form 8-K, dated December 15, 2003, Def. Ex 14 ("On the equipment side...the Company had expected to **book** orders for one to three i2000 implanters before the end of 2003, however, it now expects an order(s) for one to three 12000 implanters to be **received** in the first half of 2004.")(emphasis added)

records it on its balance sheet as deferred revenue; b) when Ibis ships the implanter, shortly thereafter, it receives a second cash payment which is also recorded on its balance sheet as deferred revenue; c) the deferred revenue is carried on Ibis' balance sheet until the implanter is finally accepted by the customer at its facility, at which time Ibis recognizes the revenue on its income statement and the amount is deducted from the deferred revenue item on the balance sheet. Complaint ¶30. These events are reported to the market in Ibis's published financial statements. Ibis's press releases and SEC filings, many of them submitted by defendants as exhibits, concerning the two i2000 implanters that Ibis has shipped confirm this treatment:

1) **i2000 implanter shipped to IBM:**

| event | financial statement treatment |
|---|---|
| 9/10/02: Ibis announces an order valued at approximately $8 million, that it expects to ship later in 2002, and that the revenue will not be recognized until 2003 when it is accepted at the customer's site (Plf. Ex. 4) | Ibis records approximately $1.1 million in deferred revenue associated with the order on its balance sheet (Plf. Ex. 1 at pp 4,18) |
| 11/20/02: Ibis announces the shipment of the implanter ordered earlier in the year and repeats that the $8 million in revenue will be recognized in 2003 (Plf. Ex. 5) | Ibis records approximately $5.8 million more in deferred revenue, for a total of $6.9 million carried on its balance sheet (Def. Ex. 5 at pp 34, 43) |
| 2002 SEC Form 10-K filed March 12, 2003 (Def. Ex. 5) | Ibis carries on its balance sheet $6.9 million in deferred revenue (Def. Ex. 5, pp 34, 43) |
| 7/23/03: Ibis announces that the implanter has been accepted and, as a result, Ibis has recognized revenue of approximately $8 million, **the majority of the cash having been received in 2002** (Def. Ex. 13) | Ibis records revenue of approximately $8 million on its income statement and reduces deferred revenues carried on its balance sheet to $252,000 (Def. Ex. 13, pp 3, 4) |
| 2003 SEC Form 10-K filed March 2, 2004 (Def. Ex. 11) | Ibis has deferred revenue of $252,000 on its balance sheet (Def. Ex. 11, page 34) |

2) **i2000 implanter shipped to Japanese wafer manufacturer:**

| event | financial statement treatment |
|---|---|
| 2/5/04: Ibis announces receipt of an order which it expects to ship in the Second Quarter of 2004 (Def. Ex. 15) | Ibis records $2.6 million in deferred revenue on its balance sheet (Plf. Ex. 2, page 4) |

4

| | |
|---|---|
| 7/21/04: Ibis announces that it shipped the implanter, **that it received a second payment upon shipment**, and that revenue of approximately $7 million will be based on customer acceptance which is not guaranteed (Plf. Ex. 6) | Ibis records an additional $2.3 million in deferred revenue on its balance sheet (Plf. Ex. 3, page 4) |

Thus, because Ibis received cash payments upon receipt of an i2000 implanter order and upon shipment of the implanter, and reported those cash payments to the market in its balance sheet, the market was focused on the status of Ibis's i2000 implanter orders and shipments as a significant measure of the amount and timing of cash payments Ibis would receive, which cash it desperately needed to continue operations.

Defendants' statements before and during the Class Period and analysts' comments and financial estimates in response to those statements[2] amply support the Complaint's allegations. The market undeniably took into account the anticipated implanter orders to gauge whether Ibis had sufficient cash to continue operations. As the Complaint alleges, defendants' misstatements misled the market into believing that Ibis would take in large amounts of cash from customers on orders of one to three i2000 implanters during 2003 and were an indicator of the strength of Ibis' cash position and investment quality. For example:

      (a)    The February 20, 2003 Needham Equity Research Report (cited in paragraph 34 of the Complaint and a complete copy of which is attached as Pltf. Ex. 7) projected $29.2 million in net sales for Ibis in 2003; given that Ibis had only one product line that could generate such a level of sales volume (at $8 million per unit), that figure necessarily included the cash proceeds from the expected orders for between one and three i2000 implanters before the end of the year. Exhibit 7

---

    [2]    Defendants fail in their effort to create disputed factual issues. The market's positive reaction to defendants' misrepresentations, both in terms of analysts' reactions, Pltfs Exs 7 and 8, and Ibis's stock price, Def. Ex. 19, tells the true story. In ruling on a motion to dismiss, a court can take judicial notice of these matters without converting the motion to one for summary judgment. *See* Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See also MHI Shipbuilding, LLC v. Nat'l Fire Insurance Co. of Hartford.,* 286 B.R. 16, 20 (D. Mass. 2002) (exception exists "for documents the authenticity of which are not disputed by the parties, for official public records, for documents central to plaintiffs' claim, or for documents sufficiently referred to in the complaint") (quoting *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir. 1993)).

at page 1 ("The company believes that it has the opportunity to book 3 Ibis 2000 implanters in 2003.").

