# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE CYTYC CORP.                        CIVIL ACTION NO.
SECURITIES LITIGATION                    02-12399-NMG

REPORT AND RECOMMENDATION RE:
DEFENDANTS' MOTION TO DISMISS THE CORRECTED
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
(DOCKET ENTRY # 30)

March 1, 2005

BOWLER, U.S.M.J.

Pending before this court is a motion to dismiss (Docket
Entry # 30) filed in this consolidated class action by defendants
Cytyc Corporation ("Cytyc"), Patrick Sullivan ("Sullivan"),
Cytyc's President and Chief Executive Officer throughout the
class period,[1] and Robert Bowen ("Bowen"), Cytyc's Chief
Financial Officer and Vice President throughout the class period.
After conducting a hearing, this court took the motion (Docket
Entry # 30) under advisement.

PROCEDURAL BACKGROUND

The gravamen of the corrected amended complaint (henceforth:
"the complaint") (Docket Entry # 27) filed by lead plaintiffs
Plumbers and Pipefitters National Pension Fund and Deka
Investment GMBH ("plaintiffs") is that Sullivan and Bowen ("the
individual defendants") and Cytyc, a company that produces and
manufactures medical devices that screen for cervical and breast

---

[1] Sullivan also took on the role of Chairman of the Board
of Directors on November 20, 2001, a role he maintained
throughout the remainder of the class period.

cancers, engaged in channel stuffing throughout the class period
(July 25, 2001 to June 25, 2002). Channel stuffing is the
practice of "inducing purchasers to increase substantially their
purchases before they would, in the normal course, otherwise
purchase products from the company." Greebel v. FP Software,
Inc., 194 F.3d 185, 202 (1st Cir. 1999). It has "the result of
shifting earnings into earlier quarters, quite likely to the
detriment of earnings in later quarters." Greebel v. FP
Software, Inc., 194 F.3d at 202.

The channel stuffing, which purportedly occurred at the end
of each quarter, concerned Cytyc's principal product, the
ThinPrep system ("ThinPrep"). ThinPrep competes with the more
traditional Pap smear test as a means of screening women for
cervical cancer.

Plaintiffs submit that the individual defendants and Cytyc
(collectively: "defendants") failed to disclose or only
partially disclosed the channel stuffing during the class period.
Statements made by Sullivan, various third parties or contained
in the company's SEC filings were false or materially misleading
regarding the deep discounts that Cytyc offered customers near
the end of every quarter. As a result, reported revenues,
earnings and market share were artificially inflated. Defendants
thereby mislead investors about earnings and the reasons for the
company's growth and increased sales. In addition, defendants
violated the company's internal revenue recognition policy, SEC
regulations and generally acceptable accounting principles

("GAAP") by shipping unordered product to customers and engaging in channel stuffing.

The two count, 62 page complaint, which includes 187 paragraphs, alleges violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Defendants move to dismiss the complaint under Rule 12(b)(6), Fed. R. Civ. P. ("Rule 12(b)(6)"), for failing to plead fraud with particularity under Rule 9(b), Fed. R. Civ. P. ("Rule 9(b)"), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. Defendants additionally seek dismissal on the basis that the statements are inactionable corporate puffery, neither false or misleading, not material and lack the necessary strong inference of scienter. Defendants also rely on the safe harbor provision of the PSLRA pertaining to forward looking statements. See 15 U.S.C. § 78u-5(c)(1)(A)(i); 17 C.F.R. § 240.3b-6.

STANDARD OF REVIEW

In reviewing the motion to dismiss, this court accepts the factual allegations in the complaint as true and draws all reasonable inferences in favor of plaintiffs. See Alternative Energy v. St. Paul Fire & Marine, 267 F.3d 30, 33 (1st Cir. 2001) (on motion to dismiss, court accepts all allegations in complaint as true and construes "all reasonable inferences in favor of the plaintiffs"). Without crediting unsubstantiated conclusions, Rodi v. Southern New England School of Law, 389 F.3d 5, 10 (1st

3

Cir. 2004) (ignoring "'bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, [and] outright vituperation'"), dismissal is appropriate "only if it 'appears to a certainty that the plaintiff would be unable to recover under any set of facts.'" State Street Bank and Trust Company v. Denman Tire Corporation, 240 F.3d 83, 87 (1st Cir. 2001); accord Blackstone Realty LLC v. FDIC, 244 F.3d 193, 197 (1st Cir. 2001) (dismissal proper "only if, under the facts alleged," plaintiffs "cannot recover on any viable theory;" internal quotation marks omitted).

The pleading standards under the PSLRA do not alter this standard of review. Aldridge v. A.T. Cross Corporation, 284 F.3d 72, 78 (1st Cir. 2002). Facts, drawn primarily from the complaint as well as certain public and integral documents referred to in the complaint,[2] are as follows.

---

[2]    In Re Stone & Webster, 253 F.Supp.2d 102, 128 & n. 11 (D.Mass. 2003) (considering copies of SEC Forms 4 without converting motion to dismiss into motion for summary judgment); In Re Millstone Scientific Securities Litigation, 103 F.Supp.2d 425, 450-451 & n. 15 (D.N.J. 2000); see Alternative Energy v. St. Paul Fire and Marine, 267 F.3d 30, 33-34 (1st Cir. 2001); Blackstone Realty, LLC v. FDIC, 244 F.3d at 195 n. 1 (exhibits attached to complaint properly considered for purposes of Rule 12(b)(6)); Shaw v. Digital Equipment Corporation, 82 F.3d 1194, 1206 n. 13 & 1220 (1st Cir. 1996) (inasmuch as complaint alleged nondisclosure in registration statement and prospectus, court may examine text of filings and any incorporated SEC filings); Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993); In Re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d 206, 213 n. 7 (D.Mass. 2001) (considering "full text of the Form 10-Q," including "parts not relied on by the plaintiffs," on a motion to dismiss inasmuch as complaint refers to the document); see also Clorox Company Puerto Rico v. Proctor & Gamble, 228 F.3d 24, 32 (1st Cir. 2000) ("'when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations'").

