involved in the company, both Sullivan and Bowen were kept informed "on an ongoing basis" about the company's problems. (¶¶ 148-149).[34] Both Sullivan and Bowen, described as "very hands-on managers," attended sales meetings where Cytyc management stressed the importance of meeting sales expectations, according to the former Cytyc CA account executive and the unnamed human resources representative. (¶¶ 153 & 154).

Sullivan also purchased Cytyc stock during the class period. More specifically, on December 6, 2001, Sullivan sold 55,000 shares of Cytyc common stock at a price of $24.90 per share. He sold an additional 20,000 shares the following day, also for $24.90 per share. Gross proceeds totaled $1,867,500 or approximately four times Sullivan's annual salary.

The amount, however, represents approximately 10% of Sullivan's Cytyc holdings. The $24.90 share price was not the high during the class period, which briefly hovered around $30.00 per share in October 2001. (Docket Entry # 32, Ex. R).[35] Even more significant, Sullivan's sales during the class period are less than his sales both prior to and after the class period.

---

[34] The complaint does not attribute the statement to anyone or provide a time frame.

[35] Although the data is attached to defendants' opposition, it is appropriate to take judicial notice of the sales price during the class period on a motion to dismiss. In Re NAHC, Inc. Securities Litigation, 306 F.3d 1314, 1331 (3rd Cir. 2002) (affirming lower court's decision to take judicial notice of stock price data on motion to dismiss). Plaintiffs did not object to the submission. In any event, the complaint reflects a class period high of $27.52 (¶ 10), a price still in excess of the price Sullivan sold his shares.

For example, Sullivan sold 130,800 shares or approximately 15% of his holdings in April 2001 and 189,930 shares or approximately 22% of his holdings in December 2002. (Docket Entry # 32, Ex. Q).[36]

## C. Cytyc's Revenue Recognition Policy

As a result of the end of quarter discounts, Cytyc pushed sales into earlier quarters than normally would have occurred. Customers also accumulated inventory in amounts that they did not immediately use. Improper recognition of revenue materially inflated the company's reported results making the financial statements misleading or false, according to the complaint.

Plaintiffs allege that the channel stuffing as well as the shipments of additional and unordered product violated the company's revenue recognition policy, GAAP and SEC regulations[37]

---

[36] Where, as here, plaintiffs raise an allegation of insider trading (see Docket Entry # 36, p. 43) and do not challenge the authenticity of the public documents, this court may consider the entirety of the Form 4 filings without converting the motion to dismiss into a motion for summary judgment. See In Re Stone & Webster, 253 F.Supp.2d at 128 & n. 11 (considering copies of SEC Forms 4 without converting motion to dismiss into motion for summary judgment); In Re Millstone Scientific Securities Litigation, 103 F.Supp.2d at 450-451 & n. 15 (considering numerous SEC public filing documents without converting motion to dismiss into motion for summary judgment and noting that court may consider "matters of public record" and "documents referred to in the complaint"); see also Blackstone Realty, LLC v. FDIC, 244 F.3d at 195 n. 1 (exhibits attached to complaint properly considered for purposes of Rule 12(b)(6), Fed. R. Civ. P.); Watterson v. Page, 987 F.2d at 3.

[37] The complaint (¶ 55) correctly notes that under an SEC regulation, 17 C.F.R. § 210.4-01(a)(1), "filings that do not comply with GAAP "'will be presumed to be misleading and inaccurate.'" In Re Cabletron Systems, Inc., 311 F.3d 11, 34

thereby evidencing a strong inference of scienter. Plaintiffs maintain that Cytyc's channel stuffing violates certain provisions of the Financial Accounting Standards Board ("FASB"), SEC Staff Accounting Bulletin 101 ("SAB 101"), FASB Statement of Financial Accounting Standards ("SFAS") and an opinion of the Accounting Principles Board ("APB").[38] The complaint alleges that during the class period, the financial statements of Cytyc violated the following principles of fair financial reporting:

(1) the principle that financial reporting should provide accurate, reliable and useful information concerning an entity's performance and that investors commonly use the company's performance in the past as a reliable indicator of the company's performance in the future (¶¶ 54 & 61, citing FASB Concepts Statement No. 1; ¶¶ 34, 42 & 58-59);[39]

(2) the principle that revenues should not be recognized until "realized or realizable and earned" (¶ 56, citing FASB Concepts Statement No. 5, ¶ 83; SAB 101; FASB Concepts Statement

---

(1st Cir. 2002) (citing to 17 C.F.R. § 210.4-01(a)(1)).

[38]     GAAP "'are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups that it established, the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB").'" In Re Enron Corporation Securities, 235 F.Supp.2d 549, 572 n. 11 (S.D.Tx. 2002). The complaint cites inter alia to FASB Concepts Statements 2, 5, 33, 34, 41, 42, 58, 59 and 83.

[39]     In relation to this category, the complaint further notes that by pulling in revenues from future quarters into earlier quarters, defendants violated FASB Concepts Statement Number One because reported revenues in the earlier quarters were not reliable representations of revenues. (¶ 62).

No. 2; SFAS No. 48;[40] Accounting Research Board No. 43; APB

opinion 10; ¶¶ 57, 59 & 80, all citing SAB 101);[41] and

 (3) the principle requiring companies to "describe known

trends or uncertainties" that have a material effect on sales and

revenues in all Form 10-K and 10-Q reports, particularly those

events known to management that would cause reported financial

information not to be reflective of future operating results (¶¶

63-66, citing 17 C.F.R. § 229.303).[42]

---

[40] SFAS 48 circumscribes declaring revenue when a right of return exists. See generally Aldridge v. A.T. Cross Corporation, 284 F.3d at 79. There are no particular allegations that ThinPrep shipments were returned or that such shipments amounted to contingent sales. Moreover, under SFAS 48 allowing a right of return in a particular transaction "does not per se mean that revenue cannot be recognized at the time of sale." In Re Focus Enhancements, Inc. Securities Litigation, 309 F.Supp.2d 134, 151 (D.Mass. 2001).
Alternatively, the complaint's brief reference to the regulation, without more, is conclusory and lacks the necessary pleading detail required under the PSLRA. See Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d 12, 35 (D.Mass. 2000).

