information known to him at the time that would show that the anticipated or projected earnings for 2001[59] and/or 2002 were unlikely. See generally Suna v. Bailey Corporation, 107 F.3d at 70. This is where the complaint falters. First, the complaint fails to plead sufficient facts to support the information and belief that Sullivan knew that the projection was false when made. See 15 U.S.C. § 78u-4(b)(1). The facts alleged fail to adequately show that Sullivan had knowledge of specific facts regarding the channel stuffing and the magnitude or extent of the end of quarter discounting in August 2001 that would make Sullivan's projection unreasonable. See In Re Boston Technology, Inc. Securities Litigation, 8 F.Supp.2d at 54 ("Absent bad faith, a defendant must have had--at the time the statement was made--knowledge of specific facts making the statement unreasonable"); see also Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d at 361. Furthermore, under the facts alleged there is absolutely no bad faith or intentional deception reasonably inferred.

Sullivan also had no knowledge that the projection was materially misleading. See Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d at 361 (under Rule 9(b), "complaint must set forth 'specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading'"). To the contrary, there was little reason to

---

[59] Cytyc met the 2001 projection. (¶¶ 96 & 115). This is true with respect to both the earnings projection on August 2, 2001 and on January 14, 2002.

59

believe that the failure to disclose the discounting was materially misleading and would alter the total mix of information inasmuch as the 2000 Form 10-K already disclosed the use of discounts. Similarly, there was no duty to disclose the discounting under the circumstances. The projection is therefore not actionable under the facts alleged.[60]

Sullivan's equally glowing repetition of 2002 projected earnings on January 14, 2002, as "approximately $0.64 to $0.66" (¶ 95) is not puffery but nonetheless fails for identical reasons. It is true that the complaint notes that the continuous channel stuffing was and would continue to have an adverse impact on future sales and/or the market share was overstated because of the channel stuffing, not to mention that customers were ceasing to do business with Cytyc because of such practices. (¶ 100). The complaint fails, however, to provide facts to support the information and belief regarding Sullivan's knowledge that the projection was false or misleading when made. In any event, the strong inference of scienter is notably absent.[61]

---

[60] Alternatively, as discussed infra, there is an absence of a strong inference of scienter.

[61] The January 14, 2002 press release contains an adequate cautionary proviso that the projections are forward looking statements and sufficiently warns investors of the risks, including those identified in the 2000 Form 10-K filing. Consequently, although defendants neglect to expressly rely on the safe harbor provision or the bespeaks caution doctrine as applied to this statement, it is highly likely that the statement is not actionable. Given the absence of an explicit argument to this effect, however, this court rests its decision with respect to this statement on the conclusion that plaintiffs fail to plead a strong inference of scienter. Defendants present the scienter argument (as well as the corporate puffery, materiality and Rule

The October 19, 2001 comment by Sullivan that the company feels "confident in our success based on our track record" with ThinPrep is sales talk. See, e.g., In Re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d at 217 (statement that "we continue to have confidence in the fundamental strength of our business and in our strong competitive position" considered puffery); Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 24 (classifying as puffery statement that, "There are very few companies that are positioned as well as us and have the track record, the experience and the management"). Unaccompanied by any specifics regarding the company's "track record," see Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 24 (finding phrase "continued market demand" vague inasmuch as it failed to "specify a particular market demand [or] a market share figure"), no reasonable investor would consider the statement material to an investing decision.

For the same reasons that apply to the July 25, 2001 statement, the strikingly similar statement in the October 24, 2001 press release ("We believe the superior clinical performance of the ThinPrep Pap Test and the effectiveness of our sales and marketing strategy have provided Cytyc with consistent revenue and earnings growth and financial performance") is not actionable. The statement does not purport to identify all of

---

9(b)/PSLRA pleading shortcomings) universally as applied to all the allegations in the complaint. (Docket Entry # 31, § Introduction & § I(C)(2)).

61

the factors effecting growth and performance. Alternatively, for reasons expressed with respect to the July 24, 2001 statement, the statement amounts to puffery. See, e.g., Suna v. Bailey Corporation, 107 F.3d at 70 ("While the company states that it *believes* [emphasis supplied] the opportunities will be comparable, the statement contains no promise to that effect").

