information known to him at the time that would show that the
anticipated or projected earnings for 2001[59] and/or 2002 were
unlikely.  See generally Suna v. Bailey Corporation, 107 F.3d at
70.  This is where the complaint falters.  First, the complaint
fails to plead sufficient facts to support the information and
belief that Sullivan knew that the projection was false when
made.  See 15 U.S.C. § 78u-4(b)(1).  The facts alleged fail to
adequately show that Sullivan had knowledge of specific facts
regarding the channel stuffing and the magnitude or extent of the
end of quarter discounting in August 2001 that would make
Sullivan's projection unreasonable.  See In Re Boston Technology,
Inc. Securities Litigation, 8 F.Supp.2d at 54 ("Absent bad faith,
a defendant must have had--at the time the statement was
made--knowledge of specific facts making the statement
unreasonable"); see also Serabian v. Amoskeag Bank Shares, Inc.,
24 F.3d at 361.  Furthermore, under the facts alleged there is
absolutely no bad faith or intentional deception reasonably
inferred.

    Sullivan also had no knowledge that the projection was
materially misleading.  See Serabian v. Amoskeag Bank Shares,
Inc., 24 F.3d at 361 (under Rule 9(b), "complaint must set forth
'specific facts that make it reasonable to believe that
defendant[s] knew that a statement was materially false or
misleading'").  To the contrary, there was little reason to

---

    [59]  Cytyc met the 2001 projection.  (¶¶ 96 & 115).  This is
true with respect to both the earnings projection on August 2,
2001 and on January 14, 2002.

believe that the failure to disclose the discounting was materially misleading and would alter the total mix of information inasmuch as the 2000 Form 10-K already disclosed the use of discounts. Similarly, there was no duty to disclose the discounting under the circumstances. The projection is therefore not actionable under the facts alleged.[60]

Sullivan's equally glowing repetition of 2002 projected earnings on January 14, 2002, as "approximately $0.64 to $0.66" (¶ 95) is not puffery but nonetheless fails for identical reasons. It is true that the complaint notes that the continuous channel stuffing was and would continue to have an adverse impact on future sales and/or the market share was overstated because of the channel stuffing, not to mention that customers were ceasing to do business with Cytyc because of such practices. (¶ 100). The complaint fails, however, to provide facts to support the information and belief regarding Sullivan's knowledge that the projection was false or misleading when made. In any event, the strong inference of scienter is notably absent.[61]

---

[60] Alternatively, as discussed _infra_, there is an absence of a strong inference of scienter.

[61] The January 14, 2002 press release contains an adequate cautionary proviso that the projections are forward looking statements and sufficiently warns investors of the risks, including those identified in the 2000 Form 10-K filing. Consequently, although defendants neglect to expressly rely on the safe harbor provision or the bespeaks caution doctrine as applied to this statement, it is highly likely that the statement is not actionable. Given the absence of an explicit argument to this effect, however, this court rests its decision with respect to this statement on the conclusion that plaintiffs fail to plead a strong inference of scienter. Defendants present the scienter argument (as well as the corporate puffery, materiality and Rule

The October 19, 2001 comment by Sullivan that the company feels "confident in our success based on our track record" with ThinPrep is sales talk. See, e.g., In Re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d at 217 (statement that "we continue to have confidence in the fundamental strength of our business and in our strong competitive position" considered puffery); Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 24 (classifying as puffery statement that, "There are very few companies that are positioned as well as us and have the track record, the experience and the management"). Unaccompanied by any specifics regarding the company's "track record," see Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 24 (finding phrase "continued market demand" vague inasmuch as it failed to "specify a particular market demand [or] a market share figure"), no reasonable investor would consider the statement material to an investing decision.

For the same reasons that apply to the July 25, 2001 statement, the strikingly similar statement in the October 24, 2001 press release ("We believe the superior clinical performance of the ThinPrep Pap Test and the effectiveness of our sales and marketing strategy have provided Cytyc with consistent revenue and earnings growth and financial performance") is not actionable. The statement does not purport to identify all of

9(b)/PSLRA pleading shortcomings) universally as applied to all the allegations in the complaint. (Docket Entry # 31, § Introduction & § I(C)(2)).

61

the factors effecting growth and performance.  Alternatively, for
reasons expressed with respect to the July 24, 2001 statement,
the statement amounts to puffery.  See, e.g., Suna v. Bailey
Corporation, 107 F.3d at 70 ("While the company states that it
*believes* [emphasis supplied] the opportunities will be
comparable, the statement contains no promise to that effect").

