UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re | ) | CIVIL ACTION |
| IBIS TECHNOLOGY | ) | NO.  04-10446-RCL |
| SECURITIES LITIGATION | ) | |
| | ) | |
| | ) | |

**REPORT AND RECOMMENDATION**
**ON DEFENDANTS' MOTION TO DISMISS**

September 22, 2005

DEIN, U.S.M.J.

## I.  INTRODUCTION

Plaintiffs Martin Smolowitz, George Harrison and Mark G. Forgue bring this class action on behalf of themselves and the class of persons who purchased the common stock of defendant Ibis Technology Corporation ("Ibis") between July 23, 2003 and December 12, 2003, inclusive (the "Class Period").  They claim that Ibis and defendant Martin J. Reid ("Reid"), who was Ibis' Chief Executive Officer, President and Chairman of the Board throughout the Class Period, engaged in securities fraud by making false and misleading statements and omissions regarding Ibis' financial condition and future prospects.  The plaintiffs assert that the defendants intentionally misrepresented the company's true condition in order to artificially inflate the price of Ibis' stock and ensure the success of its October 2003 public offering, which was necessary to ease Ibis' severe cash shortage and maintain its viability.

The Consolidated Amended Complaint ("Complaint") (Docket No. 8) contains two causes of action.  In their First Claim, the plaintiffs assert that Ibis and Reid made material misstatements and omissions in violation of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  In their Second Claim, the plaintiffs assert that Reid is liable, pursuant to section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as a "controlling person" of Ibis.

The matter is presently before the court on the defendants' motion to dismiss the Complaint, brought pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) (Docket No. 10).  The defendants contend that the allegedly misleading statements and omissions supporting the plaintiffs' claims are not actionable, and that the Complaint should be dismissed in its entirety.  The plaintiffs counter that the Complaint states claims for securities fraud based on the defendants' statements concerning Ibis' prospects for booking orders of its i2000 implanter machines by the end of 2003, and on the defendants' statements and omissions concerning the true value of Ibis' small wafer production line.  For the reasons detailed herein, this court finds that the plaintiffs have stated a claim based upon allegations that Ibis' small wafer production line was impaired and should have been written down by the start of the Class Period, but have failed to state a claim based on statements regarding the company's future sales prospects.  Accordingly, this court recommends to the District Judge to whom this case is assigned that the defendants' motion be ALLOWED IN PART and DENIED IN PART.

## II.  <u>STANDARD OF REVIEW OF RECORD</u>

### A.    <u>Motion to Dismiss Standard of Review</u>

"In considering a motion to dismiss, a court must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993).  In doing so, the court may consider "official public records," "documents central to the plaintiffs' claim," and "documents sufficiently referred to in the complaint" without converting the motion into one for summary judgment.  <u>Id.</u> at 3-4 and cases cited.[1]  The court may grant dismissal "only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  <u>Roeder v. Alpha Indus., Inc.</u>, 814 F.2d 22, 25 (1st Cir. 1987) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46, 78 S. Ct. 99, 101-02, 2 L. Ed.2d 80 (1957)).  However, the court "need not credit a complaint's bald assertions or legal conclusions."  <u>Glassman v. Computervision Corp.</u>, 90 F.3d 617, 628 (1st Cir. 1996).

### B.    <u>PSLRA Heightened Pleading Requirements</u>

In 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4,  which marked an effort to curb abuse in private securities lawsuits.  <u>See</u> <u>Greebel v. FTP Software, Inc.</u>, 194 F.3d 185, 191 (1st Cir. 1999). The PSLRA established strict pleading standards for such lawsuits, which are consistent

---

[1] The parties have submitted various exhibits in connection with the motion to dismiss which will be cited as "Pls.' Ex." and "Defs.' Ex."  With limited exceptions not relevant here, the parties agree that these exhibits are appropriately considered in connection with the motion to dismiss.

with the First Circuit's preexisting standards for pleading securities fraud under Fed. R.

Civ. P. 9(b).  See id. at 193.  The statute requires that a complaint claiming securities

fraud based on misstatements or omissions set forth "each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an allegation

regarding the statement or omission is made on information and belief, the complaint

shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-

4(b)(1).   Additionally, where a plaintiff's cause of action requires proof that a defendant

acted with a particular state of mind, the PSLRA requires the complaint to "state with

particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind."  15 U.S.C. § 78u-4(b)(2).  "The 'required state of mind' for

liability under section 10(b) [of the Exchange Act] and Rule 10b-5 is referred to as

scienter, which the Supreme Court has defined as 'a mental state embracing intent to

deceive, manipulate, or defraud.'"  Greebel, 194 F.3d at 194 (quoting Ernst & Ernst v.

Hochfelder, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 1381 n.12, 47 L. Ed.2d 668 (1976)).

Therefore, under the PSLRA, the complaint must "state with particularity facts that give

rise to a 'strong inference' of scienter rather than merely a reasonable inference."  In re

Cabletron Sys., Inc., 311 F.3d 11, 28 (1st Cir. 2002).

        Although the pleading requirements in private securities fraud cases are strict,

"they do not change the standard of review for a motion to dismiss."  See Aldridge v.

A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002).   Accordingly, the following facts are

viewed in the light most favorable to the plaintiffs.

### III.  STATEMENT OF FACTS

#### The Defendants

The defendant Ibis manufactures two lines of products for the semiconductor

industry that involve the use of SIMOX-SOI[2] technology.  (Compl. ¶ 17).  These products

include wafers and SIMOX-SOI oxygen implantation equipment, known as implanters,

that enable semiconductor companies to manufacture wafers themselves.  (Id.).  Using the

SIMOX-SOI technology, Ibis hopes to position itself in the semiconductor market as the

company with the leading new technology for the manufacture of SIMOX-SOI wafers.

(Id.).

The individual defendant, Reid, served as Ibis' Chief Executive Officer, President

and Chairman of its Board of Directors throughout the Class Period.  (Id. ¶ 8).  As the

senior Executive Officer and Chairman of the company, Reid was privy to confidential

and proprietary information concerning Ibis, its operations, financial condition, present

and future business prospects, and its relationship with its largest customer, IBM.  (Id. ¶¶

9, 21).  He also had access to internal corporate documents, contact with corporate

officers and employees, and knowledge of information presented at management and

Board of Directors' meetings.  (Id. ¶ 9).  Moreover, during the Class Period, Reid signed

---

[2]  "SIMOX" stands for separation by implantation of oxygen.  (Compl. ¶ 17).  "SOI,"
which stands for silicon-on-insulator, is a technique used in computer chip design.  (Id.).

and certified documents that Ibis filed with the Securities and Exchange Commission

("SEC") and acted as the principal spokesperson for the company.  (Id. ¶ 8).

**Overview of Ibis' Operations**

Historically, Ibis has produced two groups of wafers, those that measure 200mm

and smaller, and those that measure 300mm.  (Id. ¶ 18).  Ibis manufactured the smaller

group of wafers, which has become virtually obsolete, using older generation 1000

implanters.  (Id.).  The larger 300mm wafers are state of the art and must be produced

using different equipment.  (Id.).  Accordingly, Ibis began development on its new

generation implanter, the i2000 implanter, in 2000.  (Id.).  The i2000 implanters, which

cost approximately $8 million each and take up to ten months to build, are capable of

manufacturing both 300mm and 200mm wafers.  (Id. ¶¶ 18, 27, 67(b)).

