**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT COURT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| IN RE IBIS TECHNOLOGY SECURITIES ) | Case No. 04 cv 10446 RCL |
| LITIGATION                                    ) | |
| _____ ) | |

**PLAINTIFFS' OBJECTIONS TO THE REPORT AND**
**RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS**

SHAPIRO HABER & URMY LLP
Thomas G. Shapiro BBO #454680
Theodore M. Hess-Mahan BBO #557109
Exchange Place
53 State Street, 37th Floor
Boston, MA 02109
(617) 439-3939
_Liaison Counsel for Plaintiffs_

LAW OFFICES BERNARD M. GROSS, P.C.
Deborah R. Gross, BBO#546151
Robert P. Frutkin
1515 Locust Street, Second Floor
Philadelphia, PA 19102
(215) 561-3600


_Lead Counsel for Plaintiffs_

# <u>TABLE OF CONTENTS</u>

Page No.

TABLE OF AUTHORITIES .................................................................................................... ii

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     FACTUAL SUMMARY ............................................................................................. 1

        A.      The Complaint ................................................................................................ 1

        B.      The Magistrate's Report ................................................................................. 6

III.    ARGUMENT ............................................................................................................... 7

        A.      The Relevant Standards ................................................................................. 7

        B.      The Magistrate Misapplied The PSLRA Safe Harbor To The Facts Alleged ................. 7

                1.      Defendants' i2000 Implanter Statements Were Not Accompanied By
                        Meaningful Cautionary Language ...................................................... 8

                2.      The i2000 Implanter Statements Were Made Without Reasonable Basis
                        And/Or With Actual Knowledge Of Their Falsity ............................ 11

IV.     CONCLUSION ........................................................................................................... 16

# TABLE OF AUTHORITIES

**CASES**                                                    **PAGE(S)**

*Conley v. Gibson*,
    355 U.S. 41 (1957)................................................................15n

*Cutsworth v. Renschler*,
    235 F. Supp. 2d 1216 (M.D. Fla. 2002)...........................................10n, 12n

*Fitzer v. Security Dynamics Technologies, Inc.*,
    119 F. Supp. 2d 12 (D. Mass. 2000) ..............................................8

*In re Globalstar Securities Litigation*,
    No. 01-1748,
    2003 WL 22953163 (S.D.N.Y. Dec. 15, 2003) ...........................................11

*Gross v. Medaphis Corp.*,
    977 F. Supp. 1463 (N.D. Ga. 1997) ..............................................8n

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ....................................................12

*Harden v. Raffensperger, Hughes & Co.*,
    65 F.3d 1392 (7th Cir. 1995) ....................................................8, 9

*Harris v. Ivax Corp.*,
    183 F.3d 799 (11th Cir. 1999) ...................................................10n

*Huddleston v. Herman & MacLean*,
    640 F.2d 534 (5th Cir. 1981),
    *rev'd in part*, 459 U.S. 375 (1983)...............................................10

*In re Independent Energy Holdings PLC Securities Litigation*,
    154 F. Supp. 2d 741 (S.D.N.Y. 2001).............................................13

*Jakobe v. Rawlings Sporting Goods Co.*,
    943 F. Supp. 1143 (E.D. Mo. 1996)...............................................15

*Kunik v. Racine County, Wis.*,
    946 F.2d 1574 (7th Cir. 1991) ...................................................15n

*McMath v. City of Gary*,
    976 F.2d 1026 (7th Cir. 1992) ...................................................15n

*Milman v. Box Hill Systems Corp.*,
    72 f. Supp. 2d 220 (S.D.N.Y. 1999) .................................................................11, 12

*Negron v. Celebrity Cruises, Inc.*,
    316 F.3d 60 (1st Cir. 2003).............................................................................7

*In re Number Nine Visual Technologies Corp. Securities Litigation*,
    51 F. Supp. 2d 1 (D. Mass. 1999) ........................................................8n, 15

*Phinney v. Wentworth Douglas Hospital*,
    199 F.3d 1 (1st Cir. 1999)...............................................................................7

*In re Prudential Securities Limited Partnerships Litigation*,
    930 F. Supp. 68 (S.D.N.Y. 1996).............................................................10, 11

*Schaffer v. Evolving Systems, Inc.*,
    29 F. Supp. 2d 1213 (D. Colo. 1998).............................................................12n

