# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------- )
**IN RE IBIS TECHNOLOGY**                )
**SECURITIES LITIGATION**              )              **Civ No. 04-10446 RCL**
---------------------------------------------------------------- )


## DEFENDANTS' PARTIAL OBJECTION TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS


GOODWIN PROCTER LLP

Brian E. Pastuszenski (BBO #391030)
Christine S. Chung (BBO #631724)
William J. Trach (BBO #661401)
Exchange Place
53 State Street
Boston, Massachusetts 02109-2881
(617) 570-1000

Attorneys for Defendants
Ibis Technology Corp. and Martin J. Reid

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ................................................................................................................8

I.    THE MAGISTRATE JUDGE'S RECOMMENDATION AS TO THE
      IMPAIRMENT CLAIM MUST BE REVIEWED DE NOVO ...........................................8

II.   PLAINTIFFS' IMPAIRMENT ALLEGATIONS FAIL TO STATE A CLAIM ..............8

      A.    The Complaint Does Not Allege an Actionable Misstatement or Omission. ........10

            1.    The Complaint Reflects That Ibis Conducted An Impairment
                  Review ............................................................................................12

            2.    The Complaint Does Not Allege Particularized Facts Demonstrating
                  that Ibis Was Required To Record An Impairment Charge As Of
                  June 30, 2003 Under FAS 144 ..................................................................13

            3.    The Magistrate Judge's Assumption That Customers Were "Moving
                  Away" From Smaller Size Wafer Does Not Support An Inference
                  That Defendants Violated GAAP ..............................................................15

            4.    Other Facts Show There Was No GAAP Violation..................................18

      B.    The Complaint Does Not Contain Particularized Facts Supporting a Strong Infer-
            ence of Scienter....................................................................................................20

Conclusion ...................................................................................................................27

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                                              <u>Page(s)</u>

In re Acterna Corp. Sec. Litig.,
 378 F. Supp. 2d 561 (D. Md. 2005) ...................................................................................11, 26

Aldridge v. A.T. Cross Corp.,
 284 F.3d 72 (1st Cir. 2002) ...................................................................................................9

In re Allaire Corp. Sec. Litig.,
 224 F. Supp. 2d 319 (D. Mass. 2002) ..................................................................................26

In re Baker Hughes Sec. Litig.,
 136 F. Supp. 2d 630 (S.D. Tex. 2002) .................................................................................25

In re BellSouth Corp. Sec. Litig.,
 355 F. Supp. 2d 1350 (N.D. Ga. 2005) .......................................................................... 23-25

In re Cabletron Sys., Inc.,
 311 F.3d 11 (1st Cir. 2002) ........................................................................................9, 15, 16

Carney v. Cambridge Tech. Partners Inc.,
 135 F. Supp. 2d 235 (D. Mass. 2001) ...................................................................................9

Coates v. Heartland Wireless Comm's, Inc.,
 26 F. Supp. 2d 910 (N.D. Tex. 1998) ..................................................................................25

Cooperman v. Individual, Inc.,
 171 F.3d 43 (1st Cir. 1999) .................................................................................................10

Cutsforth v. Renschler,
 235 F. Supp. 2d 1216 (M.D. Fla. 2002) ..............................................................................10

DiLeo v. Ernst & Young,
 901 F.2d 624 (7th Cir. 1990) ..............................................................................................10

In re Galileo Corp. S'holders Litig.,
 127 F. Supp. 2d 251 (D. Mass. 2001) ...............................................................9, 20, 21, 23

Glassman v. Computervision,
 90 F.3d 617 (1st Cir. 1996) .................................................................................................10

Greebel v. FTP Software, Inc.,
 194 F.3d 185 (1st Cir. 1999) ............................................................................................9, 21

Gross v. Summa Four, Inc.,
 93 F.3d 987 (1st Cir. 1996) .................................................................................................10

**Cases**                                                                **Page(s)**

GSC Partners CDO Fund v. Washington,
    368 F.3d 228 (3d Cir. 2004) ...................................................................25

Kalnit v. Eichler,
    99 F. Supp. 2d 327 (S.D.N.Y. 2000) .......................................................25

Kalnit v. Eichler,
    264 F.3d 131 (2d Cir. 2001) ...................................................................25

Kramer v. Time Warner Inc.,
    937 F.2d 767 (2d Cir. 1991) .....................................................................1

Kriendler v. Chemical Waste Mgmt., Inc.,
    877 F. Supp. 1140 (N.D. Ill. 1995) .........................................................24

Lirette v. Shiva Corp.,
    999 F. Supp. 164 (D. Mass. 1998) ............................................................9

Maldonado v. Dominguez,
    137 F.3d 1 (1st Cir. 1998) ......................................................................25

In re Northern Telecom Ltd. Sec. Litig.,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000) .....................................................25

In re Number Nine Visual Tech. Corp. Sec. Litig.,
    51 F. Supp. 2d 1 (D. Mass. 1999) .....................................................10, 17

In re Peritus Software Servs., Inc. Sec. Litig.,
    52 F. Supp. 2d 211 (D. Mass. 1999) ........................................................20

Plevy v. Haggerty,
    38 F. Supp. 2d 816 (C.D. Cal.1998) ................................................. 24, 25

In re Saf T Lok, Inc. Sec. Litig.,
    No. 02-80252, 2003 WL 22383607 (S.D. Fla. July 3, 2003) ..................22

Schiller v. Physicians Resource Group,
    No. Civ. A. 3:97-CV- 3188L, 2002 WL 318441 (N.D. Tex. Feb. 26, 2002) .........................26

In re Segue Software, Inc. Sec. Litig.,
    106 F. Supp. 2d 161 (D. Mass. 2000) .................................................20, 25

Shaw v. Digital Equip. Corp.,
    82 F.3d 1194 (1st Cir. 1996) .....................................................................1

Sloan Coast Co. v. American Renovation & Coast Co.,
    313 F. Supp. 2d 24 (D.P.R. 2004) .............................................................8

In re Stac Sec. Litig.,
    89 F.3d 1399 (9th Cir. 1996) ....................................................................................19

Stavros v. Exelon Corp.,
    266 F. Supp. 2d 833 (N.D. Ill. 2003) ......................................................................24

In re Stone and Webster Sec. Litig.,
    414 F.3d 187 (1st Cir. 2005) .............................................................................. 20-23

In re Sunterra Corp. Sec. Litig.,
    199 F. Supp. 2d 1308 (M.D. Fla. 2002) ..................................................................25

In re Vertex Pharms., Inc. Sec. Litig.,
    357 F. Supp. 2d 343 (D. Mass. 2005) ......................................................................15

## Statutes

15 U.S.C. § 78u-4(b)(l) ....................................................................................................9

28 U.S.C. § 636(b)(1)(A) ..................................................................................................9

Defendants Ibis Technology Corp. and Martin J. Reid ("Defendants") respectfully object to that portion of the Report and Recommendation on Defendants' Motion to Dismiss ("Report") dated September 22, 2005 that recommends denial of Defendants' motion to dismiss Plaintiffs' claims relating to the alleged impairment of certain of Ibis's assets.[1]

## PRELIMINARY STATEMENT

Ibis Technology Corporation ("Ibis") is a small Massachusetts-based high technology company that manufactures and sells implanters – complex machines that use Ibis's pioneering "SIMOX" technology to implant a thin layer of oxygen atoms just below the top surface of silicon wafers used in the production of computer chips. AC ¶ 17. These so-called SIMOX-SOI ("silicon-on-insulator") wafers differ from traditional silicon wafers in that the insulating layer enables circuitry fabricated on them to run at lower temperatures and more efficiently than circuitry made on traditional, single-layer wafers. Ibis, 2002 Annual Report (Form 10-K), App. Tab 2 at 2 (hereinafter "2002 10-K"). Ibis's first generation implanter – the 1000 – is capable of manufacturing wafers up to 200 mm in size. Ibis's second generation implanter – the i2000 – is capable of manufacturing up to 300 mm wafers. AC ¶ 18.

