UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE IBIS TECHNOLOGY | ) | Case No. 04 cv 10446 RCL |
| SECURITIES LITIGATION | ) | |
| | ) | JURY TRIAL DEMANDED |
| | ) | |
| | ) | CLASS ACTION |

## CONFORMED CONSOLIDATED AMENDED COMPLAINT

Lead Plaintiffs allege the following, based upon the investigation of their counsel, which include a review of United States Securities and Exchange Commission ("SEC") filings by Ibis Technology Corp. ("Ibis" or the "Company"), securities analysts' reports about the Company, press releases issued by the Company, media reports about the Company, documents filed with the SEC by IBM, interviews with former Ibis employees and accounting consultants. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of purchasers of the common stock of Ibis between July 23, 2003 and December 12, 2003, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

441648

3.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

5.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, defendants maintain their chief executive office and principal place of business within this District.

**PARTIES**

6.    a)    Lead Plaintiff Martin Smolowitz, as set forth in his certification previously filed with the Court and incorporated by reference herein, purchased the common stock of Ibis during the Class Period and has been damaged thereby.

b)    Lead Plaintiff George Harrison, as set forth in his certification previously filed with the Court and incorporated by reference herein, purchased the common stock of Ibis during the Class Period and has been damaged thereby.

c)    Lead Plaintiff Mark G. Forgue, as set forth in his certification previously filed with the Court and incorporated by reference herein, purchased the common stock of Ibis during the Class Period and has been damaged thereby.

7.    Defendant Ibis is organized under the laws of Massachusetts and maintains its principal executive offices at 32 Cherry Hill Drive, Danvers, Massachusetts 01923.

8.      Defendant Martin J. Reid ("Reid") was Ibis' Chief Executive Officer, President and Chairman of the Board throughout the Class Period.  Reid signed Ibis' SEC Form 10-K for 2002 on March 3, 2003, authorized the filing of the Company's Amendment No. 3 to the registration statement pursuant to SEC Form S-3 dated October 2, 2003 ("Registration Statement") and the Company's Prospectus Supplement to the Registration Statement filed on October 16, 2003 ("Prospectus"), signed and certified the Company's SEC Forms 10-Q for the Second Quarter of 2003, filed with the SEC on August 8, 2003 10-Q" and for the Third Quarter of 2003, filed November 4, 2003 ("Q3 2000 10-Q"), and was the principal spokesperson for Ibis, quoted in the Company's Press Releases dated July 23, 2003, October 17, 2003 and October 22, 2003, and on the analyst conference call held on February 19, 2003.

9.      During the Class Period, Reid, as the senior executive officer and Chairman of Ibis, was privy to confidential and proprietary information concerning Ibis, its operations, finances, financial condition, present and future business prospects, including its relationship with IBM.  Reid was also the principal negotiator with respect to Ibis' i2000 implanter.  Reid consequently had access to material adverse non-public information concerning Ibis via, *inter alia,* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to him in connection therewith.  Because of his possession of such information, Reid knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

10.     Defendant Reid is liable as a direct participant in the wrongs complained of herein.  In addition, Reid, by reason of his positions at Ibis was a "controlling person" within the

meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of his positions of control, Reid was able to and did, directly or indirectly, control the conduct of Ibis' business. Reid also controlled and/or possessed the authority to control the contents of Ibis' SEC filings reports and press releases and, as alleged above, was provided with and/or signed the Company's SEC filings and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

## CLASS ACTION ALLEGATIONS

11.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the common stock of Ibis between July 23, 2003 to December 12, 2003, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest and the underwriters of Ibis' October 2003 common stock offering.

12.    The members of the Class are so numerous that joinder of all members is impracticable. As of October 21, 2003, Ibis had approximately 10.4 million shares of common stock outstanding, which were actively traded on the NASDAQ throughout the Class Period. At May 3, 2004, Ibis had approximately 10.65 million shares outstanding. During the Class Period, more than 11 million shares of Ibis common stock were reported traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class

may be identified from records maintained by Ibis, its underwriters and/or its transfer agent and may be notified of the pendency of this action by mail using the form of notice similar to that customarily used in securities class actions.

13.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

14.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

15.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Ibis; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

16.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Ibis' Business; Transition to 300mm-Based Wafer Technology

17.    Ibis has built its business on the SIMOX-SOI (i.e. separation by implantation of oxygen) technology to position itself in the semiconductor market as the company with the leading new technology for the manufacture of SIMOX-SOI wafers ("wafers").  SOI (*i.e.* silicon-on-insulator) is a technique in chip design.  Ibis manufactures two lines of products: a) wafers that are purchased by semiconductor companies such as IBM; and b) SIMOX-SOI oxygen implantation equipment (the "implanter") that is offered for sale to semiconductor companies such as IBM and enables the purchaser of the implanter to manufacture the wafers for itself.

18.    Historically, Ibis had manufactured and sold the wafers in two size groups: a) 200mm (8 inch) and smaller sizes; and b) 300mm (12 inch).  The 200mm and smaller size wafers, which have become virtually obsolete, were made by Ibis' older generation 1000 implanters.  The 300mm size wafer is the newer, state of the art, larger size wafer, requiring different manufacturing equipment from the 1000.  The i2000 implanter is the new generation implanter specifically developed by Ibis to manufacture 300mm wafers, although it can also make 200mm wafers.  Ibis began the development of the i2000 implanter in 2000.