    (b)  The July 24, 2003 Needham Equity Research Report, Pltf. Ex. 8, issued a day after defendants' July 23, 2003 second quarter earnings announcement (*See* Complaint, ¶ 47), similar to its February 20, 2003 report, projected net sales of $28.53 million in 2003, $11.2 million of which was slotted for the fourth quarter, which, again, necessarily included taking in cash from the orders for between one and three i2000 implanters. The July 24, 2003 Needham report states that "Ibis expects to receive 1 to 3 orders for the rest of 2003; and recognize revenues on 1 more system. The Report also stated that "[c]ash burn is still a key concern,"and that the company guided a cash outflow of $3 million per quarter *assuming no additional equipment orders*. (Emphasis added.) At this burn rate, said the report, the company "expects to have sufficient cash for another 9 months." Thus, the market clearly understood that orders for one to three implanters in 2003 meant taking in desperately needed cash during 2003 or Ibis would run out of cash in the first quarter of 2004.

    (c)  As reported in the July 28, 2003 <u>Electronic News</u> article, Pltf. Ex. 9, defendant Reid, in announcing Second Quarter 2003 results, touted the anticipated "bookings" of orders as indicative of Ibis' improving cash position. Reid had announced, "[w]e continue to expect wafer sales for 2003 to be higher that those of 2002. We also continue to anticipate booking orders for one to three implanters during the fiscal year." Complaint, ¶ 49. In response to Reid's statement, Electronic News commented, "[t]he company estimates that it has adequate cash available for at least nine months of operation and continues to carefully manage its cash position [and] is planning to take measures to insure the availability of sufficient cash to expand and invest in the business," referring, *inter alia*, to the anticipated one to three implanter orders.

    (d)  The critical importance of Ibis's taking in cash in 2003 from implanter sales was underscored by the market's reaction to defendants' admission at the end of the Class Period that the widely touted cash infusion would not, in fact, occur by year's end. On December 16, 2003, shares of Ibis lost 22 percent of their value and Ibis was NASDAQ's biggest percentage loser that day. This precipitous drop came in reaction to Ibis's announcing that it would write down its wafer for the fourth quarter and that there would be no shipments of i2000 implanters in 2003 and that it would write down its smaller size wafer manufacturing assets. Complaint, ¶¶ 60-62.

Thus, defendants' false and misleading statements conditioned the market to believe that Ibis would receive large cash infusions by year end 2003 to enable it to keep operations going long into 2004. Without those misrepresentations to the market, as plaintiffs allege, Ibis's precarious cash position would have foreclosed Ibis's October 2003 public common stock offering. Complaint ¶ 47(d).

Contrary to the well-pleaded allegations of the Complaint, defendants argue that when throughout 2003 they repeatedly touted their expectation that Ibis would "book" between one to three i2000 implanter orders before the end of 2003, that could have **only** one narrow meaning: that

the orders would merely be initially placed by year's end with **all** financial consequences off into the subsequent year. As shown above, Ibis did receive immediate cash payments which were recorded it on its published balance sheet as deferred revenue when an order was booked. Since, as explained above, defendants have no fact-based support for this proposition, they resort to specious legal arguments. Defendants' argument that the term "book an order" has a fixed legal meaning precluding plaintiffs from alleging that Ibis used the verb to incorporate taking in cash related to the order is simply wrong as a matter of fact and law. *Glassman v. Computervision Corp.*, 90 F. 3d 617, 630, n.18 (1st Cir. 1996), cited by defendants, does not establish their position. There, the Court noted in passing nothing more than that for that company, "booking" meant the receipt of an order. The *Computervision* opinion, however, gives no indication whether Computervision received a cash payment when it booked an order. As shown above, Ibis did receive an immediate cash payment when it booked or received an order, which cash was recorded on its published balance sheet as deferred revenue.[3] Plaintiffs properly and with ample support allege that "booking" or "receiving" an i2000 implanter order was understood by the market to mean that Ibis would contemporaneously receive an influx of cash.[4]

### B. The Complaint Adequately Alleges That Defendants' Implanter Sales Projections Were Made Without Reasonable Basis

Because defendants cannot demonstrate as a matter of fact or law that Ibis did not take in cash when it announced shipment of an order, they resort to arguing in the alternative, again contrary to the well-pleaded allegations of the Complaint, that plaintiffs "have not alleged a single fact

---

[3] In addition, the meaning of the term "book" in the context of Computervision's sales payment process has no bearing on Ibis's sales payment process. Computervision operated in entirely different market with entirely different products–selling computer software.