BACKGROUND

Cytyc develops, manufactures and markets the sample preparation system known as ThinPrep. ThinPrep is an automated system for preparing cervical cell specimens on microscope slides. In May 1996, Cytyc received premarket approval from the Food and Drug Administration ("FDA") to market ThinPrep as a screening system for cervical cancer. The product directly competes with the conventional Pap smear test. In November 1996, the FDA allowed Cytyc to label and market ThinPrep as "significantly more effective in detecting cervical cancer than the Pap smear." (¶ 34).[3]

The company, which has a plant in Boxborough, Massachusetts, began selling ThinPrep nationwide in 1997. It is the company's chief or principal product. In September 1997, the FDA gave Cytyc premarket approval to use specimen collected in ThinPrep solution to test for the presence of the human papillomavirus. The company markets ThinPrep to healthcare providers, insurance companies and clinical laboratories. In 1998, it began marketing ThinPrep selectively overseas in international markets.

Net sales for the year ending in December 2000 reached $142,337,000 before the start of the class period. Cytyc's reported share of the cervical testing market prior to the class period ranged from 50% to 60%.

---

[3] Unless otherwise noted, citations to paragraphs only refer to paragraphs in the complaint, Docket Entry Number 27.

5

A.  Customer Complaints, Discounts and Unordered Products

According to an unnamed, former medical and sales
representative ("Cytyc sales representative"), "Beginning in at
least 1999, . . . Cytyc 'typically engaged in channel stuffing at
the end of each quarter.'" (¶ 38).  This sales representative
dealt directly with physicians concerning ThinPrep and describes,
in general terms, that "Cytyc overloaded laboratories with
inventory" in order to drive up profitability and sales.  (¶ 38).
With slightly greater specifically, he or she identifies Onco,
located in Gaithersburg, Maryland as "a frequent victim of
Cytyc's channel stuffing."[4]  (¶ 47).  Also according to this
sales representative, certain unidentified "Cytyc account
executives" told him or her that "Cytyc occasionally sent
merchandise to laboratories, despite requests from those
customers to refrain from shipping any more product."  (¶ 49).

An unnamed former managed care executive ("Cytyc managed
care executive") who dealt directly with laboratories and
physicians states that, Cytyc offered special discounts to
customers "towards the end of each quarter."  (¶ 50).  He or she
does not identify the customer, the amount of the discount or the
relationship of the amount shipped to Cytyc's revenues.  Instead,
the managed care executive posits that if a customer, again
unidentified, "needed only one thousand tests a month, the
customer still knew that if it took three thousand tests in the

_____

[4]  The representative does not provide any additional detail
such as the amount of product stuffed and the dates of the
shipments.

6

last month of a quarter, Cytyc would offer a much bigger discount."  (¶ 50).

Another unnamed, former regional sales manager who became a senior representative ("Cytyc senior representative") and dealt directly with customers in six western states describes that, "from at least July 1999, Cytyc shipped additional product to its customers, above what had been ordered" until the customer complained that it had too much inventory.[5]  (¶ 44).  Labcorp was one of the Cytyc customers that complained to the Cytyc senior representative about the company's sales practices.[6]  (¶ 49).

A former Cytyc account executive who covered the northwest region ("Cytyc NW account executive") and had direct customer contact relates that customers complained about storing the excess product on "pallets in their hallways."[7]  (¶ 43).  Likewise, an unnamed, former Cytyc electrotechnical technician ("Cytyc technician") relates, again at an undetermined time and in an undetermined amount, seeing "stockpiles of inventory lying unused" when he visited customers in the New England region to fix technical problems.  (¶ 51).

_____

[5]  The complaint does not identify when these shipments occurred, the amount and the amount's relation to Cytyc's overall business.  There is no indication that the shipments were returned.

[6]  The complaint does not attribute this assertion to a particular individual.  The source of the statement is thus unknown.  There is also no indication when the complaint[s] occurred or the amount of the shipment[s] involved.

[7]  Again, no detail is provided regarding the identity of the customers and when and how much pallet storing occurred.

Another former, unnamed Cytyc account executive for California ("Cytyc CA account executive") notes that in December 2000, Cytyc shipped the Palo Alto Medical Foundation ("Palo Alto Medical") "a year's worth of product without having received an order to do so."[8] (¶ 45). There is no indication that Palo Alto returned the shipment. It was, however, given a 50% discount, which exceeded the typical 20% end of quarter discount.[9]

The Cytyc CA account executive also identifies Stockton Pathology, located in Stockton, California, as receiving "six months' worth of product," albeit at an unidentified time. Although not returned,[10] the excess product "lay unused, piled floor-to-ceiling in the customer's offices." (¶ 45). At an undetermined time, "Stanford University Hospital and Marin Pathology cancelled their agreements with Cytyc because they were fed up with being shipped unwanted merchandise," according to this executive. (¶ 157).