[41] Although revenue does not have to be received before recognized, there should be "persuasive evidence of an arrangement." (¶ 56). In other words, there should be evidence of delivery and a fixed price such that "collectability of the sales price is reasonably assured." (¶ 56). There must be sufficient evidence of an arrangement. (¶ 80, quoting SAB 101).

[42] The pertinent SEC regulation imposes a duty on registrants to:

 Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(ii).

The company's financial statements during the class period and the 2001 Form 10-K contain the company's stated policy for revenue recognition.  The policy corresponds to SAB 101 and reads as follows:

> The Company recognizes product revenue upon shipment, provided that there is persuasive evidence of an arrangement, there are no uncertainties regarding acceptance, the sales price is fixed or determinable, collection of the resulting receivable is probable and only perfunctory Company obligations included in the arrangement remain to be completed.

(¶¶ 58 & 78; accord Docket Entry # 32, Ex. J, p. F-7).  The 2001 Form 10-K elsewhere describes Cytyc's policy in a similar manner:

> The Company follows very specific and detailed guidelines in measuring revenue; *however, certain judgments affect the application of its revenue policy.  For example, revenue is not recognized from sales transactions unless the collection of the resulting receivable is reasonably assured.  The Company assess[sic] collection based on a number of factors, including past transaction history with the customer and the credit-worthiness of the customer.*  If it is determined that the collection fee is not reasonably assured, the fee is deferred and revenue is recognized at the time collection becomes reasonably assured, which is generally upon receipt of cash.

(¶ 112, emphasis in complaint; Docket Entry # 32, Ex. J, p. 20).

Cytyc's channel stuffing purportedly improperly pulled revenue from future quarters into previous quarters.  (¶ 62, citing FASB Concepts Statement No. 1; ¶¶ 33, 41 & 58-59).  Because of Cytyc's practice of channel stuffing, the Forms 10-K and 10-Q covering the class period failed to disclose that current revenues were achieved at the expense of future revenues.  (¶ 66).  The forms thereby mischaracterized current financial growth and failed to disclose known trends in violation of 17 C.F.R. § 229.303, according to the complaint.  (¶ 66).

<u>DISCUSSION</u>

A.  <u>Essential Elements of Securities Fraud Liability</u>

Liability under Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, requires the plaintiff to plead with particularity that, in connection with the sale or purchase of a security, the defendant:  (1) "made a false statement or omitted a material fact;" (2) "with the requisite scienter;" and that (3) the "plaintiff relied on the statement or omission;" (4) "with resultant injury."  <u>In Re Boston Technology, Inc. Securities Litigation</u>, 8 F.Supp.2d 43, 52 (D.Mass. 1998); <u>accord</u> <u>Gross v. Summa Four, Inc.</u>, 93 F.3d 987, 992 (1st Cir. 1996) (the "plaintiff must plead, with sufficient particularity, that the defendant made a false statement or omitted a material fact, with the requisite scienter, and that the plaintiff's reliance on this statement or omission caused the plaintiff's injury").  The circumstances in the case at bar primarily concern the first and second elements.

Under the first element, the plaintiff must allege that a defendant either:  "'(A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading.'"  <u>Baron v. Smith</u>, 380 F.3d 49, 52 (1st Cir. 2004) (quoting 15 U.S.C. § 78u-4(b)(1)).  The falsity or untruth of the various statements presents a relatively straight forward analysis.  The misleading nature of the statements poses a more exacting inquiry.

34

In order to create liability for an omission, as opposed to
an affirmatively stated falsehood, there must be a duty to
disclose the omitted nonpublic information.  <u>Gross v. Summa Four,
Inc.</u>, 93 F.3d at 992 ("corporation must first have a duty to
disclose the nonpublic material information"); <u>Shaw v. Digital
Equipment Corporation</u>, 82 F.3d at 1202 ("silence, absent a duty
to disclose, cannot be actionably misleading").  Simply reporting
past historical earnings or successes does not give rise to a
duty to report present circumstances which are less rosy.  <u>Suna
v. Bailey Corporation</u>, 107 F.3d 64, 68 (1st Cir. 1997).  For
example, if a corporation accurately reports that, "'This is our
eighth consecutive quarter in which our gross has increased,'"
there is not duty to add, "'We are concerned about the next
one.'"  <u>Serabian v. Amoskeag Bank Shares, Inc.</u>, 24 F.3d 357, 361
n. 4 (1st Cir. 1994) (further noting the rule may be different if
the defendant apprehends "'a disaster'").

Where, however, "a corporation does make a disclosure--
whether it be voluntary or required--there is a duty to make it
complete and accurate." <u>Gross v. Summa Four, Inc.</u>, 93 F.3d at
992; <u>Backman v. Polaroid Corporation</u>, 910 F.2d 10, 16 (1st Cir.
1990) ("voluntary disclosure that a reasonable investor would
consider material must be complete and accurate"); <u>In Re Boston
Technology, Inc. Securities Litigation</u>, 8 F.Supp.2d at 54 ("when
an issuer opts to make a statement, that statement must be
'complete and accurate'"); <u>see also</u> <u>Lucia v. Prospect Street High
Income Portfolio, Inc.</u>, 36 F.3d 170, 175 (1st Cir. 1994)

(recognizing that statement can be literally accurate but nonetheless misleading). A duty thus arises where, for instance, "a corporation has previously made a statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information." Gross v. Summa Four, Inc., 93 F.3d at 992; see Carney v. Cambridge Technology Partners, Inc., 135 F.Supp.2d 235, 242 (D.Mass. 2001) ("'duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement'"); see also Shaw v. Digital Equipment Corporation, 82 F.3d at 1202-1203 ("task depends, in essence, on conceptions of materiality").