Plaintiffs next challenge in a January 23, 2002 press release that Cytyc had "now reported fifteen consecutive quarters of revenue growth." (¶ 96). Although plaintiffs contend and plead that the statement is false because of the failure to disclose the channel stuffing which numerous former employees articulate, the statement was an accurate portrayal of past and present earnings. It was not false. Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d at 361 & n. 4 ("defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy"). As to the misleading nature of the statement, defendants had no duty to disclose the channel stuffing with respect to this statement. The omitted disclosure of channel stuffing did not cause what Sullivan did say, to wit, 15 past quarters of growth, to be misleading. See Shaw v. Digital Equipment Corporation, 82 F.3d at 1212 ("reports of past successes do not themselves give rise to a duty to inform the market whenever present circumstances suggest that the future may bring a turn for the worse"). In contrast to a similar statement deemed actionable in Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 302 ("we met

62

the third quarter targets we set in April"),[62] plaintiffs cannot, as explained supra, empirically show that Cytyc did not meet the earnings for the quarters in violation of the cited regulatory provisions and the company's revenue recognition policy. Cf. Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 302 (above statement actionable because, in theory, "the Purchasers could empirically disprove Harrison's statement by demonstrating that Parametric did not actually meet the financial targets set in April under GAAP and under the company's own accounting policies").

The remaining objectionable portion of the statement ("We believe the achievements of 2001 put Cytyc in a solid position to build on the momentum of the past year") is puffery. See, e.g., Suna v. Bailey Corporation, 107 F.3d at 70 ("While the company states that it *believes* [emphasis supplied] the opportunities will be comparable, the statement contains no promise to that effect"); Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 302 (after stating that company met the target for the April quarter, the further statement that "[s]olid execution of our cost reduction programs and consistent focus on our key initiatives will position us for enhanced earnings potential once the economy improves" was puffery); In Re Parametric Technology

---

[62] Like the entire objectionable portions of the January 23, 2002 statement, the statement in Orton reads in full as follows: "[W]e met the third quarter targets we set in April . . . Solid execution of our cost reduction programs and consistent focus on our key initiatives will position us for enhanced earnings potential once the economy improves." Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 302.

Corporation Securities Litigation, 300 F.Supp.2d at 220-221 (characterizing as puffery statements that company was "well positioned for growth" and that it "expects more revenue growth in opportunities in Asia in the coming years"). Such general optimism regarding the elusive concept of "momentum" building for an indeterminable amount of time into the future is not actionable.

As already explained,[63] the forecast in the January 24, 2002 Bloomberg news interview ("$295 to $305 million" and earnings per share "of between 64 and 66 cents" for upcoming year) is not puffery but nonetheless fails to constitute an actionable statement.

Sullivan's additional statement that "we believe" that Cytyc could capture "100 percent of the market" is, to a large degree, so unrealistic that no reasonable investor would give it credence. Put another way, a reasonable investor would not consider such a prophesy material to an investing decision. It also amounts to inactionable corporate puffery. See, e.g., Suna v. Bailey Corporation, 107 F.3d at 70; Orton v. Parametric Technology Corporation, 344 F.Supp.2d at 302; In Re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d at 220-221. Alternatively, as explained in connection elsewhere, the statement is not actionable because of the absence of a strong inference of scienter.

Plaintiffs next identify various statements in the April 24,

---

[63] See footnote number 22.

2002 press release and conference call as actionable. The forward looking statements (see, e.g., ¶ 118; ¶ 119, 2002 revenues) fall easily within the parameters of the PSLRA's safe harbor.[64]

The historical recitation of earnings in the April 24, 2002 press release (¶ 117), without more, was not false.[65] The statement also did not give rise to a duty to disclose the deep discounts or channel stuffing and was therefore not misleading. The press release did not present the statement of past earnings as a basis to forecast future growth but, instead, advised that Cytyc management would discuss future expectations at the conference call. See Shaw v. Digital Equipment Corporation, 82 F.3d at 1212 ("reports of past successes do not themselves give rise to a duty to inform the market whenever present circumstances suggest that the future may bring a turn for the worse").