Plaintiffs next challenge in a January 23, 2002 press
release that Cytyc had "now reported fifteen consecutive quarters
of revenue growth."  (¶ 96).  Although plaintiffs contend and
plead that the statement is false because of the failure to
disclose the channel stuffing which numerous former employees
articulate, the statement was an accurate portrayal of past and
present earnings.  It was not false.  Serabian v. Amoskeag Bank
Shares, Inc., 24 F.3d at 361 & n. 4 ("defendants may not be held
liable under the securities laws for accurate reports of past
successes, even if present circumstances are less rosy").  As to
the misleading nature of the statement, defendants had no duty to
disclose the channel stuffing with respect to this statement.
The omitted disclosure of channel stuffing did not cause what
Sullivan did say, to wit, 15 past quarters of growth, to be
misleading.  See Shaw v. Digital Equipment Corporation, 82 F.3d
at 1212 ("reports of past successes do not themselves give rise
to a duty to inform the market whenever present circumstances
suggest that the future may bring a turn for the worse").  In
contrast to a similar statement deemed actionable in Orton v.
Parametric Technology Corporation, 344 F.Supp.2d at 302 ("we met

the third quarter targets we set in April"),[62] plaintiffs cannot,
as explained <u>supra</u>, empirically show that Cytyc did not meet the
earnings for the quarters in violation of the cited regulatory
provisions and the company's revenue recognition policy.  <u>Cf.</u>
<u>Orton v. Parametric Technology Corporation</u>, 344 F.Supp.2d at 302
(above statement actionable because, in theory, "the Purchasers
could empirically disprove Harrison's statement by demonstrating
that Parametric did not actually meet the financial targets set
in April under GAAP and under the company's own accounting
policies").

    The remaining objectionable portion of the statement ("We
believe the achievements of 2001 put Cytyc in a solid position to
build on the momentum of the past year") is puffery.  <u>See</u>, <u>e.g.</u>,
<u>Suna v. Bailey Corporation</u>, 107 F.3d at 70 ("While the company
states that it *believes* [emphasis supplied] the opportunities
will be comparable, the statement contains no promise to that
effect"); <u>Orton v. Parametric Technology Corporation</u>, 344
F.Supp.2d at 302 (after stating that company met the target for
the April quarter, the further statement that "[s]olid execution
of our cost reduction programs and consistent focus on our key
initiatives will position us for enhanced earnings potential once
the economy improves" was puffery); <u>In Re Parametric Technology</u>

---

[62]  Like the entire objectionable portions of the January
23, 2002 statement, the statement in <u>Orton</u> reads in full as
follows:  "[W]e met the third quarter targets we set in April . .
. Solid execution of our cost reduction programs and consistent
focus on our key initiatives will position us for enhanced
earnings potential once the economy improves."  <u>Orton v.</u>
<u>Parametric Technology Corporation</u>, 344 F.Supp.2d at 302.

<u>Corporation Securities Litigation</u>, 300 F.Supp.2d at 220-221 (characterizing as puffery statements that company was "well positioned for growth" and that it "expects more revenue growth in opportunities in Asia in the coming years"). Such general optimism regarding the elusive concept of "momentum" building for an indeterminable amount of time into the future is not actionable.

As already explained,[63] the forecast in the January 24, 2002 Bloomberg news interview ("$295 to $305 million" and earnings per share "of between 64 and 66 cents" for upcoming year) is not puffery but nonetheless fails to constitute an actionable statement.

Sullivan's additional statement that "we believe" that Cytyc could capture "100 percent of the market" is, to a large degree, so unrealistic that no reasonable investor would give it credence. Put another way, a reasonable investor would not consider such a prophesy material to an investing decision. It also amounts to inactionable corporate puffery. <u>See</u>, <u>e.g.</u>, <u>Suna v. Bailey Corporation</u>, 107 F.3d at 70; <u>Orton v. Parametric Technology Corporation</u>, 344 F.Supp.2d at 302; <u>In Re Parametric Technology Corporation Securities Litigation</u>, 300 F.Supp.2d at 220-221. Alternatively, as explained in connection elsewhere, the statement is not actionable because of the absence of a strong inference of scienter.

Plaintiffs next identify various statements in the April 24,

---

[63]    See footnote number 22.