By the beginning of the Class Period, Ibis had decided to shift its business away

from wafer sales and concentrate on the sale of the i2000 implanter.  (Id. ¶ 20).  Ibis

announced this strategy in a prospectus that it issued during the Class Period, stating "[i]n

the future we will continue to supply small quantities of wafers for test and evaluation

purposes, but our primary emphasis will be on implanter sales and support.  We also plan

on continuing process development for SIMOX-SOI wafers."  (Id.).  Because Ibis had

stopped selling 1000 implanters prior to the Class Period due to lack of demand, (id. ¶

19), during all times relevant to the plaintiffs' claims, Ibis' business was focused largely

on sales of its i2000 implanter.  (See id. ¶ 20).

Ibis uses IBM's patented Modified Low-Dose ("MLD") technology to

6

manufacture i2000 implanters and 300mm wafers. (Id. ¶ 19). Ibis is able to produce the implanters using MLD technology, and to sell 300mm wafers directly to third parties, pursuant to licensing agreements with IBM.[3] (Id. ¶¶ 19, 23, 24). However, unlike the direct sale of wafers, which does not require additional IBM approval, IBM does not allow Ibis to ship i2000 implanters to third parties wishing to use the MLD process to manufacture SIMOX-SOI wafers unless and until that customer has entered into a licensing agreement directly with IBM.[4] (Id. ¶¶ 24, 25, 32, 63(b)). Thus, Ibis has no control over and cannot predict the timing of a shipment, nor can it guarantee that IBM will allow Ibis' customers to acquire an i2000 implanter under acceptable terms. (Id. ¶¶ 25-26).

The plaintiffs further allege that Ibis' ability to fund its ongoing operations is dependent to a significant degree upon IBM's willingness to enter into licensing agreements with third party implanter customers. (Id. ¶¶ 27, 28). That is because Ibis receives a significant portion of the approximately $8 million purchase price for its i2000 implanters upon shipment. (Id. ¶¶ 27, 28, 40; Defs.' Ex. 5 at 43). However, Ibis records

---

[3] IBM has been and continues to be the largest customer for Ibis' wafers. (Compl. ¶ 20).

[4] The defendants argue that Ibis' i2000 implanter customers would only need license agreements with IBM if they were seeking to use the MLD process, but not if they were purchasing the equipment for other types of operations. See Memorandum of Law in Support of Defendants' Motion to Dismiss Consolidated Amended Complaint ("Defs.' Memo.") (Docket No. 11) at 9. However, the allegations set forth in the Complaint indicate that the MLD technology was the primary attribute of the machines and suggest that customers wanted this technology. (See Compl. ¶¶ 63(b), 67(a)). Therefore, it can be inferred from the Complaint that most if not all of Ibis' prospective implanter customers would need to obtain permission from IBM before they could receive an i2000 implanter from Ibis.

these funds on its income statements as deferred revenues, and only recognizes the revenue on its books when the customer finally accepts the equipment following a testing period at the customer site. (Id. ¶¶ 22, 27). The testing/acceptance period takes approximately nine months, and there is no guarantee that the implanter will eventually be accepted by the customer. (Id. ¶ 22). Nevertheless, the plaintiffs contend that Ibis is able to use the cash it receives upon shipment of its products pending final customer acceptance, recognizing that the funds will have to be returned if the implanter is not accepted. (Id. ¶ 27).

Prior to the Class Period, Ibis had sold only one i2000 implanter. (Id. ¶ 30). Because IBM was the customer that had purchased the equipment, no new licensing agreement was necessary before Ibis could ship the product. (Id.). About two months after the close of the Class Period, Ibis received another order for an i2000 implanter, this time from a third party customer. (Id. ¶ 64). Ibis announced the order on February 5, 2004, and shipped the implanter to its customer in May 2004. (Id. ¶¶ 31, 64) It can be inferred, therefore, that the customer had successfully entered into the necessary licensing agreement with IBM.

### Ibis' Cash Shortage

In the months preceding the Class Period, Ibis was "bullish" about its sales prospects for the i2000 implanter beyond the one sale that Ibis had made to IBM up until that point. (Id. ¶ 32). For example, during a conference call with securities analysts on February 19, 2003, Ibis' Chief Operating Officer, Gerald Cameron, stated that "[m]ost of

the potential customers for our i2000 implanters are based in Japan," that "several more

i2000 implanters were built" in the past year, and that Ibis "expect[ed] to book orders for

at least 1 to 3 implanters during 2003 as wafer manufacturers begin equipping themselves

for the production of SIMOX-SOI wafers and as the major fabs expand their use of

SIMOX-SOI wafers for large-scale production." (Id.). Defendant Reid further

commented, however, that while Ibis anticipated implanter orders "toward the end of the

first quarter" of 2003, "[t]here's an MLD license process that these people have to go

through, which could actually delay this into the second quarter, and it really depends

upon them licensing this from IBM and then we'll start to receive orders." (Id.).

New orders for the i2000 implanters were, in fact, "delayed" during the first half

of 2003, although the Complaint contains no allegations regarding the cause for the delay.

(Id. ¶ 35). As a result, Ibis faced severe cash flow constraints and was forced to reduce

its workforce and increase the numbers of days off for remaining employees. (Id.).

While these measures may have saved the company money, the layoffs also made it more

difficult for Ibis to ramp up production on wafers and implanters. (Id.). Consequently,

throughout the Class Period, Ibis' need for cash with which to fund its operations left Ibis

is a very precarious financial and operating position. (Id. ¶ 47).

In order to ease its cash crunch, Ibis planned a common stock offering for one

million shares, which was expected to raise net proceeds of approximately $11 million, or

more if the defendants could successfully increase the market price for the company's

stock. (Id. ¶ 47(d)). The plaintiffs allege that the defendants engaged in a scheme to

9

artificially inflate the price of Ibis' stock by concealing the company's true financial and

operating condition so that they would be able to maximize the proceeds from the stock

offering.  (Id.).  They further allege that the defendants carried out this scheme by making

false and misleading statements that were disseminated to the investing public and by

omitting to disclose material facts about the company that would have made their

statements not misleading.  (Id. ¶¶ 47(a), 47(d), 49(a), 49(c), 50, 53, 56, 58).