*Searls v. Glasser*,
    64 F.3d 1061 (7th Cir. 1995) ......................................................................8, 9

*Selbst v. McDonald's Corp.*,
    No. 04-2422,
    2005 WL 2319936 (N.D. Ill. Sept. 21, 2005) .............................................13

*Shaw v. Digital Equipment Corp.*,
    82 F.3d 1194 (1st Cir. 1996).......................................................................8n

*TSC Industries, Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976).....................................................................................9

*In re Unicapital Corp. Securities Litigation*,
    149 F. Supp. 2d 1308 (M.D. Fla. 2001).......................................................9

*In re Viropharma Inc. Securities Litigation*,
    No. 02-1627,
    2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) .................................................11

## I.     PRELIMINARY STATEMENT

Pursuant to 28 U.S.C. § 636, plaintiffs Martin Smolowitz, George Harrison and Mark G. Forgue respectfully submit this Objection to the September 22, 2005 Report and Recommendation on Defendants' Motion to Dismiss issued by Magistrate Dein (the "Magistrate Report") insofar as it recommends to this Court that plaintiffs' claims regarding defendant Ibis Technology Corporation's ("Ibis") flagship product, the i2000 implanter, should be dismissed because defendants' statements regarding the product are protected by the safe harbor for forward-looking statements provided by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-5(c) (1) (A) (i)-(ii).  As demonstrated below, because defendants' statements regarding the i2000 implanter were made without meaningful cautionary language and lacked a reasonable basis and/or were known to be false when made, they are not protected by the PSLRA's safe harbor and plaintiffs' claims should be upheld.[1]

## II.     FACTUAL SUMMARY

### A.     The Complaint

Plaintiffs' Consolidated Amended Complaint (the "Complaint"), filed on behalf of a class of purchasers of Ibis common stock, alleges that Ibis and defendant Martin J. Reid ("Reid"), its Chief Executive Officer, engaged in securities fraud by making false and misleading statements regarding Ibis's financial condition and future prospects between July 23, 2003 and December 12, 2003, inclusive (the "Class Period").  Plaintiffs allege that defendants intentionally misrepresented the company's true condition in order to artificially inflate the price of Ibis's

---

[1] Plaintiffs also assert claims arising out of defendants' misstatements regarding the value of Ibis's small wafer production line, which the Magistrate Judge found to be adequate.  *See* Magistrate Report at 30-38.

stock and ensure the success of an October 2003 public offering, which was necessary to ease Ibis's severe cash shortage and maintain its viability.

Defendant Ibis manufactures wafers and oxygen implantation equipment (known as implanters).  Complaint ¶ 17.  Ibis's business relies upon SIMOX-SOI[2] technology.  *Id.*  The implanters use SIMOX-SOI to implant a layer of oxygen into the wafers; both products are used in the semiconductor industry and were sold for such use by Ibis during the Class Period. *Id.*

Defendant Reid served as Ibis's Chief Executive Officer, President and Chairman of its Board of Directors throughout the Class Period.  Complaint ¶ 8.  During the Class Period, Reid was responsible for signing Ibis's SEC filings and acting as the principal spokesperson for the company.  *Id.*  Based upon his superior position in the company, Reid had access to and/or knowledge of all material corporate information, including but not limited to Ibis's financial condition, business prospects, Board of Directors meeting minutes and internal corporate documents.  Complaint ¶ 9.

At the beginning of the Class Period, Ibis decided to focus its efforts on selling oxygen implanting equipment, more specifically, its new i2000 implanter.  Complaint ¶ 20.  This change in business strategy was explained in a prospectus issued on October 16, 2003, "[i]in the future we will continue to supply small quantities of wafers for test and evaluation purposes, but our primary emphasis will be on implanter sales and support.  We also plan on continuing process development for SIMOX-SOI wafers." *Id.*

---

[2]  "SIMOX" is an acronym that stands for **S**eparation by **IM**plantation of **OX**ygen.  "SOI" stands for **S**ilicon-**O**n-**I**nsulator.