During the proposed Class Period, Ibis also manufactured wafers for sale. Ibis Quarterly Report for the Second Quarter 2003 (Form 10-Q), App. Tab 4 at 8, 11 (hereinafter "Second Quarter 2003 10-Q"); Ibis Quarterly Report for the Third Quarter 2003 (Form 10-Q), App. Tab 5 at 8, 11 (hereinafter "Third Quarter 2003 10-Q"). Ibis's manufacturing facility consisted of eight

---

[1] Cites to the Consolidated Amended Complaint ("the Complaint") appear herein as "AC ¶ __." Cites to the Report appear as "Report at ___". The appendix accompanying the brief ("App.") contains documents (including Ibis's filings with the Securities and Exchange Commission) referred to in the Complaint, which this Court may consider in deciding the motion. See Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996). As to the one SEC filing not referenced in the Complaint – Ibis's Form 10-Q for the period ended September 30, 2002 – the Court may properly consider that filing at the pleading stage. See, e.g., Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991) (taking judicial notice of "public disclosure documents required to be filed with the SEC).

1000 implanters, which were available to manufacture 200 mm and smaller size wafers ("200

mm wafer production assets"), and two i2000 implanters which were available to manufacture

300 mm wafers.  AC ¶¶ 17; see also App. Tab 4 at 12 (Second Quarter 2003 10-Q); App. Tab 5

at 12 (Third Quarter 2003 10-Q).  As Ibis repeatedly disclosed to investors, wafer sales histori-

cally were volatile and difficult to predict.  See, e.g., App. Tab. 2 at 12 (2002 10-K).

On December 15, 2003, Ibis issued a press release in which it announced certain changed

expectations and the Company's decision to write down the value of its 200 mm wafer produc-

tion assets ("the Impairment Charge").  As Ibis disclosed in its Form 10-K for the year ended

December 31, 2003, it determined that it was necessary to record an impairment charge during

the fourth quarter because of unexpected events that occurred during that quarter:

> During the fourth quarter ended December 31, 2003, a number of unexpected
> events occurred which impacted our 200 mm and smaller wafer production line
> including the line's projected cash flow generation and our projected utilization of
> the assets within our revised plans.  These events included:
>
> • Our business prospects for 200 mm SIMOX wafers did not materialize in the
>   fourth quarter as expected, and in part as a result of this we do not now anticipate
>   significant 200 mm wafer business in the future.
>
> • Our existing and potential wafer customers are rapidly transitioning to the 300
>   mm wafer size and 92% of our wafer sales during fiscal year 2003 were for 300
>   mm SIMOX wafers;
>
> • A potential buyer completed their evaluation of a portion of our wafer production
>   line and determined that weak demand for 200 mm and smaller SIMOX wafers
>   did not warrant an investment or purchase of this proportion at the present time;
>   and
>
> • We do not believe there are any material prospects for Ibis 1000 equipment sales
>   overseas currently.

AC ¶ 63(a); Ibis 2003 Annual Report (Form 10-K), App. Tab 6 at 23 (hereinafter "2003 10-K").

This announcement did not come out of the blue.  The carrying value of Ibis's 200 mm

wafer production line was governed by FAS 144, entitled "Accounting for the Impairment of

Long-lived Assets." <u>See</u> <u>infra</u> pp. 23, 29. FAS 144 requires a complex, multi-factor analysis: it provides that an impairment loss should be recognized <u>only</u> if the carrying amount of a long-lived asset (or asset group) is not recoverable and exceeds its fair value. FAS 144, ¶ 7, App. Tab 7 at 6. Beginning in 2002, Ibis warned investors that (i) it was reviewing its 200 mm wafer production assets on a periodic basis for possible impairment under the FAS 144 test, (ii) an impairment charge might be required in the future, and (iii) such a charge could be material. Specifically, in its Form 10-K for the fiscal year ended December 31, 2002, Ibis warned investors that its 200 mm wafer production line (including its 1000-series implanters) was "underutilized" and that, if customers transitioned to 300 mm wafers sooner than expected, Ibis would be required to record an impairment loss:

> Although our 200 mm and smaller wafer size production line is currently underutilized, considering our future plans, current potential business prospects and alternatives, Management believes that we do not have an impairment issue at this time. . . . [H]owever, if our future plans and potential business prospects do not materialize, if semiconductor manufacturers fail to adopt SIMOX technology during the current process cycle (which typically lasts two to three years) or our customers transition to the 300 mm wafer size sooner than we anticipate, our 200 mm and smaller wafer size production line may become obsolete and we would be required to reduce our income by an impairment loss which could be material.

AC ¶ 44(b) (citing App. Tab 2 at 23 (2002 10-K)). In its 10-Q for the first quarter of 2003, Ibis similarly warned investors that it could not guarantee that its products would not become impaired:

> [W]e will continue to review our assumption about our long-lived assets on a periodic basis for potential impairment in future quarters. We cannot be sure that our implanters or other long-lived assets will not become impaired in the future.

Ibis Quarterly Report for the First Quarter 2003 (Form 10-Q); App. Tab 3 at 23.  These same warnings appear in other Ibis disclosures during the Class Period.  See  App. Tab 4 at 12 (Second Quarter 2003 10-Q); App. Tab 5 at 12 (Third Quarter 2003 10-Q).

Ibis also disclosed facts making it clear why it did not record an impairment charge prior to the unexpected events of the fourth quarter of 2003.  First, the market for 200 mm and smaller sized wafers remained robust.  In the third quarter of 2003, one of Ibis's customers completed the purchase of a 1000-series implanter to produce smaller size wafers.  Infra p.14  During the same period, another wafer producer entered the 200 mm wafer market to meet rising customer de-mand.  Id. at 15-16.  As late as the fourth quarter of 2003, two of Ibis's customers were evaluat-ing 200 mm wafers for potential purchase from Ibis.  Id. at 17.   Had those customers determined to purchase additional 200 mm wafers from Ibis, the wafers would have been manufactured on Ibis's 200 mm and smaller size wafers production line (i.e., the Company's 1000-series implant-ers and related assets).  Id.  Moreover, as late as the forth quarter of 2003, a potential purchaser was considering acquiring or investing in Ibis's 200 mm wafer production assets.  Id.

Ibis's December 15, 2003 announcement of the Impairment Charge did not precipitate – and to this day has not precipitated – a restatement of reported results.  In the almost two years that have passed since the announcement, Ibis's auditors have issued unqualified audit opinions as to financial statements for both 2003 and 2004.   Nevertheless, almost immediately after Ibis reported the Impairment Charge, purported class action plaintiffs immediately began to file thinly-pleaded copy-cat complaints.[2]  On March 5, 2004, three unrelated individuals – Martin Smolowitz, George Harrison and Mark G. Forgue ("Plaintiffs") – petitioned to serve as co-lead

---

[2] See Smolowitz v. Ibis Tech. Corp., Civ. No. 03-12618 (D. Mass. Dec. 29, 2003); Den v. Ibis Tech. Corp., Civ. No. 04-10060 (D. Mass. Jan. 9, 2004); Weinstein v. Ibis Tech. Corp., Civ. No. 04-10088 (D. Mass. Jan. 14, 2004); Har-rison v. Ibis Tech. Corp., Civ. No. 04-10286 (D. Mass. Feb. 11, 2004); Pitzer v. Ibis Tech. Corp., Civ. No. 04-10446 (D. Mass. Mar. 4, 2004).

plaintiffs based on the purchase of a total of 1060 shares of Ibis stock and total losses of only $4,173.  That motion was granted, and on July 6, 2004, lead counsel filed a Consolidated Amended Complaint ("Complaint").