19.    Before the commencement of the Class Period, Ibis had completely stopped selling the 1000 implanter because there was no significant market for it.  Indeed, Ibis had sold only two 1000 implanters, one to IBM in 2000 for approximately $4 million and one to Simgui in 2002 for approximately $5 million.

20.    By the beginning of the Class Period, in large part because of the dynamics of the semiconductor industry, defendants had determined to shift Ibis' business away from the manufacture and sale of all wafers and to concentrate on the sale of the i2000 implanter.  Defendants explained this change in business strategy in Ibis' Prospectus at page S-9, stating

that, "[i]n the future we will continue to supply small quantities of wafers for test and evaluation purposes, but our primary emphasis will be on implanter sales and support. We also plan on continuing process development for SIMOX-SOI wafers."

21.     IBM is, and has been, the largest customer for Ibis' wafers. For the six months ended June 30, 2003, Ibis reported product sales revenues of $4.2 million and equipment revenues of $8.4 million, of which IBM accounted for 92% of the aggregate revenues.

22.     Ibis records the revenues from wafer sales as "wafer product sales" on its financial statements. Ibis records the revenues from the sale of implanters as "equipment revenue" on its financial statements. In Ibis' SEC filings, defendants explained Ibis' revenue recognition policy as follows: "The Company typically recognizes revenue from wafer sales upon shipment and recognizes revenue from implanter sales upon acceptance at the customer's site."

23.     [Deleted pursuant to Court order.]

24.     [Deleted pursuant to Court order.]

25.     [Deleted pursuant to Court order.]

26.     [Deleted pursuant to Court order.]

27.     [Deleted pursuant to Court order.]

28.     [Deleted pursuant to Court order.]

29.     [Deleted pursuant to Court order.]

30.     Prior to the close of the Class Period, Ibis had sold only one i2000 implanter. That sale was to IBM, at a price of $8 million. Ibis announced receipt of the order on September 10, 2002. Ibis announced the shipment of the i2000 implanter on November 20, 2002, at which

time Ibis received virtually all of the $8 million cash purchase price from IBM. Ibis recorded the revenue from that sale in Q2 2003, when IBM accepted the i2000 implanter.

31.     Ibis did not complete any sales on any other i2000 implanters during the Class Period.

**Pre-Class Period Public Statements About Ibis**

32.     [Deleted pursuant to Court order.]

33.     [Deleted pursuant to Court order.]

34.     A February 20, 2003 Needham Equity Research Report discussed Ibis' wafer sales for the year, reporting that the company expected to increase wafer sales by 50% during the 2003 fiscal year.

35.     Ibis faced severe cash flow constraints in the first half of 2003, as new orders for i2000 implanters were delayed. As a result, the Company was forced to implement drastic cost-saving measures. Ibis' 10-Q report for the quarter ending March 31, 2003, revealed that Ibis had laid-off sixteen employees, which reduced the total number of employees to ninety-four. Furthermore, Ibis required all employees, except wafer manufacturing and customer support, to increase the number of days off that they were required to use during the three month period beginning on March 31, 2003. Ibis expected that those measures would annually save the company $1 million. However, the reduced work force made it more difficult for the Company to ramp up production on wafers or the i2000 implanters.

36.     In an April 23, 2003 press release, defendant Reid downplayed a decrease in revenue for the first quarter:

> "The quarter just completed was a period of progress during which we took steps necessary to enter a true production mode for producing significant quantities of advanced 300-millimeter SIMOX-SOI wafers. Wafer product sales for the quarter were down, as expected, mainly because wafer production was delayed

while our largest wafer customer was evaluating multiple types of MLD wafers for 300 mm production.

37.    Despite these temporary setbacks, Reid continued to express a positive outlook:

"Although these events took somewhat longer than anticipated and limited our ability to ship 300 mm wafers, we achieved a number of goals that position us for near-term growth:

--Working under the terms of the Joint Development Agreement (JDA) with our largest customer, we made a number of significant process improvements, leading to a new, advanced SIMOX process that we believe meets the needs of the newest, most advanced Ics.

--Our largest customer finalized the process 'recipes' to be used to manufacture the 300-millimeter production wafers they have on order

*        *        *

--We have completed the qualification of an additional i2000 implanter, which is now on line predominantly for production of 300-millimeter wafers within our Danvers Mass. Facility.

--Our second balance-of-process line has been fully qualified and is now available for completing the manufacture of 300-millimeter SIMOX-SOI wafers following the implantation process.

We have a substantial backlog of wafer orders, and we are expecting a continuous increase of wafer sales for the balance of the year in response to the greatest demand ever from our largest customer."

38.    In the April 23, 2003 press release, Reid further discussed the corporate outlook for the rest of the year. "We expect wafer sales in the second quarter to be in the range of $2.5 to $3.0 million as we ramp up production. We expect wafer sales for 2003 to be significantly higher than those of 2002."