[4] As described in the Complaint, one former employee stated that once a customer committed to an order at the booking phase, it would typically want shipment within a matter of weeks (Complaint, ¶ 67(b)), reinforcing the Complaint's allegation that the market perceived that booking an order resulted in an immediate influx of cash. This is also supported by the fact that Ibis shipped the two implanters it has sold shortly after announcing the orders.

suggesting that shipment [of one or more i2000 implanters] would not have been possible prior to December 31, 2003."[5] Def. Mem. at 9. In fact, the Complaint, based on extensive interviews from former Ibis employees, contains numerous facts showing why meeting such a schedule had become virtually impossible by the beginning of the Class Period. It took Ibis up to 10 months to build an i2000 implanter, which included custom parts that had to be ordered with long lead times from all over the world, and moving an order through shipment was such a huge capital commitment that Ibis could not afford to build an implanter on speculation without substantial progress on negotiations with a potential customer. Complaint, ¶ 67(b). While three i2000 implanters had been built by March 2003, one was just a prototype, another was the one sold to IBM and the third was a floor model used for demonstrating software; thus, nothing was in the build pipeline in 2003 dedicated for sale to a particular customer. Complaint ¶ 67(b), (c). Making matters worse, widespread layoffs at Ibis in early 2003 had slowed down the critical path on implanter production. Complaint, ¶ 67(a), (g). Given all of these factors contributing to a protracted build schedule, as the Complaint plainly alleges, it was virtually impossible by the beginning of the Class Period for Ibis to complete the build cycle on new i2000 implanters in time for shipment by the end of 2003.

Again faced with undeniable adverse facts, defendants attempt to cast doubt on plaintiffs' allegations concerning the drawn-out process for potential customers to obtain licenses from IBM, the modified low dose process, before shipment of the implanter was feasible (the "MLD process"). With absolutely no support in the record, defendants insist that a prospective purchaser was not required in all circumstances to obtain a license from IBM before booking an order and, consequently, that the MLD process was not necessarily a material drag on the implanter's sale sequence. Def. Mem. at 9. Even Ibis's own statements flatly contradict this argument. In Ibis's SEC Form 8-K filed December 15, 2003, which, in conjunction with the same-day press release, sent

---

[5] Defendants do not address or rebut the fact that Ibis also received cash when it received or booked an order.

the stock down 22%, defendants admit that no sales of the i2000 implanter would occur in 2003 because, "the exact timing is very difficult to predict because it is dependent on the customer entering into a license agreement with a third party [IBM]." Complaint, ¶ 61. A former employee confirmed that the customers' negotiations for the MLD process were a drawn-out *sine qua non* for the booking and shipment of an i2000 implanter order. Complaint, ¶ 67(a). Thus, the Complaint amply alleges a factual basis demonstrating that defendants' statements to the market that they would book between one to three orders by year end 2003 lacked a reasonable basis because of the significant timing role played by the MLD process between the customer and IBM, a process in which defendants had no role.

Finally, defendants claim that their statements concerning anticipated i2000 implanter orders were "forward looking statements" entitled to statutory "safe harbor" protection. Def. Mem. at 10. However, the "safe harbor" provisions of the PSLRA do not protect defendants' statements because they were not accompanied by meaningful cautionary language, *see*, *e.g.*, *Fitzer v. Sec. Dynamics Techs., Inc.*, 119 F. Supp. 2d 12, 31 (D. Mass. 2000), and because "plaintiffs challenge the truthfulness of a claim regarding present facts as opposed to forward-looking statements." *In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 19, 21-22 (D. Mass. 1999); *see Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1213 (1st Cir. 1996).

Defendants characterize as "forward looking" the following statements: (1) "[t]his acceptance [sale of i2000 implanter to unnamed IBM] serves as a signal to prospective implanter customers that our new implanter has been tested in a customer-oriented production mode," Complaint ¶ 49; (2) "[w]e also continue to anticipate booking orders for one-to-three implanters during the fiscal year," Complaint ¶ 49; and (3) that Ibis was experiencing strong demand for its new [i2000] implanter. Complaint ¶ 44(c).