"Management" encouraged channel stuffing to meet unrealistic quarterly quotas, according to the Cytyc CA account executive. (¶¶ 46 & 47). Channel stuffing occurred at the end of every quarter, according to both this executive and the Cytyc managed

---

[8] A "year's worth" of ThinPrep would, of course, extend into the class period which began in June 2001.

[9] The complaint fails to articulate the amount of the shipped product discounted and/or the relation to Cytyc's overall revenues.

[10] Although not expressly stated in the complaint, this is the only reasonable inference inasmuch as the complaint depicts how the excess product lay unused at the customer's offices.

care executive (¶¶ 111 & 123) and was well known in the company
(¶ 150).  During the last quarter of 2001, the company increased
its channel stuffing practices by offering "extra incentives" to
customers and created a "'war room'" to field the daily telephone
calls from sales representatives giving updates of sales figures,
according to an unnamed human resources representative at Cytyc
who describes Sullivan and Bowen as "very involved" in daily
management.[11]   (¶¶ 40 & 101).  As a result of the channel
stuffing, the market share described to analysts by Sullivan and
other management officials was allegedly overstated.  (¶ 47).

Cytyc disclosed the use of discounts in the December 2000
Form 10-K annual report, signed by Sullivan and Bowen, in the
following terms:

> The Company's success and growth will depend on market
> acceptance of the ThinPrep System among healthcare
> providers, third-party payors and clinical laboratories.
> The Company will continue to sell the ThinPrep Processor to
> customers and charge separately for related disposable
> reagent filters and supplies.  *In the past, the Company has
> offered discounts to stimulate demand for the ThinPrep
> System and may elect to do so in the future, which discounts
> could have a material adverse effect on the Company's
> business, financial condition and results of operations.*

(Docket Entry # 32, Ex. B, p. 8; emphasis supplied).  Cytyc
repeated this disclosure in the company's 2001 Form 10-K annual

---

[11]   The company was highly focused on meeting the sales
quotas which were "set by Cytyc's management" (¶ 153) and,
according to an unnamed manufacturing manager ("Cytyc
manufacturing manager"), top executives met frequently with
employees "to discuss sales strategies."  (¶ 39).  Cytyc senior
management also closely managed the everyday business of Cytyc
and attended meetings with the salesforce.  (¶¶ 41 & 150).

report.[12]  (Docket Entry # 32, Ex. J, pp. 8-9).

Cytyc also shipped "significant" amounts of "additional product" above and beyond what customers ordered.  (¶ 61).  As noted above, Cytyc's senior representative describes shipments of unknown quantities of ThinPrep to unknown customers "from at least July 1999."  (¶ 44).  At Cytyc, shipping more product than ordered to increase sales occurred near the end of the financial reporting periods.  (¶¶ 5 & 7; see also ¶ 49).

B.  Specific Company Statements During Class Period

     1.  July 25, 2001 Press Release

At the outset of the class period on July 25, 2001, Cytyc's stock was trading for $24.79.  (¶ 9).  On that day, Cytyc issued a press release reporting "record" revenue and earnings for the second quarter of 2001.  (Docket Entry # 32, Ex. A).  The release accurately reported $52,997,000 of revenue for the quarter or net income of $.13 per diluted share.[13]  (¶ 67; Docket Entry # 32, Ex. D, p. 4; Docket Entry # 32, Ex. J, p. F-22).

Plaintiffs take issue with the following statements, the first historical and the others forward looking, made by Sullivan

---

[12]  Like the 2000 Form 10-K annual report, the 2001 Form 10-K annual report discloses that, "In the past, the Company has offered discounts to stimulate demand for the ThinPrep System and may elect to do so in the future, which discounts could have a material adverse effect on the Company's business, financial condition and results of operations."  (Docket Entry # 32, Ex. J, pp. 8-9).

[13]  There is no indication that these numbers were subsequently restated.  (Docket Entry # 32, Ex. J, p. F-22).

in the press release:[14]

> "We are pleased to report record revenues and earnings,"
> said Patrick Sullivan, Cytyc's president and chief executive
> officer. "In addition, we increased our U.S. market share
> by five percentage points for the second consecutive
> quarter. Our U.S. market share has grown substantially to
> approximately 46 percent at June 30 from 36 percent at the
> end of 2000, and we expect to exceed 50 percent domestic
> market conversion by year-end. *This growth has been driven
> by the combination of our proven marketing strategy, best-
> in-class sales team, and superior technology.*"
>
> In conclusion, Mr. Sullivan stated, "As Cytyc continues to
> achieve record results in the marketplace, I am confident in
> our ability to *continue the momentum established in the
> first half of the year.* We look forward to *continuing our
> consistent quarter to quarter growth* and *delivering a record
> financial performance* for 2001."

(¶¶ 67 & 69-70; emphasis in complaint). Defendants purportedly

knew that the stated reasons ("proven marketing strategy, best-

in-class sales team, and superior technology") were not the real

reasons for the historical growth. Instead, the real reasons

were the channel stuffing of products at the end of every quarter

and the shipments of unordered product. Cytyc then improperly

recognized the revenue on these products at the expense of future

sales and in contravention of the company's stated revenue

recognition policy, GAAP and SEC rules. (¶ 68).