It is equally well settled that the false or omitted fact must be "material." An omitted or misrepresented fact is "considered material only if a reasonable investor would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'" Gross v. Summa Four, Inc., 93 F.3d at 992; accord In Re Cabletron, 311 F.3d at 33 ("fact is material if it is substantially likely that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"). "Information which would have assumed actual significance in the deliberations of a reasonable shareholder is material." Baron v. Smith, 380 F.3d at 52. Issues of materiality are normally left for the "jury rather than resolved by the court on a motion to dismiss." In Re

36

<u>Cabletron</u>, 311 F.3d at 34.

In addition to a materially false statement or the omission of a material fact, the plaintiff must show that the defendant acted with scienter. Scienter is "'a mental state embracing intent to deceive, manipulate, or defraud.'" <u>Greebel v. FTP Software</u>, 194 F.3d at 194 (quoting <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n. 12 (1976)). It can be proven with knowing or reckless conduct. <u>Geffon v. Micrion Corporation</u>, 249 F.3d 29, 35 (1st Cir. 2001). Under the former, the plaintiff must show that the defendant "knew (i) that the statement was false or misleading, and (ii) that it was made in reference to a matter of material interest to investors." <u>Geffon v. Micrion Corporation</u>, 249 F.3d at 35. Under the latter, there must be a showing of "more than mere negligence." <u>Geffon v. Micrion Corporation</u>, 249 F.3d at 35. Recklessness, which is more akin to a lesser form of intent than ordinary negligence, <u>Greebel v. FTP Software, Inc.</u>, 194 F.3d at 199, consists of "'a highly unreasonable omission, involving not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.'" <u>Geffon v. Micrion Corporation</u>, 249 F.3d at 35; <u>Orton v. Parametric Technology Corporation</u>, 344 F.Supp.2d 290, 299 (D.Mass. 2004) (same).

B. <u>Pleading Requirements</u>

<u>Greebel</u> is the seminal case in this circuit with respect to

pleading a securities action under Rule 9(b), Fed. R. Civ. P.
("Rule 9(b)"), and the PSLRA. Greebel v. FTP Software, 194 F.3d
at 193-194; In Re Allaire Corporation Securities Litigation, 224
F.Supp.2d 319, 325 (D.Mass. 2002). As explained in Greebel, the
pleading standards under the PSLRA are congruent to the First
Circuit's strict and rigorous application of Rule 9(b) prior to
the 1995 enactment of the PSLRA. Greebel v. FTP Software, 194
F.3d at 192.

The pleading requirements under the PSLRA, as well as First
Circuit caselaw interpreting Rule 9(b), first require the
plaintiff to specify in the complaint "each allegedly false or
misleading statement 'including its time, place and content.'"
In Re Allaire Corporation Securities Litigation, 224 F.Supp.2d at
324 (quoting Greebel v. FTP Software, 194 F.3d at 193-194).
Second, the complaint must "'specify the reason or reasons why
the statement is misleading.'" Greebel v. FTP Software, 194 F.3d
at 193 (quoting statute with internal brackets omitted). In
other words, the complaint must explain and provide factual
support as to "why the challenged statement or omission is
misleading." Greebel v. FTP Software, 194 F.3d at 193; see In Re
Allaire Corporation Securities Litigation, 224 F.Supp.2d at 324
("[e]very claim that a statement or omission was fraudulent must
be supported by facts showing exactly why it was misleading").
Third, if a claim rests on information and belief, the plaintiff
must "'set forth the source of the information and the reasons
for the belief.'" Greebel v. FTP Software, 194 F.3d at 194; In

Re Allaire Corporation Securities Litigation, 224 F.Supp.2d at
324; see also In Re Cabletron, 311 F.3d at 28 (discussing
inconsistency in definitions of what constitutes a statement made
upon "information and belief").

Fourth, the complaint must state "with particularity facts
that give rise to a 'strong inference' of scienter rather than
merely a reasonable inference."  In Re Cabletron, 311 F.3d at 28
(quoting statute).  Although pleading scienter may and often is
established through inference, the inference must be strong.  In
Re Cabletron, 311 F.3d at 28 (further explaining how this
framework alters "the usual contours" of Rule 12(b)(6) analysis);
Greebel v. FTP Software, 194 F.3d at 195 (same).[43]

Before exploring the absence of a strong inference of
scienter with respect to any remaining statements, this court
examines and rejects the revenue recognition allegations and the
misleading nature of the discounting statement set forth in the
financial statements as well as the allegations based upon
unordered or additional product.  Proceeding along a statement by
statement analysis, see Carney v. Cambridge Technology Partners,
Inc., 135 F.Supp.2d at 243; In Re Boston Technologies Securities
Litigation, 8 F.Supp.2d at 55, this court then culls the
actionable statements in the complaint as distinguished from the
nonactionable statements of corporate puffery and those that fall
within the safe harbor provision of the PSLRA for forward looking

---

[43]  As also explained in Greebel, the PSLRA does not alter
the pre-existing substantive definition of scienter employed in
the First Circuit.  Greebel v. FTP Software, 194 F.3d at 200.

statements.