The tightening inventory statement is not actionable for a number of reasons. First, the statement (¶¶ 119 & 124) fails the so-called "entanglement test." Under this test, recently adopted by the First Circuit, "liability may attach to an analyst's statements where the defendants have expressly or impliedly adopted the statements, placed their imprimatur on the

---

[64] See footnote 55.

[65] To the extent the market share (¶¶ 47, 68, 82, 90, 100, 102, 109 & 117) or conversion rate stated at various times in the complaint was not accurate (see, e.g., ¶ 127), there is an absence of a strong inference of scienter.

statements, or have otherwise entangled themselves with the analysts to a significant degree." In Re Cabletron, 311 F.3d at 37-38; accord Stone & Webster, Inc. Securities Litigation, 253 F.Supp.2d at 113 (same).[66] Second, the conclusory assertions that defendants intended analysts to rely upon and repeat various statements (¶ 76), that the company provided guidance to analysts and that the company used analysts, as a conduit to provide false and misleading information (¶¶ 167-172) do not satisfy Rule 9(b). See Stone & Webster, Inc. Securities Litigation, 253 F.Supp.2d at 113 ("Suna also rejects the notion that general statements regarding a company's 'practice' of 'communicat[ing] regularly with securities analysts . . . and [of] provid[ing] detailed "guidance" to these analysts' are sufficiently particularized to survive a motion to dismiss" under Rule 9(b)). The article itself does not quote a company source or imply that Cytyc adopted the statements therein. See, e.g., Suna v. Bailey Corporation, 107 F.3d at 74 (rejecting under 9(b) allegation attributing statements to company inasmuch as "reports do not appear to quote any Bailey officer or employee, nor do they imply that the forecasts were supplied or confirmed by any Bailey officer or employee").

The assertion that Cytyc falsely represented in the conference call that the inventory problem manifested itself "only in the first quarter of 2002" (¶ 125) or that, as reflected

---

[66] Plaintiffs' reliance on Stone & Webster (Docket Entry # 36, p. 30) is misplaced for reasons set forth in defendants' reply (Docket Entry # 39, pp. 13-14).

in a UBS Warburg report, the company "'instituted a one-time promotion'" (¶¶ 121 & 122) is belied by the transcript. See In Re Computervision Corporation Securities Litigation, 914 F.Supp. 717, 719 (D.Mass. 1996) (noting "fundamental and fatal defect[]" in securities fraud action that, with respect to the allegedly actionable statements, "the Company simply did not say what the plaintiffs say it said"). Sullivan explicitly stated that this was not the first time for company promotions. The 2000 and 2001 Forms 10-K also both note the use of "discounts" (plural) "[i]n the past." (Docket Entry # 32, Ex. B & J).

Having addressed various statements, this court turns to the issue of scienter or, more accurately, the absence thereof.

E.  Scienter

Having already defined the concept of scienter, this court simply notes that there is no one fact pattern that predominates the calculus. Instead, the fact pattern presented in each individual case is analyzed to determine if the allegations are sufficient to support a strong inference of scienter. Geffron v. Micrion Corporation, 249 F.3d at 36 ("this Court does not 'categoriz[e] patterns of facts as acceptable or unacceptable to prove scienter,' but instead 'analyze[s] the particular facts alleged in each individual case to determine whether the allegations [are] sufficient to prove scienter'"); Greebel v. FTP Software, 194 F.3d at 196.