2002 press release and conference call as actionable. The
forward looking statements (see, e.g., ¶ 118; ¶ 119, 2002
revenues) fall easily within the parameters of the PSLRA's safe
harbor.[64]

The historical recitation of earnings in the April 24, 2002
press release (¶ 117), without more, was not false.[65] The
statement also did not give rise to a duty to disclose the deep
discounts or channel stuffing and was therefore not misleading.
The press release did not present the statement of past earnings
as a basis to forecast future growth but, instead, advised that
Cytyc management would discuss future expectations at the
conference call. See Shaw v. Digital Equipment Corporation, 82
F.3d at 1212 ("reports of past successes do not themselves give
rise to a duty to inform the market whenever present
circumstances suggest that the future may bring a turn for the
worse").

The tightening inventory statement is not actionable for a
number of reasons. First, the statement (¶¶ 119 & 124) fails the
so-called "entanglement test." Under this test, recently adopted
by the First Circuit, "liability may attach to an analyst's
statements where the defendants have expressly or impliedly
adopted the statements, placed their imprimatur on the

---

[64]  See footnote 55.

[65]  To the extent the market share (¶¶ 47, 68, 82, 90, 100,
102, 109 & 117) or conversion rate stated at various times in the
complaint was not accurate (see, e.g., ¶ 127), there is an
absence of a strong inference of scienter.

statements, or have otherwise entangled themselves with the analysts to a significant degree." In Re Cabletron, 311 F.3d at 37-38; accord Stone & Webster, Inc. Securities Litigation, 253 F.Supp.2d at 113 (same).[66]  Second, the conclusory assertions that defendants intended analysts to rely upon and repeat various statements (¶ 76), that the company provided guidance to analysts and that the company used analysts, as a conduit to provide false and misleading information (¶¶ 167-172) do not satisfy Rule 9(b). See Stone & Webster, Inc. Securities Litigation, 253 F.Supp.2d at 113 ("Suna also rejects the notion that general statements regarding a company's 'practice' of 'communicat[ing] regularly with securities analysts . . . and [of] provid[ing] detailed "guidance" to these analysts' are sufficiently particularized to survive a motion to dismiss" under Rule 9(b)).  The article itself does not quote a company source or imply that Cytyc adopted the statements therein.  See, e.g., Suna v. Bailey Corporation, 107 F.3d at 74 (rejecting under 9(b) allegation attributing statements to company inasmuch as "reports do not appear to quote any Bailey officer or employee, nor do they imply that the forecasts were supplied or confirmed by any Bailey officer or employee").

The assertion that Cytyc falsely represented in the conference call that the inventory problem manifested itself "only in the first quarter of 2002" (¶ 125) or that, as reflected

---

[66]  Plaintiffs' reliance on Stone & Webster (Docket Entry # 36, p. 30) is misplaced for reasons set forth in defendants' reply (Docket Entry # 39, pp. 13-14).

in a UBS Warburg report, the company "'instituted a one-time promotion'" (¶¶ 121 & 122) is belied by the transcript.  <u>See</u> <u>In Re Computervision Corporation Securities Litigation</u>, 914 F.Supp. 717, 719 (D.Mass. 1996) (noting "fundamental and fatal defect[]" in securities fraud action that, with respect to the allegedly actionable statements, "the Company simply did not say what the plaintiffs say it said").  Sullivan explicitly stated that this was not the first time for company promotions.  The 2000 and 2001 Forms 10-K also both note the use of "discounts" (plural) "[i]n the past."  (Docket Entry # 32, Ex. B & J).

Having addressed various statements, this court turns to the issue of scienter or, more accurately, the absence thereof.

E.  <u>Scienter</u>

Having already defined the concept of scienter, this court simply notes that there is no one fact pattern that predominates the calculus.  Instead, the fact pattern presented in each individual case is analyzed to determine if the allegations are sufficient to support a strong inference of scienter.  <u>Geffron v. Micrion Corporation</u>, 249 F.3d at 36 ("this Court does not 'categoriz[e] patterns of facts as acceptable or unacceptable to prove scienter,' but instead 'analyze[s] the particular facts alleged in each individual case to determine whether the allegations [are] sufficient to prove scienter'"); <u>Greebel v. FTP Software</u>, 194 F.3d at 196.