### Allegedly Misleading Statements

In their Complaint, the plaintiffs allege that the defendants artificially inflated

Ibis' stock price by exaggerating the i2000 implanter's acceptance in the marketplace, by

repeatedly stating that they anticipated booking new orders for one to three i2000

implanters by December 31, 2003, by stating that Ibis would continue to record

significant revenues from product sales of all sizes of wafers, and by failing to timely

record an impairment in the value of an asset group, which consisted of eight 1000

implanters and related assets and had a carrying value of approximately $12 million.  (See

generally id. ¶¶ 47(a), 47(d), 41).  In their opposition to the defendants' motion to

dismiss, the plaintiffs clarified that their securities fraud claims are based only on the

defendants' allegedly misleading statements regarding Ibis' prospects for booking orders

for one to three implanters by the end of 2003, and on the defendants' alleged failure to

write-down $11 million in impaired assets at June 30, 2003.  See Plaintiffs' Corrected

Opposition to Defendants' Motion to Dismiss ("Pls.' Memo.") (Docket No. 28) at 10-11,

15-16.  Accordingly, the court will address only those statements that concern these two

issues.[5]

## The July 23, 2003 Press Release

On July 23, 2003, the first day of the Class Period, the defendants issued a press release in which they reported, inter alia, Ibis' financial results for Ibis' second quarter ending June 30, 2003. (Id. ¶ 49). The defendants reported that Ibis' "property and equipment" assets were valued at over $30.7 million. (Id. ¶ 49(a)). The plaintiffs allege that the reported value of these assets was inflated by $11 million due to Ibis' failure to write-down its impaired asset group in violation of Generally Accepted Accounting Principles ("GAAP"),[6] specifically Financial Accounting Standard ("FAS") 144. (Id.).

Additionally, the release contains a paragraph entitled "Corporate Outlook" in which Reid, "[c]ommenting on the company's future outlook," stated, among other things, "[w]e also continue to anticipate booking orders for one-to-three implanters during this fiscal year." (Id. ¶ 49(b); Defs.' Ex. 13). The plaintiffs allege that Reid's statement was false and misleading because Ibis used the term "book" to mean "ship," and as of the

---

[5] This court will not evaluate whether the plaintiffs have stated actionable claims of securities fraud based on allegations set forth in the Complaint concerning the defendants' failure to disclose that its only customer for the i2000 implanter prior to the Class Period was IBM (see Compl. ¶ 49(b)) and the defendants' alleged misstatements and omissions regarding declining sales of smaller sized wafers. (See id. ¶¶ 49(c), 50(a), 53). The plaintiffs have stated specifically that they do not intend to pursue these issues as independent claims. See Pls.' Memo. at 10, 15. The plaintiffs do contend, however, that these "facts" support the conclusion that they have stated a claim based on the remaining challenged statements. (See id.).

[6] Generally Accepted Accounting Principles, which are commonly referred to as "GAAP," "embody the prevailing principles, conventions, and procedures defined by the accounting industry from time to time." Cabletron, 311 F.3d at 34 (internal quotations and citation omitted).

11

date of the press release, even if orders for the i2000 implanters had been received and the customers had entered into licensing agreements with IBM, Ibis could not physically complete the manufacture of an i2000 implanter for shipment by year end.  (Compl. ¶¶ 27, 28, 49(b)).  The defendants strenuously deny that "booking" means "ship," but rather contend that "it is clear from Ibis' other public disclosures that Ibis used the word 'book' in the customary way – to mean the ***receipt*** of an order."  Defs.' Memo. at 8.  For the reasons detailed below, however, this dispute does not need to be resolved.[7]

The July 23, 2003 press release also contains a section entitled "Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995."  (Defs.' Ex. 13).  The section states in relevant part:

> This release may contain forward-looking statements that are subject to certain risks and uncertainties including statements regarding the Company's current expectations that the new advanced SIMOX process meets the needs of the most advanced ICs, wafer sales for 2003 will be higher than those of 2002, that the Company will book orders for one-to-three implanters during this fiscal year, the Company's estimate that it has adequate cash available for at least nine months of operation and that sufficient cash will be available to support company operations and growth. Such statements are based upon management's current expectations and are subject to risks and uncertainties that could cause actual results to differ materially from those set forth in or implied by forward-looking statements, including, but not limited to, product demand and market acceptance risks,

---

[7]  Relying on Glassman v. Computervision, 90 F.3d 617 (1st Cir. 1996), the defendants also contend that the First Circuit has recognized that "in common business parlance" to "book" means to "receive" an order.  Defs.' Memo. at 8.  However, the First Circuit in Glassman merely noted, without attribution, that booking in that case represented the receipt of an order.  Id. at 630, n.18.  It cannot be determined whether this definition is based on "common business parlance" or the undisputed practice of Computervision Corp.  In Geffon v. Micrion Corp., 249 F.3d 29, 36-37 (1st Cir. 2001), testimony was given as to the meaning of "booking" an order.

general economic conditions, the impact of competitive products, technologies and pricing, the impact of rapidly changing technology, equipment capacity and supply constraints or difficulties, limitations on the ability to protect the Company's patents and proprietary technology, the Company's limited history with regard to sales of implanters, the cyclical nature of the semiconductor industry, and other risks and risk factors described in the Company's Securities and Exchange Commission filings from time to time, including but not limited to, the Company's Annual Report on Form 10-K for the year ended December 31, 2002.

(Id.) (emphasis added).[8]  Moreover, in Ibis' Form 10-K for the year ended December 31, 2002, issued on March 12, 2003, the defendants had also warned investors of various additional risk factors, including, among others, the following:

Since we began selling implanters in 1996, we have only sold a total of eight Ibis 1000 oxygen implanters at an average sale price of approximately $4,000,000 each and one i2000 oxygen implanter valued at approximately $8,000,000.  We do not expect to sell more than a limited number of implanters in the near future.  The sale of one implanter would generally represent a substantial portion of our annual revenue.  Accordingly, the delay in the manufacture or delivery of even one unit would have a material adverse effect on our quarterly or annual results of operations.

(Defs.' Ex. 5 at 15).

---

[8]  In the July 23, 2003 press release, the defendants also reported that Ibis' "largest customer" had accepted the i2000 implanter that Ibis had shipped to it in late 2002, and Reid commented that "[t]his acceptance serves as a signal to prospective implanter customers that our new implanter has been tested in a customer-oriented production mode[.]"  (Compl. ¶ 49(b); Defs.' Ex. 13).  In their Complaint, the plaintiffs allege that Reid's comment was misleading because it did not identify the customer as IBM, and IBM was the company that had fostered the development of the equipment by licensing the MLD technology to Ibis.  (Compl. ¶ 49(b)).  Consequently, according to the plaintiffs, its acceptance of the implanter provided no proof to the semiconductor market that the product was a success.  (Id.).  However, in their brief in opposition to the motion to dismiss, the plaintiffs clarified that they did not intend to rely upon Reid's statement in support of an independent claim, but rather that they had pled these facts to provide further support for their claim that the defendants misled the market regarding Ibis' prospects for achieving orders and sales of the i2000 implanter in 2003.  See Pls.' Memo. at 10-11.

**The October 2003 Registration Statement and Prospectus**

On October 2, 2003, Ibis filed a Registration Statement with the SEC concerning its upcoming public stock offering, and on October 16, 2003, Ibis filed the prospectus for the offering.  (Compl. ¶ 50).  Defendant Reid signed the Registration Statement and authorized the filing of the accompanying prospectus.  (Id. ¶ 8; Defs.' Ex. 8 at II-6).  The plaintiffs allege that these documents were false and misleading because they omitted any disclosure of the fact that Ibis' small wafer production equipment was materially impaired and should have been written down by $11 million pursuant to GAAP.  (Id. ¶ 50(c)).[9]

---

[9]  The plaintiffs do not allege that the Registration Statement or the prospectus contained the elsewhere challenged statement predicting that Ibis would be able to book orders for one or more implanters in 2003.  Nevertheless, they do allege in the Complaint that "to the extent Ibis had received orders for i2000 implanters," the defendants failed to reveal in these documents that they could not predict when those products could be shipped and had no reasonable basis for statements made to the market regarding their expectation that Ibis would be able to book orders for between one and three implanters by December 31, 2003.  (Compl. ¶¶ 50(d) and (e)).  Since the plaintiffs do not argue that the silence in either the registration statement or prospectus on this point was a "material omission" actionable under the securities laws, this issue will not be addressed further.