Ibis's shipment of an i2000 implanter to a potential purchaser was contingent upon the customer's signing a licensing agreement with IBM for the Modified Low-Dose ("MLD") technology that the implanter relies upon. Complaint ¶ 25. Therefore, Ibis could not possibly control or predict the timing of a shipment, nor could it ensure that IBM and the third-party customer will form an acceptable agreement. *Id.* Prior to the close of the Class Period, Ibis had only completed one i2000 implanter sale. Complaint ¶ 30. That sale was to IBM and, consequently, unlike contemplated orders with third parties, needed no new licensing agreement. *Id.* Defendants failed to disclose that, because IBM was the sole purchaser of the i2000 implanter during the Class Period, Ibis's limited sales history to IBM was no predictor of the timing or success of any sales to third parties. *Id.*

The ability to secure a licensing agreement between IBM and Ibis's third party customer, and thus book an order or ship the i2000 implanter, was extremely important to Ibis's financial condition. Complaint ¶ 27.[3] First, Ibis did not receive any portion of the $8 million purchase price until it was actually shipped. *Id.* Upon shipment, Ibis recorded the funds received as deferred revenues and deferred expenses on its income statements. *Id.* However, on its balance sheet, Ibis recorded them as cash and Ibis was free to use the funds in its operations, with a contingent liability for return of the funds if the product was not accepted. *Id.* Second, Ibis would have necessarily had severe cash flow constraints if it had begun to build an i2000 implanter that it never shipped or if it had to wait a long time between buying the components

---

[3] Plaintiffs contend, and the Magistrate noted but declined to determine definitively in her report, that defendants used "book an order" to mean the event that allowed Ibis to take in cash on the order – *i.e.,* shipment of the order. *See* Complaint ¶ 27; Magistrate Report at 11-12.

and shipping the finished i2000 implanter because of the long lead time necessary to build an i2000 to the purchaser's specifications and the high cost of the components. *Id.*

During the Class Period, Defendants constantly emphasized the prospects of booking one-to-three i2000 implanter orders by the end of the 2003 fiscal year, which would have resulted in a cash infusion of $8 to $24 million. Complaint ¶ 32. As the Complaint alleges, defendants' misstatements misled the market into believing that Ibis would take in large amounts of cash from customers on orders of one to three i2000 implanters during 2003 and were an indicator of the strength of Ibis's cash position and investment quality. Complaint ¶¶ 34, 47, 49, 60-62. Without those misrepresentations to the market, as plaintiffs allege, Ibis's precarious cash position would have foreclosed Ibis's October 2003 public common stock offering. Complaint ¶ 47(d).

Thus, for example, in a July 23, 2003 press release, defendant Reid announced "[w]e continue to anticipate booking orders for one-to-three implanters during the fiscal year" and touted the acceptance by an unidentified customer of an order just completed as proof to the semiconductor market that the i2000 implanter was a success: "[t]his acceptance serves as a signal to prospective implanter customers that our new implanter has been tested in a customer-oriented production mode." Complaint ¶ 49(b). Reid did not acknowledge that the customer was IBM, the same company that fostered its development by licensing the MLD technology to Ibis specifically to manufacture an i2000 implanter for IBM, creating the misleading impression that this particular booked order was indicative of the increased demand and accelerating timing of subsequent orders to third parties. *Id.*

On October 17, 2003, with Ibis's common stock price artificially inflated to over $14 per share, defendants issued a press release announcing the public offering of Ibis common stock,

and on October 21, 2003, Ibis issued another press release announcing that the stock offering had closed and that Ibis netted proceeds of approximately $12.7 million.  Complaint ¶ 51.

After the public offering, defendants continued to predict one-to-three i2000 implanter sales in an October 22, 2003 press release and in a November 4, 2003 SEC Form 10-Q for the third quarter ended September 30, 2003.  Complaint ¶¶ 52-59.  Defendants made these statements even though: (1) Ibis knew that the only customer who had closed a purchase on the i2000 implanter was IBM, the company that fostered its development by licensing the MLD technology to Ibis specifically to manufacture an i2000 implanter for IBM, and (2) Ibis could not predict if and when the third parties and IBM would reach agreement on mutually acceptable terms and conditions of a licensing agreement.  Complaint ¶¶ 52, 54(b).