As interpreted by the Magistrate Judge, the Complaint makes two principal claims.  First, Plaintiffs challenge Ibis's forward-looking statement that it anticipated "book[ing]" one to three orders in 2003 for its current-model i2000 implanter, claiming that the word "book" meant ship, and further arguing that Ibis could not have shipped an implanter before the end of that year ("the Sales Projection Claim").  AC ¶¶ 47, 49; Report at 27.  Second, although this case does not involve a restatement,  Plaintiffs argue that under Generally Accepted Accounting Principles ("GAAP"), Ibis was (i) required but allegedly failed to perform an impairment analysis of its 200 mm wafer production assets, and (ii) also was allegedly required but failed to write off the carrying value of those assets by approximately $11 million as of the quarter ended June 30, 2003 ("the Impairment Claim").  AC ¶ 46; Report at 30.  Based on these allegations, Plaintiffs claim that Ibis and its CEO Martin J. Reid violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 (Count I), and further claim that Mr. Reid is liable as a control person under Section 20(a) of the Exchange Act (Count II).[3]

In the Report, the Magistrate Judge correctly recommended that the Court dismiss the Implanter Claim for failure to state a claim.  Report at 22-27.  Citing Ibis's repeated and extensive warnings that its projection of future implanter sales was an estimate and not a guarantee, the Magistrate Judge held that the challenged statements were immune from liability under the Safe Harbor provision of the Private Securities Litigation  Reform Act of 1995 ("PSLRA").  Id.

---

[3] On August 5, 2004, Defendants moved to dismiss the Complaint in its entirety for failure to state a claim upon which relief can be granted.  See Defendants Motion to Dismiss Consolidated Amended Complaints, Civ. No. 04-10446 (Aug. 5, 2004) ("Motion to Dismiss").  On September 22, 2005, following referral by this Court, the Magistrate Judge issued the Report.

The Magistrate Judge also correctly found that because the Complaint does not contain any well-pleaded facts suggesting that Mr. Reid or anyone else at the Company knew the challenged statements were false when made, Plaintiffs' argument that the Safe Harbor did not apply failed as a matter of law.  Report at 27-28.  Defendants do not object to these recommended rulings.[4]

With respect to the Impairment Claim, however, Defendants respectfully submit that the Magistrate Judge's recommendations are contrary to both the law and the facts alleged in the Complaint, and thus should be rejected:

**The Complaint Does Not Allege an Actionable Misstatement:**  First, the Magistrate Judge erred in concluding that the Complaint adequately alleges that Defendants made a mis-statement in the form of a violation of GAAP.  To allege a GAAP violation, Plaintiffs must plead "particularized factual support" for their claim that Ibis was required under applicable accounting principles to record an impairment charge for its 200 mm wafer production assets by June 30, 2003.  Report at 32.  Whether an impairment charge must be taken under FAS 144, however, is not a black and white determination, but one requiring an estimation of future cash flows from the expected use or disposition of the asset.  Here, Plaintiffs rely on generalized and unsupported allegation that Ibis had stopped marketing 1000-series implanters prior to the Class Period, and arguments that the industry and Ibis's customers had "moved away" from 200 mm wafers, that do not satisfy this standard.  Under FAS 144, these allegations do not establish that Ibis's 200 mm wafer assets as a whole were so impaired as to require a write down as of June 30, 2003.  Moreover, the allegations are not supported by well-pleaded facts requiring an impairment charge under the FAS 144 test.

---

[4] Defendants respectfully submit that the Court should dismiss the Sales Projection Claim for the reasons set forth in the Report, as well as those set forth in Defendants' Motion to Dismiss. To the extent the Magistrate Judge rejected, disregarded or did not rely upon the additional grounds for dismissal set forth in Defendants' Motion to Dismiss and supporting memorandum, Defendants object to that portion of the Report.

**The Complaint Does Not Allege Particularized Facts Supporting A Strong Inference of Scienter:** The Magistrate Judge also erred in concluding that the Complaint alleges particularized facts giving rise to a strong inference of scienter. To satisfy the PSLRA's scienter requirement, Plaintiffs must allege particularized facts showing that Ibis not only violated GAAP, but that the violation, combined with other circumstances indicative of fraudulent intent, raise a strong inference that the defendants acted with scienter. In other words, Plaintiffs must allege particularized facts making it highly likely that Defendants intended to deceive investors by failing to record an impairment charge as of June 30, 2003. The Complaint does not meet this high standard:

> ➢ **Ibis's Warnings About Possible Future Impairment Negate Any Inference of Scienter:** Here, the Magistrate Judge held that Ibis's warnings about the possible future impairment of its 200 mm wafer production assets supported an inference of an intent to defraud. As numerous courts have held, however, warnings about the possible future impairment <u>negate</u> an inference of scienter. If Ibis had intended to defraud its investors, it would have had no reason to inform investors about the very risks that ultimately caused the Company to record an impairment charge.

> ➢ **Ibis's Stock Offering Does Not Support A Strong Inference of Scienter:** The Magistrate Judge's conclusion that Ibis's public offering in October 2003 constitutes "motive" sufficient to establish a strong inference of scienter is equally flawed. Generalized allegations such as this have been rejected by numerous courts as "inadequate to raise a strong inference of scienter as a matter of law." <u>In re Baker Hughes Sec. Litig.</u>, 136 F. Supp. 2d 630, 642 (S.D. Tex. 2002).

> ➢ **The Magistrate Judge Erred In Relieving Plaintiffs of Their Burden to Plead Particularized Facts:** Finally, the Magistrate Judge erred in concluding that the Complaint supports a strong inference of scienter because Ibis was "obviously aware of the eventual need to write down the equipment [and] there were no changes between the initial pre-Class Period recognition of the impairment and the actual write-down which would explain the delay. Nor were there any potential anticipated events which would explain why the write-down was not taken earlier." Report at 35-36. This formulation improperly relieves Plaintiffs of their burden to plead particularized facts supporting a strong inference of an intent to defraud – <u>i.e.</u>, that Defendants <u>knew</u> as of June 30, 2003 that the complex estimation analysis required under FAS 144 mandating recording an impairment charge

as of that date.  Here, the Complaint demonstrate that the need for an impairment charge was not a foregone conclusion as of June 30, 2003.

For these reasons, and those discussed more fully below, the Court should reject that portion of the Report which recommends denial of Defendants' motion to dismiss the Implanter Claim.

## ARGUMENT

## I.     THE MAGISTRATE JUDGE'S RECOMMENDATION AS TO THE IMPAIRMENT CLAIM MUST BE REVIEWED DE NOVO.

When a party objects to a magistrate's report and recommendation concerning a motion to dismiss, the District Court must review the objected-to portions of the recommendation and report de novo.  28 U.S.C. § 636(b)(1)(A); see also Sloan Coast Co. v. American Renovation & Coast Co., 313 F. Supp. 2d 24, 27 (D.P.R. 2004).  Because the Magistrate Judge's recommended ruling on the Impairment Claim is contrary to the law and to facts alleged in the Complaint, that recommendation should be rejected and Defendants' Motion to Dismiss should be granted in full.