39.    [Deleted pursuant to Court order.]

40.    [Deleted pursuant to Court order.]

**Ibis' Obsolete 1000 Implanters for Making 200mm and Smaller Size Wafers
and Defendants' Failure to Write Down the Carrying Value of the Assets**

41.     At the beginning of the Class Period, Ibis had eight virtually obsolete 1000 implanters and related assets recorded as assets on its balance sheet, with a carrying value of approximately $12 million.

42.     By the beginning of the Class Period, defendants had made the decision, in large part dictated by the semiconductor industry and the demands of Ibis' customers, to get out of the business of manufacturing 200mm and smaller size wafers.  In fact, as reported in the press on January 17, 2003, defendants permitted Shanghai Simgui Technology Co. Ltd. to use Ibis' SIMOX-SOI technology and sold Simgui a 1000 implanter in 2002, to enable to Simgui to open the first commercial SOI wafer plant in China.  Lewis Li, spokesperson for Simgui, has confirmed in news stories that Simgui does not compete with Ibis because Ibis focuses on selling leading-edge 300mm SOI wafers while Simgui produces only older generation smaller size wafers.

43.     As alleged below, by the beginning of the Class Period, defendants knew that the semiconductor industry was changing quickly to the manufacture and use of 300mm size wafers and that the 200mm and smaller size wafers, as well as the 1000 implanter used to make them, were fast becoming obsolete.  By defendants' own actions in developing the i2000 implanter and touting the principal benefit of the new generation implanter as the ability to produce 300mm wafers, defendants were contributing to and furthering this industry move away from 200mm and smaller size wafers.  Ibis' own wafer sales told the story in stark detail: in the quarter ended June 30, 2003, 97% of Ibis' wafer sales were of the 300mm size compared to only 13% in the comparable quarter ended June 30, 2002; and in the quarter ended September 30, 2003, 98% of Ibis' wafer sales were of the 300mm size.  Defendants also knew from the orders and forecasts

Ibis received from its customers, including IBM, its largest customer, that there was less and less demand for the 200mm and smaller size wafers and that the trend was irreversible, as reflected, in part in paragraph 60.  In fact, commencing in 2002, Ibis had purchased new equipment only for the manufacture of 300mm wafers and saw its aging equipment for making 200mm and smaller size wafers, the 1000 implanters fall into disuse and disrepair.  As defendants would admit after the close of the Class Period, 92% of all of Ibis' wafer sales in 2003 were of the 300mm size, and there was no market for the 1000 implanters.

44.    Events in the semiconductor industry and defendants' own public statements before and during the Class Period provide ample evidence of defendants' knowledge of the obsolescence of the 1000 implanter used to manufacture 200mm and smaller size wafers, which defendants, in violation of GAAP, and specifically FAS 144: Accounting for the Impairment or Disposal of Long-Lived Assets, continued to value on Ibis' balance sheet at approximately $12 million, even though the assets' value had been impaired in the approximate amount of $11 million.  For example:

(a)    as reported in the March 20, 2002 Silicon Strategies article, defendant Reid touted the roll-out of the i2000 implanter and the fact that it produced 300mm size wafers, while also producing 200mm size wafers.  Defendant Reid stated, "This new i2000 implanter is a step function advance over any other oxygen implanter available today;"

(b)    in Ibis' SEC Form 10-K for the fiscal year ended December 31, 2002 ("the 2002 10-K"), defendants stated that, "although our 200 mm and smaller wafer size production line is currently underutilized, considering our future plans, current potential business prospects and alternatives, Management believes that we do not have an impairment issue at this time." The report further stated that, "however, if our future plans and potential business prospects do

not materialize, if semiconductor manufacturers fail to adopt SIMOX technology during the current process cycle (which typically last two to three years) or our customers transition to the 300mm wafer size sooner than we anticipate, our 200mm and smaller wafer size production line may become obsolete and we would be required to reduce our income by an impairment loss which could be material." (Page 23);

(c)       as reported in the June 27, 2002 Silicon Strategies article, defendant Reid stated that Ibis was experiencing strong demand for its new [i2000] implanter and that "Customer interest in 300mm wafers continues to be stronger than we initially expected, and we have made great progress in fine-tuning the performance of the new i2000 implanter;"

(d)       In Ibis' September 9, 2002 Press Release, announcing the receipt of an order for the i2000 implanter, defendants touted the implanter's 300mm capabilities, stating that the reason it was chosen was because of the quality of the 300mm wafers produced. Defendant Reid stated that, "[e]ven for customers who are adopting SOI technology for 200mm fabs, it's vital that there be a clear, viable path to scale the technology to 300mm wafers. This order demonstrates that the i2000 implanter provides what our customers are looking for: a low cost-of-ownership system that will produce high quality 300mm, thin SOI wafers";

(e)       In Ibis' November 20, 2002 Press Release announcing the shipment of the i2000 implanter, Reid stated that the i2000 implanter was selected because of the quality of the 300mm SOI wafers produced and that, "chipmakers are moving to larger, 300mm wafers...";