Plaintiffs allege that these statements were false and misleading when made because: (a) IBM was in a materially different position from other potential implanter customers because it

9

owned the MLD patent and did not have to negotiate a license for its use and had specifically licensed Ibis to make the i2000 implanter for it; (b) Ibis was not in a position to know if and when other prospective purchasers and IBM would reach agreement on licensing the MLD, a prerequisite to placement of an order with Ibis ; and (c) the critical path on the production of the i2000 implanters was too protracted for the projected sales and cash infusion from implanter orders to come to fruition by year end 2003.  Complaint ¶¶ 47, 49(b), 50(e), 54(b), 57(b).  At no time did defendants disclose that potential buyers of the i2000 had to first reach a licensing agreement with IBM on the MLD process.

Accordingly, because defendants' statements are alleged to have been false and misleading and to have lacked any reasonable basis at the time they were made by reason of these present facts known to defendants, the statutory safe harbor is inapplicable.  *Number Nine*, 51 F. Supp. 2d at 19.  *See Jakobe v. Rawlings Sporting Goods Co.,* 943 F. Supp. 1143, 1159-1160 (E.D. Mo. 1996) (company's earnings projections lacked reasonable basis because defendants were aware of cancelled and reduced orders and decline in sales due to major league baseball strike); see also 17 C.F.R. § 240.3b-6(a) (SEC "safe harbor" rule providing that a "forward looking statement" is not fraudulent "unless it is shown that such statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith").

### C. Defendants Misconstrue Plaintiffs' Allegations Concerning the Masking of IBM's Identity As Ibis's One And Only i2000 Customer

Defendants  mischaracterize the Complaint's allegations concerning defendants' conditioning of the market to mask the fact that IBM was Ibis's one and only i2000 implanter customer in-hand in 2003.  Rather than existing as  independent claim, as defendants imply, plaintiffs pled these facts as further support for the allegation that defendants misled the market as to the prospects for achieving orders and sales of the i2000 implanter in 2003.  As plaintiffs allege, Ibis gave false credence to its bullish 2003 sales projections by implying that the sale of its i2000

implanter to a "leading chipmaker," was an indication that a rapidly growing market existed for its i2000 implanters. For example, in the July 23, 2003 press release, defendants touted the acceptance by the unidentified customer as proof to the semiconductor market of the success of Ibis's i2000 implanter, with defendant Reid stating that "[t]his acceptance serves as a signal to prospective implanter customers that our new implanter has been tested in a customer-oriented production mode," and that "[w]e also continue to anticipate booking orders for one-to-three implanters during the fiscal year." Complaint, ¶ 49(b).

By not revealing that the customer was IBM (other than a passing reference buried in the Company's S-3 for its October 2003 stock offering), defendants created enough mystery to paint a false portrayal of the breadth and timing of the order pipeline for the i2000 implanter. As is alleged throughout the Complaint, Ibis knew that orders and sales of i2000 implanters were dependent on prospective purchasers entering into a licensing agreement with IBM. Thus, when defendants withheld the name of IBM as the customer, they painted a misleading portrayal of how quickly and smoothly (in particular, in relationship to the MLD licensing process) the market for the i2000 was developing. Because Ibis's only sale of an i2000 implanter was to IBM, which held the patent on the MLD process, and which had specifically licensed the MLD technology to Ibis so it could build the i2000 implanter for IBM , it was misleading to portray that sale as indicative of the existence of a wide market for the i2000 implanter, the acceptance of the i2000 implanter by the market or the likely timing of orders from other customers, since other customers would first have to enter into a licensing agreement with IBM for the MLD process.[6]

---

[6] Defendants argue that their statements could not have misled investors into believing that the buyer was anyone other than IBM. Def. Mem. at 7. Again, defendants wrongfully seek to usurp the role of the fact-finder. The First Circuit has stated that a voluntary disclosure is complete and accurate only if it reveals what is needed, so that what is revealed is not *so incomplete* as to mislead. *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990). Because of the unique position of IBM with respect to the MLD process and the i2000 implanter defendants' failure to disclose that IBM was the first purchaser of an i2000 implanter rendered misleading the statements touting the anticipated volume and timing of sales of the i2000

## II.    PLAINTIFFS' "IMPAIRMENT" ALLEGATION STATES A CLAIM

Plaintiffs allege that defendants overstated Ibis's financial position by $11 million at June 30, 2003, by failing to write-down the carrying value of Ibis' smaller size wafer equipment, consisting of eight obsolete 1000 implanters and related assets, in violation of GAAP (FAS 144). The applicable accounting principle is not in dispute. Nor do defendants challenge the very specific facts pleaded in the Complaint (¶¶ 41-47, 49, 55, 59) which, for purposes of the motion to dismiss, establish that defendants knew or recklessly disregarded that the relevant facts mandated the write-down of these obsolete assets by $11 million at June 30, 2003.[7]

Defendants argue instead that, as a matter of law, no claim can be stated because determinations of when to apply accounting principles to known facts are "subjective." However, there is no such "safe harbor" for accounting violations and defendants cite to no authority that recognizes one. Defendants' far-fetched argument leads quickly to the absurd conclusion that there could never be an accounting fraud. Courts have rejected this absolute position. *See, e.g., In re Chambers Dev. Sec. Litig.*, 848 F. Supp. 602, 619 (W.D. Pa. 1994) (rejecting argument that plaintiffs' allegations regarding company's restated financial statements are "little more than a disagreement over the choice made between reasonable accounting practices").