With respect to the forward looking statements, plaintiffs

submit that defendants knew that the "momentum" and "consistent

quarter to quarter growth" were the result of channel stuffing,

including the steep, end-of-quarter discounts, and that the

momentum could not continue without continuing the channel

---

[14] The press release was relatively short, consisting of
two pages of text and two pages of a company balance sheet.

stuffing practices.  (¶¶ 69-70).  It is worth noting, however,
that the relatively short press release contains the following
cautionary language:

> Investors are cautioned that statements in this press
> release which are not strictly historical statements,
> including, without limitation, statements regarding
> management's expectations for future growth, profitability,
> and objectives for future management and operations, as well
> as statements regarding the management and operations . . .
> constitute forward-looking statements which involve risks
> and uncertainties which could cause actual results to
> differ, including, without limitation, risks associated with
> the Company's dependence on a single product, uncertainty of
> market acceptance and additional cost, dependence on
> proprietary technology, dependence on timely and adequate
> levels of third-party reimbursement, dependence on key
> personnel, management of growth, limited marketing, sales,
> and private equity investment experience, and limited number
> of customers and lengthy sales cycle . . . and other risks
> detailed in the Company's filings with the Securities and
> Exchange Commission, including under the heading "Certain
> Factors Which May Affect Future Results" in its 2000 Form
> 10-K filed with the Commission.

(Docket Entry # 32, Ex. A).  The language in the Form 10-K under
the referenced caption provides added detail about the above risk
factors.  Regarding the "Limited Marketing and Sales Experience"
factor, the Form 10-K warns that:

> No assurance can be given that the Company's direct sales
> force or strategic marketing relationships will succeed in
> promoting the ThinPrep System to healthcare providers,
> third-party payors or clinical laboratories, or that
> additional marketing and sales channels will be successfully
> established . . . Failure to successfully expand its
> marketing and sales capabilities in the United States . . .
> would have a material adverse effect on the Company's
> business, financial condition and results of operations.

(Docket Entry # 32, Ex. B).  With respect to the "Limited Number
of Customers and Lengthy Sales Process" factor, the Form 10-K
explicitly states that, "Due in part to a recent trend toward
consolidation of clinical laboratories, the Company expects that

12

the number of potential domestic customers for its products will decrease." (Docket Entry # 32, Ex. B).

The press release notes that management would discuss the results and future expectations at a 5:00 p.m. conference call later that day. After the conference call, accessed by the public through the company's website, analysts projected the company's market share as soon reaching 50%. (¶ 72).

2. <u>Bloomberg News Interview August 2, 2001</u>

On August 2, 2001, Bloomberg News interviewed Sullivan and published a transcript of the interview. Whereas on July 25, 2001, Sullivan attributed past growth as driven by the company's "proven market strategy" and "sales team," he forecasted that similar factors of the company's "unique sales and marketing strategy" would allow the company to increase its market share in the future. (¶ 73). Referring to the July 25, 2001 conference call, he projected annual revenues in 2001 as between $210,000,000 and $220,000,000 and between $275,000,000 and $300,000,000 for the following year.

The text of the interview reads, in pertinent part, as follows:[15]

> [Bloomberg News]: Mr. Sullivan, taking a look at your revenue numbers, this past quarter, they grew at 12% sequentially and they were up about 60% from a year ago. *Can you maintain that kind of growth in terms of revenue?*
>
> Sullivan: *We believe so.* If you look at the market opportunity. We believe we're getting started and hitting our stride. In the sweet spot of the curve. If you look at the 50 million Pap smears, it represents for us about a $500

---

[15]    Punctuation is taken from the transcript.

13

million to $700 million market opportunity.

[Bloomberg News]: *Well, how will you increase, though market share and be aggressive in gaining market share [in] this?*

Sullivan: *We have a unique sales and marketing strategy in that we have a direct sales force that calls on the OB/GYN's who perform the procedure in their office. In addition we have a sales force calling on the laboratory. It is creating the demand at the physician's office.* And we have also started some direct consumer advertising campaigns . . .

[Bloomberg News]: *Give investors some sort of landmarks that they should sort of watch out for or milestones, if you will that they should watch for from your company over the next six to eight months to see that you're certainly on track in terms of exceeding or meeting your growth goals?*

Sullivan: Well, *we've guided the street in our conference call* that we believe we're going to finish this year somewhere between $210 million and $220 million in top line revenue, [we] believe that we will be at the top end of that range. Next year we expect to be in the $275 million to $300 million range. In addition we have these additional products that we're currently working on that we expect to have completed by the end of this year.[16]

(¶¶ 73 & 75, emphasis in complaint; Docket Entry # 32, Ex. C).

3. August 8, 2001 Second Quarter Form 10-Q

On August 8, 2001, Cytyc issued the Form 10-Q for the quarter ending June 30, 2001. All defendants, including Bowen, signed the form. The form reflects the following method for recognizing revenue:

---

[16] Like the July 25, 2001 statements, defendants submit that the statements are corporate puffery and do not denote marketing strategy and the sales force as the only factors effecting growth. They also maintain that the projections, which reference the conference call, were not material inasmuch as they did not alter the total mix of information available to the investing public. Plaintiffs characterize Sullivan's stated reasons as false and materially misleading inasmuch as channel stuffing was and would continue to have an adverse impact on future sales.

14

> The Company recognizes product revenue upon shipment,
> provided that there is persuasive evidence of an
> arrangement, there are no uncertainties regarding
> acceptance, the sales price is fixed or determinable,
> collection of the resulting receivable is probable and only
> perfunctory Company obligations included in the arrangement
> remain to be completed.

(¶¶ 58 & 78; accord Docket Entry # 32, Ex. B & J, pp. F-7).
Cytyc therefore recognized revenue upon shipment.[17]

This second quarter Form 10-Q for 2001 portrays net sales of
$100,464,000, an increase from the $62,303,000 reported during
the corresponding period in 2000.  The Form 10-Q advises that
certain factors may affect future results, refers to additional
factors disclosed in the Form 10-K for 2000 and cautions that,
"past financial performance should not be considered an indiction
of future performance."  (Docket Entry # 32, Ex. D, p. 13).