C.  Revenue Recognition

     In support of pleading a strong inference of scienter as
well as setting forth this material element, plaintiffs point to
defendants' purported violations of SEC rules, GAAP and Cytyc's
own revenue recognition policy.[44]  (Docket Entry # 36, pp. 37-
40).  Separate and apart from the fact of this case, plaintiff's
legal position is accurate.  See Aldridge v. A.T. Cross
Corporation, 284 F.3d at 83 (paraphrasing Geffon v. Micrion
Corporation, 249 F.3d at 35, that "'accounting shenanigans' may
be evidence of scienter"); In Re Cabletron, 311 F.3d at 39
("[s]ignificant GAAP violations also 'could provide evidence of
scienter'"); Greebel v. FTP Software, Inc., 194 F.3d at 203
("[v]iolations of GAAP standards . . . could provide evidence of
scienter"); In Re Galileo Corporation Shareholders Litigation,
127 F.Supp.2d 251, 266 (D.Mass. 2001) ("'a violation of a
company's own policies supports an inference of scienter'").

     Plaintiffs identify statements in the Forms 10-K regarding
discounts as materially misleading (¶¶ 110-111 & 116) as well as
the company's stated policy of recognizing revenue as materially
misleading because the company engaged in channel stuffing.  (¶¶
112-114 & 116); see, e.g., In Re Cabletron, 311 F.3d at 34
(noting the allegation of financial report filings as materially

_____

     [44]  Plaintiffs additionally contend that the violations of
GAAP, SEC regulations and Cytyc's policy show the falsity or
misleading nature of the statements made during the class period
because revenue should not be recognized until realized or
realizable.  (See, e.g., ¶¶ 60-62).

40

misleading). Plaintiffs further complain that the company's
financial statements were materially false and misleading because
they inflated or overstated revenues, accelerated revenues into
earlier quarters and failed to disclose known trends such as
channel stuffing. (See, e.g.,[45] ¶¶ 52, 53, 56 & 66).
Unfortunately for plaintiffs, none of these allegations survive
defendants' motion.

Turning to the first two aforementioned global categories of
revenue recognition violations, it is true that systemically
recognizing revenues before earned and accounting for such
premature revenues contravene GAAP principles set forth in FASB
Concepts Statement Number One. See In Re Daou Systems, Inc.
Securities Litigation, 2005 WL 237645 at * 8 (9th Cir. Feb. 2,
2005) ("premature recognition . . . could violate other GAAP
principles such as" FASB Concepts Statement No. 1); (¶¶ 34 & 58-
59; ¶ 61, citing these principles). It is also true that the
cited regulations in the second category generally require that a
company not recognize revenue in financial statements until
"realized or realizable and earned."[46] (¶ 56; see also ¶¶ 57 &
79-80). For example, SAB 101, repeatedly referenced in the
complaint (¶¶ 56, 57, 59 & 80), "requires that "'revenue should
not be recognized until it is realized or realizable and

---

[45] To state the obvious, the cited list of paragraphs is
not exhaustive.

[46] Plaintiffs' citation to a litany of SEC regulations and
accounting principles is conclusory and fails to explicitly tie
the violation to a particular duty and accounting regulation.

earned.'"  In Re BellSouth Securities Litigation, 2005 WL 327178
at * 16 (N.D.Ga. Feb. 8, 2005) (quoting SAB 101) Barrie v.
Intervoice-Brite, Inc., 2005 WL 57928 at * 3 (5th Cir. Jan. 12,
2005) (further noting that SEC adopted SAB 101 "to guide
companies in applying SEC Rules and GAAP to revenue recognition
issues").  SEC regulations additionally state that filings that
do not conform with GAAP are presumed to be misleading or
inaccurate.  (¶ 55); 17 C.F.R. § 210.4-01(a)(1); In Re Segue
Software, Inc. Securities Litigation, 106 F.Supp.2d 161, 164 n. 4
(D.Mass. 2000).

    The class period Forms 10-Q and 10-K, however, do not
evidence improper revenue recognition under these regulations.
The channel stuffing allegations (see, e.g., ¶¶ 68(f)) are not
within the reach of the aforementioned regulations inasmuch as
there is no evidence that ThinPrep shipments were returned or
that Cytyc engaged in contingent sales, a pattern of undisclosed
price protection and take back guarantees or reported revenue
from fictitious sales.  Cf. Aldridge v. A.T. Cross Corporation,
284 F.3d at 79 (involving price protection policy and contingent
sales as opposed to only channel stuffing).[47]  As aptly explained

----

[47]  The Aldridge case is distinguishable for the reasons set
forth by defendants in their reply brief.  (Docket Entry # 39, p.
16).  Although defendants exaggerate the absence of specific
statements, there remains the absence of contingent or fictitious
sales, returned product or a pattern of price protection and take
back guarantees in the case at bar.  The facts fail to indicate
that the discounts resulted in revenue not being realized, as
reported.  See Gross v. Summa Four, Inc., 93 F.3d at 994.  Thus,
there is an absence of factual support for the necessary element
of falsity or material omissions with respect to the innocuous
channel stuffing alleged in this action as applied to the alleged

by a court in this district:

> [P]ull-ins or deep discounts are not the nefariously
> manipulative scheme that plaintiffs make them out to be.
> Pull-ins do not result in the improper recognition of
> revenue under generally accepted accounting principles
> ("GAAP").  They are actual sales which are treated no
> differently than any other sale.

In Re Peritus Software Services, Inc., 52 F.Supp.2d 211, 223 n. 3

(D.Mass. 1999) (internal quotation marks, brackets and citations

omitted).  The facts fail to indicate that the discounts resulted

in revenue not being realized, as reported and in accordance with

the Cytyc's stated accounting or revenue recognition policy.  See

Gross v. Summa Four, Inc., 93 F.3d at 994.  Stated otherwise, the

excessive discounting did not prevent transactions from being

completed.  The financial statements accurately reflect earnings

made upon and after persuasive evidence of an arrangement.