What consistently strikes this court in reading and rereading the complaint and other relevant and properly

considered documents is the absence of the strong inference of scienter now required under the PSLRA. First, there is nothing inherently wrong with discounts or pressing for sales to be made in earlier quarters or at the end of a quarter. <u>Greebel v. FTP Software</u>, 194 F.3d at 202 ("[t]here is nothing inherently improper in pressing for sales to be made earlier than in the normal course");[67] <u>accord</u> <u>Johnson v. Tellabs, Inc.</u>, 262 F.Supp.2d 937, 950 (N.D.Ill. 2003) ("[i]n the business world, there certainly is nothing inherently wrong with offering incentives to customers to purchase products"). Nor is there any additional suggestion of inventory parking, contingent sales or other improper activity.[68]

Second, throughout the class period, the company's SEC filings disclosed the use of discounts, albeit not to the degree plaintiffs insist was necessary. Given the fact that Cytyc's public documents disclosed the use of discounts, i.e., the company's "channel stuffing practices," <u>see</u> <u>In Re Segue Software,</u>

---

[67] There is nevertheless a line between offering discounts or encouraging earlier than normal sales versus knowingly hiding low earnings in the earlier quarters by artificially inflating revenues through improper revenue recognition. <u>See</u> <u>Greebel v. FTP Software</u>, 194 F.3d at 202; <u>accord</u> <u>In Re Focus Enhancements, Inc. Securities Litigation</u>, 309 F.Supp.2d at 149. The latter provides a weak inference of scienter. <u>Greebel v. FTP Software</u>, 194 F.3d at 202-203; <u>accord</u> <u>In Re Focus Enhancements, Inc. Securities Litigation</u>, 309 F.Supp.2d at 149-150. Given the absence of improper revenue recognition, even this weak inference is missing.

[68] The three cases outside this circuit prominently cited by plaintiffs (Docket Entry # 36, pp. 1-2) are distinguishable for reasons stated by defendants in their reply memorandum (Docket Entry # 39, pp. 3-4 & n. 2) and eloquently expressed at the hearing.

Inc. Securities Litigation, 106 F.Supp.2d at 168 (allegation of improperly booking contingent sale to boost revenue and not disclosing the right of return in the large and identified million dollar sale to named customer not fraudulent given the Form 10-K disclosure);[69] see also Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 35-36 (finding list prices in Form 10-K not fraudulent inasmuch as the disclosure was made that the prices were "[s]ubject to volume discounts and other licensing terms and conditions"), the record fails to reflect a strong inference that defendants knew that the statements were false or materially misleading by omitting the information regarding the extent of the discounting at Cytyc. See Geffon v. Micrion Corporation, 249 F.3d at 36 ("[e]ven if the statements at issue were material and false or misleading, the evidence does not support a finding that defendants knew the statements would materially mislead the investing public"). Indeed, during the April 24, 2002 conference call, Sullivan forthrightly sought to provide investors with the information that this was not the first time the company had used promotions. See Geffon v.

---

[69] Indeed, the disclosure in the Form 10-K in Segue was even less forthcoming that the ones in the case at bar. In Segue, the Form 10-K affirmatively stated the contrary, to wit, that, "The Company typically does not grant to its customers a contractual right to return software products." In Re Segue Software, Inc. Securities Litigation, 106 F.Supp.2d at 168. The form then gave the impression that rights of return were the exception and not contained in typical, if any, contracts with customers. The relevant language was that, "When approved by management, however, the Company has accepted returns of certain software products and has provided an allowance for those specific products." In Re Segue Software, Inc. Securities Litigation, 106 F.Supp.2d at 168.

Micrion Corporation, 249 F.3d at 37 (noting that "Micrion sought to provide investors with adequate warnings of the possibility that not all seventy-five units would be purchased").

Third, as already explained, the allegations of insider trading and revenue recognition or accounting violations lack merit. Although insider trading may provide evidence of scienter, see Greebel v. FTP Software, 194 F.3d at 196 (noting the "many different types of evidence as relevant to show scienter," including insider trading), the inference is nonexistent in the case at bar. Bowen never traded during the class period. Sullivan's trading was less during the class period than prior to or after the class period. Likewise and also as previously explained, violations of GAAP, SEC or company policy may give rise to an inference of scienter, see Aldridge v. A.T. Cross Corporation, 284 F.3d at 83 ("'accounting shenanigans' may be evidence of scienter"); In Re Cabletron, 311 F.3d at 39 ("[s]ignificant GAAP violations also 'could provide evidence of scienter'"); In Re Galileo Corporation Shareholders Litigation, 127 F.Supp.2d at 266 ("'a violation of a company's own policies supports an inference of scienter'"), but the record is devoid of any such violations.