What consistently strikes this court in reading and rereading the complaint and other relevant and properly

67

considered documents is the absence of the strong inference of
scienter now required under the PSLRA.  First, there is nothing
inherently wrong with discounts or pressing for sales to be made
in earlier quarters or at the end of a quarter.  Greebel v. FTP
Software, 194 F.3d at 202 ("[t]here is nothing inherently
improper in pressing for sales to be made earlier than in the
normal course");[67] accord Johnson v. Tellabs, Inc., 262 F.Supp.2d
937, 950 (N.D.Ill. 2003) ("[i]n the business world, there
certainly is nothing inherently wrong with offering incentives to
customers to purchase products").  Nor is there any additional
suggestion of inventory parking, contingent sales or other
improper activity.[68]

    Second, throughout the class period, the company's SEC
filings disclosed the use of discounts, albeit not to the degree
plaintiffs insist was necessary.  Given the fact that Cytyc's
public documents disclosed the use of discounts, i.e., the
company's "channel stuffing practices," see In Re Segue Software,

---

[67]   There is nevertheless a line between offering discounts
or encouraging earlier than normal sales versus knowingly hiding
low earnings in the earlier quarters by artificially inflating
revenues through improper revenue recognition.  See Greebel v.
FTP Software, 194 F.3d at 202; accord In Re Focus Enhancements,
Inc. Securities Litigation, 309 F.Supp.2d at 149.  The latter
provides a weak inference of scienter.  Greebel v. FTP Software,
194 F.3d at 202-203; accord In Re Focus Enhancements, Inc.
Securities Litigation, 309 F.Supp.2d at 149-150.  Given the
absence of improper revenue recognition, even this weak inference
is missing.

[68]   The three cases outside this circuit prominently cited
by plaintiffs (Docket Entry # 36, pp. 1-2) are distinguishable
for reasons stated by defendants in their reply memorandum
(Docket Entry # 39, pp. 3-4 & n. 2) and eloquently expressed at
the hearing.

Inc. Securities Litigation, 106 F.Supp.2d at 168 (allegation of
improperly booking contingent sale to boost revenue and not
disclosing the right of return in the large and identified
million dollar sale to named customer not fraudulent given the
Form 10-K disclosure);[69] see also Fitzer v. Security Dynamics
Technologies, Inc., 119 F.Supp.2d at 35-36 (finding list prices
in Form 10-K not fraudulent inasmuch as the disclosure was made
that the prices were "[s]ubject to volume discounts and other
licensing terms and conditions"), the record fails to reflect a
strong inference that defendants knew that the statements were
false or materially misleading by omitting the information
regarding the extent of the discounting at Cytyc.  See Geffon v.
Micrion Corporation, 249 F.3d at 36 ("[e]ven if the statements at
issue were material and false or misleading, the evidence does
not support a finding that defendants knew the statements would
materially mislead the investing public").  Indeed, during the
April 24, 2002 conference call, Sullivan forthrightly sought to
provide investors with the information that this was not the
first time the company had used promotions.  See Geffon v.

---

[69]    Indeed, the disclosure in the Form 10-K in Segue was
even less forthcoming that the ones in the case at bar.  In
Segue, the Form 10-K affirmatively stated the contrary, to wit,
that, "The Company typically does not grant to its customers a
contractual right to return software products."  In Re Segue
Software, Inc. Securities Litigation, 106 F.Supp.2d at 168.  The
form then gave the impression that rights of return were the
exception and not contained in typical, if any, contracts with
customers.  The relevant language was that, "When approved by
management, however, the Company has accepted returns of certain
software products and has provided an allowance for those
specific products."  In Re Segue Software, Inc. Securities
Litigation, 106 F.Supp.2d at 168.

Micrion Corporation, 249 F.3d at 37 (noting that "Micrion sought to provide investors with adequate warnings of the possibility that not all seventy-five units would be purchased").

Third, as already explained, the allegations of insider trading and revenue recognition or accounting violations lack merit.  Although insider trading may provide evidence of scienter, see Greebel v. FTP Software, 194 F.3d at 196 (noting the "many different types of evidence as relevant to show scienter," including insider trading), the inference is nonexistent in the case at bar.  Bowen never traded during the class period.  Sullivan's trading was less during the class period than prior to or after the class period.  Likewise and also as previously explained, violations of GAAP, SEC or company policy may give rise to an inference of scienter, see Aldridge v. A.T. Cross Corporation, 284 F.3d at 83 ("'accounting shenanigans' may be evidence of scienter"); In Re Cabletron, 311 F.3d at 39 ("[s]ignificant GAAP violations also 'could provide evidence of scienter'"); In Re Galileo Corporation Shareholders Litigation, 127 F.Supp.2d at 266 ("'a violation of a company's own policies supports an inference of scienter'"), but the record is devoid of any such violations.