**The October 22, 2003 Press Release**

On October 22, 2003, the day after Ibis' public offering had closed, the defendants issued a press release announcing Ibis' financial results for the three months ended September 30, 2003. (Id. ¶ 52). In it, "Reid commented on the Company's outlook, stating," in relevant part, "[w]e also continue to anticipate booking orders for one-to-three implanters during the fiscal year." (Id. ¶ 53). The plaintiffs allege that this statement was false and misleading because the company had no reasonable expectation that it would be able to "book," i.e., "ship" implanters in fiscal 2003. (Id. ¶ 54(b)). In particular, the plaintiffs contend, even if Ibis had orders in hand for i2000 implanters, Ibis could not predict whether or when IBM would agree to license its MLD technology to Ibis' customers, and in any event, it would have been physically impossible for Ibis to ship an implanter to any customers by year end due to the time necessary to build and test the equipment.[10] (Id.).

Additionally, the plaintiffs allege that the financial statements that the defendants published in the October 22, 2003 press release were false and misleading because they artificially inflated Ibis' property and equipment value by failing to write-down the 1000 implanters and related assets by $11 million, as GAAP required. (Id. ¶ 55).

---

[10] Neither party has submitted a copy of the October 22, 2003 press release. Given the standard form of Ibis' press releases, it is likely that the October 22nd release included Ibis' standard "safe harbor" language. (See, e.g., Defs.' Exs. 13, 14, 15). However, in the absence of a copy of the press release, the court will analyze the press release as if the safe harbor language was not included.

## The Third Quarter 10-Q

On November 4, 2003, Ibis issued an SEC Form 10-Q for its third quarter ended September 30, 2003.  (Id. ¶ 56).  Defendant Reid signed and certified the document prior to filing with the SEC.  (Id. ¶ 8).  In its 10-Q, Ibis repeated its statement that "[w]e continue to anticipate booking orders for one-to-three implanters during the fourth quarter of 2003."  (Id., Defs.' Ex. 9 at 18).  Again, the plaintiffs allege that even though Ibis may have received orders for i2000 implanters, there was no reasonable basis for believing that Ibis was capable of shipping any implanters to its customers by year end because the company could not predict whether and when IBM would agree to license the MLD technology to third party customers and because Ibis was incapable of manufacturing the equipment in such a short time period.  (Id. ¶ 57(b)).  Therefore, the plaintiffs assert, the statement was false and misleading.  (Id. ¶ 57).

The paragraph immediately following Ibis' statement regarding prospects for implanter sales cautions that "[t]his Form 10-Q contains forward-looking statements within the meaning of the 'safe harbor' provisions of the Private Securities Litigation Reform Act of 1995 including . . . the anticipation of booking orders for one-to-three implanters this fiscal year."  (Defs.' Ex. 9 at 18).  It also warns that

> [s]uch statements are based on our current expectations and are subject to a number of factors and uncertainties which could cause actual results to differ materially from those described in the forward-looking statements. Such factors and uncertainties are referenced in the Company's SEC filings from time to time, including . . . in our Form 10-K for the year ended December 31, 2002.

16

(<u>Id.</u>).  As described above, the Form 10-K for the year ended December 31, 2002

contained cautionary language regarding Ibis' implanter sales, including but not limited to

a warning that "the delay in the manufacture or delivery of even one [implanter] unit

would have a material adverse effect on our quarterly or annual results of operations."

(Defs.' Ex. 5 at 15).

Finally, the plaintiffs allege that the third quarter 10-Q contained false

and misleading statements and omissions concerning the impairment of the 200mm wafer

production line.  (Compl. ¶ 58).  Specifically, the document reads:

> Although our 200 mm and smaller wafer size production line is currently
> underutilized, considering our future plans, current potential business
> prospects and alternatives, Management believes that we do not have an
> impairment issue at this time.  However, if our future plans and potential
> business prospects do not materialize, if semiconductor manufacturers fail
> to adopt SIMOX technology during the current process cycle (which
> typically lasts two to three years) or our customers transition to the 300 mm
> wafer size sooner than we anticipate, our 200 mm and smaller wafer size
> production line may become obsolete and we would be required to reduce
> our income by an impairment loss which could be material.

(Defs.' Ex. 9 at 12).  The plaintiffs allege that these statements are fraudulent because

they failed to disclose that the asset group already had become obsolete, and that the

defendants "were considering selling the asset group, having concluded that there was no

prospect for either selling the 1000 implanters overseas or selling the smaller size wafers

the 1000 implanters produced."  (Compl. ¶ 59).  Consequently, the plaintiffs contend, the

property and equipment should have been written down by approximately $11 million

pursuant to GAAP.  (<u>Id.</u>).

**The Success of Ibis' Stock Offering**

The plaintiffs allege that the defendants, by their misstatements and omissions, successfully inflated Ibis' stock price from a low of $3.90 per share in the second quarter of 2003 to a high of $13.17 per share in the third quarter of 2003, shortly before the stock offering.  (Id. ¶ 47(d)).  In fact, on October 17, 2003, when the defendants issued a press release announcing the public offering of one million shares of common stock, shares of Ibis were selling for over $14 per share.  (Id. ¶ 51).  On October 21, 2003, the defendants announced that the offering had closed and that the company had successfully netted proceeds of about $12.7 million.  (Id.).

**Ibis' Disclosures Following the Class Period**

Less than two months after the close of the stock offering, Ibis warned investors that its year end financial picture would be less than rosy.  On December 15, 2003, three days after the close of the Class Period, the defendants issued a press release in which they made the following disclosures:

> the Company had expected to book orders for one to three i2000 implanters before the end of 2003, however, it now expects an order(s) for one to three i2000 implanters to be received in the first half of 2004.  The exact timing is very difficult to predict because it is dependent on the customer(s) entering into a license agreement with a third party.
> * * *
> the increasing emphasis on the production of larger wafers and related customer forecasts will require Ibis to update its impairment analysis of its smaller wafer size production equipment and it expects to recognize an impairment charge.  This non-cash charge is expected to be material.  The

18

results of such an analysis will be reported along with year-end financial
results for 2003.

(Defs.' Ex. 14; <u>see</u> <u>also</u> Compl. ¶¶ 60-61).  Thus, Ibis alerted investors to the fact that it

would not be receiving significant cash payments associated with the shipping of one or

more implanters by year end, and that Ibis likely would be taking a material charge on its

impaired assets.  (Compl. ¶¶ 60-61).  In reaction to Ibis' announcement, the price of the

company's common stock declined from $15.40 per share at the close of December 12,

2003, to a December 15, 2003 close of $13.20 per share, to a closing price of $10.37 per

share on December 16, 2003.  (<u>Id.</u> ¶ 62).