Less than two months after its successful stock offering, Ibis unexpectedly disclosed to the investing public that its financial condition and cash flow were not as good as previously stated.  On December 15, 2003, defendants filed a Form 8-K with the SEC admitting that there would be no sales of i2000 implanters in Q4 2003 and that they now expected to receive order(s) for one-to-three i2000 implanters sometime in 2004, with actual customer acceptance taking approximately nine months at the end of which revenue for the sale would be recognized. Complaint ¶ 61.  The 8-K also disclosed for the first time that sales of the i2000 were "dependent on the customers entering into a license agreement with a third party [IBM]."  *Id.*  These disclosures informed the market that Ibis would not receive any substantial new cash in 2003, contrary to the market's expectations arising from defendants' false and misleading statements that Ibis would receive between $8 and $24 million in additional cash in the fourth quarter of 2003.  *Id.*  In reaction to these admissions, Ibis stock fell from a $15.40 share close on December 12 to a close of $10.37 on December 16, 2003.  Complaint ¶ 62.

After the Class Period, in Ibis's form 10-K for 2003, Ibis finally acknowledged the inherent delays in the MLD technology licensing process, noting that "no assurances are given that our equipment customers and IBM would come to terms acceptable to both parties in a timely manner, or at all.  These MLD process license issues have caused delays in receiving an order from one customer and could cause delays with other customers in the future if they plan to license this technology."  Complaint ¶ 63(b).

**B.      The Magistrate's Report**

On August 5, 2004, defendants moved to dismiss the Complaint.  After the parties engaged in extensive briefing, on September 22, 2005, Magistrate Dein issued the Magistrate Report recommending that defendants' motion be granted in part and denied in part.  The Magistrate found that "the plaintiffs have stated a claim based upon allegations that Ibis's small wafer production line was impaired and should have been written down by the start of the Class Period, but have failed to state a claim based on statements regarding the company's future sales prospects [concerning the i2000 implanter]".  Magistrate Report at 2.  While sustaining plaintiffs' small water production line claims as well as plaintiffs' allegations of scienter, Magistrate Dein found that defendants' statements and omissions as to the i2000 implanter were protected by the safe harbor provisions of the PSLRA.

As shown below, the Magistrate erred in applying the safe harbor provisions of the PSLRA to plaintiffs' i2000 claims, since the Complaint makes it clear that (1) the statements were not accompanied by meaningful cautionary language and (2) defendants had no reasonable basis for making the statements and/or had actual knowledge of the statements' falsity when they made them.

### III.    ARGUMENT

**A.    The Relevant Standards**

Under 28 U.S.C. §636(b)(1)(C), when a party objects to the report and recommendation of a Magistrate Judge, "[a] judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate.  The judge may also receive further evidence or recommit the matter to the magistrate with instructions."  *See, e.g., Negron v. Celebrity Cruises, Inc.,* 316 F.3d 60, 61 (1st Cir. 2003); *Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 5 (1st Cir. 1999).

As set forth below, the portion of the Magistrate Report recommending the granting of defendants' motion to dismiss as to plaintiffs' claims relating to the i2000 implanter misapplies the law to the facts pled.  Accordingly, this Court in its *de novo* review should reject that portion of the Magistrate Report and deny defendants' motion to dismiss in its totality.

**B.    The Magistrate Misapplied The PSLRA Safe Harbor To The Facts Alleged**

To qualify for protection under the PSLRA's safe harbor provision, a forward-looking statement must: (1) address the future; and (2) be accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those projected in the forward-looking statements.  15 U.S.C. § 78u-5(c)(1)(A)(i).  If such cautionary language is absent, a forward-looking statement is not protected if it "was made with actual knowledge . . . that it was false or misleading."  15 U.S.C. § 78u-5(c)(1)(B)(i).

As shown below, defendants' i2000 statements do not meet this test and, thus, the Magistrate erred in recommending dismissal of those claims.

417739v3                                    -7-

1.    **Defendants' i2000 Implanter Statements Were Not Accompanied By Meaningful Cautionary Language**

Defendants' statements fail to qualify for protection under the first PSLRA safe harbor test because, to the extent they were forward-looking,[4] contrary to the Magistrate Report, they were not accompanied by "meaningful cautionary statements."   15 U.S.C. s 78u-5(c)(1)(A)(i). *See, e.g., Fitzer v. Sec. Dynamics Techs., Inc.,* 119 F. Supp. 2d 12, 31 (D. Mass. 2000).