## II.     PLAINTIFFS' IMPAIRMENT ALLEGATIONS FAIL TO STATE A CLAIM.

To state a claim under § 10(b) of the Exchange Act and Exchange Act Rule 10b-5, Plaintiffs must allege – with factual particularity – that Defendant made a materially false or misleading statement or omission with an intent to defraud.  Greebel v. FTP Software, 194 F.3d 185, 196-97; 15 U.S.C. § 78u-4(b).  Where, as here, a complaint contains allegations made on "information and belief" or on "investigation of counsel," the Private Securities Litigation Reform Act (PSLRA) also requires that the complaint "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(l); In re Cabletron Sys., Inc., 311 F.3d 11, 28 n.8 (1st Cir. 2002); Lirette v. Shiva Corp., 999 F. Supp. 164, 165 (D. Mass. 1998) (Young, J.).  As this Court ex-

plained in <u>Carney v. Cambridge Tech. Partners. Inc.</u>, 135 F. Supp. 2d 235, 246-47 (D. Mass. 2001), "a securities fraud action brought on the basis of an 'investigation of counsel' – with its implications of lawyer-directed and motivated litigation – was precisely the kind of case Congress found most troubling."

To satisfy the PSLRA's scienter requirement, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); <u>In re Galileo Corp. S'holders Litig</u>, 127 F. Supp. 2d 251, 260 (D. Mass. 2001). In this case the required state of mind is scienter, defined as an intent to deceive or defraud. A merely reasonable inference of scienter is not enough to survive a motion to dismiss. Rather, "inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong.'" <u>Greebel</u>, 194 F.3d at 195-96. An inference can be considered strong only where plaintiff alleges particularized facts making it "highly likely" that a defendant intended to deceive investors. <u>Aldridge v. A.T. Cross Corp.</u>, 284 F.3d 72, 82 (1st Cir. 2002). These standards are consistent with the requirements of Federal Rule of Civil Procedure 9(b), which the First Circuit "has been notably strict and rigorous in applying." <u>Carney</u>, 135 F. Supp. 2d at 241 (quoting <u>Greebel</u>, 194 F.2d at 193).

Although a court must take all well-pleaded facts as true when deciding a motion to dismiss, a court "need not credit a complaint's 'bald assertions' or 'legal conclusions.'" <u>Glassman v. Computervision</u>, 90 F.3d 617, 628 (1st Cir. 1996) (internal citations and quotations omitted). Moreover, the First Circuit has made it clear that only <u>reasonable</u> inferences need be drawn in favor of the Plaintiffs, and then only with respect to the Complaint's well-pleaded facts. <u>See, e.g.</u>, <u>Cooperman v. Individual, Inc.</u>, 171 F.3d 43, 46 (1st Cir. 1999); <u>Gross v. Summa Four, Inc.</u>, 93 F.3d 987, 991 (1st Cir. 1996) (emphasis added).

## A.    <u>The Complaint Does Not Allege An Actionable Misstatement or Omission.</u>

As an initial matter, the Court should dismiss the Impairment Claim because the Complaint does not allege an actionable misstatement.  Even though Ibis has never been required by its auditors, the SEC or otherwise to restate its reported results in order to reflect the impairment charge as of June 30, 2003 (as opposed to December 2003, when the decision to record the charge actually was made), Plaintiffs allege that Defendants made a misstatement because Ibis (i) was required by GAAP to conduct an impairment analysis with respect to Ibis's 200 mm wafer production assets but allegedly failed to do so, and (ii) Ibis was required by GAAP to record an impairment charge with respect to these assets as of June 30, 2003, but allegedly failed to do so. AC ¶ 46; Report at 32.  For this claim to survive, Plaintiffs must plead "particularized factual support" for their claim that Ibis's 200 mm assets were impaired as of June 30, 2003.  Asserting conclusorily that Ibis should have recorded an impairment charge for its 200 mm wafer production assets before is not enough.  <u>See</u> <u>Cutsforth v. Renschler</u>, 235 F. Supp. 2d 1216, 1237 (M.D. Fla. 2002); <u>In re Number Nine Visual Tech. Corp. Sec. Litig.</u>, 51 F. Supp. 2d 1, 26 (D. Mass. 1999); <u>see</u> <u>also</u> Report at 3 (citing <u>DiLeo v. Ernst & Young</u>, 901 F.2d 624, 627 (7th Cir. 1990) ("If all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud . . . . " )).  This standard is particularly important where – as here – the issuer has never restated its results of operations.  <u>Cf.</u> <u>In re Acterna Corp. Sec. Litig.</u>, 378 F. Supp. 2d 561, 581-82 (D. Md. 2005) (fact that impairment did not require restatement considered in granting defendant's motion to dismiss).

The controlling GAAP standards are set forth in FAS 144, entitled "Accounting for the Impairment of Long-lived Assets."  FAS 144 is not a black and white standard.  It is not a simple, one-dimensional "yes or no" accounting determination – such as whether a product was

shipped off a company's loading dock before midnight on the last day of a quarter in order to permit recognition of revenue in the quarter on the sale of that product. Rather, it requires an issuer to make a _prediction_ of the future cash flows "expected" from the asset through its "use" in production of other products and/or from its "disposition" (i.e., sale) to a potential buyer of the asset. As such, FAS 144 requires an issuer to consider all the factual circumstances that reasonably might bear on what cash flows might be expected from the future use and/or sale of the asset. That analysis, in turn, requires the issuer to predict how and to what extent the asset may be used depending on expected customer demand for the products made on the asset and to predict the likelihood that the asset could be sold (and at what price) to a third party buyer given the needs of such buyers.

Specifically, FAS 144 states, in relevant part, that an impairment loss should be recognized only if the carrying amount of a long-lived asset (asset group) is not recoverable and exceeds its fair value:

> An impairment loss shall be recognized only if the carrying amount of a long-lived asset (asset group) is not recoverable and exceeds its fair value. The carrying amount of a long-lived asset (asset group) is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset (asset group). That assessment shall be based on the carrying amount of the asset (asset group) at the date it is tested for recoverability, whether in use . . . or under development. . . . An impairment loss shall be measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds its fair value.

FAS 144, ¶ 7, App. Tab 7 at 6. FAS 144 also provides that a long lived asset must be tested for recoverability whenever events or changes in circumstances indicate that its carrying value may not be recoverable.[5]

---

[5] Examples of such events or changes in circumstances include, among others:

    a.  A significant decrease in the market price of a long-lived asset (asset group)

1.    __The Complaint Reflects That Ibis Conducted An Impairment Review.__

The Magistrate Judge found that the Plaintiffs had alleged facts showing that prior to the Class Period, "significant adverse changes in Ibis's use of its 200 mm wafer production line and in the business climate affecting prospects for 1000 implanter and small wafer sales required Ibis to test for recoverability of its 200 mm wafer production line."  Report at 32.  Although Plaintiffs baldly allege that Ibis failed to perform such an impairment review (AC ¶ 46) as grounds for an alleged GAAP violation, facts set forth in the Complaint contradict and rebut such an inference.  Beginning in 2002 and continuing through the Purported Class Period, Ibis unambiguously warned investors that _it was reviewing_ its 200 mm wafer production assets (including its 1000-series implanters) for possible impairment under FAS 144.  See  App. Tab 2 at 23 (2002 10-K); App. Tab 4 at 12 (Second Quarter 2003 10-Q); App. Tab 5 at 12 (Third Quarter 2003 10-Q).  Ibis even listed the factors it was considering to determine whether the carrying value of these assets was recoverable.  Id.  Plaintiffs do not allege a single fact – let alone any well-pleaded facts – which would support an inference that Ibis did not in fact conduct such a FAS 144 impairment review.  Plaintiffs do not point to a single document, a single witness with personal knowledge,

---

b.    A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition

c.    A significant adverse change in legal factors or in the business climate that could affect the value of a long lived asset (asset group), including an adverse action or assessment by a regulator

d.    An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group);

e.    current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group)

f.    A current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life (emphasis in original).