(f)       as reported in the January 17, 2003 Silicon Strategies article, Shanghai Simgui Technology Co. Ltd. opened the first commercial SOI wafer plant in China using the SIMOX technology pioneered by Ibis. Simgui, through Lewis Li, said that Simgui does not compete with Ibis because Ibis focuses on selling leading-edge SOI [larger size] wafers and

Simgui "only produces 4- and 6-inch [smaller size] wafers right now."  (As alleged above, Ibis sold Simgui in 2002 a 1000 implanter to enable it to make the smaller size wafers);

(g)    In Ibis' March 31, 2003 SEC Form10-Q, defendants stated  that "our anticipated scale of operations assumes a continuous increase of wafer sales for the balance of the year, primarily 300mm SIMOX wafers;"

(h)    In Ibis' April 23, 2003 Press Release, defendant Reid downplayed the decrease in revenue for the first quarter of 2003, stating that, "[t]he quarter just completed was a period of progress during which we took steps necessary to enter a true production mode for producing significant quantities of advanced 300-millimeter SIMOX-SOI wafers.  Wafer product sales for the quarter were down, as expected, mainly because wafer production was delayed while our largest wafer customer was evaluating multiple types of MLD wafers for 300mm production.  During the quarter, we also applied several reliability upgrades to our internal i2000 implanter...We have a substantial backlog of wafer orders, and we are expecting a continuous increase of wafer sales for the balance of the year in response to the greatest demand ever from our largest customer;"

(i)    In Ibis' SEC 10-Q Report for the quarter ending June 30, 2003, defendants restated their belief that there was no impairment issue as to the 200mm and smaller size wafers assets (asset group), despite the reported fact that 300mm wafers accounted for 97% of Ibis' wafer sales in the quarter;

(j)    In Ibis' July 23, 2003 press release reporting its Q2 2003 results, defendant Reid stated that, "the majority of wafers shipped were 300mm wafers, consistent with our expectation that the semiconductor is adopting SOI technology coincident with its transition to 300mm." ("majority" actually translated into 97% of Ibis wafer sales);

(k)     In Ibis' October 22, 2003 press release reporting its Q3 2003 results, Ibis stated that "most of the wafers shipped were 300mm wafers and Ibis has shipped over 10,000 300mm SIMOX-SOI wafers in the last twelve months," and that in Q4, "our priority on the wafer side of the business will be to broaden our customer base in both 300mm and 200mm by sampling our latest SIMOX-SOI wafers." ("most" actually translated into 98% of Ibis wafer sales in Q3 2003); and

(l)     as reported in the December 5, 2003 Silicon Strategies article, IBM was in the process of obtaining the permits to build its "new 300-mm fab" in East Fishkill, New York, which it had first announced  in 2000, where it already has one 300-mm fab, and Advanced Micro was building a new 300 mm fab in Dresden, Germany.

45.     GAAP, and specifically FAS 144, requires that "a long-lived asset (asset group) shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable."  (FAS 144, para. 8).  As a result of events occurring in the semiconductor industry, defendants' own business plans, order and sales, as evidenced by defendants' public statements, defendants were required to test for recoverability the 1000 implanters and related long-lived assets (asset group) defendants carried on Ibis' balance sheet at approximately $12 million in the second quarter ended June 30, 2003.  As examples, FAS 144 provides the following events or circumstances which trigger the recoverability test requirement:

(a)     a significant decrease in the market price of a long-lived asset (asset group);

(b)     a significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition;

(c)     a significant change in ...the business climate that could affect the value of a long-lived asset (asset group);

(d)     a current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group);

(e)     a current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life (emphasis in original).

46.     The events and circumstances known to defendants during the second quarter of 2003 and continuing throughout the Class Period readily reveal that one or more of the examples cited in FAS 144, quoted above, were in existence at the outset of the Class Period and required defendants to perform an impairment analysis of the eight 1000 implanters and related equipment (which were an asset group) carried on Ibis' balance sheet at $12 million.  That impairment analysis would have led defendants, if they acted pursuant to GAAP and specifically FAS 144, to conclude that the asset group was materially impaired and to writeoff the carrying value by approximately $11 million.  Defendants, however, chose to wait until the end of the Class Period to make the disclosure of the coming write down, knowing that Ibis' independent auditors would be auditing Ibis' annual financial statements at the time and would have required the write down of the asset group before certifying the financial statements.

**Defendants' Class Period Scheme**

47.     Unbeknownst to the market and to the public throughout the Class Period, Ibis was in a very precarious financial and operating position, desperately needing to generate monies to fund its operations while waiting for new i2000 implanter sales to come to fruition.  Thus,

defendants engaged in a scheme and continuing course of conduct throughout the Class Period to misrepresent the current operating and financial condition of the Company:

      (a)    [Deleted pursuant to Court order.]