Defendants attempt to bolster their argument by positing that courts are "loathe to substitute their own judgment" for that of defendants. Def. Mem. at 12. However, defendants are, in effect, asking for summary judgment by this Court, on the pleadings alone, that, as a matter of law, their accounting treatment was proper. On a motion to dismiss, however, plaintiffs' well pleaded facts

---

implanter, the masking of IBM's identity is actionable. It is curious to consider that where the first purchaser was a major player like IBM, defendants were not shouting the name from the rooftops--but for the fact that it signaled nothing to the market to know that the buyer was IBM.

[7]    Defendants do take issue with the collective inference to be drawn from those uncontested facts. However, on a motion to dismiss, all reasonable inferences from well-pleaded facts must be construed in plaintiffs' favor. *Perry v. New England Business Service, Inc.*, 347 F.3d 343, 344 (1st Cir. 2003). "[T]he task of weighing contrary accounts is reserved for the fact finder." *A.T. Cross*, 284 F.3d at 82 (quoting *Helwig*, 252 F3d at 553).

must be accepted as true and here, where those specific and unassailable facts raise a strong inference that defendants knowingly or recklessly acted improperly, defendants' position must be rejected.[8] *See, e.g., In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997) (whether defendants violated GAAP is a factual question which should be subject to expert testimony and is not properly addressed at the pleading stage); *In re Triton Energy Ltd. Sec. Litig.*, 2001 WL 872019, at *8 (E.D. Tex. 2001) ("Whether Defendants violated the applicable accounting standards is a question of fact"); *In re High Strength Steel, Inc.*, 269 B.R. 560, 568 (Bkrtcy. D. Del. 2001) ("[T]here is a question of material fact which would preclude us from being able to grant the Insider Defendants' motion to dismiss: whether the reconciliation conformed to GAAP and GAAS.").

Defendants' reliance on *In re Galileo Corp. Shareholders Litig.*, 127 F. Supp. 2d 251, 265-66 (D. Mass. 2001), is misplaced. *Galileo* involved the very different question, governed by a different accounting standard, of when a company can recognize income.[9] In any event, the court did not

---

[8] This is especially true here where no intervening facts arose between the publication of the June 30, 2003 and December 31, 2003 financial statements that affected the necessity to write down the assets. For example, at June 30, 2003 and September 30, 2003, the percentages of larger size 300mm wafer sales by Ibis were 97% and 98%, respectively, of total wafer sales. None of those wafers were manufactured by the eight obsolete implanters. Complaint, ¶43. Defendants did not want to take the write-down before they completed the public stock offering in October 2003 but knew that their public auditors who were coming in at year end 2003 would require the write-down of the assets which were not in use by Ibis. *Id.*, ¶¶46, 68. Defendants cite to no intervening facts, arguing instead that because the market was aware that sales of smaller size wafers had declined, the market should be held to know that Ibis' financial statements overstated the value of its assets. This position flies in the face of Defendants' contemporaneous public statements to the contrary in, for example, the June 30, 2003 SEC Form 10-Q that there was no impairment issue despite the fact that the larger size 300mm wafer sales accounted for 97% of all Ibis wafer sales. *Id.*, ¶44(I). The point of the industry knowledge of the state of smaller size wafer sales is that they were still being sold but not by Ibis, which had clearly told the market that it was completely moving on to production of 300mm size wafers. That is why it sold the older 1000 implanter to Simgui. *Id.*, ¶44(f). Defendants really had no choice but to leave the smaller size wafer business because its largest customer, IBM, had stopped buying the smaller size wafers. *Id.*, ¶¶ 43, 47(c).