In describing the company's liquidity and capital resources,
the form notes that, "Net inventories decreased approximately
$1.3 million during the six months ended June 30, 2001 primarily
due to improved inventory management and production control."  (¶
81; Docket Entry # 32, Ex. D, p. 11).  The release of the August
8, 2001 Form 10-Q caused a one day increase in the price of Cytyc
stock from $24.20 to $25.90.

    4.  October 19, 2001 Boston Herald Article

On October 18, 2001, Cytyc announced that it would acquire
Pro-Duct Health, Inc. ("Pro-Duct"), a private company that makes

---

[17] As explained in greater length infra, plaintiffs allege
that Cytyc departed from this stated policy by recognizing the
revenue upon shipping the unordered product and by offering the
deep discounts offered customers at the end of every quarter or
otherwise engaging in channel stuffing.  (¶ 79).

a breast cancer screening device, for $38,000,000 in cash and 5,000,000 shares of Cytyc common stock.  Sullivan described the acquisition as an "ideal fit" with "an annual potential U.S. market of $1.5 billion, growing to $4.0 billion."  (¶ 84).  The acquisition was scheduled to close and did close in the fourth quarter of 2001.  Cytyc's stock increased from $25.79 on October 17 to $26.55 on October 18, 2001.  (¶ 84; Docket Entry # 32, Ex. E).

On October 19, 2001, the Boston Herald ran an article quoting Sullivan as saying, "'*We feel confident in our success based on our track record with the ThinPrep Pap Smear, which has made this acquisition possible.*'"[18]  (¶ 87, emphasis in complaint; Docket Entry # 32, Ex. E).  Cytyc stock closed at $28.03 on October 19, 2001.  (¶ 86).

    5.  October 24, 2001 Press Release

On October 24, 2001, Cytyc issued a press release reporting record revenues for the third quarter of 2001.  Third quarter revenue "was $57.2 million, . . . a 54 percent increase from the $37 million reported in the comparable quarter last year."[19]  (¶

---

[18]  Plaintiffs describe the statement as misleading because it omits the fact that Cytyc's "track record" is based upon undisclosed channel stuffing.  Plaintiffs also point out that Cytyc's stock would have been worthless and the acquisition therefore costlier if the company had not artificially inflated the company's stock through channel stuffing.  (Docket Entry # 36).  Defendants, in turn, assert that the statement amounts to inactionable corporate puffery and there is no connection between the statement, i.e., the efficacy of ThinPrep, and the omitted information of channel stuffing.

[19]  The Form 10-K for 2001, released in March 2002, reflects these same figures.  (Docket Entry # 32, Ex. J, p. F-22).

89; Docket Entry # 32, Ex. F).  Sullivan glowingly described the
Pro-Duct acquisition as "'provid[ing] an excellent opportunity
for significant revenue and earnings growth.'"  (¶ 89; Docket
Entry # 32, Ex. F).

Plaintiffs take issue with Sullivan's historical description
of the company's consistent revenue growth as emanating from
"'*the effectiveness of [Cytyc's] sales and marketing
strategy.*'"[20]  (¶ 89, emphasis in complaint; Docket Entry # 32,
Ex. F).  According to the complaint, the statement is misleading
because the reported growth arose from the "systemic and
continuous channel stuffing" as well as shipping unordered
products to customers, a practice that alienated such customers
and caused them to cease doing business with Cytyc.  (¶ 90).
Further, Cytyc did not experience "consistent revenue and
earnings growth" because the Cytyc sales and marketing strategy
of channel stuffing pushed sales into earlier quarters at the
expense of later periods.  (¶ 91).

---

[20]   The complete statement in the press release is as
follows:

> "We believe the superior clinical performance of the
> ThinPrep Pap Test and *the effectiveness of our sales and
> marketing strategy have provided Cytyc with consistent
> revenue and earnings growth and financial performance*," said
> Patrick Sullivan, Cytyc's president and chief executive
> officer.  "Last week we announced that Cytyc has entered
> into a definitive merger agreement to acquire Pro-Duct
> Health, Inc., an acquisition that we expect will expand our
> product line to include breast cancer and provide an
> excellent opportunity for significant revenue and earnings
> growth."

(¶ 89, emphasis in complaint; Docket Entry # 32, Ex. F).

6.  <u>January 14, 2002 Press Release</u>

On January 14, 2002, Cytyc issued a press release reiterating the company's comfort level with the estimate of "approximately $0.13 per diluted share" for the 2001 fourth quarter and "approximately $0.45 per diluted share" for the full year. (¶ 95; Docket Entry # 32, Ex. G). Cytyc also forecasted 2002 per share earnings as "approximately $0.64 to $0.66." (¶ 95; Docket Entry # 32, Ex. G). The latter forecast did not materialize.

Like the July 25, 2001 press release, the January 14, 2002 press release cautions investors not to rely on the forecasts and that current expectations "are subject to risks and uncertainties which could cause the outcomes to differ materially from [the forward-looking] statements." (Docket Entry # 32, Ex. G). The press release identifies various risk factors and refers investors to the company's SEC filings.

The complaint depicts the falsity of the statements insofar as the revenue numbers, inflated because of the company's channel stuffing practices, contravene the company's stated revenue recognition policy as well as GAAP and SEC rules. (¶ 100).