In any event, contrary to plaintiffs' position, the

discounting was adequately disclosed.  The Forms 10-K and 10-Q

recognize the use of discounts and that such discounts could have

a material adverse effect on Cytyc's financial condition.

(Docket Entry # 32, Ex. B & J, "In the past, the Company has

offered discounts to stimulate demand for the ThinPrep System and

may elect to do so in the future, which discounts could have a

---

GAAP, SEC and company policy violations.
    Thus, while the number of former unnamed employees is
sufficient and they occupy positions that give them a strong
basis for possessing the information about the company's channel
stuffing, see In Re Cabletron Systems, 311 F.3d at 30; Fitzer v.
Security Dynamics Technologies, Inc., 119 F.Supp.2d at 22, the
stories themselves lack the necessary facts to support the
allegation that Cytyc violated the aforementioned GAAP, SEC and
its own revenue recognition rules.

material adverse effect on the Company's business, financial
condition and results of operations;" Docket Entry # 32, Ex. D,
incorporating risks detailed in the 2000 Form 10-K and that such
risks "may have a material adverse effect upon on the Company's
business, financial condition and results of operations").

Accordingly, Cytyc's stated accounting or revenue
recognition policy as well as the statement regarding discounts
(¶¶ 110-116) in the financial statements neither contravenes the
aforementioned regulations in the first and second categories nor
amounts to a false or misleading statement.[48]  Also in this
respect, there is no inference of scienter due to the absence of
a violation of the foregoing GAAP and SEC provisions and Cytyc's
revenue recognition policy or otherwise.[49]

The final category of allegedly improper revenue recognition
which arises under Item 303 of 17 C.F.R. § 229.303 is likewise
unavailing.[50]  First, although the complaint expressly complains
about the failure of the Forms 10-K and 10-Q to disclose the use

---

[48]  Additional reasons explaining why the discount statement
is not misleading or false are discussed *infra*.

[49]  Even if such activity gave rise to a weak inference of
scienter, without more, the complaint fails to pled the strong
inference of scienter now required under the PSLRA.

[50]  The regulation,  17 C.F.R. § 229.303(a) and (b),
commonly referred to as "Item 303," governs Form 10-K and 10-Q
filings.  Item 303 "requires corporate management to disclose,
*inter alia*, 'any known trends or uncertainties that have had or
that the registrant reasonably expects will have a material
favorable or unfavorable impact on net sales or revenues or
income from continuing operations . . ..'"  Kafenbaum and
Schulman v. GTECH Holdings Corporation, 217 F.Supp.2d 238, 249
(D.Mass. 2002).

44

of discounts as a known trend "'that would cause reported financial information not to be necessarily indicative of future operating results'" (¶¶ 64 & 66, quoting instructions to Item 303), the rule in "Item 303, 17 C.F.R. § 229.303(a)(3)(ii), . . . has to be read in light of the SEC's instruction to this paragraph which expressly states that forward-looking information need not be disclosed.  17 C.F.R. § 229.303(a), Instruction 7." Glassman v. Computervision Corporation, 90 F.3d 617, 631 (1st Cir. 1996); accord Romine v. Acxiom Corporation, 296 F.3d 701, 708 n. 3 (8th Cir. 2002) ("While § 229.303(a)(3)(ii) provides that 'known trends or uncertainties' be disclosed in certain SEC filings, another SEC regulation, which expressly addresses forecasts, states that forward-looking information need not be disclosed.  17 C.F.R. § 229.303(a)").

Second, it is not objectively unreasonable to omit the fact that the discounts, or channel stuffing, "would" as opposed to "could" have a material adverse effect on the company's future earnings.  See, e.g., Oxford Asset Management, Limited v. Jaharis, 297 F.3d 1182, 1191 (11th Cir. 2002) ("failure to allege facts from which the objective unreasonableness of Kos management's decision not to include the prescription information . . . could be inferred forecloses reliance upon Item 303 as a source of a duty to disclose that information"), cert. denied, 540 U.S. 872 (2003).  In addition, the import of the language was obvious making the distinction between "could" and "would" immaterial.  See Baron v. Smith, 285 F.Supp. 96, 104 (D.Mass.

45

2003) ("where company disclosed that largest customer began 'trial' of service product, it was not necessary also to disclose that customer had not committed to purchasing service, since uncertainty of commitment to purchase was obvious from word 'trial'") (paraphrasing In Re Boston Technologies Securities Litigation, 8 F.Supp.2d at 61), aff'd, 380 F.3d 49 (1st Cir. 2004).  Finally, although the information regarding discounts appears in the Forms 10-K under "marketing and sales" as opposed to under "results of operations," the placement, without more, is not actionable.[51]

Third, the Forms 10-K directly and the Form 10-Q by incorporation adequately disclosed the use of discounts.  See, e.g., Shaw v. Digital Equipment Corporation, 82 F.3d at 1206 (disclosure of marketing strategy in reducing prices adequately disclosed in SEC filings thereby obviating alleged violation of 17 C.F.R. § 229.303); Baron v. Smith, 380 F.3d at 54-56.

D.  Unordered and Additional Product

Recognizing as revenue unordered product or shipping additional product without an order, as distinguished from channel stuffing through the use of deep discounts, is more egregious and poses a more forceful argument that Cytyc engaged in conduct in violation of its own or SEC and GAAP revenue recognition requirements.  With respect to unordered or additional product, however, the complaint falls well short of

---

[51]  The Form 10-Q refers to the risk factors in the annual Form 10-K report without expressly listing the use of discounts.