Defendants' alleged motive to inflate the stock price and use the inflated price to purchase Pro-Duct and Digene at more attractive prices is unconvincing. See, e.g., In Re Galileo Corporation Shareholders Litigation, 127 F.Supp.2d at 270 ("the mere statement that an acquisition occurred after Galileo's stock

70

prices increased is insufficient even to create an inference that the two events were necessarily related, not to mention insufficient to create a strong inference either of an intent to deceive or of recklessness"). Sullivan and Bowen's involvement in discussing sales strategies, knowledge of daily activities, positions in the company, setting and encouraging unrealistic sales quotas, general access to internal information and/or focus upon the company's stock price (¶¶ 39-41, 46-47, 144, 147-151 & 153-154) are also equally unconvincing. See Carney v. Cambridge Technology Partners, Inc., 135 F.Supp.2d at 254 (rejecting "knowledge derived by Sims and Toscanini from unspecified plans, budgets, forecasts, reports, conversations, connections, meetings and 'other' information to which these defendants had access because of their positions with CTP" as adequate to plead scienter); Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 25 (declining to "speculate that because former employees in the corporation knew of changes in the sales profiles, the corporate executives must also have known about the changes and fraudulently concealed them"); Lirette v. Shiva Corporation, 27 F.Supp.2d at 283 ("[a]ttempts to plead scienter by general allusions to unspecified internal corporate information are insufficient to withstand a motion to dismiss"); In Re Viewlogic Systems Securities Litigation, 1996 U.S.Dist. Lexis 22371 at * 37-39 (D.Mass. March 13, 1996); see also Maldonado v. Dominquez, 137 F.3d 1, 9-10 (1st Cir. 1998).

In sum, there is a marked void of the necessary strong

71

inference of scienter. Finally, lacking a predicate violation of section 10(b) of the Securities Exchange Act of 1934 or of Rule 10b-5, 17 C.F.R. § 240.10b-5, the section 20(a) claim is also subject to dismissal. See Suna v. Bailey, 107 F.3d at 72; In Re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d at 224.

Defendants seek a dismissal with prejudice. In a footnote, however, plaintiffs summarily request leave to replead in the event this court "determines that there are efficiencies in the Complaint as to any of the named defendants." (Docket Entry # 36, n. 26). This court assumes plaintiffs meant to use the word "deficiencies." As discussed, there are numerous deficiencies.

Although this case is rapidly approaching the three year mark, the PSLRA "stays all discovery, with certain narrow exceptions, during the pendency of any motion to dismiss." In Re Cabletron, 311 F.3d at 33. In analogous circumstances, the court in Guerra v. Teradyne, Inc., 2004 WL 1467065 (D.Mass. Jan. 16, 2004), recommended a dismissal without prejudice given the plaintiffs' footnote request for leave to replead. Accordingly, the recommendation will be to dismiss without prejudice subject to allowing plaintiffs an opportunity to replead if there are grounds for such an amendment consistent with the rulings made in this opinion.[70] See, e.g., Guerra v. Teradyne, Inc., 2004 WL

---

[70] It is, of course, entirely in the province of the district judge as to the amount of time he wishes to allow plaintiffs to submit a motion to amend together with an attached proposed consolidated second amended complaint. In the event plaintiffs chose to file a motion for leave to amend, this court

72

1467065 at * 28 (D.Mass. Jan. 16, 2004) (refusing to dismiss case with prejudice inasmuch as the plaintiffs asked to be given leave to replead in a footnote if the court dismissed the complaint).

CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[71] that the motion to dismiss (Docket Entry # 30) be **ALLOWED** except to the extent that the dismissal be without prejudice subject to allowing plaintiffs an opportunity to replead consistent with the rulings made in this opinion.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

suggests that the proposed consolidated second amended complaint should clearly identify the newly added language and any omitted language.

[71] Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order. United States v. Escoboza Vega, 678 F.2d 378-379 (1st Cir. 1982); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

73