Defendants' alleged motive to inflate the stock price and use the inflated price to purchase Pro-Duct and Digene at more attractive prices is unconvincing.  See, e.g., In Re Galileo Corporation Shareholders Litigation, 127 F.Supp.2d at 270 ("the mere statement that an acquisition occurred after Galileo's stock

prices increased is insufficient even to create an inference that the two events were necessarily related, not to mention insufficient to create a strong inference either of an intent to deceive or of recklessness").  Sullivan and Bowen's involvement in discussing sales strategies, knowledge of daily activities, positions in the company, setting and encouraging unrealistic sales quotas, general access to internal information and/or focus upon the company's stock price (¶¶ 39-41, 46-47, 144, 147-151 & 153-154) are also equally unconvincing.  See Carney v. Cambridge Technology Partners, Inc., 135 F.Supp.2d at 254 (rejecting "knowledge derived by Sims and Toscanini from unspecified plans, budgets, forecasts, reports, conversations, connections, meetings and 'other' information to which these defendants had access because of their positions with CTP" as adequate to plead scienter); Fitzer v. Security Dynamics Technologies, Inc., 119 F.Supp.2d at 25 (declining to "speculate that because former employees in the corporation knew of changes in the sales profiles, the corporate executives must also have known about the changes and fraudulently concealed them"); Lirette v. Shiva Corporation, 27 F.Supp.2d at 283 ("[a]ttempts to plead scienter by general allusions to unspecified internal corporate information are insufficient to withstand a motion to dismiss"); In Re Viewlogic Systems Securities Litigation, 1996 U.S.Dist. Lexis 22371 at * 37-39 (D.Mass. March 13, 1996); see also Maldonado v. Dominguez, 137 F.3d 1, 9-10 (1st Cir. 1998).

In sum, there is a marked void of the necessary strong

inference of scienter.  Finally, lacking a predicate violation of section 10(b) of the Securities Exchange Act of 1934 or of Rule 10b-5, 17 C.F.R. § 240.10b-5, the section 20(a) claim is also subject to dismissal.  See Suna v. Bailey, 107 F.3d at 72; In Re Parametric Technology Corporation Securities Litigation, 300 F.Supp.2d at 224.

Defendants seek a dismissal with prejudice.  In a footnote, however, plaintiffs summarily request leave to replead in the event this court "determines that there are efficiencies in the Complaint as to any of the named defendants."  (Docket Entry # 36, n. 26).  This court assumes plaintiffs meant to use the word "deficiencies."  As discussed, there are numerous deficiencies.

Although this case is rapidly approaching the three year mark, the PSLRA "stays all discovery, with certain narrow exceptions, during the pendency of any motion to dismiss."  In Re Cabletron, 311 F.3d at 33.  In analogous circumstances, the court in Guerra v. Teradyne, Inc., 2004 WL 1467065 (D.Mass. Jan. 16, 2004), recommended a dismissal without prejudice given the plaintiffs' footnote request for leave to replead.  Accordingly, the recommendation will be to dismiss without prejudice subject to allowing plaintiffs an opportunity to replead if there are grounds for such an amendment consistent with the rulings made in this opinion.[70]  See, e.g., Guerra v. Teradyne, Inc., 2004 WL

---

[70]  It is, of course, entirely in the province of the district judge as to the amount of time he wishes to allow plaintiffs to submit a motion to amend together with an attached proposed consolidated second amended complaint.  In the event plaintiffs chose to file a motion for leave to amend, this court

1467065 at * 28 (D.Mass. Jan. 16, 2004) (refusing to dismiss case
with prejudice inasmuch as the plaintiffs asked to be given leave
to replead in a footnote if the court dismissed the complaint).

## CONCLUSION

In accordance with the foregoing discussion, this court
**RECOMMENDS**[71] that the motion to dismiss (Docket Entry # 30) be
**ALLOWED** except to the extent that the dismissal be without
prejudice subject to allowing plaintiffs an opportunity to
replead consistent with the rulings made in this opinion.

                              /s/ Marianne B. Bowler
                              **MARIANNE B. BOWLER**
                              United States Magistrate Judge

---

suggests that the proposed consolidated second amended complaint
should clearly identify the newly added language and any omitted
language.

[71] Any objections to this Report and Recommendation must be
filed with the Clerk of Court within ten days of receipt of the
Report and Recommendation to which objection is made and the
basis for such objection. Any party may respond to another
party's objections within ten days after service of the
objections. Failure to file objections within the specified time
waives the right to appeal the order. United States v. Escoboza
Vega, 678 F.2d 378-379 (1st Cir. 1982); United States v.
Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

73