In its Form 10-K for 2003, which Ibis filed with the SEC on March 2, 2004, the

defendants revealed that Ibis had recognized an impairment charge for its smaller wafer

asset group pursuant to FAS 144.  (<u>Id.</u> ¶ 63(a)).  As alleged in the Complaint,

> the basis for the impairment of the eight 1000 implanters and related assets
> (asset group) under FAS 144 was the Company's business prospects for
> sales of 200mm wafers, that existing and potential wafer customers were
> rapidly transitioning to 300mm wafers and 92% of 2003 wafer sales were
> for 300mm wafers, that there was no prospect for 1000 implanter sales
> overseas and a potential buyer for a portion [undescribed] of Ibis' wafer
> production line concluded that weak demand for 200mm and smaller wafers
> did not justify an investment in or purchase of the . . . group assets.

(<u>Id.</u> ¶ 63(a)).  The plaintiffs allege that virtually all of these facts were known to, but not

disclosed by the defendants throughout the Class Period.  (<u>Id.</u>).  Indeed, as set forth in the

Complaint, even before the start of the Class Period, Reid had acknowledged publicly

that

the semiconductor industry was moving away from 200mm wafers, and the company expected that the shift would continue, and that there would be an increase in demand for 300mm wafers throughout the remainder of 2003.  (Id. ¶¶ 44(c), 44(e), 44(g), 44(j)).  In fact, during the fiscal quarter ended June 30, 2003, 97% of Ibis' wafer sales were comprised of 300mm  products, and in the quarter ended September 30, 2003, 98% of Ibis' wafer sales consisted of 300mm wafers.  (Id. ¶ 43).  Based on these allegations, it can be inferred that during the Class Period, the defendants understood that there was virtually no remaining demand for 200mm wafers, but they nevertheless delayed the decision to write-down Ibis' impaired assets.

The defendants also disclosed in Ibis' Form 10-K for 2003 that the company's existing and potential customers wishing to use IBM's MLD process to manufacture wafers using Ibis' implanters would need to license the MLD technology directly from IBM.  (Id. 63(b)).  Significantly, they revealed that "negotiations between IBM and our customer are beyond our control," that Ibis can provide "no assurances" that its customers and IBM will reach acceptable terms "in a timely manner, or at all," and that "[t]his has caused delays in receiving an order from one customer and could cause delays with other customers in the future."   (Defs.' Ex. 11 at 14; see also Compl. ¶ 63(b)).  These facts, according to the plaintiffs, also were known to, but not disclosed by the defendants during the Class Period.  (Compl. ¶ 63(b)).

# IV.  ANALYSIS

## A.     Overview of the Plaintiffs' Claims

In the First Claim set forth in the Complaint, the plaintiffs allege that defendants Ibis and Reid violated section 10(b) of the Exchange Act and Rule 10b-5 thereunder[11] by making untrue statements of material fact regarding Ibis' financial condition and sales prospects, and by failing to disclose material information necessary to make the statements not misleading.  In their Second Claim, the plaintiffs assert that defendant Reid is liable as a "controlling person" of Ibis under section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).[12]  In order to state a claim under Section 10(b) and Rule 10b-5 based on misrepresentations and omissions, the plaintiffs must plead and prove "(1) that

---

[11]  Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  Rule 10b-5 states: "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

[12]  Section 20(a) of the Exchange Act provides, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).

defendants made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) that defendants acted with scienter; (3) that either plaintiffs or the market relied on the misrepresentation or omission; and (4) resultant injury." Geffon v. Micrion Corp., 249 F.3d 29, 34 (1st Cir. 2001). In order to establish control person liability, the plaintiffs must allege and prove (i) an underlying violation by a controlled person or entity, and (ii) control over the primary violator by the defendant.[13] See In re Stone & Webster, Inc. Sec. Litig., 414 F.3d 187, 194 (1st Cir. 2005).

### B.     Statements Regarding Future Sales Prospects

The defendants argue that their statements regarding Ibis' prospects for booking one to three implanter orders in 2003 are not actionable. Specifically, the defendants argue that the plaintiffs have failed to plead, with sufficient particularity, that the statements were false or that they were made with scienter.[14] The defendants also contend that the statements are protected by the PSLRA's safe harbor provisions. This court

---

[13] To date, the First Circuit has taken no position on whether a plaintiff must prove "culpable participation" on the part of the controlling person to establish liability under section 20(a) of the Exchange Act. See In re Stone & Webster, Inc. Sec. Litig., 414 F.3d 187, 194 n. 4 (1st Cir. 2005).

[14] Much of this argument is premised on the defendants' contention that the plaintiffs have improperly defined "booking orders" as "shipping orders." Since this court recommends the dismissal of these claims under the PSLRA's safe harbor provisions, these arguments will not be addressed in any detail and the court will assume, arguendo, that booking means shipping.

concludes that the PSLRA immunizes the defendants from liability for each of these statements, and therefore, the statements are not actionable.

### 1.      PSLRA safe harbor provisions

The PSLRA created a statutory safe harbor for certain "forward-looking statements." See 15 U.S.C. § 78u-5(c)(1). "In that safe harbor, corporations and individual defendants may avoid liability for forward-looking statements that prove false if the statement is 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" Harris v. Ivax Corp., 182 F.3d 799, 803 (11th Cir. 1999) (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)). Therefore, the statute establishes "a surprising rule that the maker of knowingly false and wilfully fraudulent forward-looking statements, designed to deceive investors, escapes liability for the fraud" if the statement is identified as forward-looking and is accompanied by meaningful cautionary statements. Stone & Webster, 414 F.3d at 212. See also id. (the safe harbor "is intended to apply only to allegations of falsehood as to the forward-looking aspects of the statement."). In other words, "if a statement is accompanied by 'meaningful cautionary language,' the defendants' state of mind is irrelevant." Harris, 182 F.3d at 803.

Moreover, even if the forward-looking statement is not accompanied by meaningful cautionary statements, the PSLRA's safe harbor "precludes liability for a forward-looking statement unless the maker of the statement had actual knowledge that it was false or misleading." Greebel, 194 F.3d at 201. Ordinarily, a plaintiff may

demonstrate the intent necessary to prove its section 10(b) case by showing "either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." Aldridge, 284 F.3d at 82. However, under the safe harbor provisions, "recklessness" is not sufficient to establish liability for forward-looking statements. See Greebel, 194 F.3d at 200-01 (distinguishing safe harbor and contribution provisions of the PSLRA, that require "actual knowledge" to establish liability, from the substantive definition of "scienter" that has been adopted by the First Circuit and includes recklessness). Consequently, the dismissal of securities fraud claims based on forward-looking statements is warranted if the statements are not accompanied by cautionary language and the plaintiff fails to plead with particularity facts giving rise to a strong inference that the defendant made the statements with actual knowledge that they were false or misleading. See 15 U.S.C. § 78u-4(b)(2); 15 U.S.C. § 78u-5(c)(1)(B); Cutsforth v. Renschler, 235 F. Supp.2d 1216, 1227 (M.D. Fla. 2002).