Although the PSLRA does not define the term "meaningful cautionary statements," it is clear that Congress intended that such language be sufficient to render any false projections immaterial as a matter of law.  *See Harden v. Raffensperger, Hughes & Co.,* 65 F.3d 1392, 1404-05 (7th Cir. 1995)(finding that the bespeaks caution doctrine, the judicially created doctrine forming the basis for the statute, "when properly construed, merely represents the pragmatic application of two fundamental concepts in the law of securities fraud: materiality and reliance").

It was therefore incumbent upon the Magistrate to determine whether Ibis's cautionary language was sufficient to render the defendants' false projections immaterial as a matter of law. A court will deem a statement material if it determines that there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the total mix of information.  *See Searls v. Glasser*, 64 F.3d 1061, 1065-66

---

[4]   "[T]he statutory safe harbor, like the 'bespeaks caution' doctrine, does not insulate defendants from private securities liability based on statements that misrepresent historical /hard or current facts."  *Gross v. Medaphis Corp.,* 977 F. Supp. 1463, 1473 (N.D. Ga. 1997) (citations omitted).  Thus, to the extent that "plaintiffs challenge the truthfulness of a claim regarding present facts as opposed to forward-looking statements," *In re Number Nine Visual Tech. Corp. Sec. Litig*., 51 F. Supp. 2d 1, 19 (D. Mass. 1999); *see also Shaw v. Digital Equip. Corp*., 82 F.3d 1194, 1213 (1st Cir. 1996), the safe harbor does not apply. Defendants' statement that the final acceptance by the unidentified IBM "serves as a signal to prospective implanter customers that our new implanter has been tested in a customer-oriented production mode" (Complaint ¶ 49(b)), which was materially misleading because a sale to IBM did not have the protracted license negotiation issues that a third-party sale would, is such a statement of present fact clearly outside the safe harbor.

(7th Cir. 1995) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).  Materiality has repeatedly been recognized as consisting of a mixed question of law and facts.  *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (issue of materiality is a mixed question of law and fact that is generally for the jury).  Because materiality requires "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts," *TSC Indus., Inc.*, 426 U.S. at 450, the question "whether cautionary language" is sufficiently detailed to render forward statements immaterial is also a "fact intensive…case-by-case" inquiry.  *Harden*, 65 F.3d at 1404.  The case-by-case inquiry required under the safe harbor is whether the cautionary language relied on is sufficiently linked to the risks involved to render the additional disclosures plaintiffs seek immaterial as a matter of law.  *See In re Unicapital Corp. Sec. Litig.,* 149 F. Supp. 2d 1308, 1375 (M.D. Fla. 2001) (safe harbor did not immunize press releases that contained no warning or disclaimer providing notice of a risk of a significance similar to that allegedly realized).

The Magistrate Report fails to make the required linkage in its analysis of defendants' risk disclaimers.  Instead, Magistrate Dein found to be sufficiently cautionary language in Ibis's press releases that "product demand and market acceptance risks," as well as "Ibis's limited history with regard to sales of implanters," could cause actual results to differ from anticipated results.  Magistrate Report at 25.  However, plaintiffs do not claim any misrepresentations regarding demand for the i2000 implanters; rather, they take defendants to task for failing to disclose the protracted build schedule and licensing process – risk factors that do not appear

anywhere in defendants' boilerplate "cautionary" statements made during the Class Period.[5]

Moreover, the "limited history" disclaimer was itself materially misleading because, in fact,

during the Class Period, Ibis had *no* history with sales to anyone other than IBM, which, unlike

with third-party sales, involved no new license negotiations.

Likewise, Magistrate Dein's reliance on the boilerplate language in Ibis's pre-Class

Period 2002 10-K is unavailing. Magistrate Report at 25. The statement that "[t]he sale of one

implanter would generally represent a substantial portion of our annual revenue" is self-evident

and simply reveals the materiality of defendants' statements regarding the i2000 implanter.