FAS 144, ¶ 8, App. Tab 7 at 7.

or any other fact that suggests otherwise.  As such, Plaintiffs' unsupported claim of failure to re-

view cannot save the Impairment Claim from Defendants' motion to dismiss.

### 2.    The Complaint Does Not Allege Particularized Facts Demonstrating That Ibis Was Required To Record An Impairment Charge as of June 30, 2003 Under FAS 144.

The Magistrate Judge also found that Plaintiffs had alleged facts supporting an inference

that by the close of Ibis's second quarter ended June 30, 2003, Ibis's 200 mm wafer production

assets had become impaired and should have been written down.  Report at 32.  The Magistrate

Judge relied upon two allegations for this finding: (i) Plaintiffs' claim that "prior to the Class Pe-

riod, Ibis had stopped selling 1000 implanters due to lack of demand" (AC ¶ 19; Report at 32);

and (ii) "facts showing that even as early as 2002, the semiconductor industry in general and Ibis

in particular were moving away from smaller sized wafers."  AC ¶ 44; Report at 32-33.  Neither

of these allegations adequately pleads a violation of GAAP – that is, that the carrying value of

Ibis' 200 mm wafer production line exceeded the expected cash flows from the future use and/or

disposition of that line as of June 30, 2003.

As an initial matter, even if these allegations were true, they would not compel the con-

clusion that Ibis violated GAAP.  These allegations do not demonstrate whether, as of June 30,

2003, the carrying amount of Ibis's 200 mm wafer production assets as a whole exceeded the

sum of the undiscounted cash flows expected to result from the use and eventual disposition of

the assets, as required by FAS 144.  Plaintiffs do not even mention these concepts in the Com-

plaint, and the Report's failure rigorously to apply FAS 144 leads to the erroneous conclusion

that the Impairment Claim should survive Defendants' Motion to Dismiss.

Plaintiffs' claim that Ibis had stopped selling the 1000 implanter prior to the Class Period

due to lack of demand (AC ¶ 19) does not establish a GAAP violation for the additional reason

that it is not supported by well-pleaded facts.  In its periodic SEC filings both before and during the Class Period, Ibis stated that it had one 1000 implanter available for sale.  App. Tab 4 at 12 (Second Quarter 2003 10-Q); App. Tab 5 at 12 (Third Quarter 2003 10-Q).  In the third quarter of 2002, Ibis announced that it had worked with its customer Simgui to achieve final customer acceptance on a 1000 implanter that Simgui previously had purchased for $5 million.  AC ¶ 42; Ibis Tech. Corp., Quarterly Report for the Third Quarter 2002 (Form 10-Q), App. Tab 1 at 12 (hereinafter "Third Quarter 2002 10-Q").  As late as the fourth quarter of 2003, a potential buyer was considering purchasing or making an investment in Ibis's 200 mm wafer production line (which included eight 1000-series implanters).  AC ¶ 63(a); App. Tab 6 at 23 (2003 10-K). These facts negate any inference that Ibis had stopped marketing the 1000 implanter long before the Class Period due to lack of demand.

Plaintiffs' claim that Ibis's 1000 implanters had fallen into disuse and disrepair does not require a different result.  AC ¶ 43; Report at 33.  As support for this claim, Plaintiffs rely upon information supposedly gleaned from a former Ibis employee who worked at the Company from October 2001 through November 2002.  While this unnamed former employee is alleged to have reported that Ibis was phasing out certain undescribed technologies due to product obsolescence, this person also is alleged to have said that at some point, Ibis brought in a Japanese furnace company to "conduct a complete rehabilitation" of a furnace used to produce 200 mm and smaller sized wafers.  AC ¶ 67(e).  Ibis's alleged decision to rehabilitate equipment used to produce 200 mm and smaller sized wafers also negates any inference that Ibis had abandoned its 1000 implanters – or its 200 mm wafer production line as a whole – prior to the Class Period.[6]

---

[6] The Court should reject the "disuse and disrepair' allegation for the additional reason that the alleged former employee upon whom Plaintiffs rely stopped working at Ibis almost one year before Ibis recorded the Impairment Charge, was not employed at Ibis at all during the proposed class period, and thus is not alleged to have any knowl-

3.    **The Magistrate Judge's Assumption That Customers Were "Moving Away" From Smaller Size Wafer Does Not Support An Inference That Defendants Violated GAAP.**

The Magistrate Judge's conclusion that, as early as 2002, the semiconductor industry in general and Ibis in particular were "moving away" from smaller sized wafers also does not establish that Ibis violated GAAP. Claiming that the industry was "moving away" from one technology to another technology does not establish that the 200 mm assets were so impaired as to require a write down under the undiscounted cash flows analysis set forth in FAS 144. Furthermore, this allegation also lacks well-pleaded factual support. The Complaint reflects that in the third quarter of 2002, one of Ibis's customers (Simgui) completed the purchase of a 1000-series implanter to be used in the production of 200 mm wafers. App. Tab 1 at 12 (Third Quarter 2002 10-Q). Also in 2002, Ibis reported that a wafer producer had *just entered* the 200 mm wafer market to meet *rising* customer demand:

> Wacker Siltronic's joint venture with Nippon Steel Corporation, <u>Wacker Nippon Steel Corporation ("WNC"), has decided to enter production of 200 mm SIMOX technology to meet rising demand from its global customer base.</u>  (emphasis added).

App. Tab 2 at 8 (2002 10-K). In January 2003, Simgui confirmed that *it was using its Ibis 1000 implanter to produce smaller size wafers*. AC ¶ 42. It would make no sense for these companies to produce products – in some cases using an implanter purchased from Ibis – if there were no market for 200 mm and smaller size wafers. This may explain why the Complaint does not contain a single fact – such as sales figures from other manufacturers, write downs by other manu-

---

edge of the factors Ibis considered in determining to record the charge as of that date. Plaintiffs' allegations respecting this former employee therefore do not satisfy the requirements set forth in the First Circuit's <u>Cabletron</u> decision for information attributed to undisclosed sources. <u>See Cabletron</u>, 311 F. 3d at 38; <u>see also</u> <u>In re Vertex Pharms., Inc. Litig.</u>, 357 F. Supp. 2d 343, 353-54 (D. Mass. 2005) (holding allegations about confidential sources did not satisfy <u>Cabletron</u> standard because alleged informant did not work at the company "during the entire duration of the Class Period.").

facturers or any other contemporaneous information – demonstrating that the semiconductor industry as a whole was "moving away" from 200 mm wafers before June 30, 2003.[7]