      (b)    Ibis' eight 1000 implanters were obsolete and the carrying value of those long-lived assets (asset group) on its financial statements was materially impaired. Ibis, pursuant to GAAP and specifically FAS 144, was required to write down the carrying value by approximately $11 million. Thus, in each of Ibis' quarterly financial statements published during the Class Period, defendants overstated the value of Ibis' "property and equipment" by approximately $11 million;

      (c)    Defendants knew from customer orders and forecasts and as a result of its close working relationship with IBM, that: (i) Q4 2003 sales of all wafers, and particularly 200mm and smaller size wafers, would be greatly reduced because of reduced demand, orders, sales and bloated customer inventories; and (ii) IBM, Ibis' largest customer would be greatly reducing its purchases of wafers in Q4 2003 to approximately only $1 million, down from $2.7 million in purchases which Ibis recorded in Q4 2002. Defendants' knowledge of the decline in wafer sales is evidenced by the fact that Ibis did not create inventories of wafers, preferring to build only upon receipt of orders to avoid stockpiling wafer inventories that would have to be written down or off if not sold; and

      (d)    without a large cash infusion, Ibis would run out of cash needed to continue operations without further significant employee layoffs. Thus, defendants determined to sell Ibis common stock in a public offering to raise cash while Ibis' stock price was at record highs due to defendants' misrepresentations to the market about Ibis' financial and operating condition. With working capital of only $3.785 million at June 30, 2003, its lowest point in three

years, typical quarterly revenues of less than $3 - 4 million, and typical quarterly losses running in excess of $2-3 million, Ibis was in desperate need of a quick and significant cash infusion. Accordingly, defendants planned a common stock offering for 1 million shares, which would raise net proceeds of approximately $11 million at then current market prices for Ibis common stock and more if defendants could succeed in raising and supporting the market price for Ibis' stock.  To succeed with the new offering, defendants had to conceal Ibis' true financial and operating condition.  Defendants were successful, running-up the price of Ibis' common stock from a low of $3.90 in the second quarter of 2003, the six months ended June 30, 2003, to a high of $13.17 in the third quarter of 2003, the three months ended September 30, 2003.  Much of this sharp price increase in a very short period was the result of defendants' statements that Ibis would continue to record significant revenues from product sales of all sizes of wafers and defendants' failure to write down the carrying value of the impaired asset group carried on Ibis' balance sheet at $12 million.  The stock offering closed on October 21, 2003, at the artificially inflated price of $13.25 per share.

**Defendants' False and Misleading Statements During the Class Period**

48.    During the Class Period, defendants made the following false and misleading statements and misrepresentations of material fact.

49.    On July 23, 2003, Defendants issued a Press Release reporting, *inter alia*, Ibis' financial results for the quarter ended June 30, 2003, Ibis' second quarter 2003.

(a)    Defendants reported that Ibis' "property and equipment" assets were valued at $30.7 million.  As set forth above, in paragraphs 41-46, that valuation was inflated by $11 million because of defendants' failure to write down the value of the 200mm and smaller size assets (asset group), in violation of GAAP and specifically FAS 144.

(b)    [Deleted pursuant to Court order.]

(c)     Defendant Reid stated, "[w]e expect wafer sales in the third quarter to increase somewhat as our major customer continues to ramp their production of SOI-based chips. However, the market for SOI wafers is still in a relatively early stage of development and since a majority of our revenue is from one customer, significant variations, quarter to quarter, remain likely.  We continue to expect wafer sales for 2003 to be higher than those of 2002."  As alleged in paragraphs 42-44 above, these statements were misleading, particularly as defendants knew that sales of 200mm and smaller size wafers had all but stopped, Ibis was not building any significant inventory of finished wafers because it did not have sufficient orders, and customer forecasts and orders indicated no significant change in the downward trend.

50.     On October 2, 2003 Ibis filed the Registration Statement for the upcoming public offering of its common stock and on October 16, 2003 defendants filed the Prospectus for the stock offering.  Nowhere in these SEC-filed documents did defendants disclose the material adverse facts alleged in subparagraphs (a)-(e).  To the contrary, defendants portrayed Ibis in a misleading light and misrepresented the known and available facts in, *inter alia,* the risk disclosure sections of the Registration Statement and Prospectus, where defendants discussed numerous "risks" associated with Ibis and technology, products, customer base, patents and proprietary technology, and quarterly earnings.  These risk disclosures were exactly the same boiler plate risk disclosures listed in Ibis' 2002 SEC Form 10-K filed eight months earlier, none of which disclosed the material facts alleged herein that revealed Ibis' adverse current financial and operating condition.  Thus defendants did not disclose that:

(a)     demand for Ibis' 200mm and smaller size wafers was in dramatic decline, that demand for the 300mm wafers was in decline, and that its single largest customer, IBM, was

purchasing wafers in greatly reduced amounts from historical levels and would not be increasing the amounts of its purchases going forward in 2003;

(b)    that Ibis' revenues for Q4 2003 would be significantly reduced because of reduced wafer sales;

(c)    that the value of the 200 mm and smaller size wafer production assets (asset group) carried on Ibis' Balance Sheet at $12 million was materially impaired and, under GAAP and particularly FAS 144, was required to be written down by $11 million;

(d)    [Deleted pursuant to Court order.]

(e)    [Deleted pursuant to Court order.]

51.    On October 17, 2003, with Ibis' common stock price artificially pumped up to over $14 per share, defendants issued a press release announcing the public offering of 1 million shares of Ibis common stock, and on October 21, 2003, Ibis issued another press release announcing that the stock offering had closed and that Ibis netted proceeds of approximately $12.7 million.