[9] The accounting issue in Galileo was whether the receivables carried on its financial statements from a specific company, Imagyn, needed to be written-down because of facts specific to Imagyn that affected its ability to pay.

accept the position advanced here by defendants that accounting determinations based on subjective analysis of the relevant facts cannot as a matter of law give rise to fraud. Rather, the court, stating that the recognition of income is subject to a standard of "reasonable assurance of collection," a subjective standard, went on to conclude that, "...the Amended Complaint does not sufficiently allege that the defendants had actual knowledge of information about Imagyn, the disregarding of which would create a strong inference of intentional or reckless conduct on the part of the Defendants in the recognition of the Imagyn receivables." *Galileo*, 127 F. Supp. 2d at 265-66. *Galileo* recognized, as the quoted statement reveals, that where there are well-pleaded facts supporting a strong inference that defendants knew (or recklessly disregarded) that their accounting treatment was wrong in light of those facts, the court will dispute the judgment of defendants and deny their motion to dismiss. Here, plaintiffs plead particularized facts (¶¶ 41-47, 49, 55, 59, 68), statistical data (¶ 43) and confidential sources (¶ 67(a-g)) to demonstrate that defendants knew or recklessly disregarded that the 1000 implanters were obsolete and should have been written-down at June 30, 2003, pursuant to the required FAS 144 impairment analysis.

Defendants also argue that they cannot be liable for inflating Ibis's financial statements on or by June 30, 2003 and September 30, 2003 because they gave warning that *future* events *might* cause the company to take a different position in *future* financial statements. This argument misses the mark. Plaintiffs allege that Ibis's *current* financial statements were overstated when issued, not that defendants improperly projected that they would or would not write-down the assets in future financial statements. Because the facts alleged dictated the write-down of the assets under FAS 144 at June 30, 2003 and at September 30, 2003, no amount of warnings as to *future* events and *future* financial statements can legally justify the knowing failure to take the write-down in those *current* financial statements.[10]

---

[10] Defendants' reliance on *Plevy v. Haggerty*, 38 F. Supp. 2d 816 (C.D. Cal. 1998), does not bolster their argument. The *Plevy* court did not accept the position defendants advance

### III.   DEFENDANTS MISCONSTRUE THE WAFER SALES ALLEGATIONS

Defendants also mischaracterize the allegations concerning defendants' knowledge of its declining smaller size wafer sales. Plaintiffs do not allege that defendants should have disclosed at the outset of the Class Period what Ibis's smaller size wafer sales would be at the end of the Class Period.[11] Rather, these allegations relate to and support the allegation that defendants knew of existing facts that required Ibis to write down its smaller size wafer assets, as required under FAS 144, because those assets had become impaired by June 30, 2003.[12] One aspect of this impairment was the fact that sales of 200mm and smaller size wafers were spiraling to zero.

Thus, defendants' argument that they had no duty to disclose in July what wafer-sales would be in the quarter ending in December is irrelevant. Defendants do not dispute the alleged fact that at June 30, 2003, they knew that Ibis's smaller size wafer sales were plummeting to zero. In fact, they reported to the market that only 3% of their wafer sales were of the smaller size wafers, a mere

---

to this Court; it ruled simply that there were no factual allegations that showed that defendants knew or should have known that they were required to take a write-down three years earlier than they did. Here, plaintiffs plead those particularized facts, including prior and contemporaneous inconsistent statements by defendants. Complaint ¶¶ 41-47, 49, 55, 59, 67(a-g), 68.

[11]   Defendants argue that the following statment is full and accurate disclosure: "These ordering patterns may result in significant quarterly fluctuations in our revenue and operating results." 2002 Form 10-K, at 12 *quoted at* Def. Br. at 18. It is one thing to say, as Ibis did, that the waves vary in intensity based on the shifting of the winds. It is quite another thing to say, as Ibis should have, that there will be no more waves because the ocean has dried up.

[12]   59.   These statements were false and misleading because they failed to disclose and misrepresented that the carrying value of the eight 1000 implanters and related assets (asset group) on Ibis' balance sheet, under property and equipment, was artificially inflated by approximately $11 million and should have been written down by that amount in accordance with GAAP and, in particular FAS 144 for the reasons alleged in paragraphs 41-46. Defendants did not disclose that the asset group was actually obsolete by this date and that they were considering selling the asset group, having concluded that there was no prospect for either selling the 1000 implanters overseas or selling the smaller size wafers the 1000 implanters produced.

15

$100,000 in revenue. The Complaint alleges, ¶ 47(c), among other facts, that "Ibis did not create inventories of wafers, preferring to build only upon receipt of orders to avoid stockpiling wafer inventories that would have to be written down or off if not sold." Defendants also knew that orders were greatly reduced. Such handwriting-on-the-wall evidence mandated the write-off that Ibis did not announce until the end of the Class Period.