7.  <u>January 23, 2002 Press Release</u>

On January 23, 2002, Cytyc announced "record" revenues for the 2001 fourth quarter and for the year. The press release shows revenues "of $63 million for the quarter" representing a "49% increase over the fourth quarter 2000 revenues, and" net income of $0.13 per share. (¶ 96). Revenues grew to $221

18

million for the year.  (¶ 96).  As set forth in the complaint, these earnings include ThinPrep sales resulting from the channel stuffing and shipments of unordered product thereby violating the company's stated revenue recognition policy, GAAP and SEC rules. (¶ 100).

The complaint highlights and complains about two statements, the first being historical and the second forward looking, that Sullivan made in the press release.  The statements, italicized below, are as follows:

> "This was an outstanding year for Cytyc Corporation," said Patrick Sullivan, Cytyc's president and chief executive officer.  *"We have now reported fifteen consecutive quarters of revenue growth.*  In addition, we acquired Pro-Duct Health, expanding our product line to include breast cancer risk assessment."  Mr. Sullivan continued, "We believe the success of the company was further demonstrated by Cytyc's recent addition to the S & P Midcap 400 Index and The Nasdaq-100 Index."  Mr. Sullivan concluded, *"We believe the achievements of 2001 put Cytyc in a solid position to build on the momentum of the past year* and the success of ThinPrep(R) System, to continue domestic and international market conversion to the ThinPrep(R) PapTest(TM), and to launch Cytyc's ductal lavage procedure for patients at high risk for breast cancer."

(¶ 96, emphasis in complaint).

As the complaint alleges, plaintiffs submit that the first statement is misleading and false because Cytyc achieved the historical growth by resort to undisclosed channel stuffing.[21] (¶ 100).  Again, the reported growth improperly includes sales from the channel stuffing at the end of each quarter and the shipments of unordered products.  (¶ 100).  In light of this

---

[21]    Plaintiffs do not take issue with the veracity of the numbers as reflecting what Cytyc achieved.  (Docket Entry # 36).

19

improper revenue recognition, the assertion that Cytyc was "'in a solid position'" to build upon previous "'momentum'" was false and misleading. (¶ 100). The press release contains cautionary statements similar to those in previous press releases.

8. <u>Bloomberg News Interview January 24, 2002</u>

The day after the January 23, 2002 press release, Bloomberg News interviewed Sullivan about the reported fourth quarter profits. Without referring to the January 23, 2002 press release or the cautionary statements therein, Sullivan forecasted revenues "'in the $295 to $305 million range'" and an increase in earnings per share to "'between 64 and 66 cents.'"[22] (¶ 99).

---

[22] Defendants submit that the complaint fails to identify which remarks in the interview are false. To the contrary, however, paragraph 99 not only quotes the above forecast but also repeats the forecast by stating that, "Sullivan raised Cytyc's expected revenues for 2002 to between $295 million-$305 million, up from the $275 million-$300 million range originally given on August 2, 2001." (¶ 99). The next paragraph alleges that, "Defendants knew that the statements in paragraphs 95-97, 99, were false." (¶ 100). Defendants' additional challenge that the forecast is inactionable puffery (Docket Entry # 39, n. 3, referring to "the January 24, 2002 press release [sic]") is unavailing given the explicit nature of the forecast. The statement, to the extent based on a current projection, provides the revenue range and expected earnings per share for the time frame of one year.

As explained <u>infra</u> with respect to the August 2, 2001 projection and argued in general by defendants in their memorandum (Docket Entry # 31, p. 39) and at the hearing, however, the complaint fails to show sufficient facts to support the information and belief that Sullivan knew the forecast was either false or materially misleading. Neither the opinion by the former human resources employee (¶ 154) nor his or her characterization of Sullivan and Bowen as "'hands-on'" managers (¶ 40) is enough. As to materiality, disclosing the use of discounts as effecting the projection would not alter the total mix of information inasmuch as the SEC filings already disclosed such discounts. Alternatively, the projection fails to warrant liability given the absence of a strong inference of scienter.

Shortly after this forecast, the following exchange took place:

> [Bloomberg News]: *What keeps growth moving forward?*
>
> Sullivan: *Well, we're very focused on continued conversion of the ThinPrep Pap Test in the market, from 57 percent to- we believe we could capture-100 percent of the market.*[23] There's no reason for a physician to use a conventionally prepared Pap smear, when you have a much more effective test that's in the ThinPrep PapTest . . . In addition, we have acquired a company that puts us into breast cancer screening called Product Health [sic], that we have just launched with our sales force at the beginning of this year. And we expect somewhere between $9 and $15 million of revenue from that product, to kick in 2002.

(¶ 99, emphasis in complaint; Docket Entry # 32, Ex. I). Two market analysts repeated Sullivan's statement that the company's current market share was 57%. (¶ 102).

In February 2002, Cytyc announced a definitive merger agreement to acquire Digene Corporation ("Digene"), a publicly held manufacturer of a cervical cancer diagnostic screening system. Subject to regulatory approval and a tender of over 50% of Digene stock, the deal proposed Cytyc purchasing Digene "for $76.9 million in cash, plus 23 million shares of Cytyc common stock."[24] (¶ 103). Shortly after the announcement, Cytyc shares

---

[23] Defendants characterize this statement as inactionable puffery. Although the statement that Cytyc could capture 100% of the market is corporate puffery, the statement that Cytyc had 57% of the market is not puffery. The statement quantifies market share and two analysts repeated the statement. (¶ 102); see In Re Scientific Atlanta, 239 F.Supp.2d 1351, 1361 n. 6 (N.D.Ga. 2002). The 57% market share statement is nonetheless not actionable given the absence of a strong inference of scienter. See n. 65.