46

providing sufficient detail to satisfy Rule 9(b) and the PSLRA. See In Re Galileo Corporation, 127 F.Supp.2d at 268 (generally alleging that revenues in second quarter were false and failing to provide details about amount of warranty reserve understatement made pleading deficient under Rule 9(b) and PSLRA); Fitzer v. Security Dynamics Technologies, 119 F.Supp.2d at 35-36 (channel stuffing allegations deficient under Rule 9(b) and PSLRA); Lirette v. Shiva Corporation, 27 F.Supp. 268, 278 (D.Mass. 1998).

In contrast to the repeated and numerous allegations of channel stuffing on the part of former Cytyc employees,[52] the complaint provides few particulars about the when, where, amount and nature of the transactions of unordered product and the relationship between the amount of unordered product shipped and the company's total revenues. The two instances of shipment of additional product related by the former Cytyc senior representative (¶ 44) and the former Cytyc sales representative (¶ 38) are too general and lack repeated corroboration to satisfy PSLRA pleading. Cf. In Re Cabletron, 311 F.3d at 30-31. Thus, the instances of unordered product or shipment of additional product above what had been ordered (see ¶¶ 5, 7, 44, 49, 61 & 82(c)), as distinguished from the deep discounting at the end of every quarter and/or "channel stuffing," lack detail and corroboration by other employees. Eschewing a categorical approach, see In Re Cabletron, 311 F.3d at 32 (rejecting

---

[52]  See footnote number 47, ¶ 2.

"categorical approach" and noting that "'Congress was concerned with the quantum, not type, of proof'"), the complaint lacks the "quantum" of proof and particularity to satisfy the PSLRA with respect to the shipments of unordered or additional product. Accordingly, such allegations cannot support a finding that Cytyc's stated revenue recognition policy or the use of discounts or other channel stuffing activity was false or misleading or that defendants acted with scienter.

E. Specific Statements

    Defendants attack a number of the statements in the complaint as nonactionable corporate puffery or falling within the PSLRA's safe harbor provision for forward looking statements.

    As to the former, "Vague and loosely optimistic statements" are "nonactionable as a matter of law." Gross v. Summa Four, Inc., 93 F.3d at 987 (affirming dismissal of complaint). This rule applies to statements concerning both current affairs and future prospects. Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 300 ("corporate puffery rule 'covers loose optimism about both an issuer's current state of affairs and its future prospects'"); In Re Boston Technology, Inc. Securities Litigation, 8 F.Supp. at 54 (same). "Rosy affirmation[s] commonly heard from corporate managers," such as we "expect another year of strong growth" or "the company is on target toward achieving the most profitable year in its history," are "numbingly familiar." Shaw v. Digital Equipment Corporation, 82 F.3d at 1217-1218 (internal quotation marks and citations

48

omitted). Consequently, "no reasonable investor could find" such
"optimistic" or "vague" statements "important to the total mix of
information." Shaw v. Digital Equipment Corporation, 82 F.3d at
1217. In the parlance of common law fraud, such statements
amount to "'puffing' or 'sales talk.'" Shaw v. Digital Equipment
Corporation, 82 F.3d at 1217 n. 32.

The more specific, definite or concrete the outward
statement is, however, the greater the likelihood the statement
is material and not mere puffery. See Gross v. Summa Four, Inc.,
93 F.3d at 995 (distinguishing the actionable statements in Alfus
v. Pyramid Technology Corporation, 764 F.Supp. 598 (N.D.Cal.
1991), from inactionable statements in that case because
"statements in Alfus dealt with definite projections," such as a
forecast of 40% revenue growth). For example, the inclusion of
"a market share figure" might push a nonactionable statement
beyond the realm of "mere optimistic corporate puffery." Fitzer
v. Security Dynamics Technologies, 119 F.Supp.2d at 26 (finding
phrase "'continued market demand'" vague and optimistic in part
because phrase did not specify "market share figure").
Similarly, more cautious or subdued statements are less likely to
be actionable than more strongly optimistic or concrete
statements that contrast sharply with internal reality. See
Glassman v. Computervision Corporation, 90 F.3d at 635-636 (duty
to disclose problems with new product "may arise where a company
makes strongly optimistic or concrete statements . . . in stark
contrast to its internal reports" as opposed to "subdued

49

generally optimistic statements" that amount to "puffery," citing
San Leandro Emergency Medical Group Profit Sharing Plan v. Philip
Morris Companies, Inc., 75 F.3d 801, 811 (2nd Cir. 1996)).
"[M]ild statements of hope, couched in strongly cautionary
language," are not materially misleading.  Glassman v.
Computervision Corporation, 90 F.3d at 636.

Defendants also rely on the PSLRA's safe harbor provision
with respect to a number of the forward looking statements in the
complaint.  Generally speaking, forecasts or other forward
looking statements are not exempt from liability.  Suna v. Bailey
Corporation, 107 F.3d at 70.  They are, however, only actionable
"if the forecast might affect a reasonable investor in
contemplating the value of a corporation's stock."  Suna v.
Bailey Corporation, 107 F.3d at 70 (internal quotations marks and
citation omitted).  In addition, there must be a showing that the
forecast was false or misleading, in other words, that facts
known by the forecaster at the time of the forecast (as
distinguished from simply fraud by hindsight) made the
anticipated forecast or success unlikely.  See Suna v. Bailey
Corporation, 107 F.3d at 70 (had the plaintiff "presented facts
known by Bailey, and contemporaneous with the statements above,
that would show that Bailey's anticipated success was unlikely,
such facts would have adequately alleged a claim of securities
fraud").