### 2. **Application of the safe harbor to defendants' statements**

The defendants' statements regarding Ibis' prospects for booking implanter orders that are contained in the July 23, 2003 press release and in the company's Form 10-Q for the third quarter ended September 30, 2003 are clearly identified in the documents as forward-looking. (See Defs' Ex. 13; Defs' Ex. 9 at 18 (stating that the document "may contain forward-looking statements . . . including statements . . . that the Company will book orders for one-to-three implanters during this fiscal year . . . .")). These forward-looking statements are also accompanied by cautionary statements warning of the

24

existence of "a number of factors and uncertainties which could cause actual results to differ materially from those described in the forward-looking statements." (Defs' Ex. 9 at 18). Such factors and uncertainties, as listed in the press release and in the expressly referenced Form 10-K for the year ended December 31, 2002,[15] include risks related to implanter sales and their impact on the company's revenues. In particular, the press release includes language warning that "product demand and market acceptance risks," as well as Ibis' "limited history with regard to sales of implanters," among other things could cause actual results to differ from the anticipated results described in Ibis' statements. (Defs.' Ex. 13). Furthermore, the Form 10-K includes statements cautioning investors that "[t]he sale of one implanter would generally represent a substantial portion of our annual revenue," and "the delay in the manufacture or delivery of even one unit would have a material adverse effect on our quarterly or annual results of operations." (Defs.' Ex. 5 at 15). To invoke the safe harbor's protection, it is not necessary for a defendant to describe "the particular factor that ultimately causes the forward-looking statement not to come true," as long as the warnings accompanying the statement "mention important factors that could cause actual results to differ materially from those in the forward-looking statement." Harris, 182 F.3d at 807 (internal quotations and citations omitted). Where, as here, investors have "been warned of risks of a significance similar to that actually realized, [they are] sufficiently on notice of the danger of the

---

[15]See Stavros v. Exelon Corp., 266 F. Supp.2d 833, 844 (N.D. Ill. 2003) (direct incorporation by reference of cautionary statements in SEC filings is permissible and supports the application of the safe harbor provisions).

investment to make an intelligent decision about it according to [their] own preferences for risk and reward." Id. at 807. In sum, the cautionary statements provided by Ibis contained warnings that were specific to Ibis and its operations, and were meaningful. See id.; Compare Cutsforth, 235 F. Supp.2d at 1232 (general cautionary statements that could be characterized as "boilerplate," were still sufficient to support safe harbor protection where plaintiffs failed to identify risk factors that would have made warnings more meaningful). Therefore, the defendants are excused from liability for statements set forth in the July 23, 2003 press release and in Ibis' third quarter 10-Q predicting that Ibis would book orders for one to three implanters during 2003.

As noted above, it is unclear whether the press release of October 22, 2003 contained the same safe harbor and cautionary language as the other Ibis press releases. See note 10, supra. If so, the above analysis would control and the defendants would not be liable for the statements in the October 22, 2003 release that Ibis "continue[d] to anticipate booking orders for one-to-three implanters during the fiscal year." (Compl. ¶ 53). Assuming that there was no cautionary language, the defendants would nevertheless remain protected under the safe harbor provisions because the plaintiffs have failed to plead facts giving rise to a strong inference that Reid or any other individual[16] at Ibis

---

[16] In order to defeat the safe harbor protection pursuant to 15 U.S.C. § 78u-5(c)(1)(B), the plaintiff must prove that the forward-looking statement at issue was made by a natural person with actual knowledge that the statement was false or misleading, or was made by a business whose executive officer made or approved the statement and had actual knowledge that it was false or misleading.

actually knew that the statements were false or misleading.

The plaintiffs have alleged that the statements predicting the company's ability to book orders for one to three implanters during 2003 were fraudulent because Ibis used the term "book" to mean ship, and that at all times that the statement was made, the defendants could not have had a "reasonable basis" or "reasonable expectation" that Ibis would be able to ship any i2000 implanters to customers by December 31, 2003. (See e.g., id. ¶¶ 50(e), 54(b), 57(b)). In particular, the plaintiffs allege, Ibis could not predict whether or when IBM would agree to license the MLD technology to Ibis' customers, and in any event, it would have been too late for Ibis to ship the equipment because it took up to ten months to build a machine. (Id.).

The plaintiffs' allegation that the defendants lacked a "reasonable basis" for their forecast is insufficient to plead actual knowledge. See Cutsforth, 235 F. Supp.2d at 1232 (allegation that defendants' revenue forecast had no reasonable basis is conclusory and "falls short of asserting actual knowledge"). Additionally, even assuming that the defendants used the words "booking orders" to mean "shipping equipment," the plaintiffs' allegations still do not demonstrate that the defendants had actual knowledge that shipment would not have been possible prior to 2004. Nothing in the Complaint suggests that Reid or any of Ibis' other executive officers believed or had information that IBM would not consummate a license agreement with one or more of Ibis' customers prior to year end. To the contrary, the fact that Ibis was able to ship an i2000 implanter to a third party customer in May 2004, approximately three months after announcing that

27

it had received the order, suggests that it was possible to execute the necessary licensing

agreement within a fairly short time period.  Moreover, according to the Complaint, Ibis

may have already received orders from customers before and during the Class Period.

Thus, the consummation of the customer's agreement with IBM may have been

imminent.  There is nothing in the Complaint which compels the conclusion that the

defendants knew the statements about booking orders by year-end to be false.[17]  See Shaw

v. Digital Equip. Corp., 82 F.3d 1194, 1223 (1st Cir. 1996) (plaintiff cannot "simply

contrast a defendant's past optimism with less favorable actual results" and argue that the

difference must be the result of fraud) (superseded by PSLRA, 15 U.S.C. § 78u-4(b)(1)-

(2)).

Additional allegations also belie the plaintiffs' argument that, even by the start of

the Class Period, it would have been physically impossible for Ibis to ship an implanter

by year end due to the amount of time it takes to make an implanter.  The Complaint

contains facts suggesting that Ibis had manufactured at least one i2000 implanter prior to

the Class Period that potentially could be sold to a customer.  Thus, the plaintiffs allege

that during a February 2003 conference call with analysts, Ibis' Chief Operating Officer,

Gerald Cameron, stated that in the past year, "[s]everal more i2000 implanters were

---

[17]  It also would be counter-intuitive to infer that the defendants did not expect IBM to be
reasonable in negotiations with Ibis's customers.  It would have made no sense for Ibis to have
shifted away from the wafer business to focus almost exclusively on the sale of the i2000
implanters if Ibis knew for a fact that IBM's necessary involvement in the sale of i2000s would
preclude the timely consummation of sales.

built."  (Compl. ¶ 32).  The plaintiffs further allege that, according to a former Ibis employee,[18] Ibis had completed production of an i2000 implanter in late 2002 and early 2003.  (Id. ¶ 67(b)).  As of January or February 2003, Ibis was testing the implanter and using it to demonstrate the product's capabilities to potential customers, but it had no customer attached to it.  (Id.).  This implanter may have been available for sale.  Finally, the fact that Ibis did ship an i2000 implanter to a customer within a few months after announcing the order in February 2004 illustrates that the company was capable of shipping the product within a relatively short time period.  This court cannot conclude, based on the factual allegations set forth in the Complaint, that the defendants had actual knowledge that their forward-looking statements regarding Ibis' ability to book one or more implanter orders in 2003 were false.  Accordingly, this court finds that the statements are protected by the safe harbor and are not actionable.[19]

----

[18]  In a footnote to their Reply Memorandum in Support of Defendants' Motion to Dismiss Consolidated Amended Complaint ("Defs.' Reply")(Docket No. 18), the defendants suggest that the plaintiffs' reliance on information provided by undisclosed former employees to support their factual allegations is insufficient to meet the PSLRA's requirement that facts be pled with particularity.  See Defs.' Reply at 5 n. 5.  The defendants also submitted supplemental authority to the court addressing a plaintiff's reliance on confidential sources to plead facts supporting securities fraud claims.  However, because the defendants have not squarely addressed this issue in their motion papers, and there are ample allegations without the challenged employee statement, no further discussion of this point is necessary.