Magistrate Report at 25. As for the statement that "the delay in the manufacture or delivery of

even one unit would have a material adverse effect on our quarterly or annual results of

operations" (*id*.), in addition to being a self-evident and logical extension of the prior statement,

is also materially incomplete for failing to disclose the build schedule and licensing negotiation

delays that were already happening that were making these delays inevitable. *See, e.g.,

Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir.1981), *rev'd in part on other

grounds*, 459 U.S. 375, (1983) (to warn that the untoward may occur when the event is

contingent is prudent; to caution that it is only possible for the unfavorable events to happen

when they have already occurred is deceit). *Cf. In re Prudential Sec. Ltd P'ships Litig.,* 930 F.

Supp. 68, 72 (S.D.N.Y. 1996)(The doctrine of bespeaks caution provides no protection to

---

[5]  By contrast, in *Cutsworth v. Renschler*, 235 F. Supp. 2d 1216, 1232 (M.D. Fla. 2002), relied on by the
Magistrate (Magistrate Report at 26), the cautionary language referred directly to the revenue streams
anticipated from the newly acquired business that ultimately fell short. Likewise, in *Harris v. Ivax Corp.*,
183 F.3d 799, 807 (11th Cir. 1999) also relied on by the Magistrate (Magistrate Report at 23, 25-26), the
"detailed and informative" risk disclosures closely paralleled the claimed misstatements, and the Court
concluded that "when an investor has been warned of risks of a significance similar to that actually
realized, she is sufficient on notice of the danger."

someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away).

Accordingly, defendants' risk disclosures were not meaningfully tailored to offset the undisclosed material facts plaintiffs allege, removing defendants' i2000 statements from the PSLRA's safe harbor protection.

### 2.    The i2000 Implanter Statements Were Made Without Reasonable Basis And/Or With Actual Knowledge Of Their Falsity

In addition to alleging that defendants' i2000 implanter statements were unaccompanied by meaningful cautionary language, the Complaint sufficiently alleges that defendants had actual knowledge of their falsity when the statements were made, removing defendants' last basis of eligibility for the PSLRA safe harbor.  Complaint ¶¶ 50(e), 54(b), 57(b).

As demonstrated below, the Complaint adequately alleges a strong and reasonable inference that defendants knew their statements were misleading or that they acted with an extraordinary lack of care when making the statements.  *See In re Viropharma Inc. Sec. Litig.,* No. 02-1627, 2003 WL 1824914, at *9 (E.D. Pa. Apr. 7, 2003) (a plaintiff may allege that the defendants had actual knowledge that their statements were false by alleging "particular facts that are circumstantial evidence that a defendant acted recklessly or with conscious disregard for the truth of his statement").  Accordingly, the Magistrate should have found that the i2000 statements were not entitled to the protection of the safe harbor because defendants knew they were false when made.  *See In re Globalstar Sec. Litig.*, No. 01-1748, 2003 WL 22953163, at *9 (S.D.N.Y. Dec. 15, 2003) ("Because plaintiffs sufficiently allege that defendants knew their misrepresentations were false when made […], the safe harbor provision of the PSLRA and the 'bespeaks caution' doctrine provide no relief for defendants.")  *Cf.  Milman v. Box Hill Sys.*

*Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999) ("no degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made").[6]

Magistrate Dein erred in determining that no inference could be drawn that defendants had actual knowledge that their forward looking statements were false. According to the Magistrate, plaintiffs have not alleged that defendants had actual knowledge of the falsity of their statements because the Complaint does not raise an inference that defendants "believed or had information that IBM would not consummate a license agreement with one or more of Ibis's customers prior to year end." Magistrate Report at 27. In making this determination, the Magistrate Judge misapplied the relevant safe harbor test. The issue is not whether defendants knew as an absolute fact that the sale projections were unattainable. Rather, it is whether defendants' projections were unrealistic in light of the protracted build and licensing negotiation schedule and the fact that the only completed sale was to IBM, where the licensing was not an issue. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir. 1992) ("statement of belief" is "actionable" if there is not a reasonable basis for that belief.)[7] Accordingly, the

---

[6] Contrary to Magistrate Dein's suggestion that a defendants' state of mind is irrelevant in the face of "meaningful" cautionary language (Magistrate Report at 23), at least one court has held that where forward-looking statements are made with knowledge of their falsity, the PSLRA safe harbor is unavailable regardless of the existence of cautionary language. *Schaffer v. Evolving Sys., Inc.,* 29 F. Supp. 2d 1213, 1224 (D. Colo. 1998) (the safe harbor "provides no refuge for Defendants who make statements with 'actual knowledge' of their falsity").