Allegations in the Complaint concerning (i) Ibis's rollout of its i2000 implanter; (ii) Ibis's customers' reported desire to purchase 300 mm wafers from Ibis, and (iii) the decline in Ibis's 200 mm wafer sales during the first few months of 2003 – do not save the Impairment Claim. AC ¶ 44. Under FAS 144, Ibis was required to look at the totality of the circumstances surrounding its 200 mm wafer production assets when conducting its impairment analysis. As the Complaint itself makes clear, Ibis properly considered a number of facts under FAS 144 in reviewing its 200 mm wafer production assets for possible impairment, including the fact that: (i) wafers sales historically had been quite volatile and difficult to predict, making it difficult to determine whether a decline in sales of 200 mm wafers was due to demand volatility or a longer-term trend, (ii) as late as the fourth quarter of 2003, two potential customers were evaluating purchasing from Ibis 200 mm wafers – wafers that Ibis would have manufactured on its Ibis 1000-based production line, and (iii) as late as the fourth quarter of 2003, a potential buyer was considering whether to purchase or invest in Ibis's 200 mm wafer production lines. AC ¶¶ 53, 63; App. Tab 6 at 12, 23 (2003 10-K). Plaintiffs and the Magistrate Judge point to no authority that would have deprived Ibis of the time needed to asses whether the drop in 200 mm wafers was due to short term volatility in demand or a long-term trend. They also point to no authority

---

[7] Plaintiffs claim that Ibis had decided "to get out of the business of manufacturing 200 mm and smaller size wafers" during the class period. AC ¶ 42. The only basis for this assertion is the allegation that Simgui, a wafer manufacturer which had purchased an Ibis 1000 implanter, had allegedly "confirmed in news stories that Simgui does not compete with Ibis because Ibis focuses on selling leading-edge 300 mm SOI wafers while Simgui produces only older generation smaller size wafers. Id. Putting aside the fact that this third party allegation is not attributable to Ibis because it does not identify any sources within Ibis, see Cabletron Sys., 311 F.3d at 37, what Simgui's spokesperson is actually quoted as saying was that "Simgui . . .does not compete with Ibis because . . . Simgui 'only produces 4- and 6-inch [smaller size] wafers right now.'" AC ¶ 44(f). In other words, what Simgui allegedly stated was that the wafers it manufactured were smaller than 200 mm wafers (200 mm wafers are 8-inch wafers). This statement therefore does not support a reasonable inference that Ibis had decided to exit the 200 mm wafer market, par-

that would have required Ibis to ignore potential sales of wafers and 200 mm wafer production equipment – facts clearly relevant under a FAS 144 analysis and which existed into the fourth quarter of 2003.  In other words, Plaintiffs and the Magistrate Judge point to no authority which would support a reasonable inference that Ibis was required to record an impairment charge as of June 30, 2003.

These facts contrast sharply with the those set forth in In re Number Nine Visual Tech. Corp. Sec. Litig., 51 F. Supp. 2d 1 (D. Mass. 1999), on which the Magistrate Judge inappropriately relied.  In Number Nine, the court considered whether the defendant company violated GAAP by failing to write down the value of its prior-generation computer graphic accelerator cards before conducting a secondary offering of its stock, when the company was forced to take an $8 million charge of excess inventory some seven months later.  In denying the defendants' motion to dismiss, the court relied on computer industry trade publications "that prominently noted, well before [Number Nine's] Offering and post-Offering statements," that its prior generation products "were rapidly becoming obsolete."  Number Nine, 51 F. Supp. 2d at 26.  The publications the Court cited alleged "widespread industry knowledge that the fate of the [products] was already sealed at the time of [Number Nine's] Offering."  Id.  In the case of Ibis, none of the publication statements cited in the Complaint reflect "widespread industry knowledge" that Ibis's 200 mm wafer production assets were so impaired as to be worthless as of June 30, 2003. [8]

---

ticularly in light of the fact that Ibis's customers were evaluating the potential purchase of 200 mm wafers as late as the fourth quarter of 2003.

[8] All of the articles and press releases that Plaintiffs cite in the Complaint and upon which the Magistrate Judge relied refer to Ibis and its customers.  These sources do not contain industry statistics or any other industry-wide information which support the allegation that the semiconductor industry as a whole was moving away from 200 mm wafers prior to the Class Period.  These publications certainly do not demonstrate that the market for 200 mm wafers had declined so substantially by June 30, 2003 that Ibis was required by GAAP to write down the value of its 200 mm wafer production assets.  See AC ¶ 46.

In fact, as explained above, the facts appearing in the Complaint and in the documents to which the Complaint refers and on which it relies support exactly the opposite inference.

### 4.        Other Facts that Show There Was No GAAP Violation.

The Amended Complaint itself highlights additional facts concerning Ibis's wafer business that further undermine any inference that Ibis was required to write down its 200 mm wafer production assets by June 30, 2003.  When Ibis announced its Third Quarter results on November 4, 2003, it disclosed that two customers then were evaluating its 200 mm wafers for 2004 – 200 mm wafers that would be produced on the very same assets that Plaintiffs contend Ibis should have written down as valueless months earlier:

> During the fourth quarter our priority on the wafer side of the business will be to broaden our customer base in both 300 mm and 200 mm by sampling our latest SIMOX-SOI wafers.  We are currently undergoing 200 mm evaluation at two customers and positive results should transfer to orders in early 2004.  Forecasting future wafer sales, on a quarter-by-quarter basis, remains exceedingly difficult, and significant variations, quarter to quarter, are likely.

AC ¶ 53.  Plaintiffs do not challenge the truth of this statement, and in assessing the potential impairment of its 200 mm wafer production assets, Ibis was entitled under FAS 144 to take into account these customers' interests.

The Magistrate Judge treated these potential orders as irrelevant because she inferred that Ibis could have produced any wafers that these customers ordered on one of its i2000 machines.  This inference is not supported by well-pleaded facts, and in any event would be irrelevant even if well-pleaded.  As noted above, Ibis's manufacturing facility consisted of eight 1000-series implanters which were available to produce 200 mm and smaller size wafers and two i2000 implanters available to produce 300 mm wafers.  App. Tab 4 at 12 (Second Quarter 2003 10-Q).  Facts alleged in the Complaint make it clear that Ibis's i2000 machines were fully occupied pro-

ducing 300 mm wafers during the Class Period due to strong customer demand.  E.g., AC ¶ 45(c) (citing statement that customer interest in 300 mm wafers continued to be stronger than initially was expected); ¶ 45(h) (citing Ibis press release which referred to "a substantial backlog" of 300 mm wafer orders).  Moreover, because the customer qualification process for wafer products was complex and lengthy – taking as long as twelve to thirty-six months – it was not reasonable for the Magistrate Judge to infer that Ibis could simply have switched one of its two i2000 machine from 300 mm wafer production to 200 mm production to satisfy 200 mm and smaller size wafer orders.  ("The time to develop an integrated circuit on SIMOX-SOI is lengthy, sometimes taking twelve to thirty-six months.  The cycle typically goes from initial sampling of SIMOX-SOI wafers to more intensive sampling, the manufacture of prototype integrated circuits, circuit process modifications, yield optimization, pilot products and finally, production.")  Id. App. Tab 2 at 14 (2002 10-K).  In any event, the issue under FAS 144 is the "expected" cash flows from the "use" and/or "disposition" of the asset.  Plaintiffs have pleaded no facts supporting a strong inference that Ibis did not in fact conclude as of June 30, 2005 that the expected cash flows from such use and/or disposition exceeded the carrying value of the asset (the production line).  The possibility that Ibis might have manufactured the smaller sized wafers on other equipment (even if factually well supported, which it is not) would not have detracted from Ibis' good faith conclusion that those wafers could have been manufactured on the Ibis 1000-based production line.