52.    On October 22, 2003, defendants issued a press release announcing Ibis' results for the third quarter of 2003, the three months ended September 30, 2003.  Defendant Reid was quoted in the press release:

> We are very pleased to announce another quarter of record wafer sales...Wafer sales for the third quarter were $3.7 million, up from the previous quarter's $3.5 million.  Most of the wafers shipped were 300 mm wafers...and we are now shipping wafers produced using the newest SIMOX-SOI process that was developed under the auspices of a joint development agreement with our largest customer.

53.    In addition, defendant Reid commented on the Company's outlook, stating that:

> Although we anticipate a fourth quarter slowdown for 300 mm wafer business at our largest customer, forecasts from this customer and others for 2004 continue to look positive.  During the

fourth quarter our priority on the wafer side of the business will be to broaden our customer base in both 300 mm and 200 mm by sampling our latest SIMOX-SOI wafers. We are currently undergoing 200 mm evaluation at two customers and positive results should translate to orders in early 2004. Forecasting future wafer sales, on a quarter-by-quarter basis, remains exceedingly difficult, and significant variations, quarter to quarter, are likely.

54.     The statements quoted above in paragraphs 52 and 53 from the October 22, 2003 press release were materially false and misleading for the reasons alleged herein, including 25-30 and 42-44, and because they failed to disclose and misrepresented the following material adverse facts:

(a)     IBM, Ibis' largest customer, had reduced its orders for and purchases of wafers from $2.7 million in Q4 2002 to approximately $1 million in Q4 2003;

(b)     [Deleted pursuant to Court order.]

(c)     as a result of the foregoing, defendants lacked a reasonable basis for their statements concerning the Company's prospects, earnings and value.

55.     The financial statements published by defendants in the October 22, 2003 Press Release were false and misleading because the carrying value of the eight 1000 implanters and related assets (group asset) on Ibis' balance sheet, under property and equipment, was artificially inflated by approximately $11 million and should have been written down by that amount in accordance with GAAP and, in particular, FAS 144, for the reasons alleged in paragraphs 41-46.

56.     On November 4, 2003, defendants disseminated Ibis' SEC Form 10-Q for the third quarter ended September 30, 2003. While stating that Ibis had executed another round of lay-offs, reducing the company's headcount to approximately 80 employees, and had established a salary reduction program, measures defendants expected would annually save the company in excess of $2.5 million, defendants stated that:

> We estimate that we have adequate cash available for at least twelve months. Although we anticipate a fourth quarter slow down for 300 mm wafer business at our largest customer, forecasts from this customer and others for 2004 continue to look positive. Forecasting future wafer sales, on a quarter-by-quarter basis, remains exceedingly difficult, and significant variations, quarter to quarter, are likely.

57.    The statements quoted above from the Third Quarter 2003 SEC Form 10-Q were materially false and misleading for the reasons alleged in paragraphs 42-44 above, and because they failed to disclose and misrepresented the following material adverse facts:

(a)    that IBM, Ibis' largest customer, had reduced its orders for and purchases of wafers from $2.7 million in Q4 2002 to approximately $1 million in Q4 2003;

(b)    [Deleted pursuant to Court order.]

(c)    that as a result of the foregoing, defendants lacked a reasonable basis for their statements concerning the Company's prospects, earnings and value.

58.    Defendants also made the following statements in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD & A"), included in Ibis' Q3 10-Q:

> In 2002, we introduced the next generation of SIMOX-SOI technology which included our second-generation oxygen implanter (i2000)...licensed to Ibis by IBM.
>
> *    *    *
>
> Although our 200 mm and smaller wafer size production line is currently underutilized, considering our future plans, current potential business prospects and alternatives, Management believes that we do not have an impairment issue at this time. However, if our future current process cycle (which typically last two or three years) or our customer transition to the 300 mm wafer size sooner than we anticipate, our 200 mm and smaller wafer size production line may become obsolete and we would be required to reduce our income by an impairment loss which would be material.

59.     These statements were false and misleading because they failed to disclose and misrepresented that the carrying value of the eight 1000 implanters and related assets (asset group) on Ibis' balance sheet, under property and equipment, was artificially inflated by approximately $11 million and should have been written down by that amount in accordance with GAAP and, in particular FAS 144 for the reasons alleged in paragraphs 41-46.  Defendants did not disclose that the asset group was actually obsolete by this date and that they were considering selling the asset group, having concluded that there was no prospect for either selling the 1000 implanters overseas or selling the smaller size wafers the 1000 implanters produced.

**The Truth Emerges**

60.     On December 15, 2003, as year end approached and defendants knew they would have to write down the value of the 200mm and smaller size wafer production line, defendants made the disclosure that Ibis' fourth quarter wafer product revenues would be reduced to approximately $1 million, down from $2.7 million in the prior year's fourth quarter, due to reduced purchases by its undisclosed largest customer (IBM), and that Ibis would be taking a "material charge" due to the impairment of it smaller size wafer production equipment as Ibis was increasing its emphasis on the production of large wafers as the result, in part, of its customer forecasts.

61.     [Deleted pursuant to Court order.]