In addition, there were *no* intervening facts between the publication of the June 30, 2003 and December 31, 2003 financial statements that affected the necessity to write down these assets. For example, on June 30, 2003 and September 30, 2003, the percentages of larger size 300mm wafer sales by Ibis were 97% (of $3.5 million) and 98% (of $3.7 million), respectively, of total wafer sales. None of those wafers were manufactured by the eight obsolete implanters. Complaint, ¶ 43. It is now clear that Defendants did not want to take the write-down before Ibis completed the public stock offering in October 2003 but knew that Ibis's public auditors would require the write-down of these assets when they did their year end 2003 audit, two months later. Thus, defendants made the disclosure on December 15, 2003. *Id.*,¶¶ 46, 68.

Defendants, who cannot identify any intervening facts to justify their delay in writing down these assets, argue instead that because the market was aware that sales of smaller size wafers had declined, the market should be held to know that Ibis's financial statements overstated the value of its assets. This flies in the face of defendants' contemporaneous public statements to the contrary in, for example, the June 30, 2003 SEC Form10-Q where defendants stated that there was no impairment issue with respect to these issues despite the drop in sales of the smaller size wafers. *Id.*, ¶ 44(i). In this assurance, Ibis was misleading the market. Although smaller size wafers were still being sold in the market, they were no longer being by Ibis, which had told the market that it was completely moving on to production of 300mm size wafers. That is why it sold the older 1000 implanter to Simgui. *Id.*, ¶ 44(f). Defendants had no choice but to leave this market because its largest customer, IBM, had stopped buying the smaller size wafers. *Id.*, ¶¶ 43, 47(c).

### IV.    THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER

Under the PSLRA, a complaint must state with particularity facts giving rise to a strong inference of scienter. *Cabletron*, 311 F.3d at 38. Scienter may be established by factual allegations of knowledge and/or recklessness, of motive and opportunity, or a combination of both.[13] *Id.* at 38-39; *A.T. Cross Corp.*, 284 F.3d at 82. The First Circuit has rejected a rigid formula for pleading scienter, relying on a fact-specific approach that proceeds on a case-by-case basis. *Cabletron*, 311 F.3d at 39; *Blatt v. Muse Technologies, Inc.,* 2002 U.S. Dist. LEXIS 18466, *1, 33 (D. Mass. 2002) ("[T]he First Circuit has not delineated any particular pattern of evidence that must be pled in order to survive a motion to dismiss.") Scienter can be shown through indirect and circumstantial evidence. *In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 22-23 (D. Mass. 2004).[14] The Court must look at all of the facts alleged to see if they support an inference of scienter, under the totality of the circumstances. *Cabletron*, 311 F. 3d at 40.[15]

Here, plaintiffs plead facts which give rise to a strong inference of knowledge and/or recklessness. As set forth above, the well-pleaded facts establish, *inter alia*, that: (1) Ibis, which had two businesses before the beginning of the Class Period (wafer sales and implanter sales), had made the decision, which it publicly announced, to get out of the wafer business to concentrate on the implanter business; (2) Ibis was focusing its efforts on the development and sale of the i2000 implanter for manufacture of 300mm wafers which relied on technology licensed from IBM and, therefore, Ibis could not book an order for or ship an i2000 implanter to a third party unless and until

---

[13]    Courts in this Circuit reject the contention that facts showing motive and opportunity can never be enough to permit the drawing of an inference of scienter. *See, e.g.*, *Rosen v. Textron, Inc.,* 321 F. Supp. 2d 308, 322 (D.R.I. 2004).

[14]    The "words of the [PSLRA] neither mandate nor prohibit the use of any particular method to establish an inference of scienter." *Greebel v. STP Software*, 194 F.3d 185, 202 (1st Cir. 1999).

[15]    "Each individual fact about scienter provide only a brushstroke, but the resulting portrait satisfies the requirement for a strong inference of scienter under the PSRLA"*; see also Friedberg v. Discreet Logic Inc.*, 959 F. Supp. 2d 42, 50 (D. Mass. 1997).

the third party and IBM agreed on licensing terms; (3) IBM was Ibis's largest wafer customer and was the only purchaser of the i2000; (4) Ibis recorded as deferred revenue on its balance sheet the cash payments it received when it booked an order and when it shipped the i2000 implanter; (5) Ibis could not record the revenue from the sale of an i2000 unless and until the customer accepted the i2000, which typically took many months after shipment, and there was no guarantee that the i2000 would be accepted; (6) Ibis had sold an 1000 implanter to Simgui to enable it to make smaller size wafers; (7) IBM, Ibis's largest customer, had virtually stopped buying smaller size wafers from Ibis and demand from other purchasers had declined; (8) only 2 to 3% of Ibis's total wafer sales were of smaller size wafers; and (9) Ibis had allowed its obsolete 1000 implanters, which made the smaller size wafers, to fall into disrepair.[16]

Defendants knew all of these facts but still made the misrepresentations of material fact alleged in the Complaint. The law is clear in the First Circuit that "the fact that...defendants published statements when they *knew* facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *A.T. Cross*, 284 F.3d at 83 (emphasis added); *see also In re Transkaryotic Therapies, Inc. Sec. Litig.,* 319 F. Supp. 2d 152, 162 (D. Mass. 2004). In addition, it is well settled that allegations of significant GAAP violations support an inference of scienter for pleading purposes.[17] *Cabletron*, 311 F.3d at 39 (significant GAAP

---

[16] The Complaint, ¶ 8, alleges that Reid signed Ibis' SEC filings during the Class Period, attesting to the accuracy of the alleged false financial statements in the filings. *See, e.g., Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996).