[24] The 2001 Form 10-K released in March 2002 warns investors that, "Although [Cytyc] expects that its acquisition of Digene will close during the second quarter of 2002, [Cytyc] may

21

increased by $2.00. (¶ 104). Although Digene shareholders tendered more than 50% of outstanding Digene shares, the Federal Trade Commission ("FTC") eventually voted to block the acquisition on June 25, 2002.

On March 1, 2002, Cytyc filed the company's 2001 Form 10-K with the SEC. The form repeats the statement in the 2000 Form 10-K that Cytyc has offered discounts in the past to stimulate demand "and *may elect* to do so in the future" and that such discounts "*could have* a material adverse effect on the Company's business, financial condition and results of operations."[25] (¶ 110, emphasis in complaint; Docket Entry # 32, Ex. J). The 2001 Form 10-K shows 2001 net sales of $220,993,000 or "an increase of 55.6%" over 2000 net sales of $142,065,000. (¶ 115; Docket Entry # 32, Ex. J, p. F-4).

    9. April 24, 2002 Conference Call

In an April 24, 2002 press release, Cytyc again announced "record" earnings for the first quarter of 2002. Cytyc reported net sales "of $68 million and net income of $17.6 million" or "increases of 43% and 58%, respectively, over the numbers for the

---

not be able to complete the acquisition during the second quarter, or at all." (Docket Entry # 32, Ex. J).

    [25] Plaintiffs contend that a reasonable inference from this statement is that Cytyc only offered a one time discount. They point to the April 24, 2002 conference call as supporting this inference. On its face, however, the statement refers to "discounts," not "a discount." Thus, the language of the statement, which refers to the plural "discounts" when describing the discounting in the past, coupled with the fact that the 2000 Form 10-K also notes that Cytyc has offered "discounts" in the past to stimulate demand makes the inference unreasonable.

first quarter 2001." (¶ 117; Docket Entry # 32, Ex. K). It also reported a market share of 64%. (¶ 117). The company scheduled a conference call after the close of trading.

The conference call began by cautioning listeners not to rely on forward looking statements. (Docket Entry # 32, Ex. L). During the conference call, Bowen noted that the company's current estimate for the year 2002 is "between $0.55 and $0.60 per share" (Docket Entry # 32, Ex. L, p. 11), a downward departure from the $0.64 to $0.66 estimate forecast by Sullivan during the January 24, 2002 Bloomberg News interview.

The complaint states that during the conference call, Cytyc explained that "its larger customers were 'tightening inventory'"[26] and "that the inventory problem had manifested itself only in the first quarter of 2002." (¶¶ 124 & 125). The actual transcript reveals the following statements regarding inventory:

> Bowen: . . . Selected large lab ordering patterns shifted lower in the first quarter due to what we believe was an imbalance in physician demand versus existing lab inventory levels or a change in inventory management practice at the lab.
>
> Also during the quarter we implemented a promotional program directed at smaller labs, which was well received. Although we believe that underlying demand at large and small labs continues to increase, in light of first quarter actions by selected large labs, consolidation in the lab industry and the response to our first quarter and promotional program at smaller labs, we anticipate a decline in near term shipment levels.

---

[26]   See footnote 28.

23

(Docket Entry # 32, Ex. L, p. 10).[27]

Thus, with regard to the inventory problem manifesting "itself *only* in the first quarter of 2002" (¶ 125, emphasis supplied), the actual transcript shows that both Bowen and Sullivan noted a change or shift in ordering patterns in the first quarter.  The complaint alleges that the statement was false or misleading because it fails to disclose the "systemic and continuous channel stuffing" as well as the shipment of unordered product and customer alienation.  (¶ 126).

When asked to "flush out" this sales promotion, Sullivan explained that Cytyc introduced the sales promotion as a response to "a change in ordering pattern at selected larger labs.  That change in ordering pattern we believe was either due to an imbalance at the lab in physician demand versus their existing inventory levels at that time or a change in the way in which they choose to manage their ThinPrep Pap Test inventory levels." (Docket Entry # 32, Ex. L, p. 13).  In essence, both Bowen and Sullivan disclosed that selected larger laboratories had an inventory "imbalance" and "ordering patterns shifted lower in the first quarter."[28]   (Docket Entry # 32, Ex. L, pp. 10 & 13).  As a

---

[27]   Plaintiffs do not expressly object to considering the transcript of the conference in defendants' appendix and referred to in the complaint.  See <u>Shaw v. Digital</u>, 82 F.3d at 1220; <u>Watterson v. Page</u>, 987 F.2d at 3.

[28]   The complaint describes the "tightening inventory" statement, which originates from a Bloomberg News report, as misleading because Cytyc omitted that the inventory tightening stemmed from the channel stuffing.  (¶ 124; "Cytyc failed to state that its largest customers had been stuffed with so much extra inventory that there was no need for those customers to

24

result, the company offered a promotional program to smaller
laboratories during the first quarter.

During the conference call, Sullivan explicitly advised the
audience that, "This is not the first time-the first quarter that
we've ever had promotional type programs." (Docket Entry # 32,
Ex. L, p. 16). Bowen gave a more positive description explaining
that, "We don't expect to have promotional programs in the small
labs going forward, and what we expect to do is have our pricing
patterns return to what we would consider to be the norm."[29]
(Docket Entry # 32, Ex. L, p. 16).