The PSLRA provides a safe harbor provision for forward
looking statements that include cautionary warning[s].  Analogous

to the "bespeaks caution" doctrine, <u>see</u> H.R. Conf. Rep. No. 104-369, * 44 (1995) ("[t]he Conference Committee safe harbor, like the Senate safe harbor, is based on aspects of SEC Rule 175 and the judicial created 'bespeaks caution' doctrine"), the relevant provision in 15 U.S.C. § 78u-5(c)(1)(A)(i) "shelters forward-looking statements that are accompanied by meaningful cautionary statements." <u>Greebel v. FTP Software, Inc.</u>, 194 F.3d at 201; 15 U.S.C. § 78u-5(c)(1)(A)(i). The statutory language precludes liability for a forward looking statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or is "immaterial."[53] 15 U.S.C. § 78u-5(c)(1)(A)(i) & (ii). The Conference Committee's discussion clarifies that "'[i]mportant' factors means [that] the stated factors identified in the cautionary statement must be relevant to the projection."[54] H.R. Conf. Rep. No. 104-369, * 44

---

[53] The inclusion of the latter language simply clarifies that, "Courts may continue to find a forward-looking statement immaterial-and thus not actionable under the 1933 Act and the 1934 Act-on other grounds" irrespective of the statutory safe harbor provision." H.R. Conf. Rep. No. 104-369, * 43 (1995).

[54] The following parts of the committee's discussion are illuminating:

> The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business. As part of the analysis of what constitutes a meaningful cautionary statement, courts should consider the factors identified in the statements. "Important" factors means the stated factors identified in

(1995) (further noting that "boilerplate warnings will not
suffice"). On the other hand, the cautionary statement does not
necessarily have "to include the particular factor that
ultimately causes the forward-looking statement not to come
true."[55]  H.R. Conf. Rep. No. 104-369, * 44 (1995).

---

the cautionary statement must be relevant to the projection
and must be of a nature that the factor or factors could
actually affect whether the forward-looking statement is
realized.

The Conference Committee expects that the cautionary
statements identify important factors that could cause
results to differ materially-but not all factors. Failure
to include the particular factor that ultimately causes the
forward-looking statement not to come true will not mean
that the statement is not protected by the safe harbor. The
Conference Committee specifies that the cautionary
statements identify "important" factors to provide guidance
to issuers and not to provide an opportunity for plaintiff
counsel to conduct discovery on what factors were known to
the issuer at the time the forward-looking statement was
made.

The use of the words "meaningful" and "important factors"
are intended to provide a standard for the types of
cautionary statements upon which a court may, where
appropriate, decide a motion to dismiss, without examining
the state of mind of the defendant. The first prong of the
safe harbor requires courts to examine only the cautionary
statement accompanying the forward-looking statement.
Courts should not examine the state of mind of the person
making the statement.

H.R. Conf. Rep. No. 104-369, * 44 (1995).

[55]  The April 24, 2002 conference call fits comfortably
within this framework. Although plaintiffs complain that the
warnings in the conference call were simply boilerplate, the
warnings were specific, detailed and relevant to the projection.
Contrary to plaintiffs' position, the omission of the discounts
and inventory does not dispel the specificity of the warning and
prevent it from being sufficient under the PSLRA. This is
particularly true where, as here, the warning refers the investor
to the company's SEC filings and the 2001 Form 10-K expressly
advised the investor about the company's use of discounts. The
forward looking statements in the conference call therefore lie

52

The safe harbor provision also extends to oral statements in a less exacting manner. It allows a company to rely on this safe harbor when making an oral statement by simply referring to the written document containing the cautionary language. 15 U.S.C. § 78u-5(c)(2); see H.R. Conf. Rep. No. 104-369, * 45 (1995).

The analogous "bespeaks caution" doctrine precludes liability for forecasts and projections where the context of the forecast bespeaks caution. Shaw v. Digital Equipment Corporation, 82 F.3d at 1213-1214. Under this doctrine, the forward looking statement is not materially misleading if "accompanied by adequate cautionary disclosures." In Re Focus Enhancements, Inc. Securities Litigation, 309 F.Supp.2d at 162. Like the statutory safe harbor provision, the cautionary language under the bespeaks caution doctrine must be "'sufficiently related in subject matter'" as opposed to "merely boilerplate." In Re Focus Enhancements, Inc. Securities Litigation, 309 F.Supp.2d at 162. Summarily stated, the doctrine "embodies the principle that when statements of 'soft' information such as forecasts, estimates, opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, the

---

within the safe harbor.
    Furthermore, although not argued or addressed by the parties, the conference call was an oral warning at the time it was given even though it is now reduced to a transcript. As explained in the next paragraph, such oral statements do not require the level of specificity required for written statements. In any event, the warning is sufficient for either a written or oral forward looking statement.

'soft' statements may not be materially misleading under the securities laws." <u>Shaw v. Digital Equipment Corporation</u>, 82 F.3d at 1213.

With the foregoing principles in mind, including the adequacy of the pleading under Rule 9(b) and the PSLRA, this court turns to the statements in the complaint.

The July 25, 2001 statement that growth is "driven by our proven market strategy, best-in-class sales team, and superior technology" is not actionable due to the failure to articulate or establish a basis for the statement's false or misleading nature. <u>See</u> <u>Orton v. Parametric Technology Corporation</u>, 344 F.Supp.2d at 300 (distinguishing the actionable fueling growth statement in <u>In re Allaire Corporation Securities Litigation</u>, 224 F.Supp.2d at 331-332). Plaintiffs fail to allege that the market strategy or the sales team or the superior technology is not "without any positive impact on [Cytyc's] performance." <u>Orton v. Parametric Technology Corporation</u>, 344 F.Supp.2d at 299 (statement that credited "company's separation of business units and focus on product sales for Parametric's financial performance" as opposed to undisclosed improper revenue recognition deemed inactionable because "[p]urchasers . . . have not alleged that Parametric's strategic business decisions were without any positive impact on their performance"). Nowhere does the complaint particularize with the requisite specificity that Cytyc's growth was not assisted by the company's market strategy, sales team and superior technology. <u>See</u> <u>also</u> <u>Orton v. Parametric Technology</u>

54

<u>Corporation</u>, 344 F.Supp.2d at 301-302 (statement that "we
executed well this quarter" and "believe our strategic efforts in
this past year in developing software solutions, expanding
distribution and improving customer satisfaction are helping us
to expand our leadership position as the product development
company" lacked "requisite specificity" because "the plaintiffs
have not alleged . . . that Parametric had executed its software
development, product distribution, or customer service poorly").