[19]  The plaintiffs argue that certain of the defendants' statements are not immunized by the safe harbor because they concern present facts and not forward-looking statements.  See Pls.' Memo. at 9.  These statements consist of Reid's statement in a June 27, 2002 article that Ibis was experiencing strong demand for its i2000 implanter, (see Compl. ¶ 44(c)), and Reid's comment in the July 23, 2003 press release that the acceptance of an i2000 implanter by Ibis' largest customer "serves as a signal to prospective implanter customers that our new implanter has been tested in a customer-oriented production mode."  (Compl. ¶ 49(b); Defs.' Ex. 13).  Neither of these

C.    <u>**Alleged GAAP Violations**</u>

The plaintiffs assert that pursuant to GAAP, and in particular FAS 144, the defendants were required but failed to perform an impairment analysis of Ibis' eight 1000 implanters and related assets, and to write-off the carrying value of those assets by approximately $11 million prior to the start of the Class Period.  (Compl. ¶¶ 41-46).  As a result, according to the plaintiffs, the defendants' statements during the Class Period concerning Ibis' financial condition and the status of its 200mm wafer production line were false and misleading.  (<u>Id.</u> ¶¶ 49(a), 50(c), 55, 59).

The defendants have moved to dismiss the claims based on the alleged noncompliance with GAAP on the grounds that the decision as to the timing of the write-off was subjective, and the defendants' explicit disclosures informing investors about the status of Ibis' 200mm wafer production business and cautioning them about the possibility of obsolescence defeat any inference that the defendants were acting with scienter.  Additionally, the defendants contend that factual allegations in the Complaint

---

statements involves prospects for booking implanter orders or relates to the value of Ibis' 200mm wafer production line, which is the basis for the plaintiffs' claim.  Moreover, to the extent that the plaintiffs rely on them to support their claims, the statements are not actionable.  Reid made the June 27, 2002 statement over a year before the Class Period.  Accordingly, it cannot serve as a basis for liability.  <u>See</u> <u>In re Int'l Bus. Mach. Corp. Sec. Litig.</u>, 163 F.3d 102, 107 (2d Cir. 1998) (defendants are liable only for statements made during the class period).  Moreover, although the July 23 statement includes present facts that are not protected by the safe harbor, <u>see</u> <u>Stone & Webster</u>, 414 F.3d at 213, nothing in the Complaint suggests that the statement is untrue.  The statement says nothing about sales prospects for 2003, and nothing in the Complaint suggests that the equipment was not used by the customer or that such use could not serve as a positive signal to potential purchasers.  Therefore, the plaintiffs have not alleged facts showing that the statement was false or misleading, or otherwise actionable.

concerning the potential for future sales of 200mm wafers to two different customers undermine the argument that the write-down should have occurred earlier.  This court finds, however, that the plaintiffs' impairment loss allegations are sufficient to state a claim.

      **1.**     **<u>FAS 144</u>**

FAS 144 addresses financial accounting and reporting for the impairment or disposal of long-lived assets.  (Defs.' Ex. 18).  It states in relevant part:

> [a]n impairment loss shall be recognized only if the carrying amount of a long-lived asset (asset group) is not recoverable and exceeds its fair value. The carrying amount of a long-lived asset (asset group) is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset (asset group).  That assessment shall be based on the carrying amount of the asset (asset group) at the date it is tested for recoverability, whether in use . . . or development . . . An impairment loss shall be measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds its fair value.

(<u>Id.</u> ¶ 7).  FAS 144 also provides that "[a] long-lived asset (asset group) shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable."  (<u>Id.</u> ¶ 8; <u>see</u> <u>also</u> Compl. ¶ 45 (quoting FAS 144)). Examples of such events or changes in circumstances include, among others:

> a.  A significant decrease in the market price of a long-lived asset (asset group)
> b.  A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition
> c.  A significant adverse change . . . in the business climate that could affect the value of a long-lived asset (asset group) . . . .

(<u>Id.</u>).

### 2.    <u>Allegations concerning obsolescence</u>

The plaintiffs cannot plead a GAAP violation merely by claiming that a write-off for obsolete inventory that was taken in one quarter should have been taken in an earlier quarter.  <u>See</u> <u>Cutsforth</u>, 235 F. Supp.2d at 1257; <u>In re Number Nine Visual Tech. Corp. Sec. Litig.</u>, 51 F. Supp.2d 1, 26 (D. Mass. 1999).  Instead, they must provide particularized factual support for their claim that the inventory had become obsolete by the start of the Class Period.  <u>Id.</u>; <u>see also</u> <u>In re PETsMART, Inc. Sec. Litig.</u>, 61 F. Supp.2d 982, 993 (D. Ariz. 1999) (conclusory allegations that defendant had "accumulated a significant quantity of excess, obsolete, or otherwise unsalable inventory" are insufficient to support claim regarding timing of write-down); <u>Plevy v. Haggerty</u>, 38 F. Supp.2d 816, 825 (C.D. Cal. 1998) (plaintiff must provide more than allegation that inventory was unsalable and obsolete).  Here, the plaintiffs have met that burden.

The plaintiffs allege facts showing that prior to the start of the Class Period, significant adverse changes in Ibis' use of its 200mm wafer production line and in the business climate affecting prospects for 1000 implanter and small wafer sales required Ibis to test for recoverability of its 200mm wafer production line.  The plaintiffs also allege facts supporting an inference that by the close of Ibis' second quarter ended June 30, 2003, this asset group had become impaired and should have been written down.  Specifically, the plaintiffs allege that prior to the Class Period, Ibis had stopped selling 1000 implanters due to lack of demand.  (Compl. ¶ 19).  Additionally, the plaintiffs allege facts showing that even as early as 2002, the semiconductor industry in general and Ibis

in particular were moving away from smaller sized wafers.  For example, in September

2002, Reid, referring to an order received for an i2000 implanter, stated, "[t]his order

demonstrates that the i2000 implanter provides what our customers are looking for: a low

cost-of-ownership system that will produce high quality 300mm, thin SOI wafers."  (Id. ¶

44(d)).  Subsequently, in  November 2002, Reid was quoted as stating that "chipmakers

are moving to larger, 300mm wafers."  (Id. ¶ 44(e)).  In fact, according to the Complaint,

by the beginning of the Class Period, 97% of Ibis' wafer sales consisted of 300mm

wafers, compared to only 13% in the same quarter of the prior year, and Ibis' smaller

wafer production equipment was falling into disuse and disrepair.  (Id. ¶¶ 43, 67(e)).

    These facts allege more than a dispute simply about the timing of a write-off based

on wholly subjective criteria.  Cf., DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.