[7] Magistrate Dein compounded her error by misstating the applicable law, concluding that alleging no reasonable basis is insufficient to plead actual knowledge (Magistrate Report at 27). She relied on *Cutsworth*, 235 F. Supp 2d at 1232, for this proposition. (Magistrate Report at 27.) However, in that case, the only allegation that the defendants' statements lacked a reasonable basis was the conclusory assertion that the businesses were newly acquired and had not yet generated any revenues. Here, by contrast, the Complaint delineates a number of known facts that show defendants' statements to have (continued…)

Magistrate should have found the safe harbor to be inapplicable to the i2000 statements because plaintiffs adequately pled that the defendants "had no basis for such optimism and that such optimistic forecasts were contradicted by [relevant data]." *In re Indep. Energy Holding PLC Sec. Litig.,* 154 F. Supp. 2d 741, 767 (S.D.N.Y. 2001). *See also Selbst v. McDonald's Corp.,* No. 04-2422, 2005 WL 2319936 (N.D. Ill. Sept. 21, 2005).

Here, plaintiffs attack the following statements as lacking a reasonable basis: (1) "[t]his acceptance [sale of i2000 implanter to unnamed IBM] serves as a signal to prospective implanter customers that our new implanter has been tested in a customer-oriented production," Complaint ¶ 49(b); and (2) "[w]e also continue to anticipate booking orders for one-to-three implanters during the fiscal year," Complaint ¶ 49(b). Plaintiffs allege that these statements were false and misleading and lacking a reasonable basis when made because of the following undisclosed facts: (a) IBM was in a materially different position from other potential implanter customers because it owned the MLD patent and did not have to negotiate a license for its use and had specifically licensed Ibis to make the i2000 implanter for it; (b) Ibis was not in a position to know if and when other prospective purchasers and IBM would reach agreement on licensing the MLD, a prerequisite to placement of an order the Ibis; and (c) the critical path on the production of the i2000 implanters was too protracted for the projected sales and cash infusion from implanter orders to come to fruition by year end 2003. Complaint ¶¶ 47, 49(b), 50(e), 54(b), 57(b).

_____

(…continued)

been without reasonable basis, satisfying the knowledge of falsity test under the safe harbor. *See* discussion *infra* at 14.

In particular, the Complaint, based on extensive interviews from former Ibis employees, contains numerous facts showing why meeting such a schedule had become virtually impossible by the beginning of the Class Period.  In addition to the licensing delays, it took Ibis up to ten months to build an i2000 implanter, which included custom parts that had to be ordered with long lead times from all over the world, and moving an order through shipment was such a huge capital commitment that Ibis could not afford to build an implanter on speculation without substantial progress on negotiations with a potential customer.  Complaint ¶ 67(b).  While three i2000 implanters had been build by March 2003, one was just a prototype, another was the one sold to IBM and the third was a floor model used for demonstrating software; thus, nothing was in the build pipeline in 2003 dedicated for sale to a particular customer.  Complaint ¶¶ 67(b), (c). Making matters worse, widespread layoffs at Ibis in early 2003 had slowed down the critical path on implanter production.  Complaint, ¶¶ 67(a), (g).  Given all of these factors contributing to a protracted build schedule, as the Complaint plainly alleges, and all of which the Magistrate ignored in her report, it was virtually impossible by the beginning of the Class Period for Ibis to complete the build cycle on new i2000 implanters in time for shipment by the end of 2003.

Thus, defendants' statements about the i2000 implanter were without a reasonable basis at the time they were made and cannot be protected by the safe harbor.  Indeed, when Ibis, less than two months after the close of the October 2003 stock offering announced that no new i2000 orders would be placed by the end of 2003, causing its stock to decline from $15.40 per share to $10.37 per share, it explained the delay by citing, for the very first time, the difficulty of predicting the booking of orders because each new order required a licensing agreement amongst third parties.  Far from being a previously disclosed and now suddenly materialized risk, Ibis's inability to predict when IBM would enter into a licensing agreement with a prospective buyer

was a hard fact known by defendants throughout the Class Period. Because defendants' statements are alleged to have been false and misleading and to have lacked any reasonable basis at the time they were made by reason of these present facts known to defendants, the statutory safe harbor is inapplicable. *In re Number Nine Visual Tech. Corp. Sec. Litig.,* 51 F. Supp. 2d 1, 19 (D. Mass. 1999). *See also Jakobe v. Rawlings Sporting Goods Co.*, 943 F. Supp. 1143, 1159-60 (E.D. Mo. 1996).

In addition to erring by refusing to acknowledge that actual knowledge of falsity can be demonstrated through circumstantial evidence showing a lack of reasonable basis for making forward-looking statements, the Magistrate also erred by impermissibly making factual determinations with inferences drawn in defendants' favor.[8] For example, in the face of plaintiffs' detailed allegations, based on interviews with former employees, that the build schedule on the i2000 implanter made it impossible to ship one to three implanters in the latter half of 2003 and that the manufacturing in progress was unusable for a new order (Complaint ¶ 67), the Magistrate simply speculated that "Ibis may have already received orders from customers before and during the Class Period" (Magistrate Report at 28), and then states, contrary to the well-pled allegations of the Complaint that Ibis did not have a saleable unit in inventory (Complaint ¶¶ 67(b), (c)), that "Ibis had manufactured at least one i2000 implanter prior to the Class Period that potentially could be sold to a customer" (*id*.). Likewise, in the face of plaintiffs' allegations and defendants' own December 2003 admission that the Company could

---

[8] In ruling on a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all facts alleged in the pleadings, construing allegations liberally and viewing them in the light most favorable to the non-moving party. *See McMath v. City of Gary,* 976 F.2d 1026, 1031 (7th Cir. 1992). Dismissal is properly granted only if it is clear that no set of facts which the plaintiff could prove consistent with the pleadings would entitle the plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Kunik v. Racine County, Wis.,* 946 F.2d 1574, 1579 (7th Cir. 1991).

not reasonably estimate timing on IBM's licensing negotiations with third parties (Complaint ¶ 61), the Magistrate simply determined in hindsight that "the fact that Ibis was able to ship an i2000 implanter to a third party customer in May 2004, approximately three months after announcing that it had received the order, suggests that it was possible to execute the necessary licensing agreement within a fairly short time period." Magistrate Report at 27-28. Finally, ignoring entirely plaintiffs' allegation that IBM had business reasons to micro-manage and delay licensing negotiations with third party competitors (Complaint ¶ 25), the Magistrate baldly concluded that IBM had no reason to delay and that it would be "counter-intuitive to infer that the defendants did not expect IBM to be reasonable in negotiations with Ibis's customers." Magistrate Report at 28 n.17. These impermissible glosses in defendants' favor should not be permitted to stand, and this Court should recognize that plaintiffs have demonstrated the requisite lack of reasonable basis and actual knowledge of falsity to blow defendants out of the PSLRA safe harbor.

## IV.    CONCLUSION

For all of the foregoing reasons, plaintiffs respectfully request that the Court reject the Magistrate Report insofar as it recommends granting defendants' motion to dismiss as it applies to plaintiffs' claims based on statements regarding the i2000 implanter.

Dated:  October 24, 2005                    Respectfully submitted,

                                            /s/Theodore M. Hess-Mahan
                                            Thomas G. Shapiro BBO #454680
                                            Theodore M. Hess-Mahan BBO #557109
                                            SHAPIRO HABER & URMY LLP
                                            Exchange Place
                                            53 State Street, 37th Floor
                                            Boston, MA 02109
                                            (617) 439-3939

                                            *Liaison Counsel for Plaintiffs*

417739v3                             -16-

LAW OFFICES BERNARD M. GROSS, P.C.
Deborah R. Gross, BBO#546151
Robert P. Frutkin
1515 Locust Street, Second Floor
Philadelphia, PA 19102
(215) 561-3600

*Lead Counsel for Plaintiffs*

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Peter C. Harrar
Aya Bouchedid
270 Madison Avenue
New York, NY 10016
(212) 545-4600

LAW OFFICES OF KENNETH ELAN
Kenneth Elan
217 Broadway, Suite 606
New York, NY 10007
(212) 619-0261

KLEIN & SOLOMON, LLP
Joseph P. Garland
275 Madison Avenue
New York, NY 10016
(212) 213-1812

*Plaintiffs' Counsel*