### B.     The Complaint Does Not Contain Particularized Facts Supporting a Strong Inference of Scienter.

The Court also should reject the Report's conclusion that the Complaint adequately alleges a strong inference of scienter with respect to the Impairment Claim.  As the Magistrate

Judge correctly held, to establish scienter in a GAAP-based securities fraud case, a plaintiff must plead particularized facts demonstrating that "the alleged GAAP violations, combined with other circumstances indicative of fraudulent intent, raise a strong inference that the defendants acted with scienter."  Report at 35.  Where – as here – a complaint does not contain such well-pleaded facts, it must be dismissed under controlling First Circuit law.  In re Peritus Software Servs., Inc. Sec. Litig., 52 F. Supp. 2d 211, 224 (D. Mass. 1999); accord In re Galileo Corp. Shareholders Litig., 127 F. Supp. 2d at 265 (citing Greebel v. FTP Software, Inc., 194 F.3d 185, 196-97 (1st Cir. 1999); In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161, 170 (D. Mass. 2000).

As noted above, decisions about whether and when to take an impairment charge under FAS 144 are not one-dimensional, "yes or no" determinations, but involve complex and subjective accounting issues that depend on many factors.  See FAS 144.  When faced with accounting determinations of this sort, courts are loathe to substitute their own judgment – or that of securities class action plaintiffs – for that of the issuer and its accountants.  In Stone & Webster, for example, the First Circuit affirmed the dismissal of a claim that the CEO and CFO of the defendant company had violated Section 10(b) of the Exchange Act and Rule 10b-5 by engaging in a strategy of underbidding projects, and reporting expected profits on those projects, when in fact the projects were expected to produce a loss.  In re Stone & Webster Sec. Litig., 414 F.3d 187, 201 (1st Cir. 2005).  The Court held that under the relevant accounting standards, the question of whether to recognize a profit or a loss at the outset of a project depended "not on concrete facts but on an *estimation or prediction* of whether the project in the end would net a profit or a loss." Id. (emphasis in original).  The Court held that because the complaint failed to allege "particularized facts supporting an inference that a reasonable assessment of the facts relating to those underbid contracts could support **only** a prediction of a loss, the underbidding allegations did not

support a strong inference of scienter." Id. (emphasis added).  These words are entirely apt in this case as well – given that Ibis had potential customers evaluating the purchase of 200 mm wafers from Ibis, the possibility that Ibis had a customer willing to buy (or invest in) the production line, the fact that a leading semiconductor manufacturer had just entered the market for production of smaller sized wafers, and the possibility that demand for Ibis's 200 mm and smaller wafers might rebound after a volatile period all weigh strongly against any inference that the facts that existed as of June 30, 2003 "could support only" a determination of impairment under FAS 144.  Stone & Webster, 414 F.3d at 201.

Likewise, in In re Galileo Corp. S'holders Litig, 127 F. Supp. 2d 251, (D. Mass. 2001), this Court dismissed a securities fraud claim that defendants should have written off certain assets due to the inherent subjectivity of such a determination:

> Whether the collection of the Imagyn receivables was "reasonably assured," as Galileo argues, is fundamentally a subjective determination. . . .  Thus, application of the concept of "reasonable assurance of collection" in a given situation is a matter of judgment and estimate. In this case, "reasonable assurance of collection" was a fluid and subjective concept, dependent on the knowledge the defendants had at the time they made decisions about whether to record the Imagyn receivables . . . .  Subject thus to judgments, as to which reasonable persons might disagree, the proposition that collectibility of the Imagyn revenues was not reasonably assured . . . cannot support the strong inference of scienter required by the PSLRA and Rule 9(b).

Id. at 265-66.

The district court's opinion in In re Saf T Lok, Inc. Sec. Litig, No. 02-80252, 2003 WL 22383607 (S.D. Fla. July 3, 2003) (App. Tab 8) also is directly on point.  In Saf T Lok, the company ("STL") filed a Form 10-K Annual Report stating that it was in difficult financial straits due to poor sales and excessive debt, and that it had received a "going concern" qualification from its auditors.  Id. at *1-2.  STL nevertheless stated that it believed that it would be able to

sustain operations by "finding a strategic partner . . . to provide an immediate revenue stream and/or the marketing expertise to held increase sales revenue to a self-sustaining, profitable level." <u>Id.</u>  Based on this belief, and ongoing negotiations between STL and Smith and Wesson ("S&W"), the company classified its inventory as a current asset.  <u>Id.</u>  The plaintiffs argued that the inventory was worthless and should have been written down.  <u>Id.</u> at *4.  The district court, however, held that even though negotiations with S&W had gone on for many months, with many ups and downs, defendants' valuation of its inventory was not actionable, because plaintiffs had "failed to take into account the totality of the circumstances."  <u>Id.</u>

  Here, as in <u>Stone & Webster</u>, <u>Galileo</u>, and <u>Saf T Lok</u>, the accounting standards at issue required Defendants to review the "totality of the circumstances" concerning Ibis's 200 mm wafer production assets.  These circumstances included, without limitation, potential trends in 200 mm wafer sales, the likelihood that Ibis would receive new orders for 200 mm wafers from the potential customers then evaluating Ibis as a potential supplier of such wafers, and the likelihood that the potential purchaser for Ibis's wafer production line(s) would buy the 200 mm wafer production assets or make a substantial investment in them.  The Complaint does not allege any particularized facts supporting an inference that a reasonable assessment of these facts could "only" support a determination that Ibis's 200 mm wafer production assets were impaired, and that a write off was required, as of June 30, 2003.  <u>Stone & Webster</u>, 414 F.3d at 201.  Indeed, Plaintiffs do not even attempt to address the multifactor analysis required by FAS 144, and the Report does not either.  Thus, as in <u>Stone & Webster</u>, <u>Galileo</u> and <u>Saf T Lok</u>, the Court should dismiss the Impairment Claim for failure to plead scienter.  <u>See also</u> <u>Stavros v. Exelon Corp.</u>, 266 F. Supp. 2d 833, 851-52 (N.D. Ill. 2003) (holding claim that defendants should have written down asset two quarters earlier does not support an inference of scienter); <u>Kriendler v. Chemical Waste</u>

Mgmt., Inc., 877 F. Supp. 1140, 1153-54 (N.D. Ill. 1995) (fact that company wrote down a facility four month later than plaintiffs would have liked does not establish scienter).

While the Magistrate Judge acknowledged that disputes over the timing of a write down do not support a strong inference of scienter, the Magistrate Judge held that Ibis's warnings about a possible future impairment charge support an inference that Defendants acted with an intent to defraud.  Report at 35-37.  The Magistrate Judge's conclusion is both counterintuitive and plainly wrong.  As numerous courts have held, robust warnings like those that Ibis provided **negate** an inference of scienter.  For example, in In re BellSouth Corp. Sec. Litig., 355 F. Supp. 2d 1350 (N.D. Ga. 2005), the court dismissed a securities fraud claim for failure to plead scienter where the defendant had warned investors that political instability in Latin America might require a write-off as to goodwill.  When it filed its Form 10 Q for Q2 2002, BellSouth had announced that it was writing off $1.277 billion dollars of goodwill associated with its Latin American operations due to economic and political instability in the region.  Id. at 1356.  Securities class action plaintiffs alleged that this goodwill should have been written off as early as 1999, "when the economic, political and regulatory events in Latin America began to adversely affect the segment's results of operations . . . ."  Id.  Plaintiffs cited the BellSouth's Form 10 Q for Q2 2000, which stated that conditions in some Latin American countries had become volatile and warned that this could "impair [BellSouth's] operations" and damage future profits as grounds for this claim.  Id.  Plaintiffs alleged that this turmoil was significant prior to 2002 and that the 2000 10-Q filing demonstrated that defendants obviously were aware of it.  Plaintiffs argued that the defendants' failure to record an impairment charge earlier in the face of these warnings supported a strong inference of intent to defraud.  Id. at 1375-76.

The BellSouth court rejected this argument and held that the plaintiffs had failed adequately to plead scienter.  The court held that the defendants' alleged failure to undertake an impairment analysis and to record an impairment charge as of the date demanded by the plaintiffs was at most negligent, and did not amount to an "extreme departure from the standards of ordinary care" sufficient to support an inference of scienter.  Id. at 1377.  The court also held that BellSouth's earlier disclosure about its challenges in Latin America negated an inference of intent to defraud.  The court commented, "[t]hat Defendants generally disclosed the troubles in its Latin American operations [in earlier public filings] urges against an across the board finding of scienter."  Id. at 1375.

Here, Ibis's warnings were even more specific than in Bell South – Ibis fully disclosed that it was conducting an impairment review as to its 200 mm assets, that an impairment might be required and that the impact of such a change could be material.  As in BellSouth, Ibis's warnings are fundamentally inconsistent with an intent to deceive.  As the district court said in In re Acterna Corp. Sec. Litig., 378 F. Supp. 2d at 578, in words entirely apt here, the defendants "substantial public disclosures, which were replete with unfavorable financial information and express warnings about the possibility of writing off goodwill, do not give rise to a strong inference of intentional or reckless misconduct on the part of the individual Defendants." (citing BellSouth, 355 F. Supp. 2d at 1376, for the same proposition).  Accord Schiller v. Physicians Resource Group., No. Civ. A. 3:97-CV- 3188L, 2002 WL 318441 (N.D. Tex. Feb. 26, 2002) (same) (App. Tab. 9); Plevy v. Haggerty, 38 F. Supp. 2d, 816, 825 (C.D. Cal. 1998)(dismissing suit for failure to state a claim in part because defendants had warned of potential future obsolescence of products prior to taking the impairment).[9]

---

[9] Ibis's fulsome disclosures also stand in sharp contrast to the defendant issuer in Number Nine.  In that case, the court cited Number Nine's failure to provide specific warnings to potential investors as a fact giving rise to an infer-

The Magistrate Judge's conclusion that Ibis's upcoming public offering established a "motive" to commit securities fraud sufficient to satisfy the PSLRA's scienter requirement also ignores settled law. Numerous courts have held that pleading motive in the form of an alleged desire to complete an offering or similar transaction is "inadequate to raise a strong inference of scienter as a matter of law." In re Baker Hughes Sec. Litig., 136 F. Supp. 2d at 642. This is so because "motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from [the] fraud.'" GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir. 2004) (quoting Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001) (citation omitted)).[10]

Finally, the Magistrate Judge's conclusion that the Complaint adequately pleads scienter because "[t]here were no changes between the initial pre-Class period recognition of the impairment and the actual write-down which would explain the delay" and that there were "potential anticipated events which would explain why the write-down was not taken earlier" is equally flawed. This formulation impermissibly relieves Plaintiffs of their burden to allege particularized facts supporting their claim that a write off was required as of June 30, 2004, and instead

---

ence of scienter. The fact that Plaintiffs resort to alleged public data suggesting an industry-wide shift to 300 mm wafers also undercuts their claim that scienter exists. In Plevy, the court held that, even absent defendants' warnings of the possible obsolescence of its computer equipment, plaintiffs claims would have failed because "as a general matter, investors know of the risk of obsolescence posed by older products forced to compete with more advanced rivals. Indeed, technical obsolescence of computer equipment in a field marked by rapid technological advances is information within the public domain." 38 F. Supp. 2d at 825 (quoting In re Stac Sec. Litig., 89 F.3d 1399, 1410 (9th Cir. 1996)). Paragraph 44 of the Amended Complaint lists three pages of publicly available information, from industry articles to statements by the Company. Investors were thus repeatedly made aware of Ibis's views respecting trends in its market. As in Plevy, this counsels against a claim that Ibis, in making its "no impairment" representation, intended to deceive investors about the financial health of the company.

[10] The Magistrate also erred in by failing to conclude that the absence of trading by Mr. Reid – or indeed any other Ibis official for that matter – materially weakens, if not undermines, any inference of scienter. In re Sunterra Corp. Sec. Litig., 199 F. Supp. 2d 1308, 1326 (M.D. Fla. 2002); In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 171, 171 & n.23 (D. Mass. 2000); In re Northern Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000); Kalnit v. Eichler, 99 F. Supp. 2d 327, 337 (S.D.N.Y. 2000). "[T]he notion that [Mr. Reid] would engage in fraud then wait for the stock price to plummet before selling his securities without benefiting from the fraud is a

would require Ibis to disclose facts making it clear it had complied with GAAP to prevail on a motion to dismiss. Such a result allows Plaintiffs merely to plead "fraud by hindsight," and is contrary to clearly established case law. See In re Allaire Corp. Sec. Litig., 224 F. Supp. 2d 319, 329-30 (D. Mass. 2002). Furthermore, the Court is entitled to review Ibis's 2003 Form 10-K (on which the Complaint relies and to which it refers, see AC ¶63(a)), and that document dilutes, if not undermines completely, any inference that circumstances had not changed between June 30, 2003 and the fourth quarter of 2003 when Ibis announced its impairment charge. That Form 10-K filing indicates that: orders for 200 mm wafers that Ibis had expected from potential customers were ultimately not placed; the potential buyer for Ibis's 200 mm wafer production line ultimately declined to purchase the production line; that the decline in Ibis' 200 mm sales appeared less likely to be the result of demand volatility. App. Tab. 6 at 23 (2003 10-K). These facts undermine any inference – let along the required strong inference – that Defendants knew Ibis was required to record an impairment charge under FAS 144 as of June 30, 2003. Because the Complaint does not allege particularized facts showing that these events did not occur in the fourth quarter, nor do Plaintiffs explain why these facts are irrelevant to a FAS 144 analysis, the Complaint fails to support a strong inference that Defendants refused to take a required write down of 200 mm assets as of June 30, 2003 with an intent to defraud.

---

'nonsensical premise.'" Coates v. Heartland Wireless Comm's, Inc., 26 F. Supp. 2d 910, 920 (N.D. Tex. 1998) Accord Maldonado v. Dominguez, 137 F.3d 1, 12 n.9 (1st Cir. 1998).

## CONCLUSION

For all of the reasons set forth above, Defendants respectfully request that the Court reject the Report to the extent it denies the Defendants Motion to Dismiss the Impairment Claim. For the reasons set forth herein and in Defendants' Motion to Dismiss the Complaint, Defendants also respectfully request that this Court dismiss the Complaint with prejudice and in full for failing to state a claim upon which relief can be granted.

/s/ Brian E. Pastuszenski
Brian E. Pastuszenski (BBO #391030)
Christine S. Chung (BBO #631724)
William J. Trach (BBO #661401)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109-2881
(617) 570-1000

October 24, 2005

## CERTIFICATE OF SERVICE

I, William J. Trach, hereby certify that, on October 24, 2005, I caused a true copy of the above document to be filed electronically with the Court, to be served electronically upon counsel of record registered with the Electronic Case Filing System ("ECF"), and to be served upon counsel of record not registered with ECF by First Class United States mail at the address below.

/s/ William J. Trach
William J. Trach

Kenneth Elan, Esq.
Law Offices of Kenneth Elan
217 Broadway, Suite 606
New York, NY 10007
(212) 619-0261

LIBA/1640956.1