62.     In reaction to the announcement on December 15, 2003, the price of Ibis' common stock fell from a $15.40 per share close on December 12 to a close of $13.20 per share on December 15, 2003 and a closing price of $10.37 on December 16, 2003, on extraordinarily high combined volume of 4.4 million shares, almost 50% of the outstanding shares of Ibis common stock.

63.    In Ibis' SEC Form 10-K for 2003, filed on March 2, 2004, defendants acknowledged that:

(a)    the basis for the impairment of the eight 1000 implanters and related assets (asset group) under FAS 144 was the Company's business prospects for sales of 200mm wafers, that existing and potential wafer customers were rapidly transitioning to 300mm wafers and 92% of 2003 wafer sales were for 300mm wafers, that there was no prospect for 1000 implanter sales overseas and a potential buyer for a portion [undescribed] of Ibis' wafer production line concluded that weak demand for 200mm and smaller wafers did not justify an investment in or purchase of the assets the group assets.  Virtually all of those facts were in existence and known to, but not disclosed by, defendants throughout the Class Period; and

(b)    [Deleted pursuant to Court order.]

64.    [Deleted pursuant to Court order.]

65.    On March 12, 2004, Ibis announced that its long-term CFO, Debra Nelson, was resigning effective April 16, 2004.

## ADDITIONAL SCIENTER ALLEGATIONS

### Defendants' Knowledge of the Misrepresented Material Facts

66.    As alleged herein, defendants acted with scienter in that defendants knew that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendant Ibis is charged with the knowledge of the adverse material facts alleged herein which were known or available to its senior officers, of whom there were only five throughout the Class Period.  Defendant Reid, the Chief Executive Officer and

Chairman of the Board of Ibis, had knowledge of and/or access to all of the materially adverse facts alleged herein. Ibis is a small company all of whose activities and finances relate to the manufacture and sale of wafers and the i2000 implanter. As defendants disclosed in the Prospectus, they had determined that Ibis' business would focus on selling the i2000 implanter and that Ibis would be getting out of the business of making wafers. Thus, and as stated by former employees as alleged herein, defendant Reid was intimately involved in and fully knowledgeable of all aspects of Ibis' financial and operating condition and prospects and by reason of the due diligence he was required to do before signing off on the Prospectus, Ibis' SEC Forms 10-K and 10-Q, and Ibis' Press Releases in which he is quoted.

**Confidential Sources of Information**

67.    The following former employees of Ibis were interviewed and provided relevant information which forms the factual basis for the allegations herein, in addition to those facts available from public sources and from Lead Plaintiffs' accounting consultants, as follows:

(a)    [Deleted pursuant to Court order.]

(b)    [Deleted pursuant to Court order.]

(c)    [Deleted pursuant to Court order.]

(d)    Former Employee 4, employed at Ibis between April 2002 and August 2003, had principal responsibilities involving the manufacture of wafers. Former Employee 4 described the general process for making wafers, which include running the implanter, cleaning the wafers, and putting them through the furnace, after which the wafers go through quality control, and if they pass the particle test they get put through to shipping. Former Employee 4 stated that orders for wafers were filled to customer requests, meaning that all production was tied to a specific sale, and that Ibis did not have a backlog of wafer product to any significant extent. Former Employee 4 confirmed that IBM was Ibis' largest customer for wafers and that

other customers included Intel and MIT/Lincoln Labs. Former Employee 4 stated that Ibis had had approximately ten furnaces that manufactured 8" wafers in April 2002 but that Ibis had subsequently purchased four new furnaces specifically for the manufacture of "12" or 300mm size wafers. Former Employee 4 stated that an individual wafer takes up to two weeks to go through the infusion process at Ibis and that each furnace can hold up to 100 wafers at a time, but that a furnace may be run with far fewer, depending on the order that is being filled. Orders from particular customers could be as small as only six wafers, or up to a few dozen cases of wafers for a large order. Wafers are packed 13 to a case for 12", and 25 to a case for smaller wafers. Former Employee 4 confirmed that the wafer business became increasingly slower from April 2002 through 2003, causing a first round of lay offs in April or May of 2003. Former Employee 4 stated that the employees in the wafer department felt that their continued employment was at risk because the workflow was very slow. The pace of work continued to be slow, causing a second round of layoffs at the end of August 2003, at which time Former Employee 4 was let go.

(e)     Former Employee 5 is a former engineer employed by Ibis from October 2001 until November 2002, at which time Former Employee 5 was laid off. Former Employee 5's principal responsibilities included oversight of the wafer manufacturing process, including the process of ordering new furnaces that Ibis would purchase. Former Employee 5 also was responsible for readying  Ibis' manufacturing facilities when two of Ibis' largest wafer customers, IBM and Intel, conducted on-site reviews of Ibis' operations and facilities, which included their inspection and evaluation of the manufacturing process and in particular the loading and unloading of the furnaces and the documentation of the manufacturing process. Through November 2002, Ibis operated an 8-unit furnace bank, each with three tubes, for a total

of 24 furnace tubes, to manufacture 8", smaller size wafers.  In 2002, Ibis purchased new equipment to manufacture the 300mm larger size wafers, a machine with a total of 4 tubes, and began purchasing new furnaces because they incorporated new technologies that enabled Ibis to make 300mm larger size wafers which were the size wafers Ibis' customers were purchasing. Former Employee 5 confirmed that Ibis was phasing out certain technologies due to product obsolescence and that the furnaces that manufactured the 1" and 2" wafers were substandard as early as the end of 2001 and were not even running by October 2001.  Former Employee 5 explained that Ibis had 3 tubes that were made at least 15 years earlier and had significant quality issues.  At one point, Ibis brought in the manufacturer, Kokusai, a Japanese furnace company that used to be BTI (Bruce Technology, Bedford, MA), to conduct a complete rehabilitation of the furnace.  Former Employee 5 confirmed that by November 2002 Ibis had very few orders for 1" size wafers.

(f)    [Deleted pursuant to Court order.]

(g)    Former Employee 7 was employed for several years as Manufacturing Engineer - Equipment Manufacturing Development until he was laid-off in August 2003. Former Employee 6 confirmed that Ibis does not build wafers for inventory; but only makes them to ordered specifications.

**Ibis' Need To Raise Additional Capital is Further Evidence of Scienter**

68.    Defendants were motivated to commit the fraud alleged herein so that the Company could complete the October 2003 common stock offering, which was critically important to Ibis because it needed working capital while waiting for new i2000 implanter sales to come to fruition.  Defendant Reid, because of the public common stock offering, was not able to sell his personal shares of Ibis during much of the Class Period.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

69.    At all relevant times, the market for the common stock of Ibis' common stock was an efficient market for the following reasons, among others:

(a)    Ibis' stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Ibis filed periodic public reports with the SEC and the NASDAQ;

(c)    Ibis regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Ibis was followed by securities analysts employed by brokerage firms who wrote reports which entered the market.

70    As a result of the foregoing, the market for Ibis' common stock promptly digested current information regarding Ibis from all publicly available sources and reflected such information in Ibis' stock price.  Under these circumstances, all purchasers of Ibis' common stock during the Class Period suffered similar injury through their purchases of Ibis' common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

71.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Ibis who knew that those statements were false when made.

### FIRST CLAIM

**Violation Of Section 10(b) Of
The Exchange Act And Rule 10b-5
Promulgated Thereunder Against All Defendants**

72.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

73.   During the Class Period, defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ibis' common stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase Ibis' common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

74.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

maintain artificially high market prices for Ibis' common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

75.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Ibis as specified herein.

76.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Ibis' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Ibis and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Ibis' common stock during the Class Period.

77.     Reid's primary liability, and controlling person liability, arises from the following facts: (i) he was the most senior officer and Chairman of the Board of Ibis;  (ii) he was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (iii) he was aware of the Company's dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

78.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

79.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Ibis' common stock was artificially inflated throughout the Class Period.  In ignorance of the fact that market prices of Ibis' common stock were artificially inflated, and relying directly or indirectly on the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period. Lead Plaintiffs and the other members of the Class acquired Ibis common stock during the Class Period at artificially high prices and were damaged thereby.

80.    At the time of said misrepresentations and omissions, Lead Plaintiffs and the other members of the class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiffs and the other members of the Class and the marketplace known of the true financial condition and business prospects of Ibis, which were not disclosed by defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Ibis common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

81.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

82.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Pursuant To Section 20(a) Of
### The Exchange Act Against Defendant Reid

83.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

84.    Reid was and acted as a controlling person of Ibis within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of his high-level positions,  participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, Reid had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

85.    In particular, Reid had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

86.    As set forth above, Ibis and Reid each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of his position as  a controlling person of Ibis, Reid is liable pursuant to Section 20(a) of the Exchange Act for Ibis' violation of Section 10(b) of the Exchange Act, as a direct and proximate result of which, Lead Plaintiffs and

other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

(a)     Determining that this action is a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and their Lead Counsel as counsel to the Class;

(b)     Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Dated: June 14, 2006                    By their Attorneys,

**/s/Theodore M. Hess-Mahan**
Thomas G. Shapiro BBO#454680
Theodore M. Hess-Mahan BBO #557109
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA 02109
(617) 439-3939

*Local Counsel for Lead Plaintiffs*

**LAW OFFICES BERNARD M. GROSS, P.C.**
Deborah R. Gross, BBO#546151
Robert P. Frutkin
1515 Locust Street, Second Floor
Philadelphia, PA 19102
(215) 561-3600

*Lead Counsel for Lead Plaintiffs*

**WOLF HALDENSTEIN ADLER FREEMAN
& HERZ LLP**
Peter C. Harrar
Aya Bouchedid
270 Madison Avenue
New York, NY 10016
(212) 545-4600

**LAW OFFICES KENNETH ELAN**
Kenneth Elan
217 Broadway, Suite 606
New York, NY 10007
(212) 619-0261

**KLEIN & SOLOMON, LLP**
Joseph P. Garland
275 Madison Avenue
New York, NY 10016
(212) 213-1812

*Attorneys for Lead Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 14, 2006.

**/s/Theodore M. Hess-Mahan**
Theodore M. Hess-Mahan