[17] Defendants' violation of *FAS 144: Accounting for the Impairment or Disposal of Long-Lived Assets*, by their failure to write-down the value on Ibis' balance sheet of the eight 1000 implanters and related assets from their carrying value of $12 million to their impaired value of $1 million is ample evidence of scienter. "When significant GAAP violations are described with [such] particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000). *Accord*, *Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 16 (D. Mass. 2000)(finding "[t]he magnitude of the revenue overstatements during the class period also tends to support a strong inference of scienter."); *Rosen*, 321 F. Supp. 2d at 318; *Lalor v. Omtool, Ltd.*, 2000 WL 1843247, at *9 (D.N.H. Dec. 14, 2000).

violations can provide evidence of scienter) (citations omitted); *see also Geffon v. Micrion Corp.*, 249 F. 3d 29, 36 (1st Cir. 2001) ("Accounting shenanigans" are among the characteristic types of circumstances which may demonstrate scienter); *Greebel*, 194 F.3d at 206 n.18 ("[p]roblems with a transaction with a major impact on revenues are more likely to help support a strong inference of scienter).

Plaintiffs also plead motive and opportunity. Defendants knew that they needed a large cash infusion to continue to run the Company, having cut costs as much as practicable. Ibis was burning cash at the rate of $3 million per quarter and told analysts that it had sufficient cash for only nine months of operations. Pltf. Exs. 8, 9. Thus, defendants planned a public offering of stock for October 2003, before the 2003 year end financials were prepared. To succeed, defendants concealed Ibis's true financial and operating condition as alleged in the Complaint, allowing Ibis to close its public offering at the artificially inflated price of $13.25 per share on October 23, 2003, up dramatically from a low of $3.90 per share in the second quarter of 2003, the three months ended June 30, 2003 (¶ 47(d)).[18] *In re Resource America Sec.* Litig., 2000 WL 1053861, at *6 (E.D. Pa. 2000)("the motive alleged- that is, the desire to raise capital by means of a secondary public offering- gives rise to a strong inference of scienter")(citation omitted)*; In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 206 (E.D.N.Y.. 2000)(plaintiffs' allegations that defendants inflated stock to maximize revenue from secondary offering to obtain capital, along with other evidence, sufficient for motive).

Defendants' scienter is further supported by the close proximity between the issuance of their alleged false and misleading statements, between July 23, 2003 and November 4, 2003, and their disclosure of the truth on December 15, 2003. *Shaw*, 82 F. 3d at 1224-25; *Geffon*, 249 F. 3d at 36.

---

[18] Allegations of improper accounting practices carried out in order to maintain a high stock price are sufficient to plead motive and opportunity and to raise an inference of scienter. *See, e.g., In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 597 (D.N.J. 2001).

**CONCLUSION**

Accordingly, defendants' motion should be denied in its entirety.

Dated: January 21, 2005

Respectfully submitted,

**/s/Theodore M. Hess-Mahan**
Theodore M. Hess-Mahan BBO #557109
**SHAPIRO HABER & URMY LLP**
Exchange Place
53 State Street, 37th Floor
Boston, MA 02109
(617) 439-3939

Local Counsel for Lead Plaintiffs

**LAW OFFICES BERNARD M. GROSS, P.C.**
**Deborah R. Gross, BBO#546151**
**Robert P. Frutkin**
1515 Locust Street, Second Floor
Philadelphia, PA 19102
(215) 561-3600

**WOLF HALDENSTEIN ADLER FREEMAN**
**& HERZ LLP**
**Peter Harrar**
**Aya Bouchedid**
270 Madison Avenue
New York, NY 10016
(212) 545-4600

Lead Counsel for Lead Plaintiffs

**LAW OFFICES KENNETH ELAN**
Kenneth Elan
217 Broadway, Suite 606
New York, NY 10007
(212) 619-0261

**KLEIN & SOLOMON, LLP**
Joseph P. Garland
275 Madison Avenue
New York, NY 10016
(212) 213-1812

Attorneys for Lead Plaintiffs