After the conference call, a number of analysts made
statements that plaintiffs seek to attribute to Cytyc. One such
third party statement derives from a UBS Warburg report wherein
the analyst states that Cytyc stated during the conference call

---

order any more product for a long time to come").
    The Bloomberg News article, dated April 25, 2002, reads as
follows:

> Big laboratories are tightening inventory, and Cytyc offered
> incentives to smaller labs, analysts said.  "The big concern
> is there's an inventory pushback on the part of large labs,"
> said Banc of America Securities analyst Kurt Kruger, who
> rates Cytyc 'buy.'  "The company scrambled to provide some
> discounts to small labs to offset this."

(¶ 119, quotation marks taken from complaint).  Defendants argue,
inter alia, that the report fails the entanglement test.

[29]    Sullivan's remark not only shows that Cytyc disclosed,
again, the discounts, but also militates against a finding of
scienter.  Given Sullivan's description, Bowen's description
shows at most negligence and the attempt to put a good face on
the disclosure.  The forward looking remark, which in any event
is *not* particularized in the complaint, also falls under the safe
harbor provision of the PSLRA.  The market was not fooled
inasmuch as Cytyc stock dropped precipitously the following day.

that it had "'instituted a one-time promotion for the smaller labs to drive conversion at these customers in the quarter.'"[30] (¶ 121).  During the conference call, however, Sullivan explicitly disclaimed that the promotion was a one time offer. (Docket Entry # 32, Ex. L, p. 16).

In addition to the Bloomberg News article and the UBS Warburg analyst's comments, an April 25, 2002 Pacific Growth Equities analyst report states that, "a 'change in the ordering and inventory practices of Cytyc's large lab customers necessitated a special promotion targeting smaller labs in order for Cytyc to meet Q1 expectations.'"[31]  (¶ 120).  As a result, the report explains, "'Cytyc lowered forward guidance.'"[32]  (¶ 120).

In response to the April 24, 2002 disclosure, Cytyc common stock fell from $24.80 per share on April 24 to $15.73 per share

---

[30]  Plaintiffs seek to hold Cytyc responsible for this third party statement of the promotion as a "'one-time'" event.  They submit the description is misleading inasmuch as Cytyc engaged in a continuous pattern of channel stuffing throughout the class period.

[31]  There is nothing false or misleading about the statement that Cytyc offered a "special promotion."  Cytyc did offer a special promotion.  There was no duty to also add, "as we've done a number of times in the past."  As argued by defendants (Docket Entry # 31, pp. 22-25 & n. 14), the complaint fails to sufficiently pled why the statement was false or misleading.  The third party statement attributing the statement to "Cytyc" also fails the entanglement test described infra.

[32]  In particular, the report states that, "Cytyc's recent experience with shifting laboratory inventory practices led to lowered guidance for Q2 and the remainder of 2002."  (Docket Entry # 32, Ex. N).

26

at the close of trading on April 25.  (¶ 129).  In May and June, members of Cytyc's sales force discussed whether the stock "would plummet further."  (¶ 132).

During the April 24, 2002 conference call, Sullivan intimated that Cytyc was going to try to cue its business more closely to physician demand.  According to Sullivan, Cytyc would try to have a leaner "supply chain" and a better understanding of inventory at the laboratories.  (Docket Entry # 32, Ex. L, p. 24).  In May and June 2002, Cytyc executives informed the salesforce "that 'they were changing the market strategy to have more stable shipments so that we wouldn't be flooded at the end of the quarters,'" according to the former Cytyc manufacturing manager.  (¶ 131; see also ¶ 156).  The company, however, continued to pressure the sales force to meet the quotas, according to the former Cytyc CA account executive.[33]  (¶ 131).

At least one market analyst viewed the Cytyc issue as short term.  According to his or her June 21, 2002 report, "'We believe that some of the short term issues, mainly inventory in the

---

[33]  The former Cytyc manufacturing manager related that in May and June 2002:

> I heard that the stock is probably going to take a downswing, because of the fact that the channels are flooded.  I asked, well how did the channels get that flooded?  That became the first time that someone in distribution explained to me that the sales people were under pressure to make deep discounts [in order to convince customers] to buy bigger quantity at the end of quarters in order to meet the goals to keep the revenues up so that the stock price could be maintained.

(¶ 132).

27

channels . . . will be resolved over the next six weeks.'" (¶ 134). On June 24, 2002, however, Cytyc issued a press release further lowering the company's expected revenues for 2002 to a "'range of $230 million to $245 million, with pro forma earnings of $0.40 to $0.44 per share.'" (¶ 137).

During the conference call the following day, "Cytyc representatives explained that the downward revision was necessitated because of the method of gauging demand for ThinPrep that Cytyc had been using, which had been based on shipments to laboratories, overestimated end-user demand." (¶ 138). Cytyc also announced a change in revenue recognition "to a system that was more reflective of end-user demand." (¶ 138).

The market negatively reacted to the news and the price of Cytyc shares feel from $11.46 per share on June 24 to $6.88 per share at the close of trading on June 25, 2002. In contrast to the 64% market share Cytyc reported for the first quarter of 2002 in the April 24, 2002 press release, a Thomas Weisel Partners LLP analyst posited that, "'we believe the ThinPrep Test had a 50.0% market share at the end of 1Q02.'" (¶¶ 117 & 140). Another market analyst likewise depicted "'an inventory overhang of $32-35 million that needs to work its way through the lab channel for Cytyc to put this issue behind it." (¶ 141).

As a further means to infer scienter, the complaint notes that Sullivan and Bowen controlled the content of Cytyc press releases and SEC filings and could therefore falsify information about Cytyc's performance and products. (¶ 147). Intimately