     Moreover, defendants correctly point out that the statement
does not present an exhaustive list of all the reasons for the
growth.  <u>See</u>, <u>e.g.</u>, <u>In Re Boston Technology, Inc. Securities
Litigation</u>, 8 F.Supp.2d at 69 ("paragraph B is not reasonably
construed to attribute the shortfall to an exclusive cause, and
it was therefore immaterial to the investment decision").  As
noted by the court in <u>Polaroid</u>, "Statements discussing how some
market factors (like mergers among retail drug chains) are
affecting business are not false or misleading simply because
they do not implicate other negative market influences as well."
<u>In Re Polaroid Corporation Securities Litigation</u>, 134 F.Supp.2d
176, 185 (D.Mass. 2001).  Thus, the omission of the extensive end
of quarter discounting does not render the statement materially
misleading.  <u>See</u> <u>Gross v. Summa Four, Inc.</u>, 93 F.3d at 992
(revealing one fact about a product does not require corporation
to "reveal all others that, too, would be interesting,
market-wise, but means only such others, if any, that are needed
so that what was revealed would not be 'so incomplete as to

mislead'")

The statement is also inactionable corporate puffery.  <u>See</u>,
<u>e.g.</u>, <u>Fitzer v. Security Dynamics Technologies, Inc.</u>, 119
F.Supp.2d at 24 (classifying as puffery statement that "Our
eleventh straight quarter of record revenues is the result of
continued market demand for our enterprise network and data
security solutions").  Indeed, it is strikingly similar to the
following statement in <u>Orton</u> that the court considered puffery:
"Although we are not immune to the weakening economy in the
near-term, we feel confident that the combination of our
motivated workforce, solid infrastructure and total commitment to
product development which is intended to deliver a high return on
investment for customers, positions us for long-term growth."
<u>Orton v. Parametric Technology Corporation</u>, 344 F.Supp.2d at 300
(discounting statement as puffery and not "material to any
reasonable analysis of the company's prospects").  The court in
<u>Orton</u> rejected the foregoing statement as puffery against the
contention that the statement failed to disclose that "long-term
growth was unlikely because of Parametric's improper recognition
of revenue in earlier periods."  <u>Orton v. Parametric Technology</u>
<u>Corporation</u>, 344 F.Supp.2d at 300.  The other portions of the
statement pertaining to the continuation of "momentum" and the
company's "consistent quarter to quarter growth" is likewise mere
puffery and sales talk.  <u>See</u>, <u>e.g.</u>, <u>In Re Parametric Technology</u>
<u>Corporation Securities Litigation</u>, 300 F.Supp.2d at 220-221
(characterizing as puffery statements that company was "well

56

positioned for growth" and that it "expects more revenue growth in opportunities in Asia in the coming years").[56]

The same reasoning applies to the similar statements in the August 2, 2001 Bloomberg news article. When asked how Sullivan would increase or aggressively gain market share, Sullivan lists Cytyc's "unique sales and marketing strategy" as "creating the demand at the physician's office." (¶ 73). Although the complaint adequately pleads the time, place and content of the communication, the statement itself is not false or misleading. Like the July 25, 2001 statement, the list is not exhaustive or otherwise materially false or misleading. There is no indiction that the direct sales force was not creating, at least in part, the demand. In addition, the nondisclosure of the use of discounts did not significantly alter the total mix of information inasmuch as the 2000 Form 10-K filing discloses the use of such discounts. Alternatively, the self directed comment is puffery as is Sullivan's mildly optimistic prediction about the company's ability to maintain similar growth ("We believe so") (¶ 73).[57]

In the interview, however, Sullivan also quantifies revenue projections. (¶ 75). The quantification provides sufficient

[56] As explained _infra_ with respect to these and other statements, the omission of the deep discounting at Cytyc falls significantly short of reckless when placed in context and the complaint as a whole fails to demonstrate a strong inference of scienter.

[57] Like the July 25, 2001 comments, this court's decision obviates the need to address the applicability of the PSLRA's safe harbor provision to these comments.

specificity to avoid defendants' assertions of puffery.
Sullivan's revenue projections in the interview, bereft of
cautionary language or a reference to document[s] identified as
containing cautionary statements,[58] do not fall within the reach
of the safe harbor provision or the bespeaks caution doctrine.
See 15 U.S.C. § 78u-5(c)(2); H.R. Conf. Rep. No. 104-369, * 45
(1995) ("Companies who want to make a brief announcement of
earnings or a new product would first have to identify the
statement as forward-looking").

Contrary to defendants' position that the information does
not alter the total mix of information, the forecast gives a
specific range for 2002 revenues.  Cf. Suna v. Bailey
Corporation, 107 F.3d at 70 (discounting projections as not
actionable in part because they "do not project specific numbers
that the company will certainly attain").  Projections and the
company's ability to meet financial targets are "certainly
material to any sensible evaluation of [a] company's
performance." Orton v. Parametric Technology Corporation, 344
F.Supp.2d at 302.  Theoretically, the projection was materially
misleading when made because the preexisting and continuous deep
discounting and over-stuffing of customers would prevent Cytyc
from meeting the forecast.  Existing revenue growth was achieved
at the expense of future sales.  (¶ 82).

The issue therefore devolves into whether Sullivan had

---

[58]    Instead, during the televised exchange Sullivan simply
refers to a conference call.