1990) ("If all that is involved is a dispute about the timing of the writeoff, based on

estimates of the probability that a particular debtor will pay, we do not have fraud . . . ."),

cert. denied, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990).  Instead, they "lend

credence to the theory that the value of [Ibis' asset group] was declining" well before the

start of the Class Period.  Number Nine, 51 F. Supp.2d at 26 (factual allegations lending

credence to the theory that the value of the defendant's inventory was declining prior to

date when allegedly misleading statements were made were sufficient to support fraud

claims even though they did not establish that product was actually obsolete).

Accordingly, this court finds that the factual allegations set forth in the Complaint

adequately specify why the challenged statements made during the Class Period were

fraudulent.  See id.

The defendants rely on the allegations in the Complaint showing that on October 22, 2003, the defendants issued a press release in which Ibis revealed that two customers were considering purchases of 200mm wafers.  (Compl. ¶ 53).  The defendants argue that these allegations undermine the theory that the 200mm production line should have been written off as valueless.  Defs.' Memo. at 15.  However, the plaintiffs also allege that the i2000 implanters were capable of manufacturing 200mm wafers.  (Id. ¶ 18).  The fact that Ibis may have identified potential customers for the 200mm wafers does not mandate the conclusion that the small implanter asset group had value since the wafers could be made on the i2000 equipment.  Consequently, when the Complaint's allegations are taken together as a whole and are viewed in the light most favorable to the plaintiffs, the Complaint states a claim that there were fraudulent misrepresentations about the financial condition of the company due to the failure to write down the value of the equipment earlier.

### 3.    Scienter

A separate issue is whether the plaintiffs have sufficiently alleged scienter.  See Number Nine, 51 F. Supp.2d at 26.  "To win a section 10(b) case, the plaintiff must show either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness."  Aldridge, 284 F.3d at 82.  To accomplish this, "the plaintiff may combine various facts and circumstances indicating fraudulent intent to show a strong inference of scienter."  Id.  Accordingly, "[s]cienter may be demonstrated by indirect

evidence, and may extend to a form of extreme recklessness that 'is closer to a lesser form of intent[.]'" Cabletron, 311 F.3d at 38 (citations omitted).

"Furthermore, this circuit has rejected any rigid formula for pleading scienter, preferring to rely on a 'fact-specific approach' that proceeds case by case." Id. As part of the mix of facts, the plaintiffs may allege that the defendants had the motive and opportunity to commit the fraud. Id. at 39. "However, 'catch-all allegations' which merely assert motive and opportunity, without something more, fail to satisfy the PSLRA." Id. (citing Greebel, 194 F.3d at 197).

Although GAAP violations may provide evidence of scienter, the defendant's failure to comply with GAAP generally is not, by itself, enough to establish scienter. See In re Raytheon Sec. Litig., 157 F. Supp.2d 131, 147 (D. Mass. 2001). Thus, allegations that the defendant failed to timely record an impairment in the value of its inventory, without more, are insufficient to support an inference of scienter. See Stavros, 266 F. Supp.2d at 851. "Rather, the court must determine 'whether the alleged GAAP violations, combined with other circumstances indicative of fraudulent intent, raise a strong inference that the defendants acted with scienter.'" Raytheon, 157 F. Supp.2d at 147 (quoting Chalverus v. Pegasystems, Inc., 59 F. Supp.2d 226, 233 (D. Mass. 1999)). Here, the plaintiffs have alleged not only a GAAP violation, but also additional evidence of scienter. Not only was there motive, i.e., the upcoming public offering, but Ibis was obviously aware of the eventual need to write-down the equipment. There were no changes between the initial pre-Class Period recognition of the impairment and the actual

35

write-down which would explain the delay. Nor were there any potential anticipated events which would explain why the write-down was not taken earlier. The allegations are sufficient to find scienter.

The defendants argue that certain facts alleged in the Complaint are inconsistent with an intent to defraud investors. In particular, they point out that in its SEC filings, Ibis had cautioned investors about the possibility that the small wafer production line would become obsolete, and had disclosed information about the company's increasing production of 300mm wafers and decreasing production of smaller sized wafers. The defendants also contend that the absence of insider trading further indicates a lack of intent to defraud.

The absence of insider trading does not preclude an inference of scienter, especially where the plaintiff alleges that the defendant stood to benefit from the alleged fraud. See Crowell v. Ionics, Inc., 343 F. Supp.2d 1, 14-16 (D. Mass. 2004). Here, the plaintiffs have alleged that the defendants were motivated to delay the timing of the impairment charge in order to artificially inflate Ibis' stock price and successfully complete the October 2003 stock offering, which was necessary to ensure that Ibis would not run out of cash and could fund ongoing operations. (Compl. ¶¶ 47(d), 68). Because, as the plaintiffs have alleged, Reid was privy to confidential and proprietary information concerning Ibis' operations, financial condition, and present and future business prospects, it can be inferred that Reid understood the significance of the stock offering to Ibis' future and therefore to his own position as head of the company. Accordingly, the

plaintiffs have alleged facts supporting an inference that Reid stood to benefit from the alleged fraud and providing additional evidence of scienter.  See Aldridge, 284 F.3d at 83 (allegations that corporate officers were motivated to commit fraud in order to insure their survival and that of the company support a showing of scienter).

The fact that Ibis disclosed the future possibility of obsolescence and revealed information to the public concerning the sharp decrease in its 200mm and smaller wafer sales does not undermine the plaintiffs' allegations of fraud based on the timing of the write-down.  Rather, these statements, when coupled with the failure to write-down the equipment, support a finding of scienter.  As described above, the plaintiffs alleged facts showing that Reid knew, as early as 2002, that the semiconductor industry was moving away from smaller wafers in favor of the 300mm wafers.  They also alleged facts demonstrating that by the start of the Class Period, Ibis' own sales confirmed that its customers in fact had embraced the 300mm product, which, according to Reid's September 2002 statement, Ibis' "customers [were] looking for."  These allegations, especially when combined with the allegations concerning motive and the failure to comply with GAAP, are sufficient to support a strong inference that the defendants either knowingly misrepresented the value of the small wafer asset group at the time they made the challenged statements, or recklessly disregarded facts indicating that those assets were impaired and should have been written down in the fiscal quarter ended June 30, 2003.  See Number Nine, 51 F. Supp.2d at 27 (evidence of industry knowledge that defendant's product was becoming obsolete sufficient to support strong inference of scienter).

37

Accordingly, this court recommends that the motion to dismiss be denied as to allegedly misleading statements and omissions regarding the value of Ibis' small wafer production assets.

### V.  <u>CONCLUSION</u>

For the reasons detailed herein, this court concludes that all of the allegedly misleading  statements regarding Ibis' prospects for booking orders for one to three i2000 implanters by the end of its 2003 fiscal year are not actionable, but that the alleged misstatements and omissions regarding the value of Ibis' small wafer production assets are adequate to support the plaintiffs' securities fraud claims.  Accordingly, this court

recommends to the District Judge to whom this case is assigned that the defendants'

motion to dismiss (Docket No. 10) be ALLOWED IN PART and DENIED IN PART.[20]

/s/ Judith Gail Dein

_____
Judith Gail Dein
United States Magistrate Judge